ORIGINAL

FILED
APR 24 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

No. 07-253 C

SWALES & ASSOCIATES, INC.,

Plaintiff,

v.

UNITED STATES,

Defendant.

# COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

MARCIA G. MADSEN
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006
(202) 263-3000
(202) 263-3300 Facsimile

Of Counsel:
DAVID F. DOWD
LUKE LEVASSEUR
MAYER, BROWN, ROWE & MAW LLP
*Counsel for Plaintiff, Swales & Associates, Inc.*
April 24, 2007

# TABLE OF CONTENTS

Page


PARTIES ........ 2

JURISDICTION ........ 3

PROCEDURAL HISTORY ........ 3

FACTUAL ALLEGATIONS ........ 4

- A. NASA's RFP And The MSES II/A Competition ........ 4
  - 1. NASA's MSES II/A Requirements ........ 4
  - 2. NASA's Evaluation Criteria of Mission Suitability ........ 5
  - 3. NASA's Planned Evaluation Of The Cost / Price Factor ........ 6
- B. NASA's Initial Decision, Swales' Initial Protest, And The Agency's Corrective Action ........ 7
- C. Swales' Discovery And Presentation To NASA Of Information Related To SGT's Violation Of Procurement Integrity Rules ........ 10
  - 1. Mr. Galassi's Role With Swales, And Agreement Not To Disclose Trade Secrets In A Manner Harmful To, Swales ........ 10
  - 2. Mr. Galassi's Assistance To SGT ........ 15
  - 3. Swales' Discovery And Request for Investigation Regarding SGT's Procurement Integrity Violation And NASA's Response ........ 17
- D. NASA's Decision Following The Corrective Action To Award The MSES II/A Contract To SGT ........ 20

NASA MISEVALUATED THE PROPOSALS ........ 21

- A. NASA Erroneously Concluded That SGT Was Eligible For Award Despite SGT's Procurement Integrity Violation ........ 22
- B. NASA Failed To Perform A Reasonable Analysis Of The Respective Offerors' Likely Costs ........ 25
- C. NASA's Evaluation Of The Offerors' Technical Proposals Was Fundamentally Flawed ........ 26
  - 1. NASA Should Have Rejected SGT's Proposal As Technically Unacceptable Because It Failed To Comply With The RFP's Limitation On Subcontracting Clause ........ 26
  - 2. NASA Misevaluated SGT's Proposal Under The Mission Suitability Factor/Management Plan Subfactor ........ 28

3. NASA Misevaluated SGT's Proposal Under The Mission Suitability Factor/Technical Approach To RTOs Subfactor........... 33

4. NASA's Source Selection Decision Was Unreasonable And Inconsistent With The RFP Because The Decision Was Bases on A Flawed Underlying Evaluation Of The Proposals And A Flawed Cost-Technical Tradeoff........................................................ 35

CAUSES OF ACTION ........................................................................................................ 36

COUNT I: NASA Irrationally Awarded MSES II/A Contract To SGT After That Offeror Violated The Procurement Integrity Act ........................................... 36

COUNT II: NASA Arbitrarily Evaluated SGT'S Improper Acquisition Of Swales' Competition Sensitive Information By Its Hiring And Use Of Mr. Galassi On Parts Of SGT'S Proposal After He Had Worked As A Key Team-Member For Swales On The Same Parts Of Its Proposal.................... 37

COUNT III: NASA Arbitrarily Evaluated Sgt's Cost Proposal And Failed To Perform An Appropriate Cost Realism Analysis....................................... 38

COUNT IV: The Agency Misevaluated (And Arbitrarily Accepted) SGT'S Proposal, Which Failed To Comply With The Limitation On Subcontracting Clause And Was Therefore Unacceptable ........................ 39

COUNT V: The Agency's Evaluation Of SGT'S Mission Suitability Factor/Management Plan Subfactor Was Arbitrary And Capricious ......... 39

COUNT VI: NASA'S Evaluation Of The Mission Suitability Factor Technical Approach To RTOs Subfactor Was Contrary To Law ................................ 40

COUNT VII: The Source Selection Authority's Award Decision Cannot Be Supported........................................................................................................ 41

RELIEF REQUESTED ........................................................................................................ 42

# INDEX TO THE APPENDIX

**Exhibit No.**


| | |
|---|---|
| 1 | Excerpts from NASA's Request For Proposals No. NNG05096383R |
| 2 | Source Selection Decision (Second), March 29, 2007 |
| 3 | Source Selection Decision (Initial), December 6, 2006 |
| 4 | Mr. Galassi's Separation Agreement With Swales |
| 5 | NASA's March 29, 20007 Decision By The Procurement Officer In Response To Swales' Investigation Request |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| SWALES & ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff Swales & Associates, Inc., which does business as Swales Aerospace ("Swales"), respectfully protests the National Aeronautics and Space Administration, Goddard Space Flight Center's ("NASA" or "the Agency") March 29, 2007 award decision under Request for Proposals No. NNG05096383R ("RFP"). Ex. 1 (excerpts relevant to Complaint). That RFP sought a variety of engineering services required for space flight and NASA's ground operations, including development and validation of new technologies to enable future space and science missions. The estimated value of the contract was $400 million.

Following a competition, a bid protest, and corrective action by the Agency, NASA awarded the Mechanical Systems Engineering Services II ("MSES II/A") contract to Stinger Ghaffarian Technologies, Inc. ("SGT") on March 29, 2007. The Agency's decision was contrary to law or arbitrary and capricious in numerous respects. Among other flaws, the Agency arbitrarily assessed SGT's misappropriation of Swales proprietary and competition-sensitive information (*i.e.*, bid and proposal information),

and thus failed to properly exclude SGT from the competition. SGT violated the procurement integrity rules when it entered into a teaming arrangement with Aerostress, Inc. ("Aerostress"), a small business owned by a former Swales employee. Through this arrangement, SGT obtained an inappropriate ability to use of detailed knowledge regarding Swales' proposal—knowledge that improperly provided SGT an unfair competitive advantage, and ability to structure and strategically position its proposal. As a result, NASA misevaluated the undisputed facts regarding the procurement integrity violation.

NASA's evaluation and award decisions also are inconsistent with federal procurement requirements because the Agency failed to perform an appropriate cost realism analysis. NASA's evaluation of the technical proposals was also arbitrary and capricious because NASA failed to recognize substantial flaws that rendered SGT's proposal ineligible for award—or, at a minimum, required lower ratings.

By filing this Complaint, and the accompanying Request for a Temporary Restraining Order and Motion for a Preliminary Injunction, Swales seeks an order enjoining NASA from commencing or continuing performance of any contract awarded to SGT under the RFP. Swales also seeks any other relief the Court deems appropriate.

**PARTIES**

1. Plaintiff Swales is a Delaware corporation with its principal place of business at 5050 Powder Mill Road, Beltsville, Maryland 20705. Swales is engaged in the aerospace business and has particular expertise in space satellite design and engineering, systems integration for such satellites, complex thermal, structural, and

related mechanical engineering matters, and similarly sophisticated aerospace science. Swales is the incumbent contractor for the work covered by the RFP and satisfies all applicable qualifications to be awarded the contract. Swales submitted a timely proposal in response to the RFP, its proposal was included in the competitive range, and Swales timely submitted a final proposal revision following discussions. Swales and SGT were the only offerors.

2. The Defendant is the United States of America acting through NASA.

3. NASA is located in Greenbelt, Maryland and is chartered to expand the knowledge of the earth and its environment, the solar system, and the universe through observations from space. NASA's primary emphasis is in scientific investigation, the development and operation of space systems, and the advancement of essential technologies.

