# SELECTION STATEMENT
# FOR THE
# MECHANICAL SYSTEMS ENGINEERING SERVICES II/A (MSES II/A)
# PROCUREMENT IN SUPPORT OF
# NASA'S GODDARD SPACE FLIGHT CENTER

On March 27, 2007, I, along with other senior officials from NASA Goddard Space Flight Center met with members of the Source Evaluation Board (SEB) to hear their findings based on the evaluation of proposals for the MSES II/A solicitation.

## PROCUREMENT DESCRIPTION AND HISTORY

This procurement is a follow-on to NASA's Contract No. NAS5-01090, a Cost Plus Award Fee, Indefinite Delivery Indefinite Quantity (IDIQ) Contract for Mechanical Systems Engineering Services (MSES) in support of NASA's Goddard Space Flight Center (GSFC). Under this effort, the Contractor shall provide engineering services for the formulation, design, development, fabrication, integration, testing, verification, and operations of space flight and ground system hardware and software, including development and validation of new technologies to enable future space and science missions.

This requirement was issued as a small business set-aside competitive procurement for continued MSES services to be performed primarily at the Greenbelt, Maryland location. The procurement was structured in accordance with the Federal Acquisition Regulation (FAR) Part 15. The Government intended to evaluate proposals and award contract(s) without discussions with offerors. However, the Government also reserved the right to conduct discussions if the Contracting Officer later determined them to be necessary.

This competitive procurement will result in a Cost-Plus-Award-Fee (CPAF), Indefinite Delivery Indefinite Quantity (IDIQ) Contract. The contract will have an effective ordering period of 5 years from the effective date, with a separate contract vehicle for a 30 day phase-in period.

A first Draft RFP was issued June 23, 2005 for industry comments. After numerous "one-on-one" industry discussions regarding competition, which resulted in an amendment to the acquisition strategy, a second Draft RFP was issued February 01, 2006. The Final RFP was released March 09, 2006. Subsequently, three amendments followed to make changes to the solicitation: (1) Amendment One (issued March 16,2005) scheduled a Government conducted onsite (GSFC) visit to various labs; (2) Amendment Two (issued March 20,2006) extended the proposal due date to April 17, 2006; and (3) Amendment Three was issued (March 30, 2006) to provide information

related to recurring other direct costs (ODCs); and to revise Section J.1 in order to incorporate Attachment I "List of Installation Accountable Government Property."

Initial Proposals were due and received April 17, 2006; evaluations commenced on April 18, 2006 and were completed on June 30, 2006. A presentation to me, as the Source Selection Authority, occurred on August 22, 2006, where in consultation with NASA/GSFC senior officials I decided that it was prudent to request a revised proposal from both offerors. Discussions took place on September 8 and 11, 2006. On September 13,2006, Amendment Four was issued to: (1) modify the Mission Suitability volume page count to allow for changes to the proposal; (2) clarify the model contract completion instructions and; (3) establish the due date of September 29, 2006 for Final Proposal Revisions. On September 21, Amendment Five was issued to: (1) provide pricing information; (2) identify "manufacturing" labor categories; and (3) extend the Final Revised Proposal due date to October 3, 2006.

Final evaluations commenced on October 4, 2006 and were completed on November 6, 2006. Two revised final proposals were submitted, by SGT, Inc. and Swales Aerospace.

On December 8, 2006, SGT was awarded the MSES II/A contract. On December 12, 2006, Swales Aerospace protested the award to SGT, Inc. On December 13, 2006, the Agency suspended performance of the contract. On January 19, 2007, the Agency took corrective action, rescinded the award, and the U.S. Government Accountability Office (GAO) dismissed the protest. The corrective action consisted of the Board conducting a review of the Mission Suitability and Past Performance findings, and a re-evaluation of the cost proposals. As a result of the review, the Mission Suitability and Past Performance findings remained unchanged. However the re-evaluation of the cost proposals revealed discrepancies between the Government Pricing Model (GPM) and Mission Suitability for both offerors. On March 14, 2007 and March 15, 2007, face-to-face discussions were conducted with both offerors regarding the GPM discrepancies. Following these discussions, on March 20, 2007, Amendment 6 of the RFP was issued to delete the GPM and utilize the existing Representative Task Order information for the cost evaluation. Since Amendment 6 deleted the GPM evaluation, and RTO cost data had already been requested, proposed and evaluated, and proposals were still valid, revised proposals were not required.

## EVALUATION PROCEDURE

To aid in the evaluation, I appointed an SEB consisting of Government technical and business personnel. The SEB consisted of voting members, non-voting members, and consultants. I appointed personnel to the SEB from appropriate disciplines to provide specific expertise in identifying strengths, weaknesses, and deficiencies. The voting SEB members considered the findings of all members and consultants and used the predetermined evaluation criteria to assess the strengths and weaknesses of each proposal.

The proposals were evaluated in accordance with FAR Part 15.3, Source Selection, and NASA FAR Supplement (NFS) 1815.3, Source Selection. The RFP described three evaluation factors. The evaluation factors were Mission Suitability, Cost and Past Performance. The RFP specified the relative order of importance of the evaluation factors as follows: "The Cost Factor is significantly less important than the combined importance of the Mission Suitability Factor and the Past Performance factor. As individual factors, the Cost Factor is less important than the Mission Suitability Factor but more important than the Past Performance Factor."

Of these evaluation factors, the RFP provided that only Mission Suitability would be point scored in the evaluation process. In this regard, the RFP defined Mission Suitability as consisting of the following subfactors and assigned points to each as indicated:

| Subfactor | Description | Points |
|---|---|---|
| A | Understanding Requirements Of Statement Of Work (SOW) | 300 |
| B | Technical Approach To Representative Task Orders (RTOs) | 300 |
| C | Management Plan | 350 |
| D | Safety and Health Plan | 50 |
| Total | | 1,000 |

The SEB adjectivally rated and point scored the proposals under each Mission Suitability Subfactor. However, the total Mission Suitability score was subject to downward adjustment based on the degree of cost realism between the proposed and probable RTO costs. The RFP provided for the evaluation, not numerical scoring, of the Cost and Past Performance factors. A cost realism analysis was also performed on the overall cost proposed for the four Representative Task Orders (RTOs). The proposed firm fixed phase-in price was evaluated for reasonableness. The SEB evaluated the Past Performance Factor for relevant current and/or completed contracts and subcontracts over $500K in value which the companies have had within the last three years. The Past Performance Factor included the SEB's evaluation of technical, schedule and cost performance. To assist in evaluating the Past Performance factor, the RFP provided the adjectival ratings of "Excellent," "Very Good," "Good," "Fair," "Poor," or "Neutral" depending upon the assessment of each proposal in this area.

## MISSION SUITABILITY EVALUATION

The SEB applied the established numerical weights and produced a final Mission Suitability score for each proposal. The significant substance of the SEB's evaluation of Mission Suitability for each proposal follows.

