ORIGINAL

FILED
APR 24 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

No. 07-253 C

SWALES & ASSOCIATES, INC.

Plaintiff,

v.

UNITED STATES,

Defendant.

# SWALES' MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION AND REQUEST FOR A TEMPORARY RESTRAINING ORDER

MARCIA G. MADSEN
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006
(202) 263-3000
(202) 263-3300 Facsimile

Of Counsel:
DAVID F. DOWD
LUKE LEVASSEUR
MAYER, BROWN, ROWE & MAW LLP
*Counsel for Plaintiff, Swales & Associates, Inc.*
April 24, 2007

## TABLE OF CONTENTS

Page

INTRODUCTION .......... 1

STATEMENT OF FACTS .......... 5

A. Necessary Background Of The MSES II/A Competition .......... 5

B. NASA's Initial Decision And Swales' Initial Protest .......... 6

C. Swales' Discovery And Complaint Regarding SGT's Misconduct In Teaming With A Former Swales Employee And Improperly Benefiting From His Knowledge Of Swales' Proposal .......... 7

1. Swales' Initial Discovery Of SGT's Procurement Integrity Violation .......... 7

2. Mr. Galassi's (And Aerostress') History With Swales And Knowledge Of Swales' MSES II/A Proposal .......... 8

3. SGT's Relationship With Aerostress (And Mr. Galassi) .......... 11

4. Swales' Request That NASA Investigate And Consider SGT's Procurement Integrity Violation .......... 13

D. NASA's Corrective Action And Decisions Regarding SGT's Procurement Integrity Violation And Award Of The Contract .......... 15

APPLICABLE LEGAL STANDARD .......... 17

ARGUMENT .......... 17

I. SWALES WILL SUFFER IRREPARABLE HARM IF A IMMEDIATE INJUNCTIVE RELIEF IS NOT GRANTED .......... 18

II. SWALES IS LIKELY TO SUCCEED ON THE MERITS OF ITS CHALLENGES TO NASA'S AWARD DECISION .......... 21

A. NASA Erroneously Determined That SGT Was Eligible For Award Even Though SGT Violated Procurement Integrity Rules By Misappropriating Swales' Proprietary Information .......... 21

1. NASA Failed To Reasonably Analyze Whether SGT Illegally Obtained Swales' Proprietary Information .......... 21

2. NASA Unreasonably Demanded Direct Proof Of Copying In A Situation Where None Could Reasonably Be Expected .......... 23

3. SGT's Teaming Arrangement With Aerostress (And Mr. Galassi) Constitutes Unfair Competition That Required SGT's Disqualification From The MSES II/A Competition .......... 25

B. NASA Erroneously Accepted SGT's Technically Unacceptable Proposal, Which Failed To Comply With The RFP's Limitation On Subcontracting ..... 30

III. THE HARM SWALES WILL SUFFER, IF THE NASA TRANSITION AND AWARD IS NOT ENJOINED, OUTWEIGHS THE HARM TO NASA AND THIRD PARTIES ..... 32

IV. GRANTING A PRELIMINARY INJUNCTION IN THIS PROTEST SERVES THE PUBLIC INTEREST ..... 34

CONCLUSION ..... 35

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Childers Services Center*, B-246210.3, 92-1 CPD 524, 1992 WL 14890 ....................................25

*Chrysler Motors Corp. v. Auto Body Panels, Inc.*, 908 F.2d 951 (Fed. Cir. 1990) ....................................17

*Computer Technology Associates, Inc.*, B- 288622, Nov. 7, 2001, 2001 CPD ¶ 187, 2001 WL 1513195 ....................................25

*FMC Corp. v. United States*, 3 F.3d 424 (Fed. Cir. 1993) ....................................17

*Guardian Technologies International*, B-270213.2, 96-1 CPD ¶ 104 ....................................25

*Intelus Corp. v. Barton*, 7 F. Supp. 2d 635 (D. Md. 1998) ....................................19

*KIC Development, LLC*, B-297425.2, Jan. 26, 2006, 2006 CPD ¶ 27 ....................................31

*KIRA, Inc.*, B-287573.4, Aug. 29, 2001, 2001 CPD ¶153 at 3 ....................................32

*KPMG Peat Marwick*, B-251902, Nov. 8, 1993, 93-2 CPD ¶ 272 ....................................25

*Litton Systems*, B-234060, May 12, 1989, 89-1 CPD ¶ 450, 1989 WL 237484 ....................................26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ....................................27

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir. 1994) ....................................18

*NFK Engineering v. U.S.*, 805 F.2d 372 (Fed. Cir. 1986) ....................................25

*SAI Indus. Corp. v. United States*, 60 Fed. Cl. 731 (2004) ....................................33

*Universal Automation Labs, Inc. v. Dept. of Transportation*, 1993 WL 444355 GSBCA No. 12370-P-R ....................................27

*University Research Co., LLC v. United States*, 65 Fed. Cl. 500 (2005) .................................... *passim*

*Zenith Radio Corp. v. United States*, 710 F.2d 806 (Fed. Cir. 1983) ....................................17

**Statutes:**

41 U.S.C. § 423 ........................................................................................................2
41 U.S.C. § 423(b)....................................................................................................21
48 C.F.R. § 52-219-14 ..............................................................................................29

## INDEX TO THE APPENDIX

**Exhibit No.**


| Exhibit No. | Description |
|---|---|
| 1 | Swales' December 13, 2006 letter to NASA Regarding Procurement Integrity Violation |
| 2 | Declaration of Roger Kraus |
| 3 | Declaration of Paul Baird |
| 4 | Declaration of Cengiz Koont |
| 5 | Declaration of Stephen Chaykovsky |
| 6 | Email of April 19 from Dan Harpold of NASA to Several Swales' Employees |
| 7 | Declaration of Mark McQuaid |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| SWALES & ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## SWALES MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to RCFC 65, plaintiff Swales & Associates, Inc., which does business as Swales Aerospace ("Swales"), submits this memorandum in support of its motion for a preliminary injunction and its request for a temporary restraining order. As we demonstrate below, each of the requirements for the requested injunctive relief is satisfied in this case. Accordingly, Swales respectfully asks that the Court enjoin the National Aeronautics and Space Administration, Goddard Space Flight Center ("NASA" or "the Agency") from commencing or continuing performance of any contract awarded under Request for Proposals No. NNG05096383R ("RFP") to Stinger Ghaffarian Technologies, Inc. ("SGT").

## INTRODUCTION

This protest relates to NASA's procurement competition for the Mechanical Systems Engineering Services II ("MSES II/A") contract for complex engineering and related services supporting NASA's space flight programs, as well as some ground operations. In its Complaint, which is being filed contemporaneously with this brief

and the accompanying requests for injunctive relief, Swales alleges three sets of procurement law violations during the course of the competition, each of which requires that NASA's award to SGT be set aside. Here, to reduce the strain on judicial resources imposed by emergency requests for injunctive relief (and without waiving any of its additional grounds of this protest), Swales focuses on two NASA errors that Swales is substantially likely to demonstrate and that justify the relief sought.

