SWALES
AEROSPACE

Arthur Leaderman
Vice President & General Counsel
(301) 902- 4489

December 13, 2006

Kathleen M. Pierson
Contracting Officer
Code 210.M
NASA Goddard Space Flight Center
Greenbelt, Maryland 20771

*Re: Notice under FAR 1.602-2(b) and 33.102(f); Request for Investigation of Procurement Integrity Matter under MSES IIA*

Dear Ms. Pierson,

This letter is being sent you in accordance with the above-referenced provisions of the FAR so that there may be a prompt investigation of a serious matter of procurement integrity in connection with the recent award of MSES IIA.

Swales & Associates, Inc. learned of the matters discussed on Thursday, December 7, 2006 following an open house meeting of SGT, Inc. It immediately reviewed records available to it and had discussion with individual sources to verify that the concerns had a reasonable basis in fact.

Mr. Nicholas M. Galassi was employed by Swales Aerospace since 1993 until he resigned from the company on October 28, 2005. At the time of his departure he held a position as one of this company's managers in the stress analysis group. Mr. Galassi notified Swales that he was making a change in his career and signed a standard separation agreement acknowledging his continuing obligations to protect Swales' business sensitive data and maintain confidentiality of any third-party data obtained though company customers.

In the period before his departure, Mr. Galassi played an instrumental role in the composition of Swales' MSES IIA initial proposal that was submitted to Goddard Space Flight Center. He was a drafter and reviewer on sample tasking (RTOs) and authored elements of responsive materials to the SOW Understanding and Qualifications requirements. Among other things, he had significant involvement with the content of the proposal and the means by which Basis of Estimates were formed and presented to NASA, which comprise a map of how Swales accumulates and charges direct and other-direct costs.

Shortly after leaving Swales, Mr. Galassi decided to open a sole proprietorship/ consulting business, doing business under the name of Aerostress, Inc. He became engaged in work for other parties including obtaining a sole source contract in January 2006 for stress analysis services with GSFC under Code 500 for the GPM mission. Subsequently, he obtained additional

SWALES
AEROSPACE



new work from SGT, Inc. In this regard, it is our present understanding that his work for SGT, Inc. included active participation in the reviews and development of revisions to SGT, Inc.'s proposal. On information and belief derived from Mr. Gallassi himself and communicated to Swales employees, he presented SGT's position in discussion with the SEB in September 2006. Mr. Galassi had the opportunity to not only provide substantive correction and additions to the competitive proposal, but also to identify errors and develop matters of cost and technical performance by which one competitor could create favorable contrasts with the other. He would have had the capacity to steer and enhance the competitors' efforts vis Swales, even without the verbatim or other direct injections of Swales data. These are transfusions of business- sensitive, protected, competitive procurement data. We advise the agency on best information and belief that his presence and active participation at the SEB would be confirmed by SEB records of oral discussions.

Mr. Galassi's action would raise the follow on question of whether there may have been reasonable apprehension by at least some SEB members that Mr. Galassi had been in a key position for both competing organizations during the MSES IIA process. Notwithstanding this possibility, the facts, if borne out by your investigation, would lead to a strong inference that SGT actions in the engagement of Mr. Galassi have violated procurement integrity requirements in connection with the MSES IIA procurement.

Accordingly, we request that you investigate this matter and promptly respond to our concerns.

Very truly yours,

Arthur Leaderman

5050 Powder Mill Road • Beltsville, MD 20705 • 301-595-5500 • Fax 301-902-4114 • www.swales.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| SWALES & ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. ______________ |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF ROGER KRAUS**

1. My name is Roger Kraus. I have been employed by Swales & Associates, Inc. ("Swales") for approximately 17 years. I am currently the Manager of the Structural Dynamics Group. As Manager of the Structural Dynamics Group my responsibilities include supervising sixteen engineers working at Goddard Space Flight Center on more than six different spacecraft missions.

**[Background Of Mr. Galassi's Relationship With Swales]**

2.. Nicholas M. Galassi was an employee of Swales from 1993 through October 28, 2005. His career progressed from engineer to senior structural engineer, to Manager of the Mechanical Analysis Group.

3.. Throughout his employment, Mr. Galassi had access to Swales' sensitive proprietary information. Moreover, during the course of twelve years, Mr. Galassi obtained knowledge regarding the manner in which Swales staffed, organized, and solved difficult engineering issues related to spacecraft mechanical systems.

**[Mr. Galassi's Relationship Involvement With the MSES II/A Proposal For Swales]**

4.. Swales began working on its proposal for NASA's MSES II/A contract proposal in June 2005. There were numerous parts of that proposal. One key part of NASA's evaluation, as described in the RFP, related to what are called Representative Task Orders ("RTOs"). The RFP explained that there would be five RTOs in which competitors would compose operating plans and budgets for the solution of abstruse engineering problems based on NASA's specially drawn specifications. In preparing Swales' responses to NASA's RTOs, we understood that they would play a key role in

the Agency's evaluation, and that our responses would be compared head-to-head with any competitor(s).

5. Swales formed a team to work collaboratively to formulate our RTO responses and to explain how Swales would solve the problem from both a technical and a cost perspective. All information regarding the manner in which Swales would solve these problems—and particularly our RTO solutions—is highly competition-sensitive information. We protect that information against disclosure to competitors.

6. Mr. Galassi's involvement with Swales' proposal for NASA's MSES II/A contract began in June 2005, when he accepted an assignment to work on the proposal. Mr. Galassi was part of a team of engineers and scientists who would demonstrate that Swales understood and could perform the work required to complete the RTOs.

7. Swales' RTO responses were the collective work of Mr. Galassi and other Senior Swales personnel. Through his significant work on Swales' RTO teams, Mr. Galassi gained intimate knowledge of not only how such responses would be most efficiently formulated, but the specific solutions that Swales proposed.

8. As explained below, Mr. Galassi ended his employment with Swales in October 2005. Swales MSES II/A proposal submitted to NASA in September 2006. The RTO responses that Swales submitted were not materially changed after Mr. Galassi's departure, and thus, he had full knowledge of what became the contents of Swales' ultimate proposal. (To be clear, the final RFP was issued by NASA in March 2006, which was also after Mr. Galassi's departure from Swales. But NASA had provided several draft RFPs to industry seeking comments, and when it issued those previous drafts, NASA had made clear that the RTOs would not be materially changed in the final RFP; accordingly, offerors such as Swales were able to begin their responses before the final RFP was issued—which we did.)

9. Swales' RTO solutions also included work on Swales' Basis of Estimates. The Basis of Estimates presented estimates to perform the work and descriptions of the methods by which Swales accumulates and charges direct and indirect costs for the proposed solutions. These elements also comprise some of the most competition-sensitive components of Swales' proposal, and we protect this information from disclosure. Mr. Galassi's work on the RTOs and his possession of Swales estimating work book material gave him the capacity as a routine operation to generate basis of estimates for the RTOs. He participated in the development of RTO requirements that went into the composition of the Swales' Basis of Estimates and possessed the rates and tools by which Swales accumulates and charges direct and indirect costs for the proposed RTO solutions.

10. Mr. Galassi and the Swales employees with whom he worked also developed Statement of Work narratives to address Swales' manner and method of Structural Analysis and Loads Engineering.

**[The end of Mr. Galassi's Employment relationship]**

11. In October 2005, Mr. Galassi notified Swales that he wanted to end his employment relationship with Swales and become a part-time consultant. Swales found Mr. Galassi's proposed post-employment plan to be acceptable, and Mr. Galassi became a contractor to Swales.

12. Swales' procedures and employee handbook include standards for the handling of its own competition-sensitive data, as well as the data of third-party clients and customers. When he resigned from Swales on October 28, 2005, Mr. Galassi agreed to a Separation Agreement in which he acknowledged, among other things, his continuing obligation to protect Swales' trade secrets and competition-sensitive proprietary information.

13. Shortly before he left Swales in October 2005, Mr. Galassi began his own consulting business, which is called Aerostress, Inc. ("Aerostress"). Swales required that Aerostress execute a corporate Non-Disclosure Agreement so that this new company would, as Mr. Galassi had, affirm its obligation to protect Swales' trade secrets and other proprietary and competition-sensitive information. Aerostress complied and executed the agreement.

14. After Mr. Galassi's departure from Swales, Swales subcontracted work to Aerostress with respect to the Solar Dynamic Observatory and Lunar Reconnaissance Obiter portion of the MSES contract. Mr. Galassi continued to work as a contractor (and team-member) with Swales until shortly after NASA's initial (December 2006) MSES II/A award decision.

**[What Swales learned from the Dec. 6 Open House]**

15. After NASA made its initial MSES II/A award decision, SGT hosted and two "Open House" meetings for prospective MSES II/A employees. During the meetings, SGT made a presentation to attendees that revealed the identity of its team members. Mr. Galassi actively participated as a key member of the SGT team. As exemplified in the declaration of my colleague Steven Chaykovsky, Mr. Galassi spoke openly at the Open House meetings about his role in support of the SGT proposal.

**[Imminent Harm Associated With SGT Award]**

16.. SGT's contract is currently scheduled to become effective on May 15, 2007. Accordingly, after May 14, much of the work currently done by Swales under the MSES contract will be turned over to SGT under the MSES II/A contract. SGT is currently operating in a transition mode, in which it is attempting to entice Swales' employees to join SGT and perform work under the new contract.

17. Swales' ability to perform its ongoing and prospective contractual obligations largely depends on its ability to maintain its highly skilled, highly trained, and highly specialized employees who perform the incumbent NASA contract. Those employees are expected to perform the MSES II/A contract in the event that it is ultimately awarded to Swales.

18. The Swales employees that have performed the MSES contract have enabled Swales to satisfy NASA's highly specialized needs for more than five years. Those employees are likely to follow the contract to SGT in the event SGT obtains the MSES II/A contract.

19. NASA is currently taking steps to facilitate the movement of some of Swales' employees to SGT, a transition that will have a substantial negative effect on Swales. For instance, on April 19, a NASA official sent an email to numerous Swales employees, seeking task descriptions of the work for which they are "uniquely qualified, assuring Swales' workers that "if [he] convince[s] them you are the only one that can do the job, may be offer will be something you can't refuse." SGT's potential acquisition of a substantial portion of Swales' workforce presents an immediate and substantial threat to Swales' business.

I declare under penalty of perjury that the foregoing is true and correct.

April 20, 2007

Roger Kraus

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| SWALES & ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. _______________ |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF PAUL BAIRD**

1. My name is Paul Baird. I have been employed by Swales & Associates, Inc. ("Swales") for approximately 6 years. I am currently a Senior Structural Analyst. My responsibilities include mechanical systems lead for the NASA GLAST project office of Goddard Space Flight Center.

2. I attended an SGT Inc. Open House meeting for MSES IIA program recruitment on December 6, 2006 at Martins West in Greenbelt, Md.

3. During the presentations by SGT for its planned mobilization to perform MSES IIA work, SGT posted viewgraph slides and made an announcement that Aerostress Inc. was part of SGT's affiliated team to perform the MSES IIA contract.

I declare under penalty of perjury that the foregoing is true and correct.

April 20, 2007

Paul Baird
Paul Baird

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

SWALES & ASSOCIATES, INC., )
)
Plaintiff, )
)
v. ) No. ______________
)
UNITED STATES, )
)
Defendant. )

## DECLARATION OF CENGIZ KOONT

1. My name is Cengiz Koont. I have been employed by Swales & Associates, Inc. ("Swales") for approximately 15 years. I am currently Mechanical Analysis Group Manager. My responsibilities include supervision of mechanical analysis for several programs performed at Goddard Space Flight Center.

2. I attended an SGT Inc. Open House meeting for MSES IIA program recruitment on December 6, 2006 at Martins West in Greenbelt, Md.

3. During the presentations by SGT for its planned mobilization to perform MSES IIA work, SGT posted viewgraph slides and made an announcement that Aerostress Inc. was part of SGT's affiliated team to perform the MSES IIA contract.

I declare under penalty of perjury that the foregoing is true and correct.

April 20, 2007 Cengiz Koont

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| SWALES & ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. ______________ |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF STEPHEN CHAYKOVSKY

1. My name is Stephen Chaykovsky. I have been employed by Swales & Associates, Inc. ("Swales") for approximately 10 years. I am currently a Structural Analysis Engineer. My responsibilities include being lead structural analyst for the SAM instrument, as well as work on other programs performed at Goddard Space Flight Center.

2. I attended an SGT Inc. Open House meeting for MSES IIA program recruitment on or about December 11, 2006 at Martins West in Greenbelt, Md. This was the second of two Open House meetings.

3. Before the SGT team members' presentations during the Open House, several Swales employees discussed the MSES II/A contract award with Mr. Galassi. During this discussion, Mr. Galassi openly described his role supporting SGT's proposal to NASA. For instance, Mr. Galassi explained that he had joined the SGT proposal team in the mechanical area and had been involved in the preparation of SGT's final proposal, including participation in in-person

presentation to NASA. Mr. Galassi informed me that he had participated on behalf of SGT in discussions for the MSES II as part of the SGT proposal team. Finally, Mr. Galassi told me that as a result of participating with SGT in its proposal, Aerostress (and he) anticipated performing a substantial volume of work as a SGT contractor for MSES II/A. He said that ideally he would like to have his group back. This clearly meant to me his former group from Swales.

I declare under penalty of perjury that the foregoing is true and correct.

April 20, 2007

Stephen Chaykovsky

-----Original Message-----

From: Dan Harpold [mailto:Dan.N.Harpold@nasa.gov]
Sent: Thursday, April 19, 2007 11:07 AM
To: 'Florence Tan'; 'Michael Barciniak'; 'Eric Raaen'; 'Robert H. Arvey,III'; 'Jess Lewis'; 'Robert M Abell'
Subject: Swales conversion

As everyone probably knows by now, the Swales contract ends on May 14, and work will begin on May 15 with SGT. After May 14, there will be no Swales contract to charge to. In spite of much discussion and effort there appears to be no easy, or hard way for that matter, to get around the fact that any SAM or Cassini work after May 14 that is currently being done thru Swales will have to be done thru SGT.

I need to submit task descriptions to SGT by Monday or Tuesday detailing the work that each of you are doing and the special skills and unique qualifications that each of you have that enables you to be of such special talent that SGT will find it hard, if not impossible, to find anyone other than you to fill the tasks.

Please send me a few items that I can incorporate in each task description that shows what skills each of you have that makes you uniquely qualified for the work you are currently doing. I need this by Monday or Tuesday so I can start working on the task descriptions. It's important that I submit these task descriptions as soon as possible so SGT will be able to at least meet with each of you and give you there best offer. If I convince them you are the only one that can do the job, maybe the offer will be something you can't refuse. In any case, there will at least be some mechanism to charge to after May 14 for those of you who might want to switch over.

Dan

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| SWALES & ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. ______________ |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF MARK MCQUAID**

1. My name is Mark McQuaid. I have been employed by Swales & Associates, Inc. (Swales) for approximately 15 years. I am currently the Vice President of NASA Goddard Services Programs. As Vice President of NASA Goddard Services Programs, my responsibilities include Management of the Mechanical Systems and Engineering Services Contract (MSES) with NASA Goddard Space Flight Center (GSFC).

**Summary**

2. Stinger Ghaffarian Technologies, Inc. (SGT) does not possess four critical resources required to perform the MSES II/A contract, and thus will need to subcontract for them. For the reasons set forth below, this subcontracting approach will prevent SGT from complying with the Limitations on Subcontracting clause (FAR 52.219-14) in the MSES II/A Request for Proposals No. NNG05096383R (RFP). This clause requires that "at least 50% of the cost of contract performance incurred for personnel shall be expended for employees of the offering concern."

3. First, SGT does not possess the production facilities required to perform the tasks assigned under the MSES contract. Production facilities include far more than just machine shop capabilities. It also includes, clean rooms, assembly areas, high bays, material handling facilities, material storage capabilities, testing facilities and development laboratories. Clean rooms are areas used to assemble space flight hardware with stringent atmospheric controls on temperature and humidity and which have limits to airborne particles and other contaminates. These facilities require staff knowledgeable in their construction and maintenance and processes for their maintenance, certification and use. Furthermore, the engineering and technical staff that utilize the facilities for the processing of space systems they are developing must be knowledgeable on the procedures specific to the facility and certified for entry and operations in the facility.

4. Second, SGT does not possess the necessary computing resources, including computers, servers, networks, and software unique to mechanical development activities for space flight systems. Software requirements include high-end Computer Aided Engineering, Design and Manufacturing software for engineering analysis, design and manufacturing. This software requires sophisticated infrastructure, software and network systems to perform. Because the Integrated Product Teams (IPT's) consist of multiple individuals each utilizing common databases, sophisticated configuration management tools are required to ensure the integrity of the data. These engineering computing systems require a staff of information technology

specialists to build, maintain and configure these systems. SGT does not have such staff.

5. Third, SGT does not have the processes necessary to produce flight hardware. These processes include safety processes, quality processes, material handling, inventory management, document control, manufacturing process control, environmental regulatory compliance and more. These processes require years to develop and implement and could not possibly be implemented in a 30-day transition. Fourth, SGT does not possess the capability to produce mechanisms, structures, instrument systems and electronics systems. SGT informed Swales employees during recruiting Open Houses that SGT will rely on Ball and Northrop Grumman to produce these systems.

6. My knowledge of the resources required to perform the MSES II/A contract and my knowledge of SGT's lack of resources and capabilities required for the performance of the MSES II/A contract are a result of information obtained over years of managing the MSES contract. As Vice President of NASA Goddard Services, I am intimately involved with the operation charged with performing the task orders issued under the contract. Performance of task orders requires reviewing Statements of Work (SOW), obtaining staff and, facilities and resources, developing requirements, preparing cost estimates and implementation plans, tracking cost, schedule and technical progress, reporting progress, attending Project Status Reviews and other technical reviews, and resolving problems and issues. Execution of these duties results in expert

knowledge of the nature, scope and type of work performed throughout the contract and the resources required to perform these activities.

7. I have been involved in contract staffing and management of dozens of programs at NASA Goddard and accordingly in such capacity have directly observed and interacted with all major contractors working at the site. As MSES program manager, I have been involved in procuring goods and services from nearly all major contractors at GSFC. Through this procurement activity and with my interactions with Swales Team member contractors, I am aware of the activities of the contractors in Swales' areas of activity. Our Swales internal Project Status Reviews include discussions and understanding of the various organizations involved in the engineering activities associated with the projects and the responsibilities of these organizations. As a manager of this significant engineering activity, I have relationships with vendors that provide software, equipment and personnel required to perform this function. These organizations provide capabilities briefings that indicate who their current customers are and the goods and services provided to these customers. Finally, as a matter of business operations, it is necessary to understand the capabilities and activities of other contractors in the context of assessing the competitive landscape for purposes of preparing proposals.

8. The scope of the MSES II/A contract is congruent with the predecessor MSES contract. For example, the transition period for the MSES II/A contract has begun. NASA (GSFC) is transitioning task assignments from the MSES contract to the MSES II/A contract for a start work date of May 15. Based on these events, and the text

of the MSES II/A RFP, the work on MSES II/A will be the same work that is currently being performed on MSES.

9. Space flight and ground system hardware production activities comprise well over 50% of the labor cost of the work performed on MSES. This estimate is based on an analysis (discussed below) of the Swales labor cost on GSFC projects under the MSES contract. On these projects, Swales provided space systems hardware, which resulted in 56% of the total labor cost of the contract associated with Swales hardware production efforts. This figure does not include the production activities of Swales Team member contractors. Addition of that effort would add approximately another 20%, yielding upwards of 70+% of the cost of labor associated with hardware production and reliant on in-house production facilities. Based on the closely related MSES experience, therefore, the labor effort for these activities would far exceed the 50% limitation discussed above.

10. The production of space flight systems requires a high degree of integration between engineering and production facilities. This integration cannot be achieved unless the staff members reside in the same company. The systems developed on the MSES contract are small quantity builds, *e.g.*, one or two systems. The systems include mechanisms, structures, instrument components and complex test and calibration systems. The engineering and production activities are concurrent and integrated. Assembly methods are developed in-process with constant interaction between engineering and production personnel. Systems are assembled, tested, tuned

and tweaked. Engineering must be intimately familiar with the production capabilities, resources and processes available.

11. Guidance and interaction between engineering and production result in trade-offs that involve shifting of costs and schedule, which in turn results in shifting the burdens between production and engineering. These shifting burdens affect both cost and schedule performance. Such constant shifts would require difficult, and potentially contentious, negotiation if these elements belonged to separate companies. Such negotiations and administrative burden would be inefficient and costly, and make it very difficult to meet the tight schedules typical of the MSES contract. For a great majority of production activities, engineering requires facility and capability upgrades necessitating capital or indirect expenditures that would not be performed if engineering and production personnel belong to different companies. In short, the development of one-of–a-kind space flight and ground system hardware requires the engineering personnel to reside in the same company as the production resources required to accomplish the task. The MSES contract was overwhelmingly utilized to develop space flight hardware. Based on the RFP, MSES II/A will be utilized in the same manner. The overwhelming majority of the work, therefore, likely will be have to performed by the subcontractors on SGT's team that possess the facilities and resources required to develop and produce space flight hardware.

**Discussion**

12. As part of my responsibilities with Swales, I contributed to the Company's proposal for the MSES II/A contract. In conjunction with that effort, I reviewed

NASA's Selection Statement, which was issued on March 29, 2007. At page 7 of that Statement, the Source Selection Authority asserted:

> The [Stinger Ghaffarian Technologies, Inc. ("SGT")] proposal received a significant strength for providing excellent state-of-the-art, critical facilities that are committed and available. *SGT's teammates have extensive manufacturing and test facilities, laboratories, clean rooms, and other critical facilities. The team members' facilities have overlapping capabilities.* The SGT proposal received a strength for a sound basis for *teaming arrangements that augment their expertise and provides full coverage of the statement of work.* SGT conducted *a formal gap analysis* to identify the specific areas in which *its own capabilities required augmentation.*

The reference to manufacturing facilities corresponds to category 1 in paragraph 3 above.

13. As the material quoted above recognizes, I understand that SGT does not have many of the critical facilities that are necessary to satisfy the requirements under the MSES II/A contract. SGT therefore must rely on its subcontractors or teammates to fulfill these requirements. For example, the performance of manufacturing, fabrication, integration and testing of space flight hardware for NASA requires advanced manufacturing techniques, processes, facilities, software and certifications. Based on my knowledge gained through many interactions throughout the NASA/Goddard community, SGT had no such resources at the time of the proposal submission and evaluation. Specifically, I understand that SGT lacked the following resources required to perform the MSES II/A effort: (i) manufacturing facilities; (ii) machinists or manufacturing engineers; (iii) assembly areas; (iv) test chambers or equipment; (v) clean rooms; (vi) high bays; (vii) shipping and receiving capable of handling manufacturing

materials; (viii) 3D CAD software for design, engineering and manufacturing, such as Pro/ENGINEER; (ix) NASTRAN for analysis or any such structural or any thermal analysis software; and (x) software or information systems infrastructure, such as Pro/INTRALINK for configuration management of design drawings and computer models.

14. In addition, SGT also lacks staff who are conversant with the highly complex systems discussed above. SGT thus lacks staff who can design, install, and maintain a computing infrastructure that is capable of performing the engineering, design, analysis and manufacturing required to produce space flight hardware. The production of such hardware requires the development and implementation of complex processes and an organization experienced in executing those processes including, but not limited to, quality inspection, material handling, inventory management, document control, manufacturing process control, capacity planning, non-conformance tracking and control, configuration control board procedures, processes, traveler development and sign-off procedures, safety protocols including material handling safety processes.

15. In my experience working in the GSFC community, I am unaware of any evidence that SGT has produced space flight hardware. I am aware that SGT produced very limited quantities of electronics equipment under a contract known as METS contract, which was SGT's mission engineering contract. I understand, however, that this equipment was produced by a subcontractor because SGT lacked the resources to perform the work. At the time of proposal submission, moreover, I was unaware of any SGT employee performing any mechanical engineering discipline closely associated to

the production of hardware such as mechanical design, drawing development, structural analysis, loads analysis, or thermal analysis. I am unaware of any work of significance in these areas being performed by SGT. The very limited related work tasked on the METS contract that I am aware of was performed by SGT subcontractors.

16. It is imperative for the MSES II/A prime contractor to possess in-house production capabilities because nearly the entire effort is focused on the engineering, development and production of space flight hardware. For example, Swales organizes the MSES contract by creating Integrated Product Teams that perform multi-discipline engineering for projects. The personnel on these IPT's work on groups of tasks associated with GSFC Projects which Swales combines and assigns to a Project Lead or Lead Engineer. The fact that nearly the entire contract is focused on the development and production of space flight hardware and ground support equipment is evidenced by the fact that virtually all the Projects serviced by Swales throughout the life of the contract produced significant quantities of hardware in Swales facilities.

17. The importance of in-house facilities goes beyond cost efficiencies. Frequently, Swales is required to produce quick turn-around hardware in very short order, weeks, days or even hours. This occurs in late periods of programs when new ground support equipment is identified, hardware must be replaced, or system modifications require immediate production to meet program schedule. In these cases, only a single organization, with complete engineering and production capabilities can respond quickly and effectively enough. Furthermore, privity of contract with the facilitized contractor is vital to ensure performance.

18. The MSES II/A RFP contains the clause FAR 52.219-14 (Limitations on Subcontracting), which requires the Prime Contractor to perform at least half the work as measured by expending at least 50% of the total labor cost of contract performance for personnel of the concern.

19. Swales is capable of performing more than 50% of the contract because it has the capabilities and resources to perform all elements of the statement of work. Furthermore, the historic percentage of work performed by Swales on the MSES contract has been 70%.

20. SGT will not be able to produce machined parts, assemble mechanisms and structures, produce heat pipes, thermal blankets, radiators, thermal switches, thermal coatings and paints and related thermal control devices, perform thermal testing, build structural components, aluminum honeycomb structures, advanced composite parts, advanced composite honeycomb parts, deployable mechanisms, door systems, retention mechanisms, spacecraft structures, antenna booms, optical benches, astronaut Crew Aids and Tools, Power Ratchet Tools, kinematic brackets and mounts, monoball brackets, ground support equipment including lifting slings, spreader bars, turnover dollies, perform mechanism life testing, highly advanced calibration equipment such as Wide Field Collimator for GOES, optics calibration, material strength testing, perform parts dimensional inspections.

21. All of the items described previously were produced in the execution of the MSES contract. Through March of 2007, Swales' total labor costs were $286 million. An analysis was performed to determine the Swales labor cost for the Integrated

Product Teams (IPT's) or Project Groups on the MSES program. IPT's which produced hardware resulted in a total labor cost of $208 million. This value assumes (conservatively) that MSES Program Management was not involved in hardware development activities. Subcontractor labor cost was $86 million, for a total labor cost on the MSES contract through March 2007 of $392 million. Two of the Swales Team subcontractors, Orbital Sciences Corporation (Orbital) and Jackson and Tull (J&T), are almost entirely involved in hardware development and production activities. This analysis, however, assumed that no subcontractor participated in hardware production. Using only Swales' hardware production-related labor costs of $208 million, against the total MSES labor cost of $392 million, yields a minimum of 56% of labor costs that are production-related. Even with very conservative assumptions, therefore, more than 50% of the labor cost of the MSES contract is involved in hardware-related activities. Adding the hardware activities of Orbital and J&T could increase the percentage of hardware related labor by 20% to 76%.

22. The MSES contract has historically been the anchor contract for GSFC to obtain support in the development and the production of space flight and ground system hardware. Since the inception of the MSES contract, Swales has produced hardware flown on many shuttle missions in the form of Special Payloads and played a central role in the fabrication, production, integration and test of hardware for programs including SDO, GLAST, HST, Stereo, LRO, Swift, Triana, ST5 and many more.

23. Based on the MSES II/A RFP, one reasonably can expect that NASA will use the MSES II/A contract in a similar manner to how it has used the MSES contract. Page 2 of Attachment A of the MSES II/A RFP, Statement of Work (SOW) paragraph one states "The purpose of this contract is to acquire engineering services and related services to MSD [Mechanical Systems Division] and related organizations throughout GSFC, as required, for the formulation, design, development, fabrication, integration, testing, verification, and operations of space flight and ground system hardware and software, including development and validation of new technologies to enable future space and science missions." Based on my experience on MSES, the areas of least effort in the above sentence are in "formulation" and "operations". Nearly all activities are involved in "design, development, fabrication, integration, testing, and verification of space flight" hardware. MSES work occurs almost entirely during the Implementation Phase of programs, during which time these efforts are fully integrated and inseparable. This work requires the close coordination of the engineering functions with the facilities and resources required to complete the physical manifestation of the design effort. The major programs at GSFC going forward in which Swales is most involved are JWST, GPM, ELC, and MMS. JWST and ELC will be programs for which Swales would traditionally produce large amounts of hardware are just entering their heaviest manufacturing phases. Both GPM and MMS are planned to be largely or entirely produced as an "in-house" GSFC program, which is the type of program that GSFC typically relies heavily on the MSES contractor to produce complex hardware systems.

24. If the MSES II/A Prime contractor lacks the facilities and resources to produce space flight hardware and must rely on subcontractor facilities and capabilities, the prime contractor will be unable to perform more than 50% of the labor cost of the MSES II/A contract. The SEB findings quoted in Paragraph no. 3 above recognize the "gaps" in SGT's capability to support the bread-and-butter activity of this contract work scope. By observing that SGT is dependent on teammate facilities, it exposes the SEB's own assumption that SGT's lacks the capacity to shoulder a majority of the cost based on personnel, as required by the contract.

25. In sum, based on my understanding of SGT's resources and the SEB statements quoted above, SGT will be unable to comply with the Limitations on Subcontracting clause in the RFP.

I declare under penalty of perjury that the foregoing is true and correct.

April 23, 2007

Mark McQuaid