GAO
Accountability * Integrity * Reliability

United States Government Accountability Office
Washington, DC 20548

Comptroller General
of the United States

**DOCUMENT FOR PUBLIC RELEASE**
The decision issued on the date below was subject to a GAO Protective Order. This redacted version has been approved for public release.

# Decision

**Matter of:** Swales Aerospace--Costs

**File:** B-299260.4

**Date:** April 30, 2007

James J. McCullough, Esq., Steven A. Alerding, Esq., and Deneen J. Melander, Esq., Fried, Frank, Harris, Shriver & Jacobson LLP, for the protester.
Vincent A. Salgado, Esq., National Aeronautics & Space Administration, for the agency.
Sharon L. Larkin, Esq., and James A. Spangenberg, Esq., Office of the General Counsel, GAO, participated in the preparation of the decision.

## DIGEST

Protester's request that our Office recommend that it be reimbursed the reasonable costs of filing and pursuing protests is denied, where the agency did not unduly delay taking corrective action in the face of clearly meritorious protests.

## DECISION

Swales Aerospace requests that we recommend that it be reimbursed the reasonable costs of filing and pursuing its protests challenging the award of a contract to SGT, Inc. under request for proposals (RFP) No. NNG05096383R, issued by the National Aeronautics & Space Administration (NASA) for mechanical systems engineering services to support NASA's Goddard Space Flight Center.

We deny the request.

The RFP, issued as a small business set-aside, provided for the award of a cost-plus-award-fee, indefinite-delivery/indefinite-quantity contract with a maximum ordering value of $400 million over a 5-year ordering period commencing on the effective date of contract award. RFP at Bates Nos. 43, 46-48, 90. Award was to be made on a best-value basis, considering mission suitability,[1] cost/price, and past performance.

---

[1] The mission suitability factor included four subfactors: understanding the requirements of the statement of work, technical approach to representative task orders, management plan, and safety and health. RFP at Bates No. 163.

The cost/price factor, which included a cost realism component, was stated to be "significantly less important than the combined importance of" the mission suitability and past performance factors, and was individually less important than the mission suitability factor and more important than the past performance factor. Id. at Bates No. 159. The RFP included a "Limitations on Subcontracting" clause, which required that "[a]t least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern." Id. at Bates No. 93.

Swales and SGT were the only proposals submitted in response to the RFP. After initial evaluations, the source evaluation board (SEB) conducted discussions and sought and evaluated final proposal revisions. The source selection authority (SSA) adopted the findings of the SEB and selected SGT for award. The SSA noted that both Swales' and SGT's proposals were rated "very good" under the mission suitability factor (although Swales' proposal received a "slightly higher numerical score"), "excellent" under the past performance factor,[2] and that Swales' proposal had a "significantly higher proposed and probable cost compared to SGT." Agency Report, Vol. XXII, Tab 22, SSA Decision, at Bates No. 7798, 7800, 7803-04. While considering that Swales' proposal received a "slightly higher Mission Suitability point score," the SSA stated that he "did not note substantial differentiation in the overall technical value between the technical approaches that were offered by Swales and SGT." Id. at Bates No. 7804. The SSA found SGT's proposal to be the "most advantageous" to the government, concluding that the "significantly lower probable cost offered by SGT far outweighs the slight Mission Suitability advantage proposed by Swales." Id. at Bates No. 7805.

On December 12, 2006, after receiving notice of award, Swales protested to our Office. Swales asserted that SGT's proposal should have been found technically unacceptable because the offeror failed to comply with the limitations on subcontracting clause, that the agency misevaluated SGT's proposal under two of the mission suitability subfactors and past performance factor, and that the agency's source selection decision was based on a flawed evaluation and cost-technical tradeoff.

On December 15, Swales supplemented its protest, asserting that the agency misevaluated Swales' and SGT's proposals under the cost/price factor. With regard to its own proposal, Swales' asserted that the agency "double-counted" certain costs, used incorrect other direct cost rates, and used "grossly unrealistic" hours in computing the cost/price for several labor categories. First Supplemental Protest at 5, 7. With regard to SGT's proposal, Swales asserted that the agency failed to conduct a proper cost realism analysis of SGT's other direct costs, failed to consider

---

[2] The SSA found that past performance was not a discriminator in the source selection. Agency Report, Vol. XXII, Tab 22, SSA Decision, at Bates No. 7804.

additional costs to performance resulting from the "dispersion" of SGT's team, and failed to consider costs associated with computing infrastructure for SGT's team. Id. at 12.

Our Office requested that the agency respond on January 22, 2007 to these two protests.

On January 8, Swales again supplemented its protest, complaining that the agency failed to address "numerous patent discrepancies" between SGT's technical and cost/price proposals relating to the division of work among SGT and its teammates. Second Supplemental Protest at 2. Our Office requested that the agency respond to this protest on January 29.

On January 12, in accordance with GAO's schedule notices, the agency submitted its report on the first two protests. The agency provided detailed responses to each protest allegation, supported by 23 4-inch binders of documentation, including a detailed SEB report and SSA decision.

On January 19, before receipt of the agency report responding to the third protest, Swales withdrew all three protests based on a letter from the agency stating it would be taking corrective action. The agency stated that its corrective action would include: (1) rescinding the award to SGT, (2) conducting a review of NASA's mission suitability and past performance findings, (3) reevaluating cost proposals and performing additional cost realism analysis on both proposals, (4) preparing a revised SEB report, (5) conducting an additional SEB presentation to the SSA, and (6) issuing a new SSA decision. Letter from NASA to Swales' Counsel (Jan. 19, 2007), at 1. Based on Swales' withdrawal, our Office closed the file without further action.

Swales requests that our Office recommend that it be reimbursed the reasonable costs of filing and pursuing its protests. It asserts that it is entitled to costs because the agency delayed taking corrective action in the face of its clearly meritorious protests by waiting to take corrective action until after submitting its agency report in response to the first two protests. The agency responds that it did not take corrective action in response to the first two protests, but instead took action in response to the third protest, which raised entirely different protest issues, and that because it took this action before submitting an agency report on the third protest, Swales is not entitled to recover its costs. Swales asserts that all of the protests "were closely related and intertwined," such that if the agency had "properly investigated" the issues in Swales' first and second protests, it would have discovered the "numerous patent discrepancies" in SGT's technical and cost proposals, which were the subject of the third protest. Request for Reimbursement at 3.

Our Office may recommend reimbursement of protest costs if we sustain a protest, or where the agency unduly delays taking corrective action in the face of a clearly meritorious protest. 4 C.F.R. § 21.8(d), (e) (2006). This does not mean that costs should be reimbursed in every case where an agency decides to take corrective action; rather, we will recommend reimbursement only where an agency unduly delayed its decision to take corrective action in the face of a clearly meritorious protest. J.F. Taylor, Inc.--Costs, B-266039.3, July 5, 1996, 96-2 CPD ¶ 5 at 3. As a prerequisite to our recommending the reimbursement of costs where a protest has been settled by corrective action, not only must the protest have been meritorious, but it also must have been "clearly" meritorious--i.e., not a close question. Overlook Sys. Techs., Inc.--Costs--B-298099.3, Oct. 5, 2006, 2006 CPD ¶ 184 at 6.

Here, the agency had submitted its report in response to the first two protests, and although we had not yet received the protester's comments on this report, we had reviewed the extensive record provided by the agency and found no basis to believe that any of the grounds asserted in the protests were "clearly" meritorious. While the protester may have been able to demonstrate through comments that the evaluation contained errors, such errors were not evident to our Office based on our initial review of the record before us.[3]

With regard to the third protest, the agency took corrective action before submitting its agency report. So long as an agency takes corrective action before the due date for its report, our Office regards such action as prompt and will not recommend reimbursement of costs. The Sandi-Sterling Consortium--Costs, B-296246.2, Sept. 20, 2005, 2005 CPD ¶ 173 at 2-3; Envirosolve--Costs, B-294420.3, Feb. 17, 2005, 2005 CPD ¶ 35 at 3. We do not agree that the allegations raised in the third protest were "closely related and intertwined with" the previous protests, such that the agency's investigation of the first two protests should have revealed the asserted evaluation flaws. Swales' assertion that SGT's technical and cost proposals contained

---

[3] Swales asserts that the clearly meritorious nature of the first two protests is demonstrated by the scope of NASA's corrective action, which encompasses all three evaluation factors. Although the agency's notice of corrective action states that it will "conduct a review" of the mission suitability and past performance evaluation factors, NASA explains that it did so only as a "measure of good faith to induce the protester to withdraw its protests" and not because it agrees that any of the allegations raised in the first two protests were meritorious. NASA Response to Request for Costs at 4. NASA further explains that its promise to reevaluate cost proposals and perform an additional cost realism analysis was only to address the allegations concerning SGT's proposal discrepancies that were raised in the third protest. In any case, as concluded above, these other grounds were not "clearly meritorious" and the fact that the agency is nevertheless taking corrective action to respond to these protest concerns does not make them such.

discrepancies was not alluded to in either of the first two protests; indeed, our Office required a separate supplemental report in response to the third protest in recognition of the entirely different nature of the protest allegations.

In sum, Swales has not met the standard for demonstrating entitlement to protest costs as a result of its earlier filed protests.

The request is denied.

Gary L. Kepplinger
General Counsel