Agreed-Upon Redacted Copy - May Be Made Public

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

No. 07-253

SWALES & ASSOCIATES, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant,

and

SGT, INC.,

Defendant-Intervenor.

---

DEFENDANT-INTERVENOR SGT'S BRIEF IN OPPOSITION TO PLAINTIFF SWALES' REQUEST FOR A TEMPORARY RESTRAINING ORDER

---

James H. Roberts, III
Van Scoyoc Kelly PLLC
101 Constitution Avenue, N.W.
Suite 665 East
Washington, D.C. 20001
(202) 898-1898 Phone
(202) 898-0371 Facsimile

Of Counsel:
Carrol H. Kinsey, Jr.
Van Scoyoc Kelly PLLC
Counsel for Defendant-Intervenor, SGT, Inc.
April 30, 2007

**PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 2 of 30

# TABLE OF CONTENTS

Page

INTRODUCTION ........ 1

ALLEGED VIOLATIONS OF PROCUREMENT INTEGRITY ........ 4

A. The Court has no jurisdiction to consider this protest matter based on an alleged violation of the Procurement Integrity Act because Swales did not report the possible violation to NASA within 14-days after Swales management initially became aware of the alleged possible violation in March or April of 2006 ........ 4

B. Swales cannot satisfy its burden of showing a likelihood of success on its procurement integrity-related protest issues ........ 7

ALLEGED VIOLATIONS OF LIMITATIONS ON SUBCONTRACTING ........ 9

A. This Court should not consider this protest issue because it involves a matter of contract administration that is outside the protest jurisdiction of the Court ........ 9

B. Swales cannot satisfy its burden of showing a likelihood of success on its Limitation on Subcontracting protest issues ........ 10

[redacted]

STANDARD OF REVIEW ........ 17

A. Four Factors for TRO ........ 17

B. Likelihood of Success on the Merits ........ 18

C. Remaining Factors ........ 19

CONCLUSION ........ 23

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 3 of 30

**TABLE OF AUTHORITIES**

**Cases:** **Page(s)**

_Alfa Laval Separation, Inc. v. U.S._, 175 F.3d 1365 (Fed. Cir. 1999)....................18

_Baird Corp. v. U.S._, 1 Cl. Ct. 662 (1983)....................17

_Cincom Sys.s, Inc. v. U.S._, 37 Fed. Cl. 266 (1997)....................17, 20

_Cubic Defense Systems, Inc. v. U.S._, 45 Fed. Cl. 450 (1999)....................17

_Delbert Wheeler Constr., Inc. v. U.S._, 39 Fed. Cl. 239 (1997), aff'd, 155 F.3d 566 (Fed. Cir. 1998)....................17

_E.W. Bliss Co. v. U.S._, 77 F.3d 445 (Fed. Cir. 1996)....................17

_FMC Corp. v. U.S._, 3 F.3d 424 (Fed. Cir. 1993)....................17

_Impresa Construzioni Geom. Domenico Garufi v. U.S._, 238 F. 3d 1324 (Fed. Cir. 2001)....................18

_Kola Nut Travel, et al. v. U.S._, 68 Fed. Cl. 195, 2005 U.S. Claims (October 19, 2005).................... *passim*

_Miller-Holzwarth v. U.S._, 44 Fed. Cl. 156; 1999 U.S. Claims LEXIS 95 (May 7, 1999)....................4

_Precision Std., Inc. v. U.S._, 71 Fed. Cl. 216, (Fed. Cl. Feb. 27, 2006) aff'd. 2007 U.S. App. LEXIS 8092, April 6, 2007....................10, 16

_Statistica, Inc. v. Christopher_, 102 F.3d 1577 (Fed. Cir. 1996)....................18

_TRW, Inc. v. Unisys Corp._, 98 F.3d 1325 (Fed. Cir. 1996)....................17

**Statutes:**

5 U.S.C. § 706....................18

28 U.S.C. § 1491(b)(4)....................18

41 U.S.C. § 423(b)....................4

41 U.S.C. § 423(g)....................5

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 4 of 30

**Regulations:**

Government Accountability Office Bid Protest Regulations, 4 C.F.R. § 21.5(d)..............5

**INDEX TO THE APPENDIX**

**Exhibit No.**

1 Declaration of Nicholas M. Galassi, dated April 28, 2007.

2 Declaration of Kamal S. Ghaffarian In Re Procurement Integrity Matter, dated April 30, 2007, including the following appendix of exhibits:

A. Letter from Kathleen Pierson, NASA Contracting Officer regarding PIA Matter, dated March 1, 2007.

B. Letter from Kamal Ghaffarian to NASA Contracting Officer, dated March 12, 2007, in response to Contracting Officer's letter dated March 1, 2007.

Enclosures:

1. Answers to Questions posed in March 1 Letter
2. Affidavit of Harold S. Stinger
3. Affidavit of Kamal S. Ghaffarian
4. Affidavit of Andrew Endal
5. Affidavit of William E. Brooks
6. Affidavit of Matthew J. Yetman
7. Copy of Galassi/Aerostress Consulting Agreement
8. Copy of Aerostress Invoice and SGT Check.

C. Affidavit of Nicholas Galassi, dated March 12, 2007, in re: PIA Matter including transmittal letter from Andrew Hallowell, Mr. Galassi's attorney.

D. Decision of the NASA Procurement Officer Regarding the Procurement Integrity of the Mechanical Systems Engineering Services Procurement, dated March 29, 2007.

3 Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction in Swales and Associates, Inc. v. Aerostress, Inc., Case No. CAL07-02947 (Circuit Court of Prince George's County, Maryland), filed March 20, 2007.

4 Plaintiff's Reply in Further Support of its Motion for a Preliminary Injunction in Swales and Associates, Inc. v. Aerostress, Inc., Case No. CAL07-02947 (Circuit Court of Prince George's County, Maryland), filed April 23, 2007.

5 Declaration of Bryan A. Jennings, dated April 30, 2007.

| | |
|---|---|
| 6 | Declaration of Kamal S. Ghaffarian, In Re Limitation on Subcontracting, dated April 30, 2007. |
| 7 | Declaration of Matthew J. Yetman, In Re Limitation on Subcontracting, dated April 30, 2007. [redacted] |
| 8 | Declaration of Andrew S. Endal, dated April 30, 2007. [redacted] |
| 9 | Swales – Allied Techsystems Inc. Merger Proxy Statement, dated April 13, 2007. |
| 10 | Declaration of Shelley Johnson, dated April 29, 2007. |

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 7 of 30

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| **SWALES & ASSOCIATES, INC.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 07-253** |
| | ) | **(Senior Judge Smith)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant,** | ) | |
| **and** | ) | |
| **SGT, INC.,** | ) | |
| **Defendant-Intervenor.** | ) | |

**DEFENDANT-INTERVENOR SGT'S BRIEF IN OPPOSITION TO PLAINTIFF SWALES' REQUEST FOR A TEMPORARY RESTRAINING ORDER**

As authorized by the Order of Senior Judge Loren A. Smith, Defendant-Intervenor, SGT, Inc., submits this brief in opposition to Plaintiff Swales' request for a temporary restraining order.

As we demonstrate below, Swales cannot satisfy any of the requirements for the extraordinary equitable relief that Swales seeks from the Court.

**INTRODUCTION**

Swales is a disgruntled competitor. Swales lost the competition for NASA's Mechanical Systems Engineering Services II Contract ("MSES II/A" or "Contract") to SGT as a result of NASA's best value competition for NASA's important requirements.

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 8 of 30

Swales has been the incumbent on the NASA Contract for nearly 30 years. During the period of its incumbency with NASA, Swales apparently became complacent, and [redacted]

SGT won the NASA competition for the MSES II/A Contract because SGT offered the best value to NASA. In this regard, NASA determined that there was no significant difference between SGT and Swales in all of the non-cost areas of technical capability, mission suitability, management, and past performance.

[redacted]

SGT, on the other hand, [redacted] In awarding the Contract to SGT, NASA made the best value Contract award determination [redacted]

During the past five months, since NASA's initial award of the Contract to SGT, the incumbent Swales has [redacted]

The latest episode of Swales' long running campaign of delay and disruption is now before this Court in the form of Swales' protest and request for a temporary restraining order ("TRO") based on: 1) alleged violations of procurement integrity; and, 2) alleged violations of limitations on subcontracting.

As demonstrated in the arguments set forth below, in these circumstances, both of the bases for which Swales seeks a TRO are outside of the Court's protest jurisdiction, and, therefore, should be dismissed for lack of jurisdiction, and the TRO request summarily denied.

Beyond the jurisdictional issues, however, the following arguments and discussion also will demonstrate that Swales will not be able to satisfy its burden of showing that either of the two bases on which Swales seeks the TRO has a likelihood of success on the merits.

Finally, the arguments and discussion below will demonstrate that Swales' request for a TRO must fail because Swales, in addition to being unable to show a likelihood of success on the merits, is unable to establish that it will suffer immediate irreparable harm if a TRO is not granted, that the balance of hardships tips in Swales' favor, or, that the granting of a TRO will not be contrary to the public interest.

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 10 of 30

## ALLEGED VIOLATIONS OF PROCUREMENT INTEGRITY

**A. The Court has no jurisdiction to consider this protest matter based on an alleged violation of the Procurement Integrity Act because Swales did not report the possible violation to NASA within 14-days after Swales management initially became aware of the alleged possible violation in March or April of 2006.**

Swales alleges that a former Swales employee by the name of Nicholas Galassi and Mr. Galassi's one-man (himself) consultant company called Aerostress (herinafter together referred to as "Galassi") engaged with SGT and NASA in all sorts of alleged violations of the Procurement Integrity Act, 41 U.S.C. § 423(b) (West Supp. 1998) ("PIA").

This is Swales' latest desperation protest issue attempting to further delay and disrupt SGT's Contract performance to fulfill NASA's important missions in a cost effective manner. The lack of a likelihood of success on the merits of the PIA protest-related issues will be demonstrated in "B" below.

Here, we will show that the Swales protest issues raising alleged Galassi/PIA matters are not for this Court's protest consideration. In *Miller-Holzwarth v. U.S.*, 44 Fed. Cl. 156; 1999 U.S. Claims LEXIS 95 (May 7, 1999) at footnote 6, this Court discussed and recognized the timely initial procuring agency filing requirements that must be followed in a PIA matter that would later allow for a protest based on a PIA matter:

> The PIA precludes a person from filing a protest against the award or proposed award of a contract alleging that source selection information was improperly obtained in violation of subsection (b), "unless that person reported to the Federal agency responsible for the procurement, no later than 14 days after the person first discovered the possible violation, the

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 11 of 30

information that the person believed constitutes evidence of the offense."

41 U.S.C. § 423(g)....

The Government Accountability Office ("GAO") has recognized this PIA statutory timely agency filing requirement by including it in GAO's Bid Protest Regulations at 4 C.F.R. § 21.5 (d) as a protest issue not for consideration by GAO if the 14-day agency filing requirement is not satisfied:

> (d) *Procurement integrity.* For any Federal procurement, GAO will not review an alleged violation of subsections (a), (b), (c), or (d) of sec. 27 of the Office of Federal Procurement Policy Act, 41 U.S.C. 423, as amended by sec. 4304 of the National Defense Authorization Act for Fiscal Year 1996, Public Law 104-106, 110 Stat. 186, February 10, 1996, where the protester failed to report the information it believed constituted evidence of the offense to the Federal agency responsible for the procurement within 14 days after the protester first discovered the possible violation.

In its TRO supporting Memorandum at page 12, Swales stated, "Aerostress' (and Mr. Galassi's ) involvement with SGT was revealed to Swales during SGT's December 6 [2006] Open House." At page 13 of the TRO supporting Memorandum, Swales stated, "Following the revelation that Aerostress (Mr. Galassi) had assisted SGT with the preparation of its competing proposal, on December 13, 2006, Swales submitted a "Notice under FAR 1.602-2(b) and 33.102 (f)," requesting an "Investigation of Procurement Integrity Matter under [the] MSES IIA" RFP."

Swales will argue that this Court has protest jurisdiction because Swales reported to NASA on December 13, 2006, its December 6, 2006, "revelation" that Galassi assisted SGT in the preparation of its competing proposal, and that the subsequent Swales December 13th report to NASA was within the PIA-required 14 days. Swales management, however, knew of Galassi's assistance to SGT months earlier.

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 12 of 30

When Galassi provided approximately 34 hours of consulting services to SGT in March-April of 2006 to review and provide technical input on the SGT proposal, Mr. Galassi explicitly advised two members of Swales management during the time he was performing his brief services for SGT (in or around March-April, 2006), that he—Galassi—was working for SGT on a portion of SGT's proposal.

Specifically, Mr. Galassi informed Patrick Miller, Swales' Director of MSES, and Paul Conners, Swales' Lead for the Solar Dynamics Observatory program that he—Galassi—was working for SGT to review a portion of SGT's MSES II/A proposal to NASA. Mr. Galassi informed the two Swales management personnel of his work on the SGT proposal because he continued to have frequent contacts with them, and he wanted to ensure that they would not inadvertently disclose to him any confidential and proprietary information regarding Swales' proposal to NASA for MSES II/A. Mr.Galassi declares that Mr. Miller and Mr. Conners voiced no objection and did not disclose any Swales confidential and proprietary information to Mr. Galassi. Exhibit ("Ex.") 1 (Galassi Declaration, April 28, 2007, para. 5), see also Galassi Affidavit, March 13, 2007, attached to Ghaffarian Declaration, April 30, 2007, at Ex. 2.

Swales' statement that its knowledge that Galassi worked on the SGT proposal was only "revealed" to Swales on December 6, 2006—after Swales had lost the NASA Contract to SGT—is simply an attempt to get around the timeliness rules of the PIA statute to allow the PIA issues to be considered in a protest forum.

Mr. Galassi never hid the fact from Swales that he was going to do some work on the SGT proposal. In fact, he explicitly advised two Swales management personnel in March or April of 2006 to avoid PIA problems. Swales knew of Galassi's work on the

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 13 of 30

competing SGT proposal in March or April of 2006. If Swales had a PIA concern about a PIA violation in March or April of 2006—and if Swales wanted to preserve its ability to protest that PIA matter—Swales was required to raise the issue with NASA within 14 days of March or April of 2006. Swales did not have any PIA concerns at that time and did not raise any PIA issues with NASA; therefore, Swales will not find any bid protest jurisdiction at GAO or this Court.

A consideration by this Court of the Swales PIA protest matter would be counter to the terms of the PIA statute itself, and would allow Swales and future protesters to hold such issues in their pockets until after they lose a contract, and then attempt to bootstrap a timely 14-day PIA filing with the procuring agency by claiming an initial "revelation" of a PIA matter that suits the protester's purposes.

For the foregoing reasons, the Court has no jurisdiction to consider the PIA-related protest issues raised by Swales, and the Court should summarily dismiss the Swales PIA-related protest issues.

**B. Swales cannot satisfy its burden of showing a likelihood of success on its procurement integrity-related protest issues.**

Should this Court agree to consider Swales' PIA-related protest issues, Swales will be unable to show a likelihood of success on the merits for these issues.

We commend to the Court's reading the thorough and well-reasoned, six-page Decision of the NASA Procurement Officer, dated March 29, 2007, regarding the Procurement Integrity of the Mechanical Systems Engineering Services Procurement. Appendix D to Ghaffarian Declaration, April 30, 2007, Ex.2.

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 14 of 30

This March 29, 2007, NASA Decision addressed all of the Swales alleged Galassi PIA-related issues, and concluded that the integrity of the procurement was intact. The NASA Decision was developed based on NASA's own investigation and NASA's review of information and affidavits that both Swales and SGT provided to NASA. In this regard, the Ghaffarian Declaration of April 30, 2007, at Ex. 2, includes in its Appendix all of the Affidavits and other information submitted to NASA by SGT. Ex. 2 also includes at C in the Ghaffarian Appendix a copy of the sworn Affidavit from Mr. Galassi, dated March 13, 2007, that Mr. Galassi provided directly to NASA.

Despite the NASA Decision showing clearly that there was no violation of procurement integrity, Swales continues, without any proof, to pursue its groundless allegations in other forums. Swales has called for a NASA Inspector General Investigation on this issue. Swales continues its suit against Galassi in Maryland State Circuit Court on these matters. Ex. 3 and Ex. 4 are the most recent Galassi and Swales substantive filings in the Maryland matter. Once again, Swales is unable to offer any proof of its allegations because there is none. Now, Swales comes to this Court with the same unproven—and unprovable—allegations of PIA wrongdoing.

Swales' continuing efforts are calculated to raise suspicion and cause concern, but these efforts have no substance behind them. Mr. Galassi's most recent Declaration at Ex. 1 addresses the most recent round of baseless arguments made by Swales. To further show that Galassi had no input into the SGT costing proposal, we provide the Declaration of Bryan Jennings, Ex. 5, showing that SGT's standard costing was used in the development of the SGT proposal, that the costing was developed before the time Galassi

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 15 of 30

assisted SGT, and that Galassi had no input whatsoever in the SGT cost proposal processes.

In *Kola Nut Travel et al v. U.S. et al*, 68 Fed. Cl. 195, 2005 U.S. Claims LEXIS 299 (October 19, 2005) (hereinafter *Kola Nut Travel*), this Court held that suspicion and concern are not proper thresholds for triggering injunctive relief. In the instant case suspicion and concern are all that Swales offers to support its position.

In *Kola Nut Travel*, with facts similar to the instant Swales protest, this Court opined:

> Indeed, there is no *per se* prohibition on the common use of consultants in the preparation of proposals. The evidence presented thus far simply does not even come close to the level of proof necessary to justify the extraordinary relief sought in this bid protest.

For the same reasons expressed in *Kola Nut Travel*, this Court should find that Swales has not shown any likelihood of success on the merits on these PIA-related protest issues, and the request for TRO should be denied.

## ALLEGED VIOLATIONS OF LIMITATIONS ON SUBCONTRACTING

**A. This Court should not consider this protest issue because it involves a matter of contract administration that is outside the protest jurisdiction of the Court.**

There is absolutely no support in the record for Swales' allegations that SGT should be found technically unacceptable for allegedly failing to show in its proposal to NASA that it intends to comply with the Limitation on Subcontracting requirements during contract performance.

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 16 of 30

SGT's proposal exhibited a clear commitment to fully comply with the Limitation on Subcontracting requirements. NASA recognized this commitment by SGT and actually awarded SGT strengths in the evaluation process for aspects of this commitment in the SGT proposal.

On October 3, 2006, SGT submitted its proposal to NASA for the MSES II/A requirements. That proposal clearly exhibited SGT's ability and intent to comply with the limitations on subcontracting, and gave no indication whatsoever that SGT would not comply with the limitations on subcontracting. As the contract awardee, SGT is complying and will continue to comply with the limitations on subcontracting. Ghaffarian Declaration regarding Limitation on Subcontracting Issue, Ex. 6.

Whether SGT follows through with its commitment—and it will—is a matter of contract administration for NASA, and, therefore, outside the bounds of the Court's Tucker Act protest jurisdiction that does not include matters of contract administration. See generally *Precision Std., Inc. v. U.S.*, 71 Fed. Cl. 216, (Fed. Cl. Feb. 27, 2006) *aff'd.* 2007 U.S. App. LEXIS 8092, April 6, 2007.

For the foregoing reasons, this Court should dismiss the Swales Limitation on Subcontracting protest issues because they are matters of contract administration and outside the Court's protests jurisdiction.

**B. Swales cannot satisfy its burden of showing a likelihood of success on its Limitation on Subcontracting protest issues.**

Should this Court agree to consider Swales' Limitation on Subcontracting protest issue, Swales will be unable to show a likelihood of success on the merits for this issue.

In SGT's proposal to NASA, [redacted] of the work share based on loaded labor dollars in both the Mission Suitability Volume and the Cost Volume was proposed to be

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 17 of 30

performed by SGT. The remaining [redacted] was proposed to be performed by four subcontractors.

| | |
|---|---|
| SGT | [redacted] |
| Subcontractors: | |
| [redacted] | [redacted] |

Yetman Declaration, para. 7, Ex. 7.

Nowhere in SGT's proposal was there any indication that SGT would perform less than 50% of the labor cost of the contract nor was there any indication whatsoever that SGT would not comply with the Limitation on Subcontracting clause. Yetman Declaration, para. 8, Ex. 7.

SGT's MSES II/A Contract performance and transition began on April 15, 2007. NASA has issued a few substantive task orders for preliminary pricing. Most task orders typically will come in toward the end of the transition period in mid-May. However, for those that have been issued already, SGT will perform the majority of the work share in compliance with the Limitation on Subcontracting provisions. SGT intends to, and will, comply with the Limitation on Subcontracting clause throughout the term of contract performance. Yetman Declaration, paras. 10 and 11, Ex. 7.

The McQuaid Declaration, included by Swales as support for its request for TRO concerning the Limitation on Subcontracting issue, shows just how complacent and out of touch Swales has become as a long-term incumbent, and very expensive, contractor for

NASA. It appears as though Swales and Mr. McQuaid have lost touch with the industry by not recognizing the possibility of innovative [redacted] and, further, by simply making a basic argument and incorrect assumption that effectively says, "SGT couldn't possibly do more than 50% of the work on its own" because, as Mr. McQuaid incorrectly surmises, SGT does not possess four critical resources required to perform the MSES II/A contract, and, as a result, will not be able to comply with the Limitation on Subcontracting clause requiring that "at least 50% of the cost of contract performance incurred for personnel shall be expended for employees of the offering concern."

Mr. McQuaid's analysis is flawed. SGT's response to the McQuaid Declaration is contained in the Endal Declaration at Ex. 8, the contents of which are summarized in the following paragraphs.

First, as stated in the McQuaid Declaration, SGT does not have company-owned production facilities for fabrication of spacecraft hardware. The MSES II/A solicitation did not require the offering concern to possess such facilities, but required the offeror to demonstrate that it can access such facilities when Task Orders issued under the MSES II/A Contract require hardware fabrication at contractor facilities.

SGT's approach to this requirement was and is to [redacted]

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 19 of 30

In its proposal, SGT characterized these costs savings to NASA missions as [redacted] NASA's Selection Statement of March 29, 2007, correctly identifies this outsourcing approach as a significant strength of SGT's proposal:

> *The proposal received a significant strength for providing excellent state-of-the-art, critical facilities that are committed and available. SGT's teammates have extensive manufacturing and test facilities, laboratories, clean rooms, and other critical facilities. The team members' facilities have overlapping capabilities. The SGT proposal received a strength for a sound basis for teaming arrangements that augment their expertise and provides full coverage of the statement of work. SGT conducted a formal gap analysis to identify the specific areas in which its own capabilities required augmentation.*

In other words, NASA correctly evaluated this aspect of SGT's proposal as a benefit to NASA, due to cost savings and risk reduction.

Second, contrary to the McQuaid Declaration, SGT has access to the necessary computing resources (hardware and software) to support mechanical engineering development activities for space flight systems. SGT's proposal identified the required computing hardware and software. [redacted]

[redacted] The engineering activities that utilize these computing resources will account for more than 50% of the total labor cost for this contract.

Third, contrary to the McQuaid Declaration, SGT has the processes in place to support NASA's spaceflight missions as a result of performing NASA engineering contracts since 1994. These processes include safety processes, quality assurance processes, material handling, inventory management, document control, environmental regulatory compliance, engineering processes, and more. These documented processes are part of SGT's ISO 9000 certified Quality Management System. [redacted]

The fourth point in Mr. McQuaid's Declaration (that SGT does not have the capability to produce mechanisms, structures, instrument systems, and electronic systems) is a repetition of his first point that SGT addressed above.

The central point in Mr. McQuaid's Declaration is that, based on an analysis of the history of the current MSES contract, at least 56% of the total contract labor costs are associated with the Integrated Product Teams ("IPTs") or Project Groups which produced hardware (Paragraph 21 of the McQuaid Declaration). However, the overwhelming majority of the IPT labor costs are in the engineering design and analysis activities, and in the integration and test activities, which will be performed by SGT, with minority participation by SGT's subcontractors.

In a typical Goddard in-house spacecraft project, a Systems Engineering IPT is initially formed to develop the mission requirements and define the mission subsystems (spacecraft structures, electronics, software, etc.). Subsystem IPTs are then formed to further refine the design and analyze the design elements to ensure that they will meet mission requirements. Both the Systems Engineering IPT and the Subsystems IPTs are comprised of NASA engineers and contractor engineers, working in a collaborative manner under the leadership of the NASA engineers. The contractor engineers perform according to Task Orders issued to the MSES (MSES II/A) contract, the current SGT METS contract, and other service contracts. The subsystem designs are refined by these IPTs to the level of component drawings. Drawings for the mechanical components are typically outsourced to vendors that fabricate the components and deliver them to Goddard for testing and assembly into subsystems. The subsystems are then integrated and the spacecraft goes through an extensive series of functional and environmental tests.

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 22 of 30

The assembly, integration and testing for Goddard in-house missions is typically performed using facilities at the Goddard Space Flight Center, though outside facilities may be used if the Goddard facilities are oversubscribed. Upon completion of testing, the spacecraft is shipped to a launch site for integration with the launch vehicle. After launch, mission operations are performed at control centers located at Goddard. The fabrication and assembly element of this development sequence typically comprises much less than 10% of the total labor costs associated with the mission. Thus, the fact that SGT does not have its own fabrication facilities will not impact SGT's ability to perform more than 50% of the total contract labor cost.

In summary, SGT proposed that significantly more than 50% of the cost of contract performance incurred for personnel will be expended for employees of SGT, and SGT has all the capabilities required to perform accordingly.

SGT took on the [redacted] complacent, incumbent contractor in Swales, and won the NASA Contract because SGT offered NASA a very cost effective and highly technically qualified solution to NASA's mission critical needs.

The record of evidence shows that SGT complied in all respects with the Limitation on Subcontracting requirements. *Precision Standard, Inc. v. U.S.*, supra.

As this Court found in *Kola Nut Travel*, it also should find with regard to this protest issue that "The evidence presented thus far simply does not even come close to the level of proof necessary to justify the extraordinary relief sought in this bid protest."

For the same reasons expressed in *Kola Nut Travel*, therefore, this Court should find that Swales has not shown a likelihood of success on the merits on this Limitation on Subcontracting protest issue, and the Swales request for TRO should be denied.

## STANDARD OF REVIEW

### A. Four Factors for TRO

Four factors must be proven by a plaintiff seeking to obtain extraordinary injunctive relief, as Swales seeks here. In order to establish a right to the temporary restraining order sought here, Swales must establish:

> 1) that [they are] likely to succeed on the merits at trial; 2) that [they] will suffer irreparable harm if preliminary relief is not granted; 3) that the balance of the hardships tips in the [Plaintiffs] favor; and 4) that a preliminary injunction will not be contrary to the public interest.

*Kola Nut Travel, et al. v. U.S.*, citing *FMC Corp. v. U.S.*, 3 F.3d 424, 427 (Fed. Cir. 1993). As also noted in *Kola Nut Travel*, plaintiffs must establish their entitlement to injunctive relief by clear and convincing evidence. See, e.g., *Baird Corp. v. U.S.*, 1 Cl. Ct. 662, 664 (1983).

With regard to the important first factor concerning the likelihood of success on the merits, agency procurement personnel are granted a great deal of discretion and deference when, as here, a negotiated procurement is involved, and the deference is greater still when, as here, the procurement is a "best value" procurement. *Cubic Defense Systems, Inc. v. United States*, 45 Fed. Cl. 450, 458 (1999) (citing *Delbert Wheeler Constr., Inc. v. United States*, 39 Fed. Cl. 239, 247 (1997), aff'd, 155 F.3d 566 (Fed. Cir. 1998); *Cincom Sys.s* 37 Fed. Cl. at 671-72; FAR 15.605(c); *TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); *E.W. Bliss Co. v. U.S.*, 77 F.3d 445 (Fed. Cir. 1996).

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 24 of 30

A reviewing court does not disturb an agency contract award unless it is arbitrary, capricious, an abuse of discretion, or otherwise violates applicable procurement law. 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706; *Impresa Construzioni Geom. Domenico Garufi v. U.S.*, 238 F. 3d 1324, 1332 (Fed. Cir. 2001).

Swales has utterly failed to show, by any standard of persuasion, that NASA engaged in arbitrary or capricious decision making in its award of the MSES II/A Contract to SGT, nor has Swales shown that NASA's award decision constituted an abuse of discretion or that NASA violated any applicable procurement law or regulation in making its best value award decision here.

Swales has failed to establish any of the four factors in the instant protest and request for TRO.

**B. Likelihood of Success on the Merits**

As demonstrated *infra*. in the context of each of the two Swales protest issues (PIA-related matters, and Limitation on Subcontracting) Swales cannot satisfy the burden of showing a likelihood of success on the merits. As noted in *Kola Nut Travel*, "[i]n order to prevail in a bid protest, the Plaintiffs 'must show a significant, prejudicial error in the procurement process.' *Alfa Laval Separation, Inc. v. U.S.*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (citing *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)."

Swales has not made, and will not be able to make, such a showing of a likelihood of success on the merits for either of the protest issues raised in this request for TRO.

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 25 of 30

### C. Remaining Factors

Because Swales is in the midst of a very lucrative merger with Alliant Techsystems, Inc. ("ATK"), Swales will be unable to demonstrate immediate irreparable harm should the TRO not be granted.

In a published Proxy Statement (Ex. 9 at page 4), the Merger Consideration equals $333.76 per share of Swales Common Stock. Swales will survive the Merger as an indirect wholly-owned subsidiary of ATK. Swales' Chief Executive Officer will receive over $2 million in bonuses and an equity dividend upon the effectiveness of the merger, and certain Swales employees will receive Transaction Bonuses aggregating not more than $300,000. (Ex. 9 at page 1.) There are 299,615 shares of Swales Common Stock outstanding, over 82% of which are held in beneficial ownership by the Swales Employee Savings and Stock Ownership Program ("ESSOP"). (Ex. 9 at page 14.) Thus, the merger is valued at approximately $100 million, over $80 million of which will benefit Swales employees participating in the ESSOP.

Finally, the Proxy Statement acknowledges Swales' loss of the NASA MSES II/A Contract at Goddard Space Flight Center, the amount of Swales' annual revenue that the NASA Contract generated, and pledged that, through the high value merger, the merged companies would seek to continue to provide services to Goddard. (Ex. 9 at page 1.) It is noteworthy that the merger has already considered (and discounted) the loss of the NASA Contract in issue here, (Ex. 9 at page 1), and in the context of the ATK merger, Swales is no worse off financially because of the NASA Contract loss. Certainly, Swales is not immediately and irreparably harmed.

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 26 of 30

Swales argues, in addition to loss of revenue represented by the NASA MSES II/A Contract, that it will lose its employees and the ability to perform its present contracts if the TRO it seeks is not granted. As the Proxy shows, Swales employees have substantial opportunities in the newly merged entity should they remain with Swales, rather than departing to work for SGT. Indeed, Swales' highly skilled workforce will, due to the merger with ATK, have the ability to choose between joining SGT on the NASA MSES II/A Contract or remaining with Swales as it begins to undertake performance of other contracts as a wholly-owned subsidiary of ATK. That such a highly lucrative merger is proceeding with its merger partner's full appreciation of Swales' loss of the MSES II/A Contract to SGT clearly demonstrates that Swales will not suffer any irreparable harm should the equitable relief sought be denied.

Finally, as noted in *Kola Nut Travel*, where, as here, an expedited schedule has been embarked upon by the Court and the parties to address the merits of the Plaintiff's protest, any modicum of harm that might result would not be irreparable. *Kola Nut Travel*, citing *Cincom Sys.s, Inc. v. U.S.*, 37 Fed. Cl. 266, 268 (1997).

With regard to the balancing of harms and harm to the public interest factors, NASA and SGT will be harmed more than Swales if extraordinary equitable relief is granted because valuable Swales employees will go elsewhere because of the unsettled nature of MSES II/A Contract performance. NASA will suffer significant disruption and adverse impacts to its critical missions, along with suffering a "brain drain" as employees leave the NASA engineering world entirely due to uncertainty that will result should contract performance be stopped by a TRO.

If a TRO is granted, SGT's efforts to recruit Swales engineering and other highly skilled technical and professional personnel during this transition period will suffer. Conversely, Swales will only suffer the loss of Contract revenues, and employees working on that Contract, while still enjoying the fruits of a highly lucrative merger with ATK a large space hardware engineering and manufacturing concern that will provide diverse professional opportunities for Swales employees.

In further substantiation of the recruiting difficulties SGT is experiencing due to the uncertainties caused by Swales' continuing litigation over the MSES II/A Contract award, SGT's Director of Program Management and Transition Manager of the MSES II/A Contract relates numerous instances of recruiting difficulties. Johnson Declaration at Ex. 10.

Ms. Johnson describes a strained recruiting atmosphere poisoned by a new Swales policy to immediately terminate any Swales employee giving two weeks' notice to transition to SGT with the NASA MSES II/A Contract. This is an unusual policy for contract transitions at NASA's Goddard Center. Normally, the incumbent contractor and the incoming contractor work together to ensure a seamless transition so that NASA's important missions are not disrupted and their mission-imperative projects are performed expeditiously and professionally. Johnson Declaration, Ex. 10. As Ms. Johnson notes, many Swales employees are simply afraid to join SGT until they can be assured that they will have a job and that there is a definite substantive Contract performance start date.

Even NASA project customers are expressing concerns about their ability to navigate what would normally be a smooth transition and the departure of some

contractor staff from the NASA support staff altogether. NASA mission performance is being endangered as a result. (Ex. 10 at page 2.)

The public interest will clearly not be served by significant disruption and adverse impacts to NASA's critical mission, along with the "brain drain" as Swales employees consider leaving the NASA engineering world due to the uncertainty that would continue to ensue should injunctive relief be granted.

As in the *Kola Nut Travel* circumstances, NASA and SGT have begun to implement the Contract, transition is underway, and NASA task orders are being presented to SGT for performance. There would be a significant disruption, and added cost—at Swales' significantly higher contract costs in comparison to SGT's lower costs—if injunctive relief were granted. A TRO, therefore, would cause significant hardships for both NASA and SGT, and would be contrary to the public interest.

Swales, in addition to being unable to show a likelihood of success on the merits, has not shown, and cannot show, that it has satisfied the three remaining TRO factors, and no TRO should be granted.

Case 1:07-cv-00253-LAS Document 13 Filed 04/30/2007 Page 29 of 30

## CONCLUSION

For the reasons set forth above, Swales' request for a temporary restraining order should be denied.

Respectfully submitted,

James H. Roberts, III
Van Scoyoc Kelly PLLC
101 Constitution Avenue, N.W.
Suite 665 East
Washington, D.C. 20001
(202) 898-1898 Phone
(202) 898-0371 Facsimile

Of Counsel:
Carrol H. Kinsey, Jr.
Van Scoyoc Kelly PLLC
Counsel for Defendant-Intervenor, SGT, Inc.
April 30, 2007

**CERTIFICATE OF FILING**

I hereby certify that on this 30th day of April 2007, a copy of the foregoing, "DEFENDANT-INTERVENOR SGT'S BRIEF IN OPPOSITION TO PLAINTIFF SWALES' REQUEST FOR A TEMPORARY RESTRAINING ORDER" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ James H. Roberts, III
JAMES H. ROBERTS, III