## JURISDICTION

4. The Court possesses jurisdiction to entertain this action pursuant to the Tucker Act, 28 U.S.C. § 1491(b).

## PROCEDURAL HISTORY

5. This is the second bid protest concerning NASA's procurement decisions with respect to the MSES II/A contract. Swales protested NASA's initial (December 6, 2006) award to SGT before the Government Accountability Office ("GAO"), and filed a Supplemental Protest at GAO following production of the initial Agency Report in that action. On the eve of the Agency's production of the Second Agency Report, NASA

took corrective action and "vacated" its original award to SGT. GAO ruled that NASA's remedial decision rendered the issues in the first protest academic, at that time.

## FACTUAL ALLEGATIONS

### A. NASA's RFP And The MSES II/A Competition

#### 1. NASA's MSES II/A Requirements

6. NASA's Applied Engineering Technology Directorate ("AETD") plans, organizes, and conducts a broad range of technical research and development activities in support of science applications. The AETD is responsible for providing engineering expertise and support in the formulation, design, development, fabrication, integration, test, verification, and operation of components, subsystems, systems, science instruments, and complete spacecraft for multiple projects. The scientific components, subsystems, systems, and science instruments are ultimately integrated into spacecraft to form science observatories, which are launched to fulfill NASA's mission.

7. The RFP for the MSES II/A contract concerns the acquisition of engineering and related services for the AETD's Mechanical Systems Division, and related organizations throughout NASA. The procurement will require the contractor to provide services such as the formulation, design, development, fabrication, integration, testing, verification, and operations of space flight and ground system hardware and software, including development and validation of new technologies to enable future space and science missions. Ex. 1 (RFP, Statement of Work ("SOW")) at 2.

8. On March 9, 2006, NASA issued the RFP. It calls for the award of a Cost-Plus-Award-Fee, Indefinite-Delivery, Indefinite-Quantity ("IDIQ") Task Order contract

with a maximum value of $400 million during a five-year ordering period. Ex. 1 (RFP) at 7, 9, 89. The procurement is set-aside for small business concerns, with a size standard of 1,000 employees. *Id.* at 78.

9. The engineering services listed in the RFP are multidisciplinary in nature, with concentration in the mechanical engineering areas of materials, structural analysis and loads, mechanical design, electromechanical design, thermal, contamination and coatings, manufacturing, and integration and testing. Ex. 1 (RFP, SOW) at 2. The RFP calls for offerors capable of providing not only the labor but also the facilities and materials to accomplish the tasks enumerated in the RFP. *Id.*

### 2. NASA's Evaluation Criteria of Mission Suitability

10. According to the RFP, NASA expects to issue Task Orders under the contract that will require the awardee to perform services in all aspects of mission and instrument development and implementation for components, subsystems, systems, science instruments, observatories, launch, ground system, spacecraft, and suborbital craft (*e.g.*, aircraft, sounding rockets, unmanned aerial vehicles, and balloons), including attached shuttle or Space Station payloads, free-flying spacecraft, suborbital craft payloads, as well as ground support equipment, simulators, non-flight models, and prototypes, among many others. Ex. 1 (RFP, SOW) at 2.

11. The RFP identifies the following evaluation factors and subfactors:

(1) Mission Suitability
- (A) Understanding Requirements of Statement of Work
- (B) Technical Approach to Representative Task Orders ("RTOs")
- (C) Management Plan
- (D) Safety and Health

(2) Cost/Price
(3) Past Performance

Ex. 1 (RFP) at 123-31. The Cost/Price factor is "significantly less important" than the combined importance of the Mission Suitability and Past Performance factors. *Id.* at 123. The Cost/Price factor is "less important" than the Mission Suitability factor, but "more important" than the Past Performance Factor. *Id.*

12. The RFP makes clear that the four Mission Suitability subfactors would be weighted/scored as follows in the evaluation:

> Understanding Requirements of Statement of Work – 300 points;
> Technical Approach to Representative Task Orders – 300 points;
> Management Plan – 350 points; and
> Safety and Health – 50 points.

Ex. 1 (RFP) at 127. The RTO components of the offerors' proposals, which comprise the second item in this list, were always important to the evaluation, but as discussed below, ultimately became critical parts of the technical and cost evaluations. The manner in which these RTOs were generated, and their importance to the issues presented in this protest, are discussed in paragraphs 30-36 below.

### 3. NASA's Planned Evaluation Of The Cost / Price Factor

13. For the Cost/Price factor, the RFP explained that NASA would perform a two-part cost realism analysis.

14. *First*, the RFP requires offerors to propose loaded prime and subcontractor rates for each direct labor category identified in RFP Exhibit 1A ("Bid Rates") and RFP Exhibit 1B ("Ceiling Rates"), which NASA initially planned to apply against an undisclosed government direct labor hour pricing model (the "Government

Pricing Model"). Ex. 1 (RFP) at 128; *see id.* at 112-14 (providing instructions to offerors on the completion of Exhibits 1A and 1B). The RFP requires offerors to identify recurring Other Direct Costs ("ODCs"), which NASA was also to add to the Government Pricing Model to arrive at a proposed contract cost. *Id.* at 128; *see id.* (RFP Amendment 0003) at 2.

15. Prior to Amendment No. 6, the RFP stated that NASA would perform a cost realism analysis on the total proposed cost to arrive at a total probable contract cost. Ex. 1 (RFP) at 128. In determining a total probable cost, the RFP stated that NASA would use indirect rate ceilings that the RFP required offerors to propose in RFP Clause B.3 "Limitation of Indirect Costs." *Id.* at 7-8, 128. The RFP does not require offerors to propose, and the RFP does not impose ceilings on recurring ODCs.

16. ***Second***, the RFP states that NASA will also perform a cost realism analysis on offerors' proposed costs for four RTOs. Ex. 1 (RFP) at 129. Although the RFP provides that the cumulative result of the cost realism analysis (from both factors) will be used to make a downward adjustment to an offeror's score under the Mission Suitability Factor (*id.* at 129), such an adjustment will be made only if the difference between the proposed and probable RTO costs is at least 11 percent. *Id.* at 128.

**B. NASA's Initial Decision, Swales' Initial Protest, And The Agency's Corrective Action**

17. The offerors' proposals were due on April 17, 2006. Swales timely submitted a timely proposal on that day. On August 24, 2006, NASA informed Swales that its proposal had been included in the Competitive Range.

18. Although the RFP had indicated that NASA did not plan to engage in discussions with offerors regarding their proposals, Ex. 1 (RFP § L) at 97, the Source Selection Authority ("SSA") decided that discussions were necessary. Ex. 2 (SSDD) at 2. NASA's written discussions began on August 31, 2006, and NASA conducted oral discussions with the offerors on September 8 and 11, 2006. *Id.* at 2. Following discussions, NASA amended the RFP and requested final revised proposals, and Swales timely submitted its final proposal revision on October 3, 2006.

19. On December 1, 2006, NASA informed Swales that the Agency had awarded the contract to SGT. In its award letter, NASA stated that the major discriminator in the selection decision was SGT's significantly lower proposed and probable costs. Ex. 3 (Initial SSDD) at 10. On December 8, 2006, NASA provided an oral debriefing to Swales.

20. On December 12, 2006, Swales timely protested the award to SGT at the GAO on the bases that: (1) NASA should have rejected SGT's proposal as unacceptable for failure to comply with the RFP's Limitations on Subcontracting clause; (2) NASA misevaluated SGT's proposal under the Mission Suitability, Past Performance, and Cost/Price factors; (3) NASA misevaluated Swales' proposal under the Cost/Price factor; and (4) NASA's source selection decision was unreasonable and inconsistent with the RFP. Pursuant to the automatic stay provisions applicable in GAO protests, NASA suspended SGT's performance of the contract on December 13, 2006.

21. Swales also filed two supplemental protests in the GAO, challenging (among other things) NASA's analysis of SGT's costs. Relevant here, on January 8,

2006, Swales timely protested NASA's failure to recognize and address numerous discrepancies between SGT's technical proposal and its cost proposal regarding the division of work among SGT and its teammates.

22. Before the GAO reached a decision in Swales' protests, by letter dated January 19, 2007, NASA announced that it was taking corrective action due to serious questions about the justification for the award. Specifically, NASA indicated that it would reopen the competition, and stated that all elements of the proposals may be subject to reevaluation, further discussions, and re-competition. As a result of NASA's plan to take corrective action, GAO dismissed Swales' protest.

23. NASA announced that the corrective action would include a review of the Mission Suitability and Past Performance findings, and a reevaluation of the cost proposals. Ultimately, as described below, the Mission Suitability and Past Performance scores remained unchanged after NASA's reevaluation. Exhibit 2 (SSDD) at 2. However, NASA's re-evaluation of the cost proposals revealed "discrepancies" between the Government Pricing Model and Mission Suitability for both offerors. *Id.*

24. As part of its corrective action, on March 14 and 15, 2007, NASA held face-to-face discussions with both offerors concerning the discrepancies found with respect to the Government Pricing Model. *Id.* at 2. On March 20, 2007, NASA issued Amendment 6 to the RFP, which explained that the Agency would ***not*** use the Government Pricing Model in the evaluation. Instead, NASA announced that it would conduct the cost evaluation based on the information from the RTOs.

25. Other than the reevaluation of the offerors' cost proposals, the other evaluation criteria, procedures, and point distribution were not affected by the Agency's corrective action. Ex. 2 (SSDD) at 2. Because NASA decided [to] reevaluate the cost proposals based on previously submitted RTO data, it did not request proposal revisions. *Id.* at 2.

### C. Swales' Discovery And Presentation To NASA Of Information Related To SGT's Violation Of Procurement Integrity Rules

#### 1. Mr. Galassi's Role With Swales, And Agreement Not To Disclose Trade Secrets In A Manner Harmful To, Swales

26. Nicholas M. Galassi was an employee of Swales from 1993 through October 28, 2005. His career progressed from engineer to senior structural engineer, to Manager of the Mechanical Analysis Group, which was his position at the time of his departure from the Company.

27. Throughout his employment, Mr. Galassi had access to Swales' most sensitive trade secrets and proprietary information. Moreover, during the course of twelve years, Mr. Galassi obtained knowledge regarding the manner in which Swales staffed, organized, and solved some of the most vexing engineering issues related to spacecraft mechanical systems.

28. Swales was the incumbent contractor on the predecessor contract to the MSES II/A contract *i.e.*, the MSES contract. Swales worked on the MSES contract for more than five and a half years. During the latter part of the MSES contract, Swales also worked with NASA under a contract related to the Solar Dynamics Observatory (or "SDO") program. Among other projects, Mr. Galassi performed substantial work as

senior stress engineer for the SDO program in conjunction with his work as Manager of Swales' Mechanical Analysis Group.

29. Mr. Galassi's involvement with Swales' proposal for NASA's MSES II/A contract began in June 2005, when he accepted an assignment to work on the proposal.

30. According to NASA's RFP, the two most important evaluation criteria for this procurement related to: (a) a set of five RTOs in which competitors composed operating plans and budgets for the solution of technically complex engineering problems based on NASA's specially drawn specifications (with the understanding that the offerors' RTO responses would be compared head-to-head); and (b) Statement of Work narratives and compliance matrices to demonstrate the particular manner and methods of performing these complex engineering tasks. *See* Ex. 1 (RFP § M) at 127.

31. In a NASA procurement for complex engineering and technical services such as MSES II/A, an offerors' set of responses to a RTO requirement presents a critical way to distinguish the competing proposals. Developing responses to these complicated sets of engineering and cost-related questions requires a large team of sophisticated and experienced individuals and a collaborative process in which an offeror develops a way to explain how it would solve the problem from both a technical and a cost perspective. All information regarding the manner in which a company solves such problems—and particularly its solutions in a given competition—is ***highly*** competition-sensitive information and is strenuously protected by Swales.

32. With regard to the first category, SGT assigned Mr. Galassi to formulate RTO solutions as part of a team of engineers and scientists who would demonstrate that they understood and could perform the work required to complete the RTOs.

33. As just one example of the RTOs to which Swales responded, the offerors were required to describe a solution for a complex series of problems with a lunar exploratory satellite mission. These included (among others): "A structural/thermal/optical (STOP) analysis [to] be performed to determine the motion of each optical element and the relative motion between each optical element due to the instrument's temperature environments." Ex. 1 (RFP, Exhibit 8) at 3. NASA complicated this problem by giving detailed characteristics of the instrument's scan length, tilt, shear, configuration, power requirements, and other specifications on which competitors were to base their proposed response. Ex. 1 (RFP, Exhibit 8) at 8. Other parts of Swales' proposed solution contained presentations of finite element model analysis, projected work-flow of a coupled load analysis, lift-off analysis, and stress analysis, again in the context of specific design solutions in a head-to-head competition, not merely a theoretical discussion of formulae and principles from physics textbooks. Ex. 1 (RFP, Exhibit 8) at 3. In their responses, offerors could demonstrate to NASA their understanding of the technical requirements of the procurement and to distinguish their proposals from the competition.

34. Swales' RTO responses were the collective work of Mr. Galassi and other Senior Swales personnel. Through his significant work on Swales' RTO teams, Mr. Galassi gained intimate knowledge of not only how such responses would be

formulated, but the specific solutions that Swales proposed. Ultimately, the Swales RTO solutions on which Mr. Galassi worked were included in Swales' final proposal that was submitted to NASA in September 2006. As such, they were contractor bid or proposal information. (Although Swales' proposal was submitted after Mr. Galassi's October 2005 departure from the Company, he worked on the RTOs before he ended his employment. Prior to issuing the final RFP (in March 2006), NASA had provided several draft RFPs to industry seeking comments. When it issued the draft RFPs, NASA made clear that the RTOs would not be materially changed in the final RFP; accordingly, offerors were able to begin their responses before the final RFP was issued.)

35. Mr. Galassi's significant involvement in Swales' RTO solutions also included work on Swales' Basis of Estimates. These estimates include descriptions of the methods by which Swales accumulates and charges direct and indirect costs for the proposed solutions. These elements also comprise some of the most competition-sensitive components of a proposal. This highly sensitive and confidential cost data constitutes trade secrets that are protected under federal and state law, and are protected by Swales in accordance with the law.

36. Mr. Galassi and the Swales employees with whom he worked also developed Statement of Work narratives to address Swales' manner and method of Structural Analysis and Loads Engineering. This work included, among other topics: (a) Finite Element Model Analysis; (b) flight loads analyses including lift-off, ascent, descent, and landing for the Space Transportation System (STS or Shuttle), and launch

and ascent for Expendable Launch Vehicles (ELVs) (including distinctions with regard to U.S., European, and Japanese launch vehicles); (c) coupled on-orbit loads analyses on task specified payload configurations for STS/payload, ELV/payload and ISS (*i.e.*, Space Station)/payload combinations; (d) stress and margin of safety analyses of spacecraft structures, electromechanical devices, and mechanisms using both classical "hand" stress analysis and computerized stress analysis techniques; (e) vibration, frequency response, shock and vibro-acoustic analyses to simulate spacecraft test and flight events; and (f) fracture mechanics analyses in accordance with GSFC standards to ensure that the maximum crack size which can exist in structural elements, as determined by Non-Destructive Investigation (NDI) test procedures, will not propagate failure as a result of intended service usage.

37. Swales' procedures and employee handbook include standards for the handling of its own competition-sensitive data, as well as the data of third-party clients and customers. Mr. Galassi was subject to such standards and procedures throughout his tenure with Swales.

38. In October 2005, Mr. Galassi notified Swales that he wanted to sever his relationship with Swales as an employee and become a part-time consultant. In short, he indicated that he wanted to complete his assignments at Swales and be free, after a period of time, to pursue other interests. At that time, Mr. Galassi's work on the MSES II/A proposal had been substantially completed, and his work on the Solar Dynamics Observatory—which is part of the current Swales' MSES contract—was the focus of his

efforts. Swales found Mr. Galassi's post-employment plan to be acceptable, provided that he sign a Separation Agreement.

39. When he resigned from Swales on October 28, 2005, Mr. Galassi agreed to a Separation Agreement in which he acknowledged, among other things, his continuing obligation to protect Swales' trade secrets and competition-sensitive proprietary information. Specifically, that agreement both recognized Mr. Galassi's previous "professional obligation to maintain in strict confidence any and all information or insights concerning the Company or its customers that were not, or did not come to be, in the public domain and that [he] acquired during [his] employment with the Company," and "reaffirm[ed his comment to] not, without the Company's prior written consent, disclose any information concerning the structure, organization, operations or other business affairs of the Company or any information obtained from past or present customers that is not generally available to the public." Ex. 4.

**2. Mr. Galassi's Assistance To SGT**

40. Shortly before he left Swales in October 2005, Mr. Galassi began his own consulting business, which was known as Aerostress. Swales required that Aerostress execute a corporate Non-Disclosure Agreement so that this new company would, as Mr. Galassi had, affirm its obligation to protect Swales' trade secrets and other proprietary and competition-sensitive information. Aerostress executed the agreement.

41. After Mr. Galassi left Swales, Swales worked with Aerostress as that company began to build its consulting business. Swales subcontracted work to Aerostress (and thus to Mr. Galassi) with respect to the Solar Dynamic Observatory

portion of the MSES contract. Mr. Galassi continued to work as a contractor (and team-member) with Swales until shortly after NASA's initial (December 2006) MSES II/A award decision.

42. While continuing to work as a consultant for Swales, and without informing Swales of its activities (in this respect), Aerostress, acting through Mr. Galassi, began discussions with SGT in April 2006. The upshot of those talks was that SGT would obtain the assistance of Aerostress (Mr. Galassi) to help develop its competing proposal for NASA's MSES II/A contract *i.e.*, the same $400 million procurement for which Mr. Galassi had been a key member of the Swales' proposal team. By enticing one of Swales' key personnel to its team during the competition to work on the identical portion of the proposal that he had prepared for Swales, SGT obtained invaluable assistance of an individual who was intimately familiar with virtually every aspect of its competitor's RTO responses, and, in exchange SGT assisted Aerostress in developing its start-up business.

43. During the MSES II/A competition, SGT publicized the fact that that it was assembling a bid team and would submit a proposal for the contract. SGT did not disclose (nor was Swales otherwise aware) that SGT planned to associate with Aerostress and Mr. Galassi. Swales later learned, after the initial award, that not only was Aerostress assisting SGT with its proposal generally, Aerostress (and Mr. Galassi) secretly assisted SGT in developing its critical responses to NASA's RTOs.

**3. Swales' Discovery And Request for Investigation Regarding SGT's Procurement Integrity Violation And NASA's Response**

44. After NASA initially awarded the MSES II/A contract on December 1, 2006, SGT held an Open House for prospective MSES II/A employees. At that December 6, 2006 Open House, SGT made a presentation to attendees that revealed the identity of its team members.

45. Mr. Galassi actively participated as a key member of the SGT team during the December 6 Open House. SGT also published promotional material identifying Aerostress as one of its MSES II/A partners.

46. During SGT's December 6 meeting, several Swales employees discussed the MSES II/A contract award with their former colleague (and current consultant), Mr. Galassi. Mr. Galassi openly described his role supporting SGT's proposal to several Swales employees. Mr. Galassi told former co-workers that he had joined the SGT proposal team in the mechanical area and had been involved in the preparation of SGT's final proposal, including participation in an oral presentation to NASA. For instance, Mr. Galassi informed the Swales employees that he had participated on behalf of SGT in discussions with the MSES II/A Source Selection Evaluation Board ("SEB") in September 2006. Mr. Galassi also told his former Swales colleagues that in exchange for participating with SGT in its proposal, Aerostress (and he) expected to perform a substantial volume of work as a SGT contractor for MSES II/A. He stated that, ideally, Aerostress would use the members of the Swales team he had led before he began working with SGT.

47. Following the revelation that Aerostress (Mr. Galassi) had assisted SGT with preparation of its competing proposal, on December 13, 2006, Swales submitted a "Notice under FAR 1.602-2(b) and 33.102(f)," requesting an "Investigation of Procurement Integrity Matter under [the] MSES IIA" RFP. Ex. 5 at 1. After describing Mr. Galassi's background, Swales made clear to NASA that Mr. Galassi had "played an instrumental role in the composition of Swales' MSES IIA initial proposal" and had been a "drafter and reviewer on sample tasking (RTOs)" and other significant parts of Swales' proposal. *Id.* Swales described Mr. Galassi's departure from its employment and the beginning of Aerostress' business activities, then explained what it had learned during SGT's December 6 Open House. Specifically, Swales' December 13 letter described Mr. Galassi's representation that he had "not only provide[d] substantive correction and additions to the competitive proposal," but that he had also been able "to identify errors and develop favorable matters of cost and technical performance by which one competitor could create favorable contrasts with the other." *Id.* Swales also explained the types of competitive harm that could result from such improper activity: "[Mr. Galassi] would have had the capacity to steer and enhance the competitors' efforts vis Swales, ***even without . . . verbatim or other direct injections of Swales' data.***" *Id.* (emphasis added).

48. As noted above, the key problem with respect to SGT's acquisition of Aerostress' information regarding Swales' RTO responses (and its proposal overall) would likely not be outright copying or other, similarly crude, practices. Instead, Swales explained that by acquiring Aerostress' assistance, SGT was able to structure its

proposal and strategic approach to the procurement by purchasing the services of someone who had already developed the competitor's proposed solution for the same competition. SGT obtained an unfair competitive advantage from being able to position its proposal to, among other things: (a) avoid errors and potholes, and (b) differentiate SGT when it was evaluated against the competing proposal on which Mr. Galassi had previously worked is patent. Swales complained that by using Aerostress in this manner, SGT had violated procurement integrity requirements in connection with the MSES II/A competition. Accordingly, Swales requested a complete investigation of these improprieties, as well as appropriate responsive action by NASA. NASA failed to assess these serious procurement integrity concerns in a reasonable manner.

49. Swales made a series of written follow-up efforts to prompt NASA to look into the Galassi/Aerostress matter after the initial request of December 13, 2006. By written email responses, NASA assured Swales that it would respond to the matter. On February 8, 2007, the day after Swales notified NASA that it had initiated legal action against Galassi in the Prince George's Circuit Court, the Contracting Officer informed Swales that the matter which Swales raised in its December 13, 2006 request was *not* within the agency's responsibility to investigate, since its duty to investigate was limited to the improper acts of government officials under Section 423(a). The Contracting Officer said that because Mr. Galassi was not a government employee, it was NASA's view that Mr. Galassi's and SGT's conduct should not be investigated. After Swales objected to this position, NASA counsel notified Swales that the initial

position of the contracting officer would be reconsidered and advised that Section 423(a) was not necessarily the sole relevant legal standard for consideration.

50. On March 29, 2007, NASA issued its "Decision of the Procurement Office Regarding the Procurement Integrity of the [MSES] Procurement." In that decision, the NASA Procurement Officer determined that Aerostress' (and Mr. Galassi's) contributions to SGT's proposal were not inconsistent with procurement integrity requirements that apply to federal procurements. Despite SGT's undisputed use of Mr. Galassi's services on the same part of the proposal response for which he had been a key team member for Swales, NASA declined to exclude SGT from the competition.

**D. NASA's Decision Following The Corrective Action To Award The MSES II/A Contract To SGT**

51. On March 30, 3007, the day after NASA issued its decision with respect to the procurement integrity investigation and with knowledge of Mr. Galassi's improper conduct, NASA informed Swales of its decision to again select SGT for award of the contract. In short, the SSA determined that although Swales had a higher Mission Suitability point score, the award would be made in favor of SGT because Swales' "probable cost" was "significantly higher." Ex. 2 (SSDD) at 9. (Both offerors were both rated excellent for Past Performance.)

52. For the Mission Suitability ratings, NASA awarded Swales an overall Very Good, which was the second-highest rating on the adjectival scale. Ex. 2 (SSDD) at 3-4; *see* Ex. 1 ( RFP) at 130 (possible ratings were Excellent, Very Good, Good, Fair, Poor, or

Neutral). That overall rating was derived from Swales' ratings of four significant strengths, 11 strengths, one weakness, and no significant weaknesses. *Id.* at 4

53. In its March 29 award decision, NASA also assigned SGT a mission suitability rating of "Very Good." *Id.* at 5. However, SGT's point score was lower because SGT received more weaknesses than Swales. SGT was rated as having four significant strengths, 11 strengths, *three* weaknesses, and no significant weaknesses. *Id.*

54. NASA rated the Swales proposal as follows:

| | |
|---|---|
| Subfactor A – Understanding the Requirements of SOW | Very Good |
| Subfactor B – Technical Approach to RTOs | Excellent |
| Subfactor C – Management Plan | Very Good |
| Subfactor D – Safety and Heath Plan | Good |

Ex. 2 (SSDD) at 4. NASA determined that no adjustment to Swales' Mission Suitability score was required based on the cost realism analysis.

55. NASA rated the SGT proposal as follows:

| | |
|---|---|
| Subfactor A – Understanding the Requirements of SOW | Good |
| Subfactor B – Technical Approach to RTOs | Very Good |
| Subfactor C – Management Plan | Excellent |
| Subfactor D – Safety and Heath Plan | Good |

*Id.* at 5-6. NASA determined that no adjustment to Swales' Mission Suitability score was required based on the cost realism analysis.

**NASA MISEVALUATED THE PROPOSALS**

56. NASA's award decision was arbitrary and capricious, or otherwise contrary to law in three principal respects. *First,* NASA failed to properly assess and address the serious procurement integrity violation that occurred when SGT retained a

key member of the Swales' RTO team to assist it in crafting and distinguishing its RTO responses from Swales' proposal, which that individual also had helped to craft.

57. *Second,* NASA failed to perform an appropriate cost realism analysis and failed to account (or adjust in any way) for increased costs related to SGT's teaming arrangements. Half (if not more) of the required testing and manufacturing work will have to be conducted by its teaming partners, and transportation costs, which will increase SGT's costs. No such adjustment is reflected in NASA's decision. (Notably, Swales will not experience any such costs, as all of its testing and manufacturing are performed in-house, at the facility near NASA; if a proper evaluation had been performed, Swales' costs would have been lower than SGT's.)

58. *Third,* NASA failed to reasonably evaluate the offerors' technical proposals. Among other problems, the Agency failed to consider SGT's inability to comply with the RFP's Limitation on Subcontractors clause, as a result of SGT's dependence on other contractors to perform a substantial portion of the services required under the contract.

### A. NASA Erroneously Concluded That SGT Was Eligible For Award Despite SGT's Procurement Integrity Violation

59. In its procurement integrity investigation, NASA purported to analyze whether Mr. Galassi's role violated either the Procurement Integrity Act, 41 U.S.C. § 423(a), (b); FAR 3.104, or any other procurement integrity rule. Even though Swales had no access to SGT's proprietary, competition-sensitive proposal, NASA appeared to fault Swales for failing to provide "concrete assertion or evidence that Mr. Galassi had

accurate and current . . . information and that he shared it with SGT." Exhibit 5 at 4. In short, NASA believed that before it could find a procurement integrity violation had occurred, Swales was required to prove how its proprietary information had been provided to, and directly used by, SGT. *Id.* (finding that "Swales has provided no evidence of . . . a release [of marked contractor bid or proposal information] to SGT"). Few (if any) offerors wronged by procurement integrity violations could satisfy that burden because offerors are not provided copies of their competitors' proposals. (Ironically, the Procurement Integrity Act prohibits release of these materials and thus makes it impossible for Swales to satisfy the burden imposed by the Agency.)

60. When SGT engaged Mr. Galassi and Aerostress, Aerostress had a consulting contract with Swales. Mr. Galassi had a long history of on-site work at the Center. He had been visible as a team manager for Swales. Accordingly, both his expertise and his history as a manager of Swales were well known. Based on its own work at Goddard, SGT had reasonably knew that Mr. Galassi would be intimate with Swales' cost and technical competition-sensitive data. SGT also would have had a good understanding of his value to target his services on their proposal. Mr. Galassi and Aerostress were deeply familiar with Swales' proprietary cost data and possessed a Swales *estimating work book* in violation of Mr. Galassi's separation agreement with Swales.

61. By virtue of employing Mr. Galassi to prepare the same portion of the SAGT proposal that he had prepared for Swales, SGT obtained and used its competitor's bid or proposal information. NASA's decision fails to address the key

facts or implications of the compromise of an offeror's proprietary and trade secret information in the course of a procurement. By its misconduct, SGT obtained a substantial unfair competitive advantage that NASA ignored.

62. NASA's decision recognized that "Mr. Galassi provided comments that were used to revise [the RTOs and other] sections" of SGT's proposal prior to NASA's review. That is the same information that Mr. Galassi assisted Swales with when employed by plaintiff. And yet nowhere in NASA's decision does the Agency address the impropriety (both actual and apparent) related to one offeror enlisting another offeror's key proposal writer to prepare the same section of a competing proposal, as SGT did with Aerostress.

63. In its decision on the procurement integrity issue, NASA also irrationally asserted that SGT did not benefit from Mr. Galassi's assistance because it "received two technical weaknesses for RTOs 1 and 2 including one that Mr. Galassi's expertise should have helped avoid." Ex. 5 at 4. But, among many other problems, NASA's decision does not reflect any before-and-after analysis of SGT's proposal ratings. Put another way, there is no indication that absent Mr. Galassi's assistance, SGT likely would not have received more weaknesses and/or would have been rated as having *significant* weaknesses. Indeed, given SGT's lack of capacity and experience in this area, the gaps in its capabilities may well have rendered SGT's proposal unacceptable.

**B. NASA Failed To Perform A Reasonable Analysis Of The Respective Offerors' Likely Costs**

64. Section M.5 of the RFP originally provided that NASA would use a "Government Pricing Model" or "GPM" for purposes of the cost evaluation.

65. In its GAO protest, Swales alleged that NASA misevaluated the SGT proposal with regard to the GPM because the Agency failed to address discrepancies between the SGT technical and cost proposals regarding the division of work between SGT and its proposed teammates. The SGT cost proposal claimed that SGT would perform work that the SGT technical proposal showed would be performed by subcontractors.

66. As a result of its failure to address such discrepancies, NASA accepted inflated percentages of anticipated effort that SGT, as opposed to its teammates, allegedly would perform. Unlike Swales, SGT lacks an existing, local facility that it can use to perform the work under the contract. SGT also must coordinate work by dispersed subcontractors in their facilities as well as work by its own staff, which its technical proposal (but not its cost proposal) reflects. SGT's approach reasonably would entail greater costs than a centralized approach that is based on existing facilities.

67. In Amendment No. 6 to the RFP, NASA deleted the GPM and stated that it instead would evaluate cost based on the RTOs. NASA did not request revised proposals. The SGT cost proposal, therefore, was not revised to address the discrepancies discussed above. By shifting cost evaluation way from the Government Pricing Model and to the RTOs, NASA further moved the center of gravity of the *entire*

*evaluation process* to the areas of the proposal that depended on SGT's arrangements with Aerostress and Mr. Galassi.

68. During Swales' debriefing, NASA informed Swales that its evaluated RTO cost was roughly $9.6 million, approximately $130,000 higher than Swales' proposed cost. NASA further stated that this amount was approximately 20% higher than SGT's evaluated cost.

69. On information and belief, in conducting the cost evaluation based on the RTOs, NASA again accepted inflated claims by SGT regarding the work that it (as opposed to its proposed subcontractors) would perform under the contract. Those claims are inconsistent with the work allocation reflected in SGT's technical proposal. NASA thus failed to consider the additional facility costs and other costs that SGT's distributed approach (reflected in its technical proposal) will require in performance. If NASA reasonably had evaluated SGT's probable cost of performance based on its technical proposal, the evaluation would have reflected a higher evaluated cost for SGT.

## C. NASA's Evaluation Of The Offerors' Technical Proposals Was Fundamentally Flawed

### 1. NASA Should Have Rejected SGT's Proposal As Technically Unacceptable Because It Failed To Comply With The RFP's Limitation On Subcontracting Clause

70. Because this is a set-aside procurement, the RFP includes FAR Clause 52.219-14, "Limitations on Subcontracting." This clause requires that at least 50% of the cost of contract performance incurred for personnel shall be expended for employees of the offering concern. *See* Ex. 1 (RFP) at 57.

71. SGT's proposal should have led NASA to conclude that SGT could not and would not comply with the RFP's Limitations on Subcontracting clause. This is clear from NASA's evaluation of SGT's proposal under the Management Plan subfactor. The RFP states that, in evaluating offerors' proposals under this subfactor, NASA will, among other things, (1) evaluate "the availability of the offeror's resources," including "staffing, corporate support, facilities and equipment," and (2) evaluate the offeror's "capability to provide adequate critical facilities and equipment needed to perform the requirements of the SOW," including "facilities for off-site personnel." Ex. 1 (RFP) at 125-26. In its evaluation of SGT's Management Plan proposal, NASA recognized that SGT's proposal relies heavily on other companies to provide critical facilities and capabilities that SGT does not possess:

> The SGT proposal received a significant strength for providing excellent state-of-the-art, critical facilities that are committed and available. ***SGT's teammates have extensive manufacturing and test facilities, laboratories, clean rooms, and other critical facilities. The team members' facilities have overlapping capabilities.*** The SGT proposal received a strength for a sound basis for ***teaming arrangements that augment their expertise and provides full coverage of the statement of work.*** SGT conducted ***a formal gap analysis*** to identify the specific areas in which ***its own capabilities required augmentation.***

Ex. 2 (SSDD) at 6-7 (emphasis added).

72. Because of the nature of the work required by the RFP, SGT's reliance on its teammates for "extensive manufacturing and test facilities, laboratories, clean rooms, and other critical facilities," as well as other "augment[ing]" capabilities to provide "full coverage" of the SOW, will prevent SGT from complying with the 50% subcontracting

limitation. NASA therefore should have concluded that SGT's proposal is unacceptable and rejected it as ineligible for award. Had NASA done so, it would have selected Swales' technically superior proposal for award.

### 2. NASA Misevaluated SGT's Proposal Under The Mission Suitability Factor/Management Plan Subfactor

73. NASA's evaluation of SGT's proposal under the Management Plan subfactor was unreasonable and inconsistent with the RFP. NASA identified three Significant Strengths and four Strengths in SGT's proposal under this subfactor, and assigned SGT a rating of "Excellent," the highest possible rating. As discussed below, NASA should not have identified any Significant Strengths, should have identified no more than three Strengths, and should have identified several Significant Weaknesses in SGT's Management Plan proposal.

74. *First*, NASA acted unreasonably and inconsistently with the RFP by identifying a Significant Strength in SGT's Management Plan proposal for providing "excellent state-of-the-art, critical facilities that are committed and available" when, as discussed above, SGT is heavily relying on "teammates" who have "extensive manufacturing and test facilities, laboratories, clean rooms, and other critical facilities" with "overlapping capabilities." *See* Ex. 2 (SSDD) 6-7. Because the RFP's Limitations on Subcontracting clause requires that at least 50% of the cost of contract performance incurred for personnel must be expended for employees of SGT, SGT's acknowledged gap in critical facilities and capabilities is a Significant ***Weakness*** and perhaps even a ***Deficiency***, assuming for argument's sake, that the proposal is even eligible for award.

75. In other words, because the RFP requires SGT to perform "half the work," the same lack of critical facilities and capabilities that necessitates SGT's heavy reliance on other companies presents a major risk that SGT will not satisfy the RFP's requirements.

76. Moreover, apart from the RFP's subcontracting limitations, SGT's reliance on companies for "critical" facilities and capabilities increases programmatic risk because, as the prime contractor, SGT is responsible for satisfying all technical requirements, yet is relying on teammates and other subcontractors with whom NASA lacks privity and, therefore, contractual leverage. SGT's substantial reliance upon subcontractors also adds an additional layer of management, thereby decreasing efficiency, hampering communications, and increasing costs. For these additional reasons, SGT's heavy reliance on its teammates and other subcontractors should, at a minimum, have been recognized as a Significant Weakness, not a Significant Strength.

77. *Second*, NASA acted in a similarly unreasonable and inconsistent manner in assessing a Strength to SGT's Management Plan proposal for "a sound basis for teaming arrangements that augment their expertise and provides full coverage of the statement of work." *See* Ex. 2 (SSDD) at 7. Again, the fact that SGT, despite the constraints of the RFP's subcontracting limitations, must look outside its organization to obtain the expertise necessary to satisfy the technical requirements—indeed, must conduct a "formal gap analysis," identifying area areas in which it cannot satisfy the RFP requirement (*see id.*)—constitutes a Significant Weakness and perhaps even a proposal Deficiency, not a Strength.

78. *Third*, it also was unreasonable and inconsistent with the RFP for NASA to identify a Significant Strength in SGT's Management Plan proposal for its "exceptional commitment to developing small businesses, as demonstrated by the signing of Letters of Intent with three engineering companies to execute formal Mentor/Protégé Agreements in accordance with Small Business Administration ("SBA") procedures and by providing the protégés access to its large business teammates for additional educational and business opportunities." *See* Ex. 2 (SSDD) at 6. Although the RFP states that the evaluation for the Management Plan subfactor will consider, among other things, an offeror's "proposed plan for developing/educating small business subcontractors who specialize in engineering disciplines," *see* RFP at 125, the RFP does not communicate to offerors that this aspect of their Management Plans could be given such significant weight—particularly because the procurement is set-aside for small businesses.

79. Even if one assumes that the RFP reasonably contemplates the possibility of a Significant Strength for small business subcontractor development/education plans, SGT's proposal does not merit such a rating. Because SGT must comply with the RFP's subcontracting limitations and apparently has several large contractor teammates to whom it has committed huge portions of the work, SGT likely will not be able to provide much work to any other small business engineering firms. Moreover, SGT has not executed formal Mentor/Protégé Agreements; it merely has signed Letters of Intent to do so.

80. NASA's rating also reflects unequal treatment of the offerors. Unlike SGT's mere Letters of Intent, Swales has committed to provide work under the contract to three small business concerns, including two companies that have strong independent records of past performance and a backlog of subcontracts with Swales and NASA that must be sustained for them to remain viable. Although Swales' commitment to small business subcontractor development is far more substantive than mere Letters of Intent to execute Mentor/Protégé Agreements at some future point, NASA assigned Swales only a single Strength "for providing a strong rationale in support of the teaming relationship" and "for facilitating the development of small businesses." *See* Ex. 2 (SSDD) at 5. To the extent SGT was rated a Significant Strength for its three Letters of Intent to execute Mentor/Protégé Agreements, Swales deserved a Significant Strength for its more substantial and immediate small business commitments.

81. *Fourth,* NASA unreasonably identified a Significant Strength in SGT's proposal for "a well planned, comprehensive and detailed phase-in plan that provided for a smooth transition by performing analysis of various aspects of transition, identifying challenges and risks, and providing excellent detail on how they intend to successfully transition into these areas." Ex. 2 (SSDD) at 6. Because Swales is a successfully-performing incumbent with a workforce and team in place, it was irrational for NASA to elevate SGT's proposed phase-in plan to a Significant Strength and, therefore, a discriminator between the offerors. As the incumbent, Swales' proposal undeniably offers inherently less risk in transitioning to the new contract than SGT's proposal.

82. By assigning SGT this Significant Strength, however, and by not assigning a comparable Significant Strength to Swales, NASA's rating decision had the irrational effect of determining that there was less risk for SGT to begin performing a new effort than the incumbent Swales to continue with its excellent performance.

83. Moreover, assigning SGT a Significant Strength for its phase-in plan also is inconsistent with the RFP, which states that, in NASA's evaluation of such plans, "[t]he risks to the Government beyond what can reasonably be expected in a transition period will be assessed for reasonableness." Ex. 1 (RFP) at 126. Because the significant immediate workload and the demand for locally-situated personnel creates enormous pressure on offerors to hire personnel working under the incumbent contract, the RFP requires offerors to discuss their plans for incumbent capture employee retention, morale, and productivity in their Management Plan proposals, which is to be evaluated for reasonableness and consistency with other parts of the proposal. *See id.* at 106, 126. In that regard, the RFP requires offerors to provide a total compensation plan for all proposed labor categories in their Management Plan proposals, which NASA is to review to determine the offeror's ability to provide uninterrupted high-quality work, its expected impact on recruiting and retention, its realism, and its consistency with the total plan for compensation. *Id.* (cautioning offerors that lowered compensation for essentially the same professional work may indicate lack of sound management judgment and lack of understanding of the requirement); *id.* at 110 (requiring clear explanations of any labor rate variances when proposing to capture incumbent personnel); *id.* at 121; *See* FAR 52.222-46.

84. NASA concluded that SGT's proposed costs were lower than Swales' proposed costs. Ex. 2 (SSDD) at 9. Thus, pursuant to the RFP's transition risk, incumbent capture, and compensation plan provisions, NASA should have identified a Significant Weakness in SGT's Management Plan proposal, and should not have identified a Strength, much less a Significant Strength, for SGT's phase-in plan.

**3. NASA Misevaluated SGT's Proposal Under The Mission Suitability Factor/Technical Approach To RTOs Subfactor**

85. In addition to NASA's failure to properly address SGT's procurement integrity violation and its misevaluation of cost realism, NASA's evaluation of SGT's proposal under the Technical Approach to RTOs subfactor was also unreasonable and inconsistent with the RFP.

86. Although NASA identified one Significant Strength and ***three Weaknesses*** in SGT's proposal, the Agency nonetheless assigned SGT a rating of "Very Good," the second highest possible rating. *See* Ex. 2 (SSDD) at 6. Not only is this rating inconsistent with NASA's ratings of proposals under other evaluation factors, but even if these three Weaknesses were minor, SGT still merited a rating no higher than "Good." As discussed below, however, at least two of the Weaknesses should have been rated as ***Significant*** Weaknesses, if not Deficiencies.

87. *First*, RTO-1 involved "Mechanical Systems Engineering and Analysis for [Lunar Optical Observatory] Mission," and focuses on mission-level mechanical engineering, spacecraft structural analysis, and instrument STOP (structural, thermal, optical) analysis. Ex. 1 (RFP, Exhibit 8, RTO Summary; (RTO) – 1). NASA identified a

Weakness in SGT's proposal for "a ***lack of understanding*** of creating a finite element model for STOP (structural, thermal, optical) analysis use in RTO-1 when given a FEM created for dynamics analysis use" and because "[r]igid elements and effects on coefficient of thermal expansion during analysis at cryogenic **temperatures *were not discussed.*"** *See* Ex. 2 (SSDD) at 6 (emphasis added). SGT's "lack of understanding" regarding the creation of a finite element model for STOP analysis would almost certainly result in invalid analytical results and, hence, a failure to solve the task. Moreover, the RFP indicated that RTO-1 would "focus on," among other things, "instrument STOP (structural, thermal, optical) analysis." *See* Ex. 1 (RFP, Exhibit 8, RTO Summary). This Weakness therefore should have been characterized as a Deficiency or, at best, a Significant Weakness. Such errors may have a profound impact on program costs because they create duplicative costs and economic waste for the agency civil servants who depend on the contractor. Such errors can easily close an ostensible 20% cost difference.

88. *Second*, RTO-2 required the offerors to provide its analysis of a problem with the "Precision Scanner for the Lunar Infrared Spectrometer," and focused on detailed mechanism life-cycle design and fabrication, with emphasis on failure modes and effects analysis Ex. 1 (RFP, Exhibit 8, RTO Summary). NASA identified a weakness in SGT's proposal for "a technically complex test apparatus to measure and validate scanning mechanism system performance at 30K" and because "[t]he proposal ***did not adequately discuss*** the technical challenges involved for this test, and therefore ***did not demonstrate a successful approach to the validation of system performance.***" *See* Ex. 2

(SSDD) at 6 (emphasis added). SGT's failure to demonstrate "a successful approach to the validation of system performance" is not merely a Weakness, particularly given RTO-2's requirement to deliver "a fully tested and documented flight Scanner." *See* (RFP, Exhibit 8, RTO-2, Deliverables). Instead, NASA should have assigned SGT a Deficiency or, at best, a Significant Weakness. Such errors may have a profound impact on program costs because they create duplicative work and economic waste for the contractor and agency civil servants who depend on the contractor. Such errors can easily close an ostensible 20% cost difference.

**4. NASA's Source Selection Decision Was Unreasonable And Inconsistent With The RFP Because The Decision Was Bases on A Flawed Underlying Evaluation Of The Proposals And A Flawed Cost-Technical Tradeoff**

89. NASA's source selection decision was unreasonable and inconsistent with the RFP because, as discussed above, the decision was based on a flawed evaluation of the proposals. Errors in NASA's cost evaluation significantly inflated SGT's perceived cost advantage over Swales, further undermining the SSA's selection decision, which was premised on the notion that SGT's offered a "significantly lower probable cost." *See* Ex. 2 (SSDD) at 10.

90. NASA's source selection decision also was unreasonable and inconsistent with the RFP because the decision was based upon a flawed cost-technical tradeoff. Specifically, in selecting SGT's proposal for award, the SSA erroneously concluded that there was no "substantial differentiation in the overall technical value" between the two

offeror's technical approaches. *See id.* at 9. In fact, as discussed above, Swales' proposal offers significantly greater technical value than SGT's proposal.

## CAUSES OF ACTION

91. Plaintiff, Swales respectfully sets forth the following seven causes of action based on the facts alleged above.

### COUNT I
### NASA Irrationally Awarded MSES II/A Contract To SGT After That Offeror Violated The Procurement Integrity Act

92. Swales realleges and incorporates by reference all of the allegations contained in the paragraphs set forth above.

93. By entering into a teaming agreement with Aerostress, SGT improperly procured the services of a key Swales employee. SGT not only used his services with respect to its overall proposal, but SGT also knowingly obtained and used information from Mr. Galassi that had been developed by, and was owned and protected for the sole benefit of, Swales. This information was Swales' "bid or proposal information," as defined in the Procurement Integrity Act. 41 U.S.C. § 423(f)(1).

94. The Procurement Integrity Act makes it illegal for "[a] person, other than as provided by law, [to] knowingly obtain contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 423(b). By entering into the teaming agreement with Aerostress and using Mr. Galassi's knowledge of Swales' proposal (which cannot be divorced from his general knowledge of the procurement), Swales knowingly obtained Swales protected proposal information before the award of a

Federal Agency procurement contract to which the information relates. SGT thus violated the Procurement Integrity Act.

95. Before NASA made its award decision which is the subject of this protest, it was provided with detailed information regarding SGT's misappropriation of Swales' proprietary proposal information via SGT's teaming with Aerostress and Mr. Galassi. Yet NASA failed to exclude SGT from the competition for violations of federal law. Because SGT's conduct during this procurement was plainly inconsistent with the requirements of federal procurement law, NASA improperly awarded the MSES II/A contract to that offeror.

**COUNT II**
**NASA Arbitrarily Evaluated SGT's Improper Acquisition Of Swales' Competition Sensitive Information By Its Hiring And Use Of Mr. Galassi On Parts Of SGT's Proposal After He Had Worked As A Key Team-Member For Swales On The Same Parts Of Its Proposal**

96. Swales realleges and incorporates by reference all of the allegations contained in the paragraphs set forth above.

97. Even if SGT's misappropriation of Swales' information did not violate the Procurement Integrity Act, NASA nevertheless conducted an arbitrary and capricious evaluation by refusing to exclude SGT from the MSES II/A competition. Among other reasons, SGT clearly benefited improperly from purchasing RTO development and correction assistance (and services) from a company whose principal (if not only) employee developed the RTO responses for a competitor in the same procurement. Basic fairness requires that the government act when such conduct is brought to its attention. This information conferred a substantial competitive advantage on SGT. An

agency cannot close its eyes to theft of trade secret information in this manner. And the Agency violated its duties when it condoned that conduct here.

**COUNT III**
**NASA Arbitrarily Evaluated SGT's Cost Proposal And Failed To Perform An Appropriate Cost Realism Analysis**

98. Swales realleges and incorporates by reference all of the allegations contained in the paragraphs set forth above.

99. Federal Acquisition Regulation ("FAR") 15.404-1(d) requires agencies to conduct a cost realism analysis for any cost-based contract. In such an analysis, the agency must: (i) analyze the proposed costs to determine, among other things, whether they are "consistent with the unique methods of performance and materials described in the offeror's technical proposal"; and (ii) determine a "probable cost of performance" for the offeror based on its proposed approach. This evaluated cost must be used for purposes of making a source selection decision. *See* FAR 15.404-1(d)(2)(i).

100. The cost evaluation was arbitrary and failed to comply with FAR 15.404-1(d). NASA failed to recognize or address discrepancies between the SGT technical and cost proposals that should have been reflected in a higher evaluated cost for SGT. If NASA reasonably had evaluated SGT's probable cost of performance based on its technical proposal, the evaluation would have reflected a higher evaluated cost for SGT.

**COUNT IV**
**The Agency Misevaluated (And Arbitrarily Accepted) SGT's Proposal, Which Failed To Comply With The Limitation On Subcontracting Clause And Was Therefore Unacceptable**

101. Swales realleges and incorporates by reference all of the allegations contained in the paragraphs set forth above.

102. The RFP includes FAR Clause 52.219-14, "Limitations on Subcontracting." FAR 52.219-14 mandates that for small business set-asides, "at least 50% of the cost of contract performance incurred for personnel shall be expended for employees of the offering concern." SGT could not comply with this requirement, as demonstrated in NASA's evaluation of SGT's proposal under the Management Plan subfactor—which explains SGT's heavy reliance on other companies to provide crucial facilities and capabilities needed for the contract.

103. By failing to enforce the 50% limitation in the RFP, the Agency failed to follow applicable law. Its decision in this regard was arbitrary and capricious.

**COUNT V**
**The Agency's Evaluation Of SGT's Mission Suitability Factor/Management Plan Subfactor Was Arbitrary And Capricious**

104. Swales realleges and incorporates by reference all of the allegations contained in the paragraphs set forth above.

105. An agency's evaluation of technical proposals must be reasonable and consistent with the stated evaluation criteria. *See, e.g.*, FAR 15.305.

106. In its analysis of the Mission Suitability Factor/Management Plan subfactor, NASA made a series of errors that benefited SGT and substantially harmed

Swales. As explained above, NASA's erroneous evaluations of this subfactor include: (1) NASA's unreasonable identification as a Significant Strength SGT's Management Plan for providing "excellent state-of-the-art facilities," when SGT is (in fact) has no such facilities and is completely dependent on teammates who actually have those facilities; (2) the Agency's arbitrary identification of a Strength for SGT related to its teaming arrangements, when that offeror's dependence on team members for vital functions actually should have resulted in a Significant Weakness or proposal Deficiency; (3) NASA unreasonably rated SGT a Significant Strength of its commitment to developing small businesses; and (4) the Agency unreasonably and inconsistently identified a Significant Strength in SGT's phase-in plan.

107. These numerous errors clearly were prejudicial to Swales. Had NASA properly evaluated the Strengths and Weaknesses in SGT's proposal, the Agency would have assigned SGT a rating of "Poor," and not "Excellent," for the vital Management Plan subfactor.

**COUNT VI**
**NASA's Evaluation Of The Mission Suitability Factor Technical Approach To RTOs Subfactor Was Contrary To Law**

108. Swales realleges and incorporates by reference all of the allegations contained in the paragraphs set forth above.

109. As explained above, NASA's evaluation of the RTOs was critical and, with respect to SGT, fundamentally flawed. NASA's description of SGT's weaknesses with respect to its responses demonstrate that SGT actually should have been given

Deficiency ratings (or at best a Significant Weaknesses) with respect to these critical parts of the proposal; it should not have received Weaknesses.

110. NASA's failure to properly evaluate SGT's proposal under the Technical Approach to RTOs subfactor was highly prejudicial to Swales because, had NASA properly evaluated the Weaknesses and Deficiencies in SGT's proposal, the Agency would have assigned a rating of Poor, and not Very Good, for this subfactor. As a result, NASA would have recognized Swales' significant advantage over SGT under the Mission Suitability factor, *the most important of the three evaluation factors*, and the Agency thus likely would have selected Swales' proposal for award.

**COUNT VII**
**The Source Selection Authority's Award Decision Cannot Be Supported**

111. Swales realleges and incorporates by reference all of the allegations contained in the paragraphs set forth above.

112. A procuring agency's source selection decision, including any cost-technical tradeoff therein, must be reasonable and consistent with the solicitation's evaluation criteria. *See* FAR 15.308.

113. In making the award decision, the SSA arbitrarily concluded that there was no "substantial differentiation" in the overall technical value between the two offeror's technical approaches. That conclusion is based on misevaluations of SGT's proposal, and thus was unreasonable.

## RELIEF REQUESTED

Plaintiff Swales respectfully requests a judgment against the United States with respect to the causes of action set forth above. Swales also requests that the Court grant the following relief.

1. The Court should declare that NASA violated federal procurement law by awarding the MSES II/A contract to SGT because this procurement action is irrevocably tainted by SGT's acquisition of Aerostress' improper assistance, and for the other reasons set forth above.

2. The Court should enjoin NASA from permitting any performance of any contract awarded to SGT under the MSES II/A contract, *i.e.*, any contract related to RFP No. NNG05096383R.

3. Alternatively, Swales requests that the Court direct NASA to reevaluate the proposals and make a new selection in accordance with the RFP.

4. Finally, Swales asks that the Court enter any further relief that is just and appropriate.

Respectfully submitted,

MARCIA G. MADSEN
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006
(202) 263-3000
(202) 263-3300 Facsimile

Of Counsel:
DAVID F. DOWD
LUKE LEVASSEUR
MAYER, BROWN, ROWE & MAW LLP
*Counsel for Plaintiff, Swales Aerospace*
April 24, 2007

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 24th day of April 2007, I caused to be served, by hand delivery, one copy of plaintiff's Complaint For Injunctive And Declaratory Relief upon the following:

Mark Melnick
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, NW
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530

Marcia [signature]