Swales Aerospace

Overall, the Swales proposal received a rating of "Very Good," earning a slightly higher numerical score than SGT. The overall proposal received four (4) significant strengths, eleven (11) strengths, one (1) weakness and no significant weaknesses. No adjustment to the Mission Suitability score for cost realism was required. The Swales proposal received the following rating for each individual subfactor:

| | |
|---|---|
| Subfactor A — Understanding Requirements of SOW | Very Good |
| Subfactor B — Technical Approach to RTOs | Excellent |
| Subfactor C — Management Plan | Very Good |
| Subfactor D — Safety and Health Plan | Good |

In the area of Understanding Requirements of the SOW, the Swales proposal received one (1) significant strength, four (4) strengths, and no weaknesses. The Swales proposal received a significant strength for an excellent, comprehensive, thorough and wide-ranging understanding of structural analysis and loads engineering in Function 2B, including the areas of finite element analysis, coupled loads analysis, stress analysis, and fracture control. The Swales proposal received a strength for presenting a strong technical approach and demonstrating a very good understanding of Function 2A, Materials Engineering, in the areas of risk mitigation, specialized training for laboratory analysts, and preparation of mission assurance requirements; and in Function 2G3, Manufacturing Engineering - Composites, conveying a thorough understanding of the manufacturing challenges of composite materials. The Swales proposal also received a strength in understanding SOW requirements for Function 4D, Research and Technology Services/Advanced Coatings and Film Technology; Function 2E, Thermal Engineering/Thermal Design and Analysis; and Function 2F, Contamination and Coatings Engineering. The Swales proposal received a strength for demonstrating a comprehensive understanding of Function 3U, Configuration Management, by conforming to NASA guidelines and procedures as well as ISO standards, and by providing for an active self audit program; and of Function 3V, Hardware Refurbishment and Reuse. The Swales proposal received a strength for a very good understanding of SOW requirements for Function 2E, Thermal Engineering, in the areas of Thermal Vacuum Test Support, Thermal Device Design and Validation, and Test Plan/Report/Documentation.

Under Technical Approach to RTOs, the Swales proposal received two (2) significant strengths, three (3) strengths, one (1) weakness and no significant weaknesses. The Swales proposal received a significant strength for demonstrating an overall excellent technical approach and understanding in addressing the mechanical engineering design and analysis tasks in RTO 1. This approach stressed the interdependence of the three subtasks, presented a comprehensive list of interface control documents required, described coupled loads analysis in detail, provided mechanical systems requirements and the associated design impact, and provided for model accuracy in the STOP

analysis. The Swales proposal received a significant strength for demonstrating an excellent understanding of the complex challenges presented by the RTO 2 task requirements. The proposal included a novel flexure design to meet requirements, identified a means for damping to meet jitter performance, recognized the importance of material selection, and recognized the complexity of cryogenic performance testing. The Swales proposal received a strength for presenting a thorough staffing plan for RTO 2 that was complete in all areas and provided the appropriate skill mix and labor hours to complete the task on schedule and within budget. The Swales proposal received a strength for insightfully providing details on tasks and process flows associated with performing contamination control on RTO 4. The proposal provided details into how the contamination control process fits into the spacecraft manufacturing process. The Swales proposal received a strength for demonstrating a very good technical approach to RTO 3 by recognizing the significant thermal design challenge, by identifying the risks and critical issues, and by proposing acceptable mitigation plans. The Swales proposal received one weakness for the staffing plan in RTO 1, which inadequately covered the skill mix requirements.

Under Management Plan, the Swales proposal received one (1) significant strength, three (3) strengths, no weakness and no significant weaknesses. The Swales proposal received one significant strength for an outstanding list of available critical facilities, equipment and software tools (critical non-personnel resources), including complete manufacturing and integration facilities, overlapping team member and government facilities (providing additional facility options for the government), and in-house developed software packages. The Swales proposal received a strength for effective processes in place in the areas of task order management and managing multiple tasks, including identifying all steps in the task order process, and a solid understanding of the Task Order Management System (TOMS). The Swales proposal received a strength for providing an effective plan in the areas of staffing, responding to critical requirements, award fee incentives, and maintaining and augmenting an on-going workforce. The Swales proposal received a strength for providing a strong rationale in support of the teaming relationship, which provided complete coverage of the SOW, nurtured successful business relationships, and for facilitating the development of small businesses.

Under Safety and Health Plan, the Swales proposal received one (1) strength and no weaknesses. The Swales proposal received one strength for a very good safety and health program in the areas of Hazard Communication, Lockout/Tagout, Electrical Training, Confined Space Entry, and Bloodborne Pathogen.

<u>SGT, Inc.</u>

Overall, the SGT proposal received a rating of "Very Good." The proposal earned four (4) significant strengths, eleven (11) strengths, three (3) weaknesses and no significant weaknesses. No adjustment to the Mission Suitability score for cost realism was required. The SGT proposal received the following rating for each individual subfactor:

| | |
|---|---|
| Subfactor A — Understanding Requirements of SOW | Good |
| Subfactor B — Technical Approach to RTOs | Very Good |
| Subfactor C — Management Plan | Excellent |
| Subfactor D — Safety and Health Plan | Good |

In the area of Understanding Requirements of SOW, the SGT proposal received six (6) strengths, and no weaknesses. The SGT proposal received a strength for a very good understanding of SOW requirements for Function 2E, Thermal Engineering, including the approach to performing thermal design and analysis using thermal software, thermal device design, cryogenic GSE, thermal vacuum test support, and risk identification and mitigation. The SGT proposal received a strength for a very good understanding of SOW requirements for Function 4A, Advanced Thermal Control Systems, including proposed techniques and technical approach to developing advanced thermal control systems. The SGT proposal received a strength for a very good understanding of fracture control under SOW Function 2B6, Structural Analysis and Loads Engineering, including the use of a fracture-critical parts list for tracking those parts through fabrication, and an accurate description of the types of fracture control analyses required for STS payloads. The SGT proposal received a strength for a very good understanding of SOW Function 3K, Software Engineering in the areas of requirements, risk recognition, software testing, and using the customer's own standard information management tools. The SGT proposal also received a strength for a very good technical understanding of Function 2D, Electromechanical Systems, in the areas of sensors, micro electro mechanical systems (MEMS), systems design and analysis, electronics and electromagnetics, and bearing tribology. The SGT proposal received a strength for a complete and well-integrated approach to GN&C Component and Hardware-Specific Tasks in Function 31, Guidance, Navigation and Control. The proposal effectively described the design, development, and verification of GN&C components and systems, and provided insight into test and simulation validation.

Under Technical Approach to RTOs, the SGT proposal received one (1) significant strength, no strengths, three (3) weaknesses and no significant weaknesses. The SGT proposal received one significant strength for an excellent technical approach to RTO 3, for recognizing the thermal design challenges and proposing technically insightful solutions. The proposal presented a staffing plan with skill mix and labor hours that were realistic and complete. The proposal showed an excellent understanding of the challenges inherent to cooling detectors to cryogenic temperatures, and identified the risks and critical issues, as well as a mitigation plan. The SGT proposal received a weakness for a lack of understanding of creating a finite element model (FEM) for STOP (structural, thermal, optical) analysis use in RTO 1 when given a FEM created for dynamics analysis use. Rigid elements and effects on coefficient of thermal expansion during analysis at cryogenic temperatures were not discussed. The SGT proposal received a weakness for a technically complex test apparatus to measure and validate scanning mechanism system performance at 30K. The proposal did not

adequately discuss the technical challenges involved for this test, and therefore did not demonstrate a successful approach to the validation of system performance. The SGT proposal received a weakness for an inadequate staffing plan for RT02, underestimating the skill mix requirements.

Under Management Plan, the SGT proposal received three (3) significant strengths, four (4) strengths, no weaknesses and no significant weaknesses. The SGT proposal received a significant strength for exceptional commitment to developing small businesses, as demonstrated by the signing of Letters of Intent with three engineering companies to execute formal Mentor/Protégé agreements in accordance with Small Business Administration (SBA) procedures and by providing the protégés access to its large business teammates for additional educational and business opportunities. The SGT proposal received a significant strength for a well planned, comprehensive and detailed phase-in plan that provided for a smooth transition by performing an analysis of various aspects of transition, identifying challenges and risks, and providing excellent detail on how they intend to successfully transition into these areas. The SGT proposal received a significant strength for providing excellent state-of-the-art, critical facilities that are committed and available. SGT's teammates have extensive manufacturing and test facilities, laboratories, clean rooms, and other critical facilities. The team members' facilities have overlapping capabilities. The SGT proposal received a strength for a sound basis for teaming arrangements that augment their expertise and provides full coverage of the statement of work. SGT conducted a formal gap analysis to identify the specific areas in which its own capabilities required augmentation. The SGT proposal also received a strength for effective systems in place to process task orders and to manage multiple ongoing tasks. The SGT proposal received a strength for a very good, comprehensive, and detailed approach to organizing and managing its workforce in support of MSES II/A. SGT's organizational structure demonstrates a thorough understanding of the overall contract requirements. The SGT proposal received a strength for a comprehensive Mission Assurance Plan, which provided a very good discussion of various aspects of the Mission Assurance discipline.

Under Safety and Health Plan, the SGT proposal received one (1) strength and no weaknesses. The SGT proposal received one strength in the element of Work site Analysis. During the phase-in period, SGT proposed a very good plan to conduct training and certification, and to perform a formal and comprehensive assessment of assigned workspaces.

## COST EVALUATION

The SEB evaluated the proposed cost for the four Representative Task Orders (RTOs) and the 30-day phase-in period to determine reasonableness and cost realism. The cost evaluation for the MSES II/A procurement was conducted in accordance with FAR 15.305(a) (1) and NFS 1815.305(a)(1 )(B) and (C) and Request for Proposal (RFP) Clause M.5 - Cost Evaluation Factor.

The RFP stated that cost realism analysis would be performed on the overall cost proposed for the four Representative Task Orders (RTOs). The RFP included four RTOs to help the government understand how the offeror would carry out representative tasks associated with the SOW. They were purely hypothetical situations that were provided for technical and cost proposal purposes. The offeror was to describe its approach to implement and staff each RTO. It was to include a staffing plan and other required resources, such as facilities and equipment, travel, and materials.

In accordance with the RFP, a cost realism analysis was performed on the overall cost proposed for the four RTOs, and the cumulative cost realism analysis results were subject to a Mission Suitability point score adjustment. The adjustment was to be made based on the percentage difference between proposed and probable cumulative RTO costs excluding fee. Proposed bid rates were to be utilized in proposing costs for the RTOs. Each offeror presented reasonable cost approaches in most areas of the four RTOs, however, cost realism adjustments were made to the RTOs.

Swales had the highest total proposed and probable cost for the Representative Task Orders (RTOs) by a significant amount. Cost realism adjustments were made to the skill mix and staffing levels of the RTOs. These adjustments did not necessitate a reduction of the Mission Suitability score.

SGT had the lowest total proposed and probable cost for the RTOs. Cost realism adjustments were made to the skill mix, staffing levels, and a direct labor rate for the RTOs. These adjustments did not necessitate a reduction of the Mission Suitability score.

## PAST PERFORMANCE EVALUATION

The evaluation was conducted in accordance with FAR 15.305(a)(2) and NFS 1815.305(a)(2), "Past Performance Evaluation."

Each offeror's past performance, along with that of its significant subcontractors, was evaluated based on relevance and performance of past work including technical, business, and schedule performance. Considering these areas, one of the following adjectival ratings was assigned: Excellent, Very Good, Good, Fair, Poor, or Neutral.

Swales received an overall rating of Excellent under the Past Performance Factor. Swales' outstanding performance on the MSES contract is highly relevant to MSES II/A. Also, Swales demonstrated outstanding performance on the Systems Analysis and Mission Support Contract at Langley Research Center, and very high performance on most of their other contracts. Furthermore, the past performance of Swales' team members was found relevant and was particularly strong.

SGT received an overall rating of Excellent under the Past Performance Factor. SGT demonstrated outstanding performance under the Multi-Disciplinary Engineering and

Technology Services (METS) contract, which is highly relevant to MSES II/A. In addition, the performance of SGT's team members was found relevant and of very high quality overall.

DECISION

I reviewed the SEB's revised report and attended the presentation summarizing their extensive evaluation. I first determined that the findings presented by the SEB, as documented in the record, were reasonable and valid for purposes of making selection. I then analyzed more closely the SEB's findings concerning the proposals, relative to the three evaluation factors: Mission Suitability, Cost and Past Performance. I considered their relative ranking as stated in the RFP.

During the course of the presentation, I solicited and considered the views of senior NASA/Goddard personnel who heard the presentation and who have responsibilities related to this procurement, referred to as "senior officials." I considered the report and the presentation from the SEB along with the views of senior officials in making my decision.

I accepted the Mission Suitability findings of the SEB as reflected in the presentation and final report. I noted that the Swales Aerospace proposal and the SGT proposal received the same overall Mission Suitability rating of "Very Good," but differed slightly in point scores. I noted that Swales had a slightly higher Mission Suitability point score. However, I did not note substantial differentiation in the overall technical value between the technical approaches that were offered by Swales and SGT.

I examined the proposed and probable costs for the RTOs and agree with the SEB's evaluation of the offerors' probable cost. I noted that Swales has a significantly higher proposed and probable cost compared to SGT. I also noted that the cost evaluation factor is less important than the Mission Suitability Factor, but more important than the Past Performance Factor.

Swales and SGT were each rated excellent in Past Performance. Therefore, this was not a discriminator in the selection decision.

In conclusion, based on the foregoing and considering the contents in the report and presentation of the SEB, it is my judgment that the SGT proposal is the most advantageous to the Government. Although cost was not the most significant factor in this evaluation, it was the second most significant factor and it included the most significant differentiation between the two offerors. The significantly lower probable cost offered by SGT far outweighs the slight Mission Suitability advantage proposed by Swales. Accordingly, I selected SGT for award of the Mechanical Systems Engineering Services II/A contract.

Orlando Figueroa
Source Selection Authority

March 29, 2007
Date

# SELECTION STATEMENT FOR THE MECHANICAL SYSTEMS ENGINEERING SERVICES II/A (MSES II/A) PROCUREMENT IN SUPPORT OF NASA'S GODDARD SPACE FLIGHT CENTER

On November 28, 2006, I, along with other senior officials from NASA/Goddard Space Flight Center met with members of the Source Evaluation Board (SEB) to hear their findings based on the evaluation of proposals for the MSES II/A solicitation.

## PROCUREMENT DESCRIPTION AND HISTORY

This procurement is a follow-on to NASA's Contract No. NAS5-01090, a Cost Plus Award Fee, Indefinite Delivery Indefinite Quantity (IDIQ) Contract for Mechanical Systems Engineering Services (MSES) in support of NASA's Goddard Space Flight Center (GSFC). Under this effort, the Contractor shall provide engineering services for the formulation, design, development, fabrication, integration, testing, verification, and operations of space flight and ground system hardware and software, including development and validation of new technologies to enable future space and science missions.

This requirement was issued as Small Business set-aside competitive procurement for continued MSES services to be performed at the Greenbelt, Maryland location. The procurement was structured in accordance with the Federal Acquisition Regulation (FAR) Part 15. The Government intended to evaluate proposals and award contract(s) without discussions with offerors. However, the Government also reserved the right to conduct discussions if the Contracting Officer later determined them to be necessary.

This competitive procurement will result in a Cost-Plus-Award-Fee (CPAF), Indefinite Delivery Indefinite Quantity (IDIQ) Contract. The contract will have an effective ordering period of 5-years from the effective date, with a separate contract vehicle for a 30-day phase-in period.

A first Draft RFP was issued June 23, 2005 for industry comments. After numerous "one-on-one" industry discussions regarding competition, which resulted in an amendment to the acquisition strategy, a second Draft RFP was issued February 01, 2006. The Final RFP was released March 09, 2006. Subsequently, three amendments followed to make changes to the solicitation: (1) Amendment One (issued March 16, 2005) scheduled a Government conducted onsite (GSFC) visit to various labs; (2) Amendment Two (issued March 20, 2006) extended the proposal due date to April 17, 2006; and (3) Amendment Three was issued (March 30, 2006) to provide information related to recurring other direct costs (ODCs); and to revise Section J.1 in order to incorporate Attachment I "List of Installation Accountable Government Property."

Initial Proposals were due and received April 17, 2006; evaluations commenced on April 18, 2006 and were completed on June 30, 2006. A presentation to me, as the Source Selection Authority, occurred on August 22, 2006, where the SSA in consultation with NASA/GSFC senior officials decided that it was prudent to request a revised proposal from both offerors. Discussions took place on September 8 and 11, 2006. On September 13, 2006, Amendment Four was issued to: (1) modify the Mission Suitability volume page count to allow for changes to the proposal; (2) clarify the model contract completion instructions and; (3) establish the due date of September 29, 2006 for Final Proposal Revisions. On September 21, Amendment Five was issued to: (1) to provide pricing information; (2) identify "manufacturing" labor categories; and (3) extend the Final Revised Proposal due date to October 3, 2006.

Final evaluations commenced on October 4, 2006 and were completed on November 6, 2006. Two initial/final proposals were submitted by SGT, Inc and Swales Aerospace.

## EVALUATION PROCEDURE

To aid in the evaluation, I appointed an SEB consisting of Government technical and business personnel. The SEB consisted of voting members, non-voting members, and consultants. I appointed personnel to the SEB from appropriate disciplines to provide specific expertise in identifying strengths, weaknesses, and deficiencies. The voting SEB members considered the findings of all members and consultants and used the predetermined evaluation criteria to assess the strengths and weaknesses of each proposal.

The proposals were evaluated in accordance with FAR Part 15.3, Source Selection, and NASA FAR Supplement (NFS) 1815.3, Source Selection. The RFP described three evaluation factors. The evaluation factors were Mission Suitability, Cost and Past Performance. The RFP specified the relative order of importance of the evaluation factors as follows: "The Cost Factor is significantly less important than the combined importance of the Mission Suitability Factor and the Past Performance factor. As individual factors, the Cost Factor is less important than the Mission Suitability Factor but more important than the Past Performance Factor."

Of these evaluation factors, the RFP provided that only Mission Suitability would be point scored in the evaluation process. In this regard, the RFP defined Mission Suitability as consisting of the following subfactors and assigned points to each as indicated:

| Subfactor | Description | Points |
|---|---|---|
| A | Understanding Requirements Of Statement Of Work (SOW) | 300 |
| B | Technical Approach To Representative Task Orders (RTOs) | 300 |
| C | Management Plan | 350 |
| D | Safety and Health Plan | 50 |
| Total | | 1,000 |

The SEB adjectivally rated and point scored the proposals under each Mission Suitability Subfactor. However, the total Mission Suitability score was subject to downward adjustment based on the degree of cost realism between the proposed and probable RTO costs. The RFP provided for the evaluation, not numerical scoring, of the Cost and Past Performance factors. A cost realism analysis was also performed on the overall cost proposed for the four Representative Task Orders (RTOs). The proposed firm fixed phase-in price was evaluated for reasonableness. The SEB evaluated the Past Performance Factor for relevant current and/or completed contracts and subcontracts over $500K in value which the companies have had within the last three years. The Past Performance Factor included the SEB's evaluation of technical, schedule and cost performance. To assist in evaluating the Past Performance factor, the RFP provided the adjectival ratings of "Excellent," "Very Good," "Good," "Fair," "Poor," or "Neutral" depending upon the assessment of each proposal in this area.

## MISSION SUITABILITY EVALUATION

The SEB applied the established numerical weights and produced a final Mission Suitability score for each proposal. The significant substance of the SEB's evaluation of Mission Suitability for each proposal follows.

### Swales Aerospace

Overall, the Swales proposal received a rating of "Very Good," earning a slightly higher numerical score than SGT. The overall proposal received four (4) significant strengths, eleven (11) strengths, one (1) weakness and no significant weaknesses. No adjustment to the Mission Suitability score for cost realism was required. The Swales proposal received the following rating for each individual subfactor:

| | |
|---|---|
| Subfactor A — Understanding Requirements of SOW | Very Good |
| Subfactor B — Technical Approach to RTOs | Excellent |
| Subfactor C — Management Plan | Very Good |
| Subfactor D — Safety and Health Plan | Good |

In the area of Understanding Requirements of the SOW, the Swales proposal received one (1) significant strength, four (4) strengths, and no weaknesses. The Swales proposal received a significant strength for an excellent, comprehensive, thorough and wide-ranging understanding of structural analysis and loads engineering in Function 2B, including the areas of finite element analysis, coupled loads analysis, stress analysis, and fracture control. The Swales proposal received a strength for presenting a strong technical approach and demonstrating a very good understanding of Function 2A, Materials Engineering, in the areas of risk mitigation, specialized training for laboratory analysts, and preparation of mission assurance requirements; and in Function 2G3, Manufacturing Engineering – Composites, conveying a thorough understanding of the manufacturing challenges of composite materials. The Swales proposal also received a strength in understanding SOW requirements for Function 4D, Research and Technology Services/Advanced Coatings and Film Technology; Function 2E, Thermal Engineering/Thermal Design and Analysis; and Function 2F, Contamination and Coatings Engineering. The Swales proposal received a strength for demonstrating a comprehensive understanding of Function 3U, Configuration Management, by conforming to NASA guidelines and procedures as well as ISO standards, and by providing for an active self audit program; and of Function 3V, Hardware Refurbishment and Reuse. The Swales proposal received a strength for a very good understanding of SOW requirements for Function 2E, Thermal Engineering, in the areas of Thermal Vacuum Test Support, Thermal Device Design and Validation, and Test Plan/Report/Documentation.

Under Technical Approach to RTOs, the Swales proposal received two (2) significant strengths, three (3) strengths, one (1) weakness and no significant weaknesses. The Swales proposal received a significant strength for demonstrating an overall excellent technical approach and understanding in addressing the mechanical engineering design and analysis tasks in RTO 1. This approach stressed the interdependence of the three subtasks, presented a comprehensive list of interface control documents required, described coupled loads analysis in detail, provided mechanical systems requirements and the associated design impact, and provided for model accuracy in the STOP analysis. The Swales proposal received a significant strength for demonstrating an excellent understanding of the complex challenges presented by the RTO 2 task requirements. The proposal included a novel flexure design to meet requirements, identified a means for damping to meet jitter performance, recognized the importance of material selection, and recognized the complexity of cryogenic performance testing. The Swales proposal received a strength for presenting a thorough staffing plan for RTO 2 that was complete in all areas and provided the appropriate skill mix and labor hours to complete the task on schedule and within budget. The Swales proposal received a strength for insightfully providing details on tasks and process flows associated with performing contamination control on RTO 4. The proposal provided details into how the contamination control process fits into the spacecraft manufacturing process. The Swales proposal received a strength for demonstrating a very good technical approach to RTO 3 by recognizing the significant thermal design challenge, by identifying the risks and critical issues, and by proposing acceptable mitigation plans. The Swales proposal received one weakness for the staffing plan in RTO 1, which inadequately covered the skill mix requirements.

Under Management Plan, the Swales proposal received one (1) significant strength, three (3) strengths, no weakness and no significant weaknesses. The Swales proposal received one significant strength for an outstanding list of available critical facilities, equipment and software tools (critical non-personnel resources), including complete manufacturing and integration facilities, overlapping team member and government facilities (providing additional facility options for the government), and in-house developed software packages. The Swales proposal received a strength for effective processes in place in the areas of task order management and managing multiple tasks, including identifying all steps in the task order process, and a solid understanding of the Task Order Management System (TOMS). The Swales proposal received a strength for providing an effective plan in the areas of staffing, responding to critical requirements, award fee incentives, and maintaining and augmenting an on-going workforce. The Swales proposal received a strength for providing a strong rationale in support of the teaming relationship, which provided complete coverage of the SOW, nurtured successful business relationships, and for facilitating the development of small businesses.

Under Safety and Health Plan, the Swales proposal received one (1) strength and no weaknesses. The Swales proposal received one strength for a very good safety and health program in the areas of Hazard Communication, Lockout/Tagout, Electrical Training, Confined Space Entry, and Bloodborne Pathogen.

**SGT, Inc.**

Overall, the SGT proposal received a rating of "Very Good." The proposal earned four (4) significant strengths, eleven (11) strengths, three (3) weaknesses and no significant weaknesses. No adjustment to the Mission Suitability score for cost realism was required. The SGT proposal received the following rating for each individual subfactor:

| | |
|---|---|
| Subfactor A — Understanding Requirements of SOW | Good |
| Subfactor B — Technical Approach to RTOs | Very Good |
| Subfactor C — Management Plan | Excellent |
| Subfactor D — Safety and Health Plan | Good |

In the area of Understanding Requirements of SOW, the SGT proposal received six (6) strengths, and no weaknesses. The SGT proposal received a strength for a very good understanding of SOW requirements for Function 2E, Thermal Engineering, including the approach to performing thermal design and analysis using thermal software, thermal device design, cryogenic GSE, thermal vacuum test support, and risk identification and mitigation. The SGT proposal received a strength for a very good understanding of SOW requirements for Function 4A, Advanced Thermal Control Systems, including proposed techniques and technical approach to developing advanced thermal control systems. The

SGT proposal received a strength for a very good understanding of fracture control under SOW Function 2B6, Structural Analysis and Loads Engineering, including the use of a fracture-critical parts list for tracking those parts through fabrication, and an accurate description of the types of fracture control analyses required for STS payloads. The SGT proposal received a strength for a very good understanding of SOW Function 3K, Software Engineering in the areas of requirements, risk recognition, software testing, and using the customer's own standard information management tools. The SGT proposal also received a strength for a very good technical understanding of Function 2D, Electromechanical Systems, in the areas of sensors, micro electro mechanical systems (MEMS), systems design and analysis, electronics and electromagnetics, and bearing tribology. The SGT proposal received a strength for a complete and well-integrated approach to GN&C Component and Hardware-Specific Tasks in Function 3I, Guidance, Navigation and Control. The proposal effectively described the design, development, and verification of GN&C components and systems, and provided insight into test and simulation validation.

Under Technical Approach to RTOs, the SGT proposal received one (1) significant strength, no strengths, three (3) weaknesses and no significant weaknesses. The SGT proposal received one significant strength for an excellent technical approach to RTO 3, for recognizing the thermal design challenges and proposing technically insightful solutions. The proposal presented a staffing plan with skill mix and labor hours that were realistic and complete. The proposal showed an excellent understanding of the challenges inherent to cooling detectors to cryogenic temperatures, and identified the risks and critical issues, as well as a mitigation plan. The SGT proposal received a weakness for a lack of understanding of creating a finite element model (FEM) for STOP (structural, thermal, optical) analysis use in RTO 1 when given a FEM created for dynamics analysis use. Rigid elements and effects on coefficient of thermal expansion during analysis at cryogenic temperatures were not discussed. The SGT proposal received a weakness for a technically complex test apparatus to measure and validate scanning mechanism system performance at 30K. The proposal did not adequately discuss the technical challenges involved for this test, and therefore did not demonstrate a successful approach to the validation of system performance. The SGT proposal received a weakness for an inadequate staffing plan for RTO2, underestimating the skill mix requirements.

Under Management Plan, the SGT proposal received three (3) significant strengths, four (4) strengths, no weaknesses and no significant weaknesses. The SGT proposal received a significant strength for exceptional commitment to developing small businesses, as demonstrated by the signing of Letters of Intent with three engineering companies to execute formal Mentor/Protégé agreements in accordance with Small Business Administration (SBA) procedures and by providing the protégés access to its large business teammates for additional educational and business opportunities. The SGT proposal received a significant strength for a well planned, comprehensive and detailed phase-in plan that provided for a smooth transition by performing an analysis of various aspects of transition, identifying challenges and risks, and providing excellent detail on how they intend to successfully transition into these areas. The SGT proposal received a

significant strength for providing excellent state-of-the-art, critical facilities that are committed and available. SGT's teammates have extensive manufacturing and test facilities, laboratories, clean rooms, and other critical facilities. The team members' facilities have overlapping capabilities. The SGT proposal received a strength for a sound basis for teaming arrangements that augment their expertise and provides full coverage of the statement of work. SGT conducted a formal gap analysis to identify the specific areas in which its own capabilities required augmentation. The SGT proposal also received a strength for effective systems in place to process task orders and to manage multiple ongoing tasks. The SGT proposal received a strength for a very good, comprehensive, and detailed approach to organizing and managing its workforce in support of MSES II/A. SGT's organizational structure demonstrates a thorough understanding of the overall contract requirements. The SGT proposal received a strength for a comprehensive Mission Assurance Plan, which provided a very good discussion of various aspects of the Mission Assurance discipline.

Under Safety and Health Plan, the SGT proposal received one (1) strength and no weaknesses. The SGT proposal received one strength in the element of Worksite Analysis. During the phase-in period, SGT proposed a very good plan to conduct training and certification, and to perform a formal and comprehensive assessment of assigned workspaces.

## COST EVALUATION

The SEB evaluated the proposed cost for the total five-year effort and the 30-day phase-in period to determine reasonableness and cost realism. The cost evaluation for the MSES II/A procurement was conducted in accordance with FAR 15.305(a) (1) and NFS 1815.305(a)(1)(B) and (C) and Request for Proposal (RFP) Clause M.5 – Cost Evaluation Factor.

The RFP stated that a Government Pricing Model would be utilized to determine the overall proposed contract cost. The model comprised the Total Composite Contract (Prime/Sub) Loaded Rate for each Contract Direct Labor Category in Exhibits 1A (Bid Rates) and 1B (Ceiling Rates), which was applied against the established Government direct labor hour pricing model. In addition, proposed recurring Other Direct Costs (ODCs, Exhibit 10) were applied, if applicable. The cost evaluation was based on the Government Pricing Model for total proposed and probable cost. The Government used proposed ceilings in Clause B.3, Limitation of Indirect Costs, in determining the total contract probable cost.

The RFP stated that cost realism analysis would be performed on the overall cost proposed for the four Representative Task Orders (RTOs). The RFP included four RTOs to help the government understand how the offeror would carry out representative tasks associated with the SOW. They were purely hypothetical situations that were provided for technical and cost proposal purposes. The offeror was to describe its approach to

implement and staff each RTO. It was to include a staffing plan and other required resources, such as facilities and equipment, travel, and materials.

In accordance with the RFP, a cost realism analysis was performed on the overall cost proposed for the four RTOs, and the cumulative cost realism analysis results were subject to a Mission Suitability point score adjustment. The adjustment was to be made based on the percentage difference between proposed and probable cumulative RTO costs excluding fee. Proposed bid rates from Exhibit IA, Contract Direct Labor Loaded Rates and Percent of Effort – Bid Rates, were to be utilized in proposing for the RTOs. Each offeror presented reasonable cost approaches to the RTOs and no cost realism adjustments were made to this area.

Swales had the highest total contract proposed and probable cost. A cost realism analysis was performed on the overall proposed cost. No adjustments were made to the total contract proposed cost. A cost realism analysis was also performed on the overall cost proposed for the four Representative Task Orders (RTOs). Cost realism adjustments were made to the skill mix and staffing levels of the RTOs. These adjustments did not necessitate a reduction of the Mission Suitability score. All direct labor rates, indirect rates and ODCs submitted in the proposal were considered fair and reasonable.

SGT had the lowest total contract proposed and probable cost. A cost realism analysis was performed on the overall proposed cost. No adjustments were made to the total contract proposed cost. A cost realism analysis was also performed on the overall cost proposed for the four Representative Task Orders (RTOs). Cost realism adjustments were made to the skill mix and staffing levels of the RTOs. These adjustments did not necessitate a reduction of the Mission Suitability score. All direct labor rates, indirect rates and ODCs submitted in the proposal were considered fair and reasonable.

## PAST PERFORMANCE EVALUATION

The evaluation was conducted in accordance with FAR 15.305(a)(2) and NFS 1815.305(a)(2), "Past Performance Evaluation."

Each offeror's past performance, along with that of its significant subcontractors, was evaluated based on relevance and performance of past work including technical, business, and schedule performance. Considering these areas, one of the following adjectival ratings was assigned: Excellent, Very Good, Good, Fair, Poor, or Neutral.

Swales received an overall rating of Excellent under the Past Performance Factor. Swales' outstanding performance on the MSES contract is highly relevant to MSES II/A. Also, Swales demonstrated outstanding performance on the Systems Analysis and Mission Support Contract at Langley Research Center, and very high performance on most of their other contracts. Furthermore, the past performance of Swales' team members was found relevant and was particularly strong.

SGT received an overall rating of Excellent under the Past Performance Factor. SGT demonstrated outstanding performance under the Multi-Disciplinary Engineering and Technology Services (METS) contract, which is highly relevant to MSES II/A. In addition, the performance of SGT's team members was found relevant and of very high quality overall.

## DECISION

I reviewed the SEB's report and attended the presentation summarizing their extensive evaluation. I first determined that the findings presented by the SEB, as documented in the record, were reasonable and valid for purposes of making selection. I then analyzed more closely the SEB's findings concerning the proposals, relative to the three evaluation factors: Mission Suitability, Cost and Past Performance. I considered their relative ranking as stated in the RFP.

During the course of the presentation, I solicited and considered the views of senior NASA/Goddard personnel who heard the presentation and who have responsibilities related to this procurement, heretofore referred to as "senior officials." I considered the report and the presentation from the SEB along with the views of senior officials in making my decision.

I accepted the Mission Suitability findings of the SEB as reflected in the presentation and final report. I noted that the Swales Aerospace proposal and the SGT proposal received the same overall Mission Suitability rating of "Very Good," but differed in point scores. I noted that Swales had a slightly higher Mission Suitability point score. However, I did not note substantial differentiation in the overall technical value between the technical approaches that were offered by Swales and SGT.

I examined the proposed and probable costs and agree with the SEB's evaluation of the offeror's probable cost for the total five-year effort. I noted that Swales has a significantly higher proposed and probable cost compared to SGT. I also noted that the cost evaluation factor is less important than the Mission Suitability Factor, but more important than the Past Performance Factor.

Swales and SGT were each rated excellent in Past Performance. Therefore, this was not a discriminator in the selection decision.

In conclusion, based on the foregoing and considering the contents in the report and presentation of the SEB, I decided that the SGT proposal is the most advantageous to the Government. Although cost was not the most significant factor in this evaluation, it was the second most significant factor and it included the most significant differentiation between the two offerors. The significantly lower probable cost offered by SGT far outweighs the slight Mission Suitability advantage proposed by Swales. Accordingly, I selected SGT for award of the Mechanical Systems Engineering Services II/A contract.

Orlando Figueroa
Source Selection Authority

11/6/06
Date

## SEPARATION AGREEMENT

When I joined Swales Aerospace (the "Company"), I undertook a professional obligation to maintain in strict confidence any and all information or insights concerning the Company or its customers that were not, or did not come to be, in the public domain and that I acquired during my employment with the Company. This obligation included the confidential data of third parties received from the customer. Upon termination of my employment relationship with the Company, I hereby reaffirm that professional obligation.

*I acknowledge that my professional obligation with respect to the confidential information of the Company, its customers and related third parties remains in effect even though my employment with the Company ceases. I therefore reaffirm that I will not, without the Company's prior written consent, disclose any information concerning the structure, organization, operations or other business affairs of the Company or any information obtained from past or present customers that is not generally available to the public.*

*I certify to the best of my knowledge and belief that I have reviewed carefully all my documents and files and that I have returned to the Company all customer reports, memorandums, notes, proposal letters or other materials, including data on computer disks containing confidential information furnished by the Company or through any of its customers and that I therefore have no personal copies of any such materials.*

I have returned to Swales Aerospace's custody all tangible Company property issued to me on the premises or otherwise obtained by me. The term " tangible property" includes but is not limited to computers, equipment, supplies, or fixtures.

I understand that by signing this Agreement, I waive any and all rights to be reimbursed for expenses incurred prior to the date of my termination, except for those expenses for which an Expense Report has already been submitted.

Date: 10/28/2005

Employee Signature: [signature]
Print Name: Nicholas M. Galassi

Decision of the Procurement Officer Regarding the Procurement Integrity of the Mechanical Systems Engineering Services Procurement

By letter dated February 27, 2007, Swales requested a reconsideration of the NASA-GSFC Contracting Officer (C.O.) determination finding no violation of the procurement Integrity Act on the Mechanical Systems Engineering Services (MSES) II/A procurement. In its request Swales presented new evidence to support its assertions. Based upon this new information, I agreed to review the issue.

As way of background information, on or about December 13, 2006, Swales Aerospace sent a letter to the C.O. for the MSES II/A solicitation, Mrs. Kathleen Pierson. In this letter, Swales representatives assert that its competitor for this acquisition, SGT, has breached the Procurement Integrity Act by hiring one of its former employees to assist it in its drafting of its proposal for MSES II/A. See Exhibit 1. Swales followed up this initial letter with another letter dated December 16, 2006. See Exhibit 2. In this letter, Swales requested an investigation and notification that an investigation would be conducted. On February 8, 2007, the C.O. notified Swales that it was her opinion that the Procurement Integrity Act was not applicable. The C.O. reasoned that the Procurement Integrity Act applies to Government employees and contractor employees serving as advisors to NASA on Source Evaluation Boards (SEB). She concluded by saying that the alleged acts were not committed by a Government employee or a contractor employee advising the SEB on this procurement, so the Procurement Integrity Act was not applicable. See Exhibit 5. By letter dated February 22, 2007, Swales requested a reconsideration of this decision In support of this request, Swales furnished an affidavit from Mr. Thomas G. Swales, founder and Chairman of the Board of Swales & Associates, Inc., stating that Mr. Galassi, a former Swales employee, misappropriated Swales trade secrets when he became involved with SGT's competitive proposal for MSES II/A. See Exhibit 7. In response, the C.O. initiated an inquiry and asked both Swales and SGT for affidavits and supporting information to address the issue of a Procurement Integrity Act problem related to Mr. Galassi's involvement in the MSES II/A proposals. See Exhibits 9 & 10. Both companies responded. See Exhibits 11, 12, 13, 14.

Discussion

The Procurement Integrity Act is implemented into the Federal Acquisition Regulation (FAR) at Part 3.104. The statute and implementing regulation contain prohibitions and restrictions. Specifically, FAR Part 3.104-3 provides:

> (a)(1) A person described in paragraph (a)(2) of this subsection must not, other than as provided by law, knowingly disclose contractor bid or proposal information or source selection information before the award of a Federal agency procurement **contract to which the information relates.**

(a)(2) Paragraph (a)(1) of this subsection applies to any person who-(i) Is a present or former official of the United States, or a person who is acting or has acted for or on behalf of, or who is advising or has advised the United States with respect to, a Federal agency procurement; (ii) By virtue of that office, employment, or relationship, has or had access to contractor bid or proposal information or source selection information.

In addition, provisions of the United States Code prevent certain individuals from "knowingly disclosing contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates." **MTB Group, Inc. v United States,** 65 Fed. Cl. 516 (June 2005) citing 41 U.S.C. § 423 (a) (1). This prohibition applies to "a present or former official of the United States, or a person who is acting or has acted for or on behalf of, or who is advising or has advised the United States with respect to, a Federal agency procurement," and, because of that office, employment, or relationship, "has or had access to" the information protected in 41 U.S.C. § 423(a)(1). Id. §423 (a)(2).

In the instant case, Mr. Galassi is not a present or former official of the United States. Further, he did not provide advice to the United States on the MSES II/A procurement. Mr. Galassi is the sole owner of Aerostress which received a sole source award from GSFC in 2006 to perform structural engineering analysis on the Global Precipitation Mapper (GPM). See Exhibit 13 (Cover letter from Swales to C.O., dated March 14, 2007). However, this work did not involve MSES II/A. The GPM is a different and distinct contract from the planned MSES II/A contract.

In arguing that a Procurement Integrity Act violation has occurred, Swales relies on 41 U.S.C. 423(b) which prohibits an individual from "**knowingly obtaining contractor bid or proposal information** or source selection information before the award of a Federal agency procurement contract to which the information relates." Contractor bid and proposal information is defined as any of the following information submitted to a Federal agency as part of or in connection with a bid or proposal to enter into a Federal agency procurement contract, if that information has not been previously made available to the public or disclosed publicly: (1) Cost or pricing data; (2) indirect costs and direct labor rates; (3) Proprietary information about manufacturing processes, operations, or techniques marked by the contractor in accordance with applicable law or regulation; (4) information marked by the contractor as "contractor bid or proposal information" in accordance with applicable law or regulation. See FAR 3.104-1. I have reviewed each one of these areas and my review and findings are listed below.

In the area of cost and pricing data including indirect costs and labor rates, I find no evidence that SGT obtained Swales cost or pricing proposal information. Numerous SGT management employees provided affidavits denying that Mr. Galassi had any

involvement in SGT's cost proposal. See Exhibits 11 & 12. For example, Mr. Harold Stinger, co-owner SGT and Chief Executive Officer in his affidavit states, " I have made inquiries of management team into allegations made by Swales Aerospace regarding an alleged procurement integrity violation by Mr. Nicholas Galassi. Based on my inquiries I believe the following to be true: Mr. Galassi's role in SGT's MSES II/A proposal was limited to providing limited technical input within his narrow sphere of expertise. Mr. Galassi did not share with SGT personnel, consultants hired by SGT or SGT officials any Swales proprietary information including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information." Mr. Kamal Ghaffarian, co-owner of SGT and Executive Vice President, in his affidavit states "As Lead Executive I was heavily involved in setting the proposal strategy, including pricing strategy for SGT and I made all final decisions in this regard...To my knowledge, Mr. Nicholas M. Galassi did not participate in the development of SGT's MSES II/A cost strategy nor did he work on or assist in SGT's MSES II/A cost proposal or revised cost proposal." Mr. Matthew Yetman, Vice President and Chief Financial Officer for SGT, in his affidavit states, "To my knowledge, Mr. Nicholas M. Galassi did not participate in the development of SGT's MSES II/A cost strategy nor did he work on or assist in SGT's MSES II/A cost proposal or revised cost proposal." Mr. William Emmett Brooks III, President and sole proprietor of Aldebaran, the SGT contractor responsible for production of the SGT MSES II/A proposal, in his affidavit states, "At no time did Mr. Galassi participate or provide inputs to any aspects of the Cost Volume." Mr. Andrew Endal, Vice President for Business Development for SGT, in his affidavit states, "At no point did Mr. Galassi see, help develop, or review any aspects of SGT's cost strategy, Cost proposal (original or revised), or Past Performance Proposal (revised Past Performance Volume not required)." And finally, Mr. Nicholas Galassi, President of Aerostress, in his affidavit states, " I did not provide input or otherwise assist SGT in the preparation of any aspect of its cost or business proposal. Further, I have never seen any portion of SGT's cost or business proposal, nor has any portion of SGT's cost or business proposal been verbally disclosed to me." Mr. Galassi concludes his affidavit by stating, "The external drive that I returned to Swales included data that I had used and/or retained in connection with my performance of services for the Solar Dynamics Observatory (SDO) program, both as a Swales employee and as a Swales consultant. At no time did I use or disclose to SGT any such data." All of the SGT affidavits directly support the position that Mr. Galassi did not assist SGT in its Cost proposal.

I have also reviewed the Swales affidavits, two of which were provided. Mr. David Baran, Engineer for Swales & Associates, Inc., states "Mr. Galassi served as a subcontractor/consultant to Swales providing structural analysis support on MSES Task 572 for the SDO with primary focus on the Propulsion Module primary structure." At the end of the task, Mr. Galassi delivered the final stress analysis report and all finite models, analyses and other materials related to his performance on the task. Mr. Baran states, " I was surprised to find Swales MSES task planning spreadsheets, internal Project Status Review presentations, MSES Monthly Reports and MSES Performance Evaluation Board

write-ups among the technical data...The planning spreadsheet data contains business confidential data of Swales costs of performance including, its management fees (known as PMT) its information technology and financial data charges (which are categories of ODCs or other Direct Costs, Swales overhead and G&A loadings on direct labor rates, and its labor escalation rates, all matters of great competition sensitivity. It is evident from the data itself that it was accumulated while Mr. Galassi was working as a Swales employee on the SDO effort, as was I at the time." See Exhibit 13. Mr. Galassi left Swales employment in October 2005. See Exhibit 12 affidavit of Mr. Galassi. Mr. Thomas Swales does not mention Mr. Galassi's possession of cost data. I note that neither of these affidavits provides any type of concrete assertion or evidence that Mr. Galassi had accurate and current rate information or that he shared it with SGT or that SGT knowingly tried to acquire such information. Rather, the Swales affidavits merely state that he had access to old cost estimates and speculate that he may have provided this outdated information to SGT. Mere speculation without more is not sufficient to find a violation of the Procurement Integrity Act.

In the area of proprietary information, I find that there is no evidence of technical transfusion of the Swales proprietary information to SGT. The concept of technical transfusion refers to an improper disclosure by agency officials of information contained in one firm's proposal which resulted in the improvement of a competing proposal. See Matter of: Contact International Corporation, B-237122.3, B-237122.4, 70 Comp. Gen 115 (Dec 1990). Technical transfusion is inapplicable to this case because agency officials did not have the information contained in Swales proposal at the time of the alleged transfer. Further, a technical review of the SGT and Swales proposal did not reveal any use of Swales proprietary information in the SGT proposal. See Exhibit 15 (Report of Ryan Simmons regarding the allegations of technical transfusion) All information utilized in SGT's proposal is available in the public domain according to Mr. Ryan Simmons, NASA engineer. See Exhibit 15, Report of Ryan Simmons. In fact, it must be pointed out that SGT's proposal did not improve with Mr. Galassi's assistance. SGT received two technical weaknesses for RTOs 1 and 2 including one that Mr. Galassi's expertise should have helped avoid. This weakness is in regard to finite element modeling and analysis. Mr. Simmons concludes his analysis in this area by stating, " No proprietary information is involved, but the nature of the weakness is such that if Mr. Galassi had helped with this portion of the proposal, his expertise proved inadequate." Therefore, I find no evidence of technical transfusion of proprietary information from Swales to SGT.

In the area of information marked by the contractor as "contractor bid or proposal information" in accordance with applicable law or regulation, I find no evidence of disclosure. The spreadsheets presented with the Swales affidavits were not marked "contractor bid or proposal information." Further, Swales has provided no evidence of such a release to SGT.

Finally, I looked at Title 41 U.S.C. § 423 (h)(2) which provides, "This section does not: (2) restrict a contractor from disclosing its own bid or proposal information or the recipient from receiving that information." In the instant case, Swales admits it gave Mr. Galassi its technical proposal information when it permitted him to work on its response to the RTOs and by providing him with estimated rate information for the SDO contract, a separate and distinct contract from the MSES II/A procurement. The Court of Claims has held that the Procurement Integrity Act has removed from the disclosure prohibition restrictions on the contractor from disclosing its own bid or proposal information. At the same time, these provisions also allow the recipient of that information to receive it. MTB Group, Inc. v United States, 65 Fed. Cl. 516 (June 2005) citing 41 U.S.C. § 423 (h)(2); 48 C.F.R. § 3.104-4(e)(1). While, SGT states that it did not receive Swales' proposal information, the statute would have excluded this type of disclosure.

In addition to a strict review of the Procurement Integrity Act, I have also considered whether the alleged actions, if true, would have so tainted this procurement to warrant administrative action to be taken by NASA. A review of the facts reveals that at no time did Mr. Galassi ever advise NASA on the MSES II procurement. The record does indicate that Mr. Galassi had a consulting contract with SGT for the limited purpose of assisting it with the final reviews of the Understanding the Requirements and RTO portions of the SGT's MSES II/A proposal. Mr. Galassi provided comments that were used to revise these sections prior to the Red Team Review. He was then assigned to the Red Team of the RTOs on March 24-25, 2006. Mr. Galassi spent a total time of 34 hours in assisting SGT. See Exhibit 11 affidavit of Mr. Andrew S. Endal, Vice President for Business Development for SGT, Inc. However, his work was so limited and did not result in a strength for SGT in this area, that it is doubtful to me that Mr. Galassi utilized any Swales proprietary information. Further, I note that Mr. Galassi was only paid $3,400.00 for this work. This small payment amount and limited hours further leads me to believe that Mr. Galassi's involvement with the SGT proposal was limited and not of major importance. Finally, I note the record is devoid of any evidence to indicate that Mr. Galassi improperly used Swales cost and pricing information or proprietary information. Based upon these facts it is my determination that the integrity of this procurement is still intact.

## Conclusion

Based upon the above review, it is my determination that a Procurement Integrity Act violation has not occurred. Mr. Galassi was not and is not a Federal Government Official nor was he working as a contractor providing advice to the SEB on the MSES II/A procurement. Mr. Galassi may have had access to Swales technical information on the RTOs for MSES II/A. But there is no evidence to establish that SGT officials either asked for this information or received it. Mr. Galassi may have had access to Swales estimated rate information for the SDO contract dated before Oct 2005. However, there is no evidence to establish that SGT employees either asked for this information or knowingly

accepted this type of information. In fact, the evidence presented establishes that SGT did not ask for or receive any type of cost assistance or information from Mr. Galassi. Further, the Procurement Integrity Act statute does not restrict contractors from disclosing their bid or proposal information or recipients from receiving it. Thus, it is my determination that a Procurement Integrity Act violation has not occurred. I find that the overall integrity of this procurement is still intact.

Valorie A. Burr
Valorie A. Burr
Procurement Officer

3/29/07
Date