*First*, during the competition, the prevailing offeror, SGT, misappropriated Swales' proprietary technical approach (as well as pricing data) and thus improperly improved its (SGT's) chance of prevailing in the MSES II/A competition. SGT's procurement integrity violation occurred when SGT entered into a teaming arrangement with a small business, Aerostress, Inc. ("Aerostress"), which is operated by a former Swales employee, Nicholas M. Galassi. Mr. Galassi had been a key member of Swales' team of engineers and scientists who developed (among other things) Swales' responses to the Representative Task Orders ("RTOs"), which played a vital role in NASA's evaluation and source selection decision and, consequently, were highly protected, competition-sensitive material. Mr. Galassi possessed the collective knowledge of Swales' RTO team. These RTO responses were bid or proposal information covered by the Procurement Integrity Act, 41 U.S.C. § 423.

In exchange for the teaming arrangement under which Aerostress (and Mr. Galassi) will receive a substantial opportunity to grow its business in the future through work on the MSES II/A contract, as well as direct payments to Aerostress for time spent providing consultation services, SGT obtained Mr. Galassi's assistance with writing

and improving its RTO responses, which were submitted as part of SGT's MSES II/A proposal. Mr. Galassi's intimate knowledge of Swales's proposal gave SGT an unfair competitive advantage, because "[Mr. Galassi] would have had the capacity to steer and enhance the competitors' efforts vis Swales, ***even without . . . verbatim or other direct injections of Swales' data.***" Ex. 1 at 1 (Swales' Dec. 13, 2006 letter) (emphasis added).

NASA's personnel surely knew about SGT's misappropriation of Swales' proprietary information during the competition. That is because Mr. Galassi, who NASA officials almost certainly knew was a key member of Swales' RTO response team when he worked for plaintiff, then assisted SGT with presentations on its behalf after he had switched sides (but before Swales learned of his relationship with SGT). And yet NASA turned a blind eye to a substantial procurement integrity violation.

When Swales' personnel learned about the improper Aerostress/Galassi relationship with SGT, Swales raised the issue with NASA, requesting a full investigation and appropriate corrective action regarding the procurement integrity violation and the unfair competitive advantage obtained by SGT thereby. NASA considered the matter but declined to take any action, applying an flawed methodology that is both contrary to provisions of the Procurement Integrity Act, and is arbitrary and capricious.

Since the contract award, NASA has improperly assisted SGT with its attempted raid of Swales' employees. Its decisions to ignore SGT's illegal conduct and to potentially benefit from that misconduct, as well as the Agency's efforts to assist SGT with appropriation of Swales' workforce, are extremely inappropriate.

*Second*, NASA's Source Selection Decision Document ("SSDD") reveals that the Agency dramatically misevaluated SGT's technical proposal with respect to the "limitations on subcontracting" for this small business set-aside procurement that were required by the RFP and the FAR. Although the RFP required that at least 50% of the cost of performance be expended for employees of the offering concern, SGT's proposal (as explained in the SSDD) placed heavy reliance on large subcontractors to perform critical tasks that, when considered in light of the procurement as a whole, exceeded the regulatory limitation. This violation should have rendered SGT ineligible for award, or at a minimum resulted in a Weakness or Significant Weakness with a recognition of risk. NASA's rating of this part of SGT's proposal as a Significant Strength ignores substantial problems with SGT's proposal and cannot support the award.

Swales now faces the immediate and pressing risk of losing its highly skilled, highly trained, and highly specialized employees who have performed on the incumbent NASA contract. In addition, the MSES contract has represented, and the MSES II/A contract is projected to represent, a substantial percentage of Swales' annual revenues. Accordingly, as a result of SGT's misappropriation of Swales' trade secrets, and the Agency's misevaluation of numerous other issues, Swales stands to lose its ability to perform on the incumbent NASA contract, the advantages it fairly should have enjoyed in a competition for the MSES II/A contract. NASA's actions thus threaten irreparable harm to Swales, and because the remaining requirements for injunctive relief are satisfied, the Court should grant this motion and enjoin NASA's actions with respect to the award of the MSES II/A contract to SGT.

## STATEMENT OF FACTS

The facts relevant to this bid protest, including the issues addressed in this motion, are set forth in the accompanying Complaint, the exhibits attached to that pleading, and several supporting declarations. As noted above, this motion is based on two of the grounds of that protest, *i.e.*, NASA's failure to respond appropriately to, or to properly analyze, the effect of, SGT's violation of procurement integrity requirements, and NASA's arbitrary and capricious evaluation of SGT's failure to comply with FAR's 50% Limitation on Subcontracting requirement. For the Court's convenience, only the facts relevant to the issues addressed as part of our demonstration that Swales[7] is entitled to immediate injunctive relief (in addition to necessary background facts) are described below.

### A. Necessary Background Of The MSES II/A Competition

The MSES II/A procurement will require the contractor to provide services such as the formulation, design, development, fabrication, integration, testing, verification, and operations of space flight and ground system hardware and software, including development and validation of new technologies to enable future space and science missions. Complaint, Ex. 1 (RFP) at cover. On March 9, 2006, NASA issued the MSES II/A RFP, which calls for the award of a Cost-Plus-Award-Fee, Indefinite-Delivery, Indefinite-Quantity ("IDIQ") Task Order contract with a maximum value of $400 million during a five-year ordering period. Complaint, Ex. 1 (RFP) at 7, 9, 89. The procurement is set-aside for small business concerns, with a size standard of 1,000 employees. *Id.* at 78.

According to the RFP, NASA expects to issue Task Orders under the contract that will require the awardee to perform services in all aspects of mission and instrument development and implementation. In evaluating the prospective offerors' technical proposals, the RFP made clear that NASA intended to focus on Representative Task Orders ("RTOs"), in which competitors composed operating plans and budgets for the solution of abstruse engineering problems based on NASA's specially drawn specifications (with the understanding that the offerors' RTO responses would be compared head-to-head). Those RTO responses were always important to the Agency's evaluation, but (as explained below and in the Complaint), following a corrective action that NASA took in response to an earlier protest before the Government Accountability Office ("GAO"), the RTOs became critical to numerous aspects of NASA's evaluation.

The offerors' proposals were due on April 17, 2006. After submission, NASA conducted written and oral discussions in August and September 2006. Then, NASA amended the RFP and requested final revised proposals, and Swales timely submitted its final proposal revision on October 3, 2006.

**B. NASA's Initial Decision And Swales' Initial Protest**

On December 1, 2006, NASA informed Swales that the Agency intended to award the MSES II/A contract to SGT. In its award letter, NASA stated that the major discriminator in the selection decision was SGT's significantly lower proposed and probable costs. Complaint, Ex. 3 (Initial SSDD) at 10. On December 8, 2006, NASA provided an oral debriefing to Swales.

Swales filed a timely protest at the GAO. Swales protested the award on the grounds that: (1) NASA should have rejected SGT's proposal as technically unacceptable for failing to comply with the RFP's Limitations on Subcontracting clause; (2) NASA misevaluated SGT's proposal under the Mission Suitability, Past Performance, and Cost/Price factors; (3) NASA misevaluated Swales' proposal under the Cost/Price factor; and (4) NASA's source selection decision was unreasonable and inconsistent with the RFP. Pursuant to the automatic stay provisions applicable in GAO protests, NASA suspended SGT's performance of the contract on December 13, 2006. Swales also filed two supplemental protests in the GAO, challenging (among other things) NASA's analysis of SGT's costs.

Before the GAO reached a decision in Swales' protests, by letter dated January 19, 2007, NASA announced that it was taking corrective action due to serious questions about the justification for the award. Specifically, NASA indicated that it would reopen the competition, and stated that all elements of the proposals may be subject to reevaluation, further discussions, and re-competition. As a result of NASA's plan to take corrective action, GAO dismissed Swales' protest.

### C. Swales' Discovery And Complaint Regarding SGT's Misconduct In Teaming With A Former Swales Employee And Improperly Benefiting From His Knowledge Of Swales' Proposal

#### 1. Swales' Initial Discovery Of SGT's Procurement Integrity Violation

After NASA initially awarded the MSES II/A contract, SGT held an Open House for prospective employees to work on the contract. At that December 6, 2006 meeting,

SGT presented information to attendees which revealed the identity of the companies with which it had teamed in making its proposal to NASA. One of those companies was Aerostress, which (as noted above) is a small business operated by Mr. Galassi, a former Swales employee. Ex. 2 (Kraus Decl. ¶ 13). During the Open House, Mr. Galassi actively participated as a key member of the SGT team. SGT also posted "viewgraph slides" announcing that Aerostress was part of SGT's affiliated team to perform the MSES II/A contract. Ex. 3 (Baird Decl. ¶ 3); Ex. 4 (Koont Decl. ¶ 3).

### 2. Mr. Galassi's (And Aerostress') History With Swales And Knowledge Of Swales' MSES II/A Proposal

Mr. Galassi had been a Swales' employee of Swales from 1993 through October 28, 2005. His career progressed from engineer to senior structural engineer, to Manager of the Mechanical Analysis Group, which was his position at the time of his departure from the Company. Throughout his employment, Mr. Galassi had access to Swales' most sensitive trade secrets and proprietary information. Moreover, during the course of twelve years, Mr. Galassi obtained knowledge regarding the manner in which Swales staffed, organized, and solved some of the most vexing engineering issues related to spacecraft mechanical systems.

Mr. Galassi's involvement with Swales' proposal for the MSES II/A contract began in June 2005. Mr. Galassi was assigned to formulate RTO solutions as part of a team of engineers and scientists who would demonstrate that they understood and could perform the work required to complete the RTOs.

Swales' RTO responses were the collective work of Mr. Galassi and other senior Swales personnel. Through his significant work on Swales' RTO teams, Mr. Galassi gained intimate knowledge of not only how such responses would be most efficiently formulated, but the specific solutions that Swales proposed. Mr. Galassi's work as a senior engineer in mechanical stress analysis had resulted in his working at NASA on site in a leadership capacity on various programs. His role as a leading subject matter expert for Swales was undoubtedly known to many people working for the Agency.

Ultimately, the Swales RTO solutions on which Mr. Galassi worked were included in Swales' final proposal that was submitted to NASA in September 2006.[1] Ex. 2 (Kraus Decl., ¶¶ 6-8). The solutions thus were bid or proposal information.

In October 2005, Mr. Galassi notified Swales that he wanted to end his direct employment relationship with Swales and become a part-time consultant for the Company. He explained that he wanted to complete his assignments at Swales and pursue other interests. Ex. 2 (Kraus Decl., ¶ 11). At that time, Mr. Galassi's work on the MSES II/A proposal had been substantially completed, and Swales found Mr. Galassi's post-employment plan to be acceptable, provided that he sign a Separation Agreement.

[1] Although Swales' proposal was submitted after Mr. Galassi's October 2005 departure from the Company, which is described below, he worked on the RTOs before he ended his employment. Prior to issuing the final RFP (in March 2006), NASA had provided draft RFPs to industry seeking comments. When it issued the draft RFPs, NASA notified offerors that the RTOs would not be materially changed in the final RFP; accordingly, offerors were able to begin their responses before the final RFP was issued. No such changes occurred. Ex. 2 (Kraus Decl., ¶ 8). Swales' RTO responses were formulated while Mr. Galassi was working on the responses as a Swales employee.

When he resigned from Swales on October 28, 2005, Mr. Galassi agreed to a Separation Agreement in which he acknowledged, among other things, his continuing obligation to protect Swales' trade secrets and competition-sensitive proprietary information. Specifically, that agreement both recognized Mr. Galassi's previous "professional obligation to maintain in strict confidence any and all information or insights concerning the Company or its customers that were not, or did not come to be, in the public domain and that [he] acquired during [his] employment with the Company," and "reaffirm[ed his comment to] not, without the Company's prior written consent, disclose any information concerning the structure, organization, operations or other business affairs of the Company or any information obtained from past or present customers that is not generally available to the public." Complaint, Ex. 4 (Separation Agreement).

Shortly before he left Swales in October 2005, Mr. Galassi began his own consulting business, which is called Aerostress, Inc. ("Aerostress"). Swales required that Aerostress execute a corporate Non-Disclosure Agreement so that the new company would, as Mr. Galassi had, affirm its obligation to protect Swales' trade secrets and other proprietary and competition-sensitive information. Aerostress executed the agreement.

After Mr. Galassi left Swales, Swales worked with Aerostress as that company began to build its consulting business. Swales subcontracted work to Aerostress (and thus to Mr. Galassi) with respect to the Solar Dynamic Observatory portion of the MSES

contract. Mr. Galassi continued to work as a contractor (and team-member) with Swales until shortly after NASA's initial (December 2006) MSES II/A award decision.

**3. SGT's Relationship With Aerostress (And Mr. Galassi)**

While continuing to work as a consultant for Swales, and without informing Swales of its activities (in this respect), Aerostress, acting through Mr. Galassi, began discussions with SGT in April 2006. The upshot of those talks was that SGT would obtain the assistance of Aerostress (Mr. Galassi) with respect to the development of its competing proposal for NASA's MSES II/A contract *i.e.*, the same $400 million procurement for which Mr. Galassi had been a key member of the Swales' proposal team. By enticing one of Swales' key personnel to its team during the competition to work on the identical portion of the proposal that he had prepared for Swales, SGT obtained invaluable assistance of an individual who was intimately familiar with virtually every aspect of its competitor's RTO responses, and, in exchange SGT assisted Aerostress in developing its start-up business.

During the MSES II/A competition, SGT publicized the fact that that it was assembling a bid team and would submit a proposal for the contract. SGT did not disclose to the public (nor was Swales otherwise aware) that SGT planned to associate with Aerostress and Mr. Galassi. Swales later learned that not only was Aerostress assisting SGT with its proposal generally, Aerostress (and Mr. Galassi) assisted SGT in developing its critical responses to NASA's RTOs.

Unlike Swales, however, NASA received ample signals, both during the competition and when it performed its initial evaluation, that SGT was using Mr.

Galassi's knowledge of Swales' proposal for SGT's benefit. Although Mr. Galassi had worked at NASA's facilities for years as a Swales employee—and was continuing to work as a subcontractor for Swales during the competition—Mr. Galassi participated as part of the SGT team that explained its competing proposal to NASA. Ex. 5 (Chaykovsky Decl. ¶3). Thus, NASA knew that Mr. Galassi, a former Swales' employee who had been in a position to do substantial competitive harm to Swales, was working with SGT on its competing proposal. During the contest, however, the Agency did nothing to alert Swales to the potential breach of procurement integrity.

As noted above, Aerostress' (and Mr. Galassi's) involvement with SGT was revealed to Swales during SGT's December 6 Open House. Ex. 3 (Baird Decl. ¶ 3); *id.*, Ex. 4 (Koont Decl. ¶ 3). At that meeting, several Swales' employees discussed the MSES II/A contract award with their former colleague (and current consultant), Mr. Galassi. During those discussions, Mr. Galassi openly described his role supporting SGT's proposal to several current Swales' employees. Ex. 5 (Chaykovsky Decl. ¶ 3); *id.*, Ex. 2 (Kraus Decl. ¶ 15). Mr. Galassi told former co-workers that he had joined the SGT proposal team in the mechanical area and had been involved in the preparation of SGT's final proposal, including participation in an oral presentation to NASA. Ex. 5 (Chaykovsky Decl., ¶ 3). For instance, Mr. Galassi informed the Swales employees that he participated on behalf of SGT in discussions with the MSES II/A Source Selection Evaluation Board ("SEB") in September 2006. *Id.* Mr. Galassi also told his former Swales colleagues that in exchange for participating with SGT in its proposal, Aerostress (and he) expected to perform a substantial volume of work as a SGT

subcontractor for MSES II/A. *Id.* He stated that, ideally, Aerostress would use the members of the Swales team he had led before he began working with SGT. *Id.*

### 4. Swales' Request That NASA Investigate And Consider SGT's Procurement Integrity Violation

Following the revelation that Aerostress (Mr. Galassi) had assisted SGT with preparation of its competing proposal, on December 13, 2006, Swales submitted a "Notice under FAR 1.602-2(b) and 33.102(f)," requesting an "Investigation of Procurement Integrity Matter under [the] MSES IIA" RFP. Ex. 1 at 1. After describing Mr. Galassi's background, Swales made clear to NASA what the Agency must already have known, *i.e.*, that Mr. Galassi had "played an instrumental role in the composition of Swales' MSES IIA initial proposal" and had been a "drafter and reviewer on sample tasking (RTOs)" and other significant parts of Swales' proposal. *Id.* Swales described Mr. Galassi's departure from its employment and the beginning of Aerostress' business activities, then explained what it had learned during SGT's December 6 Open House. Specifically, Swales' December 13 letter described Mr. Galassi's representation that he had "not only provide[d] substantive correction and additions to the competitive proposal," but that he had also been able "to identify errors and develop favorable matters of cost and technical performance by which one competitor could create favorable contrasts with the other." *Id.* Swales also explained the types of competitive harm that could result from such improper activity: "[Mr. Galassi] would have had the capacity to steer and enhance the competitors' efforts vis Swales, ***even without . . . verbatim or other direct injections of Swales' data.***" *Id.* (emphasis added).

As noted above, the key problem with respect to SGT's acquisition of Aerostress' information regarding Swales' RTO responses (and its proposal overall) would likely not be outright copying or other, similarly crude, practices. Instead, Swales explained that by acquiring Aerostress' assistance, SGT was able to structure its proposal and its strategic approach to the procurement by essentially purchasing the services of someone who had already developed the competitor's proposed solution for the same competition. Swales complained that by using Aerostress in this manner, SGT had violated procurement integrity requirements in connection with the MSES II/A competition. Accordingly, Swales requested a complete investigation of these improprieties, as well as appropriate responsive action by NASA.

Swales made a series of written follow-up efforts to prompt NASA to look into the Galassi/Aerostress matter after the initial request of December 13, 2006. By written email responses, NASA assured Swales that it would respond to the matter. On February 8, 2007, the day after Swales notified NASA that it had initiated legal action against Galassi in the Prince George's Circuit Court, the Contracting Officer informed Swales that the matter which Swales raised in its December 13, 2006 request was *not* within the agency's responsibility to investigate, since its duty to investigate was limited to the improper acts of government officials under Section 423(a). The Contracting Officer said that because Mr. Galassi was not a government employee, it was NASA's view that Mr. Galassi's and SGT's conduct should not be investigated. After Swales objected to this position, NASA counsel notified Swales that the initial

position of the contracting officer would be reconsidered and advised that Section 423(a) was not necessarily the sole relevant legal standard for consideration.

### D. NASA's Corrective Action And Decisions Regarding SGT's Procurement Integrity Violation And Award Of The Contract

Although NASA's announcement regarding its corrective action indicated that multiple parts of the proposals would be reevaluated, the Agency ultimately focused on problems with its initial evaluation of the cost proposals.[2] In mid-March 2007, NASA held face-to-face meetings with both offerors concerning discrepancies related to its previous cost evaluation, and on March 20, 2007, NASA issued Amendment No. 6 to the RFP, attempting to resolve that problem. Ultimately, as described below, NASA's scoring (and evaluation) of the remaining issues, Mission Suitability and Past Performance, remained unchanged. Complaint, Ex. 2 (SSDD) at 2.

To undertake the promised "corrective" action regarding the initial award, NASA determined it would jettison the original Government Pricing Model that was initially to be used to evaluate proposed costs. Instead, NASA decided to evaluate comparative costs solely by reference to the offerors' RTO. Thus, NASA gave additional—and vastly increased—weight to the same areas of the proposal in which Mr. Galassi and Aerostress had, contrary to Swales' interests, worked on both sides of the competitive fence.

---

[2] NASA's reevaluation of the cost issues is also flawed for reasons we will demonstrate in our protest, but in the interest of efficient use of judicial resources (as described above), we do not focus on that issue in this motion.

During March 2007, NASA asked Swales for some documentation regarding its request for an investigation into SGT's relationship with Aerostress (and Mr. Galassi). But no face-to-face meetings were held with respect to Swales' request for an investigation into the unfair competition inherent in Aerostress' involvement with SGT. On March 29, 2007, NASA issued its "Decision of the Procurement Office Regarding the Procurement Integrity of the [MSES] Procurement." In that decision, the NASA Procurement Officer determined that Aerostress' (and Mr. Galassi's) contributions to SGT's proposal were not inconsistent with procurement integrity requirements applicable to federal procurement competitions. NASA, therefore, declined to preclude SGT from the competition, despite SGT's undisputed use of Mr. Galassi's services on the same part of the proposal response for which he had been a key team member for Swales.

On March 30, 2007, the day after NASA issued its decision with respect to the procurement integrity investigation, NASA informed Swales of its decision to again select SGT for award of the MSES II/A contract. In short, the Source Selection Authority (SSA) determined that although Swales had a higher Mission Suitability point score, the award would be made in favor of SGT because Swales' "probable cost" was "significantly higher." Complaint, Ex. 2 (SSDD) at 9.

Since NASA's award decision was issued, SGT has attempted to raid Swales' employees, hoping to provide services to NASA with the same incumbent employees, but have them begin working as SGT employees (instead of Swales). During the last several days, NASA has taken steps to facilitate the movement of some of the Swales'

employees to SGT. Ex. 2 (Kraus Decl. ¶ 19). For instance, on April 19, a NASA official sent an email to several Swales' employees, asking for task descriptions of the work they are "uniquely qualified" to perform, assuring them that he will attempt to facilitate SGT employment for those individuals. *Id.*

## APPLICABLE LEGAL STANDARD

In determining whether preliminary injunctive relief in a bid protest action should be granted, this Court considers four requirements. First, plaintiff must show that it will suffer irreparable injury if the procurement decision is not enjoined. Second, plaintiff must possess a "reasonable likelihood of success on the merits" of its claim. Third, the harm suffered by plaintiff, if the procurement is not enjoined, must outweigh the harm to the government and to third parties. And fourth, granting injunctive relief must serve the public interest. *University Research Co., LLC v. United States*, 65 Fed. Cl. 500, 504 (2005); *see Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983). None of the four factors, standing alone, is dispositive. And any perceived "weakness of the showing regarding one factor may be overborne by the strength of the others." *Chrysler Motors Corp. v. Auto Body Panels, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990); *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

## ARGUMENT

Preliminary injunctive relief is required by NASA's arbitrary award decision and the devastating effect on Swales' business that will occur should SGT begin performance of the improperly awarded contract. As the facts set forth above reveal, and as shown below, NASA improperly selected SGT for award after that offeror

committed a substantial procurement integrity violation of which NASA had almost certainly been aware. In addition, the Agency's SSDD plainly reveals that NASA misapplied its selection criteria by choosing an offeror that cannot satisfy the small business requirement that more than 50% of the services performed on a contract be performed by direct employees of the offeror. Thus, on the merits of just these two issues (and putting aside the other bases of plaintiff's Complaint), Swales has a high likelihood of success on the merits.

Swales requires immediate, injunctive relief because, as demonstrated below, if SGT commences or continues performance of the contract awarded by NASA under the RFP, there is a substantial likelihood that Swales' employees performing on the incumbent contract will begin to depart. Thus, SGT will not only have improperly acquired Swales' proprietary approach to the NASA proposal, but will have used the ill-gotten proposal to raid Swales' employee base and deprive Swales of the talent resources built during many years of successful operation.

## I. SWALES WILL SUFFER IRREPARABLE HARM IF AN IMMEDIATE INJUNCTIVE RELIEF IS NOT GRANTED

SGT's contract is currently scheduled to become effective on May 15, 2007; thus after May 14, much of the work currently done by Swales under the MSES contract is scheduled to be turned over to SGT under the MSES II/A contract. Ex. 2 (Kraus Decl., ¶ 16). SGT is currently operating in a transition mode, in which it is attempting to entice Swales' employees to join SGT and perform work under the new contract. *Id.*

Swales has performed the work scope of the MSES contract at NASA Goddard for more than six years, and has received uniformly outstanding rating and award fee scores. Indeed, NASA's demand for Swales' services has increased steadily from year-to-year to a total of more than $600 million.

This Court has recognized that the loss of a critical mass of skilled employees from an incumbent contractor to an awardee during the transition of a protested award is sufficient to establish irreparable injury. *University Research*, 65 Fed. Cl. at 513. Other courts have also found irreparable harm to be imminent when a former employee has caused his former employer to lose customers, misappropriated confidential and proprietary information, or engaged in unfair competition with the plaintiff. *See, e.g., Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (finding irreparable harm when failure to grant preliminary injunctive relief would create the possibility of a permanent loss of customers or goodwill); *Intelus Corp. v. Barton*, 7 F.Supp. 2d 635, 639 (D. Md. 1998) (concluding that plaintiff "could reasonably expect to suffer [harm], in the form of lost customers and loss of good will, should the Court refuse to issue an injunction").

In this case, Swales' ability to perform its contractual obligations largely depends on its ability to maintain its highly skilled, highly trained, experienced and highly specialized employees. These employees have enabled Swales to satisfy NASA's highly specialized needs for more than five years. Ex. 2 (Kraus Decl., ¶¶ 17-18). Unfortunately for Swales, those employees are likely to follow the contract to SGT in the event that an injunction does not issue. On information and belief, SGT's proposal represented that

its non-subcontractor workforce, which would perform the MSES II/A undertaking, would be obtained by "capturing" the Swales' incumbents. Indeed, NASA is currently taking steps to facilitate the movement of some of Swales' employees to SGT, a transition that will have a substantial negative effect on Swales. Ex. 2 (Kraus Decl. ¶ 19); Ex. 6 (NASA Apr. 19 email). SGT's potential acquisition of a substantial portion of Swales' workforce would have the perverse effect of enabling SGT to acquire the NASA contract as well as Swales' knowledge- and skill-base as a direct result of its misappropriation of Swales' proprietary and trade secret information.

As Swales' proposal was predicated on its ability to maintain the specialized employee base which is performing on the incumbent NASA contract, Swales' capability to perform the remaining period of performance, as well as perform the contract at issue here should this protest succeed, will be seriously impaired if the transition is permitted to continue and SGT's performance under the contract is permitted to begin. *See University Research Corp.*, 65 Fed. Cl. at 514.

There is no question that, taken as a whole, Swales' potential injury amounts to "sufficiently immediate and irreparable harm for the purposes of a preliminary injunction." *See id.*

## II. SWALES IS LIKELY TO SUCCEED ON THE MERITS OF ITS CHALLENGES TO NASA'S AWARD DECISION

### A. NASA Erroneously Determined That SGT Was Eligible For Award Even Though SGT Violated Procurement Integrity Rules By Misappropriating Swales' Proprietary Information

#### 1. NASA Failed To Reasonably Analyze Whether SGT Illegally Obtained Swales' Proprietary Information

The essential facts related to SGT's misappropriation and use of Swales' highly competition sensitive, proprietary information are clear and not subject to substantial dispute. First, when he was a Swales' employee, Mr. Galassi was a key member of the team of engineers and scientists who developed the RTO responses that were ultimately submitted as part of Swales' MSES II/A proposal. Ex. 2 (Kraus Decl., ¶¶ 6-8). These RTO responses were bid or proposal information as defined in the Procurement Integrity Act. Second, when he served on Swales' RTO team, Mr. Galassi became intimately familiar with every material aspect of several of Swales' RTOs. Third, with his knowledge of Swales' proposal and RTO responses in-hand (and without disclosing his activities to Swales), Mr. Galassi provided assistance to SGT with respect to revisions of the RTOs and other sections of SGT's proposal prior to NASA's review. Complaint, Ex. 5 at 5. And fourth, when NASA evaluated the proposals and made its award determination, the Agency was aware that Mr. Galassi had worked on SGT's RTOs after being a key member of Swales RTO team—and the Agency placed great weight on the offerors' RTO responses in its decision. *Id.*

The Procurement Integrity Acts makes it illegal for "[a] person, other than as provided by law, [to] knowingly obtain contractor bid or proposal information or

source selection information before the award of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 423(b). By entering into the teaming agreement with Aerostress and employing Mr. Galassi as it did to work on the same area of SGT proposal that he had prepared for Swales, SGT clearly understood it was obtaining Swales' confidential information, which was known to Mr. Galassi because of his prior relationship with Swales, regarding a critical aspect of Swales' proposal.

The fact that SGT unlawfully obtained Swales' confidential information results inexorably from the position in which SGT placed him, *i.e.*, assisting with a part of its proposal after he had worked on the same part of Swales' proposal. Simply put, a person with highly valuable, competitive information belonging to one competitor cannot work on another competitor's proposal – particularly on the same section thereof – without using the knowledge for the second competitor's improper benefit. SGT thus obtained Swales' bid or proposal information through the manner in which it solicited and employed Mr. Galassi and Aerostress.

That a person possessing highly valuable (and confidential) information belonging to one offeror cannot work for a competitor without presumptively divulging it (or providing the benefit of that knowledge to the new employer) is well understood and is the cause of safeguards routinely implemented by businesses and courts. For instance, the assumption that a person with such competitive information will use it in a manner that is harmful to the owner of the information is the reason that companies routinely require their employees to execute non-compete agreements before proprietary information is divulged. It is also the reason this Court, the GAO, and other

courts require protective orders prohibiting any person provided confidential information from working on a competitive procurement in which such information could conceivably be beneficial.

**2. NASA Unreasonably Demanded Direct Proof Of Copying In A Situation Where None Could Reasonably Be Expected**

When NASA explained its analysis of SGT's teaming arrangement with Aerostress (and Mr. Galassi) and the procurement integrity concerns it raised, NASA revealed its methodology for analyzing the matter was plainly inadequate to address the serious concerns presented. Instead of looking broadly at the obvious effect of having a key member of Swales' RTO team assisting with the final revisions to SGT's RTOs, the Agency fixed a narrow focus on whether evidence had been submitted that SGT had obtained specific information through a showing that Swales' information had been copied into SGT's proposal.

**a.** The RTOs are intended to enable NASA to understand how the contractor "would carry out representative tasks associated with the" RFP Statement of Work. RFP, Section L.14.3, Subfactor B. The RFP required the RTO responses to be "specific, detailed, and complete enough to demonstrate [the offeror's] understanding of the technical objectives and problems in meeting the task order requirements." *Id.*

The RTOs thus are intended to illustrate the offerors' capabilities and proposed approaches through practical applications to sample tasks that NASA considers to be representative of the contract scope in an integrated set of mission problems. In light of NASA's views in that regard and the emphasis on the RTOs in the evaluation, NASA

reasonably should have understood that in preparing their RTO responses, the offerors would discuss in detail their capabilities and proposed approaches to perform the contract, including strengths, staff, necessary tools, and weaknesses with regard to the Statement of Work.

NASA reasonably should have analyzed the full ramifications of the insights that Mr. Galassi would have gained through his role in preparing Swales' RTO responses, rather than limited its inquiry to looking for simple copying or other obvious uses. NASA's review barely scratched the surface. Mr. Galassi's participation in the Swales' RTO responses reasonably gave him knowledge and insight regarding such matters as: (i) how Swales proposed to approach dynamics and structural stress problems; (ii) the techniques Swales would employ in modeling; (iii) the mission examples on which Swales relied in preparing its proposal (*e.g.*, techniques and tools for analyzing designs for coupling of satellites to launch vehicles); and (iv) the key assumptions underlying Swales' approaches to the specific problems in these RTOs. Because he worked on the Swales RTO team with other Swales subject matter experts, moreover, he would have collected more data about Swales' presentation of its capabilities and approach than could be derived from his work area alone. Once he performed this role for one contractor, it was inevitable that the insights gained materially would inform and guide his work in performing the same role for a second contractor in preparing its responses for the same set of RTOs.

**b.** In NASA's decision regarding the procurement integrity issue, the Procurement Official who considered the issue for NASA discussed whether specific

evidence showed whether several narrow types of use of information directly from Swales' proposal could be found. These included: (1) "SGT obtained Swales' cost or pricing proposal information," Complaint, Ex. 2 (SSDD) at 2; (2) Mr. Galassi "assist[ed] SGT in its Cost proposal," *id.* at 3; (3) Mr. Galassi "had accurate and current rate information or . . . shared it with SGT," *id.* at 3; or (4) whether there had been disclosure of contractor bid or proposal information, *id.* at 4.

But SGT clearly could have obtained the direct benefit of Mr. Galassi's knowledge of Swales' proposal without possessing such specific data from the proposal itself. As Swales explained to NASA when it sought an investigation: by entering into a teaming arrangement with Aerostress and obtaining consultative services of someone who had been a key contributor on the most relevant areas of its competitors' proposal, SGT obtained the services of someone who "had the capacity to steer and enhance the competitors' efforts vis Swales, ***even without . . . verbatim or other direct injections of Swales' data.***" *Id.* (emphasis added). That is how SGT obtained the Swales information (and the benefit thereof) that Mr. Gallassi had.

The competitive advantage SGT gained by its acquisition of Aerostress' (and Mr. Galassi's) services is as obvious as it is unfair, and NASA refusal to do anything about it cannot withstand review.

### 3. SGT's Teaming Arrangement With Aerostress (And Mr. Galassi) Constitutes Unfair Competition That Required SGT's Disqualification From The MSES II/A Competition

NASA's decision in response to Swales' request for an investigation purported to go beyond the "strict review of the Procurement Integrity Act" and asked whether

SGT's teaming arrangement with Aerostress (and Mr. Galassi) "so tainted this procurement to warrant administrative action be taken." Complaint, Ex. 5 at 5. NASA's negative response was arbitrary and capricious for at least four reasons.

*First*, NASA's position cannot be reconciled with relevant precedent. Numerous decisions of this Court and of GAO make clear that in assessing a potential procurement integrity violation, the crucial standard is the appearance of impropriety or whether an unfair competitive advantage in the procurement system was gained. *See, e.g., NFK Engineering v. U.S.*, 805 F.2d 372, 377 (Fed. Cir. 1986); *Childers Services Center*, B-246210.3, 92-1 CPD ¶ 524, 1992 WL 14890 at *3 (finding reasonable agency's decision to terminate due to "the appearance of an unfair competitive advantage"). Disqualification should occur when "the [disqualified] firm may have obtained an unfair competitive advantage, even if no actual impropriety can be shown, so long as the determination is based on facts and not mere innuendo or suspicion." *Guardian Technologies International*, B-270213.2, 96-1 CPD ¶ 104, 1996 WL 74483 at *4; *see, e.g., Computer Technology Associates, Inc.*, B- 288622, Nov. 7, 2001, 2001 CPD ¶ 187, 2001 WL 1513195; *KPMG Peat Marwick*, B-251902, Nov. 8, 1993, 93-2 CPD ¶ 272, 1993 WL 476704 (noting that record need reveal only "a mere likelihood of an actual impropriety or conflict of interest" for disqualification to be appropriate); *Litton Systems*, B-234060, May 12, 1989, 89-1 CPD ¶ 450, 1989 WL 237484 at *3 (emphasizing the importance of "the integrity of the competitive process" in sustaining a protest despite government's claim that terminated awardee did not obtain any actual competitive advantage upon improperly obtaining source selection sensitive material).

When NASA explained its rejection of Swales' complaints regarding SGT's procurement integrity violation, the Agency revealed a profound misunderstanding with respect to the necessary analysis that should have been applied. Indeed, the Agency did not appear to consider whether SGT's teaming arrangement with Aerostress (and work with Mr. Galassi) resulted in any "appearance of impropriety" or gave SGT an "unfair competitive advantage" in any way.

As explained above, NASA's questions looked at whether certain glaring irregularities occurred, not whether the discernible facts showed that SGT likely obtained an unfair competitive advantage. When NASA failed to locate the proverbial smoking gun of specific "evidence of [] a release" of information to SGT, it closed the book and concluded that the integrity of the procurement was intact. But that methodology fails to address the fundamental question: whether it appears that Mr. Galassi's knowledge of Swales' proposal improperly provided SGT an unfair competitive advantage, and ability to structure and strategically position its proposal. SGT sought such an advantage in hiring Mr. Galassi to work on the same area of SGT's proposal that Mr. Galassi had prepared for Swales. That is a textbook example of an arbitrary or capricious agency action in which an agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

When an Agency's approach to evaluating a procurement integrity irregularity is not sufficiently broad to logically reach proper conclusions, any determination regarding whether the alleged improprieties tainted the decision will be made only by

chance rather than from the even-handed application of rational method intended to root out problems. Here, NASA's methodology is arbitrary, because it fails to incorporate the criteria that logic dictates (and this Court and GAO have recognized) are crucial.

Review of an Agency's decision whether to take corrective action begins with an assessment of the reasonableness of such a decision. *See Universal Automation Labs, Inc. v. Dept. of Transportation*, 1993 WL 444355 (G.S.B.C.A.), GSBCA No. 12370-P-R. Here, NASA chose not to do anything. That decision cannot be viewed as reasonable because it was a function of a methodology whose very design made it extremely unlikely that certain types of improprieties would be uncovered—other than by chance.

*Second* (and related), the Agency's evaluation of whether SGT's actions tainted the procurement process was incomplete with respect to the means by which an appearance of impropriety or an unfair competitive advantage may arise. To cite just two examples, NASA failed to examine whether the sequence of events—Mr. Galassi's decision to continue his consulting relationship with Swales while simultaneously (and without informing Swales) beginning to provide consulting services to SGT with respect to the same parts of its proposal that he had previously developed for Swales—gives rise to an appearance of impropriety. Nor did NASA consider whether SGT must have known that when Mr. Galassi participated in developing and revising SGT's RTO responses, he clearly drew on his knowledge of the Swales' RTO team, as well as his residual knowledge of the Swales' proposal, which had already been developed and committed to writing. Based on industry practice, SGT certainly knew that it was

benefiting from confidential, proprietary knowledge that Mr. Galassi had promised not to use for the benefit of anyone other than Swales.

*Third*, NASA's decision that SGT's actions did not taint the procurement is illogical because it effectively placed the burden of proof on Swales, which had no way to satisfy the Procurement Officer's arbitrary requirement. Swales had no access to SGT's proposal and, thus, could not provide a "concrete assertion or evidence that Mr. Galassi had accurate and current . . . information and that he shared it with SGT." Complaint, Ex. 5 (NASA's Mar. 29 letter) at 4. In short, NASA believed that before it could find a procurement integrity violation had occurred, Swales was required to prove how its proprietary information had been provided to, and directly used by, SGT. *Id.* (finding that "Swales has provided no evidence of . . . a release [of marked contractor bid or proposal information] to SGT"). Few (if any) offerors wronged by procurement integrity violations satisfy that burden; ironically, the Procurement Integrity Act prohibits release of these materials to competitors and makes it impossible for Swales (lawfully) to satisfy the burden imposed by the Agency.

And *fourth*, in its decision on the procurement integrity issue, NASA also irrationally asserted that SGT did not benefit from Mr. Galassi's assistance because it "received two technical weaknesses for RTOs 1 and 2 including one that Mr. Galassi's expertise should have helped avoid." Complaint, Ex. 2 (SSDD) at 4. But, among many other problems, NASA's decision does not reflect that any before-and-after analysis of SGT's proposal ratings was performed. Put another way, there is no indication that absent Mr. Galassi's assistance, SGT likely would have received more weaknesses

and/or would have been rated as having *significant* weaknesses. Indeed, given SGT's lack of capacity and experience in this area, the gaps in its capabilities may well have rendered SGT's proposal unacceptable.

### B. NASA Erroneously Accepted SGT's Technically Unacceptable Proposal, Which Failed To Comply With The RFP's Limitation On Subcontracting

Because this is a set-aside procurement, the RFP includes FAR 52.219-14 (48 C.F.R. § 52-219-14), "Limitations on Subcontracting." This clause requires that "at least 50% of the cost of contract performance incurred for personnel shall be expended for employees of the offering concern." *See* Ex. 1 (RFP) at 57. SGT's proposal on its face should have led NASA to the conclusion that SGT could not and would not comply with the RFP's Limitations on Subcontracting clause. For the reasons explained below, this is clear from NASA's evaluation of SGT's proposal under the Management Plan subfactor.

The RFP states that in evaluating offerors' proposals under this subfactor, NASA will, among other things, (1) evaluate "the availability of the offeror's resources," including "staffing, corporate support, facilities and equipment," and (2) evaluate the offeror's "capability to provide adequate critical facilities and equipment needed to perform the requirements of the SOW," including "facilities for off-site personnel." Complaint, Ex. 1 (RFP) at 125-26. In its evaluation of SGT's Management Plan proposal, NASA recognized that SGT's proposal relies heavily on other companies to provide critical facilities and capabilities that SGT *does not possess*. In its Source Selection Decision, NASA explained:

> The SGT proposal received a significant strength for providing excellent state-of-the-art, critical facilities that are committed and available. ***SGT's teammates have extensive manufacturing and test facilities, laboratories, clean rooms, and other critical facilities. The team members' facilities have overlapping capabilities.*** The SGT proposal received a strength for a sound basis for ***teaming arrangements that augment their expertise and provides full coverage of the statement of work.*** SGT conducted ***a formal gap analysis*** to identify the specific areas in which ***its own capabilities required augmentation.***

Complaint, Ex. 2 (SSDD) at 6-7 (emphasis added).

Because of the nature of the work required by the RFP, SGT's reliance on its teammates for "extensive manufacturing and test facilities, laboratories, clean rooms, and other critical facilities," as well as other "augment[ing]" capabilities in order to provide "full coverage" of the SOW, clearly will prevent SGT from complying with the subcontracting limitation contained in FAR 52.219-14.

Based on an analysis of the MSES II/A work scope and SGT's resources, SGT will need to subcontract more than 50% of the MSES II/A labor effort. For example, SGT lacks the production facilities required to perform the tasks assigned under the MSES contract. Ex. 7 (McQuaid Decl. ¶ 3). SGT also lacks the necessary computing resources, including computers, servers, networks, and software unique to mechanical development activities for space flight systems. Ex. 7 (McQuaid Decl. ¶ 4). These engineering computing systems require a staff of information technology specialists to build, maintain and configure these systems. SGT does not have such staff. *Id.* SGT also lacks the processes necessary to produce flight hardware. Ex. 7 (McQuaid Decl. ¶ 5). Such processes require years to develop and implement and could not possibly be

implemented in a 30-day transition. Finally, as SGT informed Swales, SGT plans to rely on subcontractors Ball and Northrop Grumman to produce mechanisms, structures, instrument systems and electronics systems. Ex. 7 (McQuaid Decl. ¶ 5).

Based on a conservative assessment of work under the predecessor MSES contract, the space flight and ground system hardware production activities that SGT will subcontract comprise well over 50% of the labor cost for MSES II/A. Ex. 7 (McQuaid Decl. ¶ 9).

NASA therefore should have concluded that SGT's proposal is unacceptable and rejected it as ineligible for award. Had NASA done so, it would have selected Swales' technically superior proposal for award.

In sum, NASA failed to follow a provision of the RFP (and of the FAR). Because the Agency declined to enforce the RFP's requirement, and applicable law, this protest should be sustained. *See KIC Development, LLC*, B-297425.2, Jan. 26, 2006, 2006 CPD ¶ 27, n.3 ("a proposal that fails to conform to a material term or condition of the solicitation such as the subcontracting limitation is unacceptable and may not form the basis for an award"); *KIRA, Inc.*, B-287573.4, Aug. 29, 2001, 2001 CPD ¶153 at 3. Alternatively, Swales is likely to prevail on this protest ground because the Agency's decision in this respect was arbitrary and capricious.

## III. THE HARM SWALES WILL SUFFER, IF THE NASA TRANSITION AND AWARD IS NOT ENJOINED, OUTWEIGHS THE HARM TO NASA AND THIRD PARTIES

As described above, Swales is likely to suffer the immediate loss of its employees and ability to perform its present contracts in the event that the MSES II/A contract (or

the transition period that precedes it) is permitted to begin. Swales' highly skilled, highly trained, and highly specialized employees represent the Company's knowledge-base and skills-base, and the NASA MSES contract represents approximately half of Swales' annual revenue.

NASA, on the other hand, stands to suffer no harm in the event this Court grants our request for injunctive relief. Swales is currently performing the incumbent contract, through which NASA is obtaining and may continue to obtain the relevant services from many of the same people that currently employed by Swales. NASA's evaluation (*i.e.*, the Agency's Excellent past performance rating for Swales) attests to the quality of Swales' performance. Simply put, a brief delay in transition to the new contract until this protest is resolved will not prevent NASA from acquiring the services that it needs.

In very similar circumstances, this Court has explained:

> An incumbent is likely to suffer potentially greater injury than a new bidder for a contract, based on the difference between the actual and the prospective: an incumbent's bid is based on keeping together a team whose existence is eliminated in the absence of injunctive relief, while a new bidder is usually projecting the sort of team it could assemble if awarded the contract.

*University Research Co.*, 65 Fed. Cl. at 514. Put another way, the harm to Swales outweighs the potential harm to SGT because Swales already has a highly skilled, highly trained, and highly specialized employee team in place and capable of performing the NASA contract. SGT does not. This factor must favor Swales.

## IV. GRANTING A PRELIMINARY INJUNCTION IN THIS PROTEST SERVES THE PUBLIC INTEREST

The public interest also favors granting a preliminary injunction. This is true because, "by upholding the integrity of the procurement process, public confidence in the federal procurement process will be preserved." *SAI Indus. Corp. v. United States*, 60 Fed.Cl. 731, 747 (2004). As explained above, this award was predicated on the misappropriation of Swales' proprietary information, SGT's desire to acquire Swales' highly skilled, highly trained, and highly specialized employees, and a substantial misevaluation of the Limitation on Subcontracting provision of the RFP and the FAR.

NASA and SGT (in the event that SGT intervenes) will likely argue that delay in the award of a contract contravenes public interest. But, this Court has already ruled that delay is acceptable if it prevents an arbitrary and/or capricious contract award:

> The public interest is not served when a government contract that is subject to competitive bidding is arbitrarily awarded. The likelihood that this would result absent an injunction strongly militates in favor of injunctive relief. And thus the desire for a timely completion of the procurement process may thereby be enlisted in the cause of ensuring that the procurement process is properly conducted—by giving the Government an incentive to take the time needed to get the award right the first (or at least the second) time. The public interest is not well-served when contracting officials rush to save a few weeks and end up delaying contracts by many months.

*Univ. Research Co.*, 65 Fed.Cl. at 515. Here, the public has no meaningful interest in allowing the transition and performance of the NASA contract to continue without an injunction.

## CONCLUSION

For the reasons set forth above, Swales' motion for a preliminary injunction should be granted.

Respectfully submitted,

MARCIA G. MADSEN
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006
(202) 263-3000
(202) 263-3300 Facsimile

Of Counsel:
DAVID F. DOWD
LUKE LEVASSEUR
MAYER, BROWN, ROWE & MAW LLP
*Counsel for Plaintiff, Swales Aerospace*
April 24, 2007

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that on this 24th day of April 2007, I caused to be served, by hand delivery, one copy of Plaintiff Swales' Memorandum In Support Of Its Motion For A Preliminary Injunction And Request For A Temporary Restraining Order on the following:

Mark Melnick
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, NW
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530