# <u>Exhibit 1</u>

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | |
|---|---|
| SWALES & ASSOCIATES, INC., Plaintiff, v. UNITED STATES OF AMERICA, Defendant, and SGT, INC., Defendant-Intervenor. | No. 07-253 (Senior Judge Smith) |

DECLARATION OF NICHOLAS M. GALASSI

I, NICHOLAS M. GALASSI, being duly sworn, hereby declare as follows:

1. I am the President and sole owner of Aerostress, Inc. ("Aerostress"), a consulting company that provides structural analysis and engineering. I have provided structural and mechanical engineering services at NASA Goddard Space Flight Center since 1987, as an employee of various companies, including Fairchild Industries (1987-1993), Swales & Associates, Inc. ("Swales") (1993-2005), and Aerostress.

2. I worked at Swales as a structural engineer from 1993 through the effective date of my resignation, October 28, 2005. As of the date of termination of my employment with Swales, Solicitation No. NNG0596383 ("MSES-IIA") had not been released by NASA. Previously, however, NASA had circulated drafts of certain portions of the anticipated MSES-IIA solicitation for industry comment. While employed with Swales, I attended the MSES-IIA

kickoff meeting and subsequent meetings in or around June-July 2005. These meetings involved only issues relating to RTO No. 1. To the best of my recollection, I was not involved in any other areas relating to Swales' MSES-IIA effort. I had no involvement in Swales' MSES-IIA effort after July 2005.

3. In April 2006, my company, Aerostress, entered into a Consulting Agreement with SGT dated March 28, 2006 to review and provide technical input on SGT's proposal for the MSES-IIA procurement in the areas of Understanding the Requirements ("UTR") and Representative Task Orders ("RTOs"). Through Aerostress, I performed approximately 34 hours of consulting services in March-April 2006 consisting of reviewing and commenting on SGT's proposed solution to RTOs and UTR in the MSES-IIA procurement. At no time was I involved with drafting SGT's proposal. Rather, my involvement primarily involved cross-checking SGT's proposal against the RFP requirements. In performing these services for SGT, I relied on my skills and expertise as a structural analysis engineer. At no time did I use or disclose to SGT any information regarding Swales' proposed solutions to RTOs or any confidential information or trade secrets of Swales.

4. I did not provide input or otherwise assist SGT in the preparation of any aspect of its cost or business proposal. Further, I have never seen any portion of SGT's cost or business proposal, nor has any portion of SGT's cost or business proposal been verbally disclosed to me.

5. During the time that I was performing services for SGT (in or around March – April, 2006), I advised two members of Swales management (who supervised me on the work I performed while I was with Swales) that I was working for SGT on a portion of its proposal. Specifically, I informed Patrick Miller, Swales' Director of MSES, and Paul Conners, Swales' Lead for the Solar Dynamics Observatory ("SDO") program, that I was working for SGT to

review a portion of its MSES-IIA proposal. I informed them of this because I had frequent contacts with them on the SDO program, and I wanted to ensure that they would not inadvertently disclose to me any confidential and proprietary information regarding Swales' proposal for MSES-IIA. They did not voice any objection and did not disclose any such confidential and proprietary information to me.

6. In September 2006, I was asked by SGT to participate in an oral presentation to NASA in the area of Integration and Test Engineering. I participated at SGT's oral presentation in this limited area. Following the presentation, I provided input in connection with SGT's response to NASA in the same area, i.e., Integration and Test Engineering.

7. After SGT received the MSES-IIA award on or about December 6, 2006, SGT requested my assistance in transitioning the MSES staff from Swales. SGT indicated that in exchange for my assistance in this regard, there might be subcontracting opportunities for Aerostress in the future. Accordingly, I attended two SGT open houses in December 2006. During one of the open houses, a then current Swales employee asked me whether Aerostress had a retirement plan. As a single-employee company, I replied that Aerostress did not have such a plan. The individual suggested that it would be beneficial if her 401(k) account under Swales' 401(k) plan could be rolled over to Aerostress. Later in December, as a result of that conversation, I contacted the Principal Financial Group ("Principal"), which administers Swales' 401(k) plan. I inquired whether employee accounts could be rolled over to Aerostress. I was informed that this would not be possible. I had no further contact with Principal regarding the issue.

I HEREBY DECLARE under the penalties of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

[signature] 4/22/2007
NICHOLAS M. GALASSI

# Exhibit 2

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| **SWALES & ASSOCIATES, INC.,** **Plaintiff,** v. **UNITED STATES OF AMERICA,** **Defendant,** **and** **SGT, INC.,** **Defendant-Intervenor.** | ) | **No. 07-253** **(Senior Judge Smith)** |

**DECLARATION OF KAMAL S. GHAFFARIAN**
**IN RE: PROCUREMENT INTEGRITY MATTER**

1. My name is Kamal S. Ghaffarian. I am the co-owner, Executive Vice President and Chief Operating Officer for SGT, Inc. (SGT). I am also the acting Vice President of Business Development (VP BD). I have been employed by SGT since 1994.

2. On March 1, 2007, I received a letter from Kathleen Pierson, the Contracting Officer for NNG056383R, MSES II/A, requesting that I respond to questions in regard to allegations made by Swales Aerospace, Inc.,that Mr. Nicholas Galassi, a former Swales employee, provided SGT with proprietary data belonging to Swales Aerospace. A copy of Ms. Pierson's letter is included in the appendix to this Declaration

3. I investigated the matter thoroughly and concluded that there was no substance whatsoever to the allegations.

4. I responded to Ms. Pierson's letter on March 13, 2007 stating *"Harold Stinger* (SGT's President) *and I, along with our MSES II/A Capture Manager, Dr. Andy Endal, our MSES II/A Proposal Manager, Bill Brooks, and our CFO, Matt Yetman, have enclosed sworn affidavits supporting the position that SGT did not ask for and Mr. Galassi did not communicate in any way Swales proprietary data to anyone associated with SGT and its MSES II/A proposal effort."* A complete copy of my response including all enclosures is included in the appendix to this Declaration.

5. As noted in my response to Ms. Pierson, Mr. Galassi, through his legal counsel, provided an affidavit on the Procurement Integrity matter directly to Mr. Pierson. Mr. Galassi's counsel provided me a copy of the Galassi Affidavit, dated March 12, 2007, in which Mr. Galassi categorically denies the allegations made by Swales, and, further, Mr. Galassi stated that he advised Swales management personnel as early as March 2006 that he would be doing some work on the SGT MSES II/A proposal to NASA. A copy of the March 12, 2007, Galassi Affidavit, copied to me by Mr. Galassi's attorney is in the appendix to this Declaration

6. NASA investigated the PIA charges and responded on March 30, 2007, with the Decision of the Procurement Officer Regarding the Procurement Integrity of the Mechanical Systems Engineering Services Procurement dated March 29, 2007. A copy of the March 29, 2007, NASA decision is in the appendix to this Declaration. The conclusion of this six-page NASA decision appears below.

Conclusion

Based upon the above review, it is my determination that a Procurement Integrity Act violation has not occurred. Mr. Galassi was not and is not a Federal Government Official nor was he working as a contractor providing advice to the SEB on the MSES II/A procurement. Mr. Galassi may have had access to Swales technical information on the RTOs for MSES II/A. But there is no evidence to establish that SGT officials either asked for this information or received it. Mr. Galassi may have had access to Swales estimated rate information for the SDO contract dated before Oct 2005. However, there is no evidence to establish that SGT employees either asked for this information or knowingly accepted this type of information. In fact, the evidence presented establishes that SGT did not ask for or receive any type of cost assistance or information from Mr. Galassi. Further, the Procurement Integrity Act statute does not restrict contractors from disclosing their bid or proposal information or recipients from receiving it. Thus, it is my determination that a Procurement Integrity Act violation has not occurred. I find that the overall integrity of this procurement is still intact.

Valorie A. Burr (signature)
Valorie A. Burr
Procurement Officer

3/29/07
Date

7. I hereby reaffirm all statements that I made in my letter to Ms. Pierson dated March 13, 2007, and my Affidavit dated March 12, 2007, in its entirety including the following statement "*To my knowledge, Mr. Galassi did not share with SGT personnel, consultants hired by SGT or SGT officials any Swales proprietary information including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information.*"

I declare under penalty of perjury that the foregoing is true and correct.

4/30/07
Date

Kamal S. Ghaffarian

**APPENDIX TO DECLARATION OF KAMAL S. GHAFFARIAN IN RE: PIA MATTER**

Table of Contents

A. Letter from Kathleen Pierson, NASA Contracting Officer regarding PIA Matter, dated March 1, 2007.

B. Letter from Kamal Ghaffarian to NASA Contracting Officer, dated March 12, 2007, in response to Contracting Officer's letter dated March 1, 2007.

Enclosures:

1. Answers to Questions posed in March 1 Letter
2. Affidavit of Harold S. Stinger
3. Affidavit of Kamal S. Ghaffarian
4. Affidavit of Andrew Endal
5. Affidavit of William E. Brooks
6. Affidavit of Matthew J. Yetman
7. Copy of Galassi/Aerostress Consulting Agreement
8. Copy of Aerostress Invoice and SGT Check.

C. Affidavit of Nicholas Galassi, dated March 12, 2007, in re: PIA Matter including transmittal letter from Andrew Hallowell, Mr. Galassi's attorney.

D. Decision of the NASA Procurement Officer Regarding the Procurement Integrity of the Mechanical Systems Engineering Services Procurement dated March 29, 2007.

# Exhibit 2 A

# FAX TRANSMISSION

NASA/GODDARD SPACE FLIGHT CENTER
BLDG. 11 ROOM S215
GREENBELT, MD 20771

**FAX: 301-286-1720**

**To:** Dr Ghaffarian **Date:** 3/1/07

**Fax#:** 301 614 8601 **Pages:** 3
*(Including this cover sheet)*

**From:** **210.M/Mission Enabling Procurement Office**

**Name:** Cathy Pierson

**Phone#** (301) 286-5257

**Subject:** MSES II/A Procurement Integrity Matter

**COMMENTS:**

___ Urgent!/Please Respond ASAP ___ FYI ___ NOT URGENT

National Aeronautics and
Space Administration

**Goddard Space Flight Center**
Greenbelt, MD 20771

March 1, 2007

SGT, Inc.
Attn: Dr. Kamal S. Ghaffarian
Executive Vice President/COO
7701 Greenbelt Road, Suite 400
Greenbelt, MD 20770

Re: NASA Solicitation No. NNG0596383R, MSES II/A - Procurement Integrity Matter

Dear Dr. Ghaffarian,

National Aeronautics Space Administration Goddard Space Flight Center takes allegations of procurement integrity very seriously. We have received allegations questioning the integrity of the procurement in solicitation number NNG05096383R. Specifically, the allegations assert that Mr. Nicholas Galassi worked on both the Swales proposal and the SGT revised proposal for this solicitation. The allegations have been supported by affidavits. I am looking into these allegations to determine if there is any merit to them.

During this inquiry I will need your company to answer several questions and provide any proof it deems necessary to support its answers including, but not limited to: affidavits regarding the facts and relevant written work performed by Mr. Galassi in support of SGT's proposal or revised proposal. I have attached for your review a copy of the Swales affidavits. Please review the affidavits and address the assertions therein. Specifically, at a minimum, please address the following questions:

1.) When did Mr. Galassi begin working for SGT?
2.) What were his duties at that time?
3.) What duties and responsibilities did Mr. Galassi have at or for SGT in assisting it with its proposal or revised proposal in response to solicitation NNG05096383R?
4.) Did Mr. Galassi write or assist, in any manner, SGT in its proposal or revised proposal?
5.) If Mr. Galassi did assist SGT in its proposal or revised proposal, please explain specifically what he contributed.
    a. Did he work on the mission suitability portion of the proposal or revised proposal?
    b. Did he work on or assist in the cost proposal or revised cost proposal?

c. Did he work on or assist in the past performance section of the proposal or revised proposal?
d. Did Mr. Galassi share with SGT officials any Swales proprietary information he acquired while working at or with Swales Aerospace including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information?

Please provide the requested information and any additional information you believe relevant to this inquiry to me on or before March 14, 2007. If you have any questions, I may be reached at 301-286-5257.

Sincerely,

Kathleen M. Pierson
Contracting Officer

# Exhibit 2 B

**SGT, Inc.**

March 13, 2007

National Aeronautics and
Space Administration
Goddard Space Flight Center
Greenbelt, MD 20771
Attn: Kathleen Pierson
Contracting Officer

Hand Delivered

**Subject: Response in re: Procurement Integrity Matter- MSES II/A – RFP NNG0596383R**

Dear Ms. Pierson:

I am responding to your March 1, 2007, letter regarding the Procurement Integrity Act allegations made by Swales Aerospace in regard to Nick Galassi.

SGT, like NASA, is very serious about issues of procurement integrity. My staff and I have conducted a thorough review of the matter as it pertains to SGT and we find no evidence whatsoever that any one associated with SGT or Mr. Galassi did anything unethical or in violation of the Procurement Integrity Act.

Harold Stinger and I, along with our MSES II/A Capture Manager, Dr. Andy Endal, our MSES II/A Proposal Manager, Bill Brooks, and our CFO, Matt Yetman, have enclosed sworn affidavits supporting the position that SGT did not ask for and Mr. Galassi did not communicate in any way Swales proprietary data to anyone associated with SGT and its MSES II/A proposal effort. I have enclosed some additional evidentiary documents supporting our statements.

Furthermore, to assist in your review, I provided to Mr. Galassi's legal counsel, Andrew Hallowell, a copy of your March 1st letter for a response to you by Mr. Galassi. It is my understanding that Mr. Galassi, through counsel, will provide an affidavit responsive to the matters raised in your March 1st letter directly to you for your consideration during this review process.

I have provided answers to your specific questions in the attachment marked Answers to Questions posed in March 1 Letter.

Mr. Galassi was hired by SGT as a consultant for the period March 17, 2006, through April 15, 2006 to support SGT's MSES II/A proposal effort as a Red Team reviewer for the sections Understanding the Requirements (UTR) and Representative Task Orders (RTO) in the narrow areas of his field of specialization. He later assisted SGT in discussions with NASA. Mr. Galassi never worked on the management, cost or past performance volumes. Through this process SGT gained an appreciation for Mr. Galassi's technical capabilities and, as part our commitment to supporting small businesses we added him to our team of associate subcontractors as NASA is aware. No promise of workshare was made. Though we appreciate Mr. Galassi's assistance, his role was relatively minor in the scheme of things and did not have a major affect on the proposal product.

Based on your review of the complete record of evidence, you should find that the Swales allegations of a possible violation of the Procurement Integrity Act are without merit. In accordance with FAR 3.104-7, therefore, you should determine that the alleged possible violation of the Procurement Integrity Act has no impact on the award or pending selection processes.

Moreover, in addition to the Swales allegations having no substantive merit, it is noteworthy from a procedural standpoint that in any follow-on Swales protest at GAO, these Swales allegations of a possible violation of the Procurement Integrity Act will not be reviewed by GAO. Under GAO's protest regulations at 4 CFR 21.5 (d), GAO will not review allegations of Procurement Integrity Act violations "where the protester failed to report the information it believed constituted evidence of the offense to the Federal agency responsible for the procurement within 14 days after the protester first discovered the possible violation." Here, the Swales report to NASA of an alleged possible violation of the Procurement Integrity Act was submitted to NASA well beyond 14 days after Swales first discovered evidence of what it alleges is a possible violation.

Please feel free to contact me personally if you have any further questions. I have instructed all persons associated with SGT and our team to cooperate with and provide their full attention and assistance to NASA in this matter.

Best regards,

Kamal S. Ghaffarian

Executive Vice President and Chief Operating Officer
SGT, Inc.

Enclosures:

1. Answers to Questions posed in March 1 Letter
2. Affidavit of Harold S. Stinger
3. Affidavit of Kamal S. Ghaffarian
4. Affidavit of Andrew Endal
5. Affidavit of William E. Brooks
6. Affidavit of Matthew J. Yetman
7. Copy of Galassi/Aerostress Consulting Agreement
8. Copy of Aerostress Invoice and Check.

# Exhibit 2 B. 1.

**Answers to Questions posed in March 1 Letter**

Q1. When did Mr. Galassi begin working for SGT?

A1. Mr. Galassi was hired as a consultant on or about March 17, 2006.

Q2. What were his duties at that time?

A2. In March/April 2006 Mr. Galassi performed 34 hours of work as a consultant in support of SGT's MSES II/A (solicitation NNG05096383R) proposal effort as a Red Team reviewer for the sections Understanding the Requirements (UTR) and Representative Task Orders (RTO) in the area of structural analysis engineering. Mr. Galassi later provided input in these same areas into the Final Proposal Revision (FPR).

In September 2006 Mr. Galassi assisted SGT in discussions with NASA related to Representative Task Orders (RTO) in the area of Integration and Test Engineering.

Q3. What duties and responsibilities did Mr. Galassi have at or for SGT in assisting it with its proposal or revised proposal in response to solicitation NNG05096383R?

A3. Same as A2 above.

Q4. Did Mr. Galassi write or assist, in any manner, SGT in its proposal or revised proposal?

A4. Yes. Mr. Galassi assisted in the both the proposal and FPR in the areas of Understanding the Requirements and in the RTOs. See A2 above.

Q5. If Mr. Galassi did assist SGT in its proposal or revised proposal please explain specifically what he contributed.

a. Did he work on the mission suitability portion of the proposal or revised proposal?
b. Did he work on or assist in the cost proposal or revised proposal submission?
c. Did he work on or assist in the past performance section of the proposal or revised proposal?
d. Did Mr. Galassi share with SGT officials any Swales proprietary information he acquired while working at or with Swales Aerospace including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information?

A5 a. Yes – see A2 and A4.
b. No
c. No
d. No - for all elements described.

# Exhibit 2 B. 2.

# AFFIDAVIT OF HAROLD S. STINGER

Harold S. Stinger, being first duly sworn, hereby deposes and says:

I have reviewed the NASA letter to SGT dated March 1, 2007, on the subject of Procurement Integrity Matter, and I have reviewed the two Swales affidavits that NASA attached to that letter. This affidavit is provided in response to that letter.

1. I am over the age of 21 years; a permanent resident of Fairfax County, Virginia and the following statement are made based on my personal knowledge.
2. I am the co-owner and President and Chief Executive Officer of SGT, Inc. (SGT). I have been employed by SGT since 1994. I am also the Head Pastor of the First Mount Olive Baptist Church in Leesburg, Virginia.
3. In my capacity as President and CEO I have limited involvement in the details of specific proposals and was not directly involved in overseeing the MSES II/A proposal but I do require that our company maintain high standards of integrity.
4. I have made inquiries of management team into the allegations made by Swales Aerospace regarding an alleged procurement integrity violation by Mr. Nicholas M. Galassi. Based on my inquiries I believe the following to be true: Mr. Galassi's role in SGT's MSES II/A proposal was limited to providing limited technical input within his narrow sphere of expertise. Mr. Galassi did not share with SGT personnel, consultants hired by SGT or SGT officials any Swales proprietary information including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information.
5. Regarding the affidavit of Mr. Tom Swales concerning the telephone conversation that I held with him on February 17, 2007 my recollection of the conversation agrees with Mr. Swales' recollection except for the Items 13 and 14.
   Item14: My pause (non-answer) was not in response to the question about participation on the Swales proposal. I am sure that I indicated that I was not aware.
   Item13: I failed to answer when Mr. Swales asked about Mr. Galassi's participation in our orals, as I was extremely surprised that he would know who was assigned to our orals.

I declare that under penalty of perjury and under the laws of the State of Maryland that the foregoing is true and correct.

Dated March 12, 2007
Greenbelt, Maryland

Harold S. Stinger

Subscribed and sworn to before me, the undersigned Authority, by the said Harold S. Stinger this 12th day of March, 2007 at Greenbelt, Maryland

Notary Public

My Commission Expires

WANDA HOLBROOK
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
My Commission Expires Aug. 28, 2007

# Exhibit 2 B. 3.

# AFFIDAVIT OF KAMAL S. GHAFFARIAN

Kamal S. Ghaffarian, being first duly sworn, hereby deposes and says:

I have reviewed the NASA letter to SGT dated March 1, 2007, on the subject of Procurement Integrity Matter, and I have reviewed the two Swales affidavits that NASA attached to that letter. This affidavit is provided in response to that letter.

1. I am over the age of 21 years; a permanent resident of Howard County, Maryland and the following statement are made based on my personal knowledge.
2. I am the co-owner and Executive Vice President and Chief Operating Officer for SGT, Inc. (SGT). I am also the acting Vice President of Business Development (VP BD). I have been employed by SGT since 1994. In my capacity as acting VP BD I oversee all business development activities and am involved in setting overall strategy including pricing strategy for proposals.
3. I was the Lead Executive and oversaw the capture and proposal efforts for MSES II/A for SGT, Inc. Dr. Andy Endal, an SGT Vice President, was Capture Manager under my direction and Bill Brooks, a consultant hired by SGT, was Proposal Manager under Dr. Endal's direction. As Lead Executive I was heavily involved in setting the proposal strategy, including pricing strategy for SGT and I made all final decisions in this regard.
4. Mr. Nicholas M. Galassi, through his company Aerostress, Inc., was hired by SGT to provide "Red Team" review support in the areas of Understanding the Requirement and Representative Task Orders. He assisted in discussions with NASA in these areas.
5. Up until the time of the Protest by Swales Aerospace (Swales) and the subsequent allegations by Swales against Mr. Galassi, SGT had no indication whatsoever that Mr. Galassi allegedly supported the Swales MSES II/A proposal effort. It is my understanding that this is a matter of dispute between Mr. Galassi and Swales.
6. To my knowledge, Mr. Nicholas M. Galassi did not participate in the development of SGT's MSES II/A cost strategy nor did he work on or assist in SGT's MSES II/A cost proposal or revised cost proposal.
7. To my knowledge, Mr. Galassi did not share with SGT personnel, consultants hired by SGT or SGT officials any Swales proprietary information including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information.
8. I declare that under penalty of perjury and under the laws of the State of Maryland that the foregoing is true and correct.

Dated March 12, 2007
Greenbelt, Maryland

Kamal S. Ghaffarian

Subscribed and sworn to before me, the undersigned Authority, by the said Kamal S. Ghaffarian this 12th day of March, 2007 at Greenbelt, Maryland

Notary Public

My Commission Expires ______

WANDA HOLBROOK
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
My Commission Expires Aug. 28, 2007

# Exhibit 2 B. 4.

AFFIDAVIT OF ANDREW S. ENDAL

Andrew S. Endal, being first duly sworn, hereby deposes and says:

I have reviewed the NASA letter to SGT dated March 1, 2007, on the subject of Procurement Integrity Matter, and I have reviewed the two Swales affidavits that NASA attached to that letter. This affidavit is provided in response to that letter.

1. I am over the age of 21 years; a permanent resident of Anne Arundel County, Maryland and the following statement are made based on my personal knowledge.
2. I am a Vice President for Business Development for SGT, Inc. where I have been employed for more than five years. In my capacity as Vice President for Business Development among other duties I oversee proposal development, including strategies, management approach and technical approach.
3. I was the Capture Manager for SGT's MSES II/A proposal and was involved with setting overall strategies for MSES II/A.
4. In the first part of March 2006, I contacted Mr. Nicholas Galassi to assist in providing expert review and inputs to the Understanding the Requirements (UTR) and Representative Task Order (RTO) portions of SGT's MSES II/A proposal, based on Mr. Galassi's reputation in the NASA community as an expert mechanical stress analyst. I requested that SGT hire Mr. Galassi as a consultant to assist with the final reviews of the UTR and RTO portions of SGT's MSES II/A proposal. I was the SGT Technical Monitor for Mr. Galassi's work under this consulting agreement.
5. I first assigned Mr. Galassi to review and comment on drafts of the UTR sections on Structural Analysis & Loads Engineering and on Mechanical Engineering, his areas of engineering expertise. This review was performed on March 19, 2006. His comments were used to revise these sections prior to the Red Team Review. I then assigned him to participate in the Red Team Review of the RTOs on March 24-25, 2006. The Red Team Review involved 21 reviewers, with 6 of them assigned to review the RTOs. Mr. Galassi concentrated on RTOs 1 and 2, which dealt with mechanical engineering, consistent with his area of expertise. Subsequently, Mr. Galassi assisted our UTR and RTO authors in understanding his comments and revising their sections appropriately. SGT's initial proposal was submitted to NASA on April 17, 2006. The total time spent by Mr. Galassi in assisting with the reviews and revisions of the technical sections of SGT's initial proposal was 34 hours.
6. Around September 1, 2006, I requested that Mr. Galassi assist SGT in addressing the NASA findings on the UTR and RTO sections of our original proposal (findings transmitted by NASA letter of August 31, 2006). Specifically, I assigned Mr. Galassi to assist in addressing the findings on the Integration and Test (I&T) Engineering section of the UTR and to review (again) RTOs 1 and 2 with respect to the associated NASA findings. Mr. Galassi assisted in developing our presentation, and led the discussions with NASA on September 11, 2006 regarding the findings on the I&T Engineering section of the UTR. In doing so, Mr. Galassi applied his expertise as a mechanical engineer on aerospace projects. Mr. Galassi was one of 16 SGT Team participants in these discussions.
7. Subsequently, I requested Mr. Galassi to help incorporate the materials from the discussions into our final proposal. Mr. Galassi was assigned to revise Section 1.2.8 (UTR section on I&T Engineering). After several iterations, this assignment was completed on September 26, 2006. SGT's Final Proposal Revision (FPR) was submitted to NASA on October 3, 2006.

8. Throughout all of the above assignments performed by Mr. Galassi, he applied industry-wide and NASA-specific engineering practices and his engineering training and judgment to address the technical requirements of the MSES II/A RFP. Mr. Galassi participated as part of a large team of aerospace engineers, including SGT staff and consultants, as well as Team Member staff. This Team has over 5 decades of experience in addressing technical problems similar to those posed in the MSES II/A RFP. In developing the UTR and RTO sections of SGT's MSES II/A proposal, we utilized the proposal engineering processes, outlines, and presentation techniques previously developed for SGT's successful METS proposal to NASA/GSFC.
9. At no point did Mr. Galassi see, help develop, or review any aspects of SGT's cost strategy, Cost Proposal (original or revised), or Past Performance Proposal (revised Past Performance Volume not required).
10. Throughout all my interactions with Mr. Galassi, I did not solicit nor did he share, with SGT personnel, consultants hired by SGT, or SGT officials any Swales proprietary information including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information.
11. I declare that under penalty of perjury and under the laws of the State of Maryland that the foregoing is true and correct.

Dated March TBD, 2007
Greenbelt, Maryland

Andrew S. Endal

Subscribed and sworn to before me, the undersigned Authority, by the said Andrew S. Endal this ___ day of March, 2007 at Greenbelt, Maryland

Notary Public

My Commission Expires ___________

WANDA HOLBROOK
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
My Commission Expires Aug. 28, 2007

# Exhibit 2 B. 5.

# AFFIDAVIT OF WILLIAM EMMETT BROOKS, III

William E. Brooks, III, being first duly sworn, hereby deposes and says:

I have reviewed the NASA letter to SGT dated March 1, 2007, on the subject of Procurement Integrity Matter, and I have reviewed the two Swales affidavits that NASA attached to that letter. This affidavit is provided in response to that letter.

1. I am over the age of 21 years; a permanent resident of Anne Arundel County, Maryland and the following statement are made based on my personal knowledge.
2. I am the President and sole proprietor of Aldebaran, LLC that has been in existence since 2003.
3. For the MSES II/A proposal, Aldebaran, LLC was under contract to SGT, Inc with duties as Proposal Manager. The Proposal Manager is responsible for organizing, planning, scheduling, and overseeing the daily details of proposal production. A part of this responsibility also involves setting up and conducting reviews of the various proposal volumes.
4. I first met Mr. Nick Galassi at a Red Team Review conducted at SGT on March 23-24, 2006. The Red Team Review is a review of the "almost final" proposal in that the text and graphics are in the final formats and have been reviewed at least twice before. Mr. Galassi was asked to review Representative Task Orders (RTO's) 1 and 2. As I recall, he had minor technical suggestions. The review of the RTO Basis of Estimates (BOE) was limited to a smaller team consisting of the RTO author's, Dr. Andy Endal, Bill Brooks, Mr. Al Sherman, and Mr. Don Krueger. This review of the BOEs was technical in nature and did not contain the cost data that was prepared by Mr. Matt Yetman and his finance team.
5. At no time did Mr. Galassi participate or provide inputs to any aspects of the Cost Volume.
6. At this time, March 2006, I was unaware that Mr. Galassi was a former employee of Swales Aerospace.
7. When SGT received notification of Discussions for the MSES II/procurement, a matrix of responsibilities was developed by me and Dr. Andy Endal to address each discussion item. Mr. Galassi was not on this initial matrix. As the team progressed in the preparation of specific answers to each Discussion Item, it became clear that we were not making adequate progress on several of the items. One of these was for Integration and Test (This was Question #4 under Subfactor A.4.a and A.4.b).
8. With Dr. Endal's approval, I personally contacted Mr. Galassi and asked if he would be willing to support the SGT response. He agreed to support this effort and did prepare the responses to this specific question for both the Discussion Presentation and the Final Proposal Revision (FPR) text. That was the limit of his participation in the MSES II/A Proposal. This work was performed in September, 2006.
9. I can state without equivocation that Mr. Galassi did not participate or have knowledge of any aspects of the SGT Cost strategy or Cost Volume. All Cost Volume work was physically and electronically isolated from the proposal team responsible for the Technical and Past Performance Volumes of the Proposal.
10. Mr. Galassi did not participate in the preparation or review of the Basis of Estimates (BOEs) required for the Representative Task Orders.
11. To my knowledge Mr. Galassi did not share with SGT personnel, consultants hired by SGT or SGT officials any Swales proprietary information including but not limited to:

Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information.

12. I declare that under penalty of perjury and under the laws of the State of Maryland that the foregoing is true and correct.

Dated March TBD, 2007
Greenbelt, Maryland

William E. Brooks, III

Subscribed and sworn to before me, the undersigned Authority, by the said William E. Brooks, III this 12th Day of March, 2007 at Greenbelt, Maryland

Notary Public

My Commission Expires ______

WANDA HOLBROOK
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
My Commission Expires Aug. 28, 2007

# Exhibit 2 B. 6.

AFFIDAVIT OF MATTHEW J. YETMAN

Matthew J. Yetman, being first duly sworn, hereby deposes and says:

I have reviewed the NASA letter to SGT dated March 1, 2007, on the subject of Procurement Integrity Matter, and I have reviewed the two Swales affidavits that NASA attached to that letter. This affidavit is provided in response to that letter.

1. I am over the age of 21 years; a permanent resident of Montgomery County, Maryland and the following statement are made based on my personal knowledge.
2. I am a Vice President and Chief Financial Officer (CFO) for SGT, Inc. where I have been employed for more than ten years. In my capacity as CFO among other duties I oversee proposal pricing and am involved in setting pricing strategy for proposals. I also approve consulting agreements for SGT.
3. I oversaw the pricing of SGT's MSES II/A proposal and was involved with setting pricing strategy for MSES II/A.
4. On 4/19/2006 I signed a consulting agreement on behalf of SGT with Mr. Galassi's company Aerostress, Inc. whereby Aerostress, Inc. was to "provide SGT Business Development expert reviews and contributions to understanding requirements and Representative Task Orders (RTO) for MSES II/A proposal". The value of the Aerostress task was not to exceed $4,400 and the period of performance was March 17, 2006 through April 15, 2006. The task monitor and requestor of the consulting agreement was Dr. Andy Endal, SGT's capture manager. On June 1, 2006 SGT paid an invoice in the amount of $3,740 for these services.
5. To my knowledge Mr. Nicholas M. Galassi did not participate in the development of SGT's MSES II/A cost strategy nor did he work on or assist in SGT's MSES II/A cost proposal or revised cost proposal.
6. To my knowledge Mr. Galassi did not share with SGT personnel, consultants hired by SGT or SGT officials any Swales proprietary information including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information.
7. I declare that under penalty of perjury and under the laws of the State of Maryland that the foregoing is true and correct.

Dated March 12, 2007
Greenbelt, Maryland

Matthew J. Yetman

Subscribed and sworn to before me, the undersigned Authority, by the said Matthew J. Yetman this 12th day of March, 2007 at Greenbelt, Maryland

Notary Public

My Commission Expires ________

WANDA HOLBROOK
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
My Commission Expires Aug. 28, 2007

# Exhibit 2 B. 7.

SGT, Inc.

7701 Greenbelt Road
Suite 400
Greenbelt, MD 20770
Phone: (301) 614-8600
Fax: (301) 614-8601

| | | | |
|---|---|---|---|
| ID No: | SGT | | |
| Date From: | March 17, 2006 | | |
| Date To: | April 15, 2006 | | |
| Agreement No: | 06-30 | | |

**CONSULTANT AGREEMENT**
**Between**
**SGT, INC.**
**and**
**Aerostress, Inc.**

**THIS CONSULTANT AGREEMENT** (hereinafter Agreement) is made as of this **28th** day of **March, 2006**, in the City of Greenbelt, Maryland by and between SGT, Inc. (herein "SGT"), a Maryland corporation, and **Aerostress, Inc.**(hereinafter "Consultant").

**WITNESSETH:**

**WHEREAS, SGT, Inc.** is now, among other activities, engaged in performance of certain studies, experiments, research and development projects at SGT, Inc., Greenbelt, MD., and

**WHEREAS**; **SGT** desires to retain the services of Consultant in connection with such activities and Consultant desires to render such services:

**AGREEMENT:**

**NOW THEREFORE,** in consideration of the foregoing and mutual covenants and conditions and warranties hereinafter contained, it is mutually agreed as follows:

**SECTION 1.0. STATEMENT OF WORK:**

1.1 Consultant shall provide SGT with his best efforts, information, and professional skills in the following areas (s):

**See Attached Exhibit A**

1.2 Consultant shall perform the work according to mutually agreed upon Task Assignment Orders (TAO's) issued on an as needed basis.

**See Attached Exhibit A**

Initial Here

**SECTION 2.0. COMPENSATION:**

2.1 For such Consultant services, SGT shall, within thirty (30) calendar days after receipt of invoices submitted in accordance with Section 4.0 hereof, compensate Consultant at the hourly rate listed for the services rendered in accordance with this Agreement, for the period of performance indicated:

| Fixed Hourly Rate | Period of Performance | | Initials | |
|---|---|---|---|---|
| **$110.00** | (From)<br>**March 17, 2006** | (To)<br>**April 15, 2006** | **Aerostress, Inc.** | **SGT** |

2.2 Travel, if authorized, for the performance of work effort, will be reimbursed for actual and reasonable costs. Travel will not be reimbursed beyond the amount specified in the TAO.

2.3 Travel arrangements must be made through or coordinated with the SGT Task Monitor.

2.4 In no event shall the total cost to SGT exceed the sum of TAO (s) issued unless so modified by written revision hereto.

2.5 SGT will provide consultant with task orders that will specify specific duties and will provide hour and dollar authorization. Consultant shall not exceed the cumulative amount of funding authorized.

2.6 Consultant, if not a US Citizen, shall obtain, appropriate visa status in order to be reimbursed for work performed under this Agreement. Reimbursement will be made in United States dollars.

2.7 Consultant will be responsible for payment of his/her own social security and other taxes and insurances. SGT is not responsible for the payment of these or any other benefits.

**SECTION 3.0. IDENTIFICATION, NON-DISCLOSURE:**

3.1 Consultant shall identify his/her affiliation as representing SGT when performing any effort funded under this agreement, such as attendance and presentations at meetings and conferences, in any written reports, or at any work location.

**SECTION 4.0. PAYMENT/INVOICE REQUIREMENTS:**

**4.1 Invoice Requirements:**

**Invoices Shall**

- **Clearly distinguish cost by specific Task Assignment Order/Proposal efforts**
- Reference Agreement Number

Initial Here

- Be submitted on a monthly basis
- Be submitted in arrears
- Be numbered chronologically
- Specify period covered by invoice
- Specify by proposal effort current period hours, other direct costs, and labor dollars
- Specify proposal effort cumulative-to-date hours, ODC's, and labor dollars
- Specify cumulative-to-date hours, ODC's, and labor dollars
- Include an itemized detail of dates and hours worked for the month covered by invoice
- Be attached to an Expense Report, if travel's applicable
- Be signed and mailed to the attention of:

SGT, Inc.
7701 Greenbelt Rd., Suite 400
Greenbelt, MD 20770
**Attn: Sharon Tolson,**
**Subcontract Administrator**

**SECTION 5.0. INVENTION: DATA: CONFIDENTIAL INFORMATION: SURVIVAL OR COVENANTS:**

5.1 ***Inventions:*** Consultant shall:

(i) Promptly disclose to SGT all inventions, developments, improvements and contrivances (herein collectively called "inventions") in the line of SGT's present or future business which are made or conceived or actually reduced to practice by Consultant or with Consultant's assistance or under Consultant's direction in the course of performance under this Agreement, whether or not patentable and whether so made by Consultant, individually or jointly with others, which relate or are attributable to or result from any work which Consultant may do pursuant to this Agreement or any information obtained by Consultant in any discussions or meetings with employees of SGT.

(ii) Assign and does hereby assign all Consultant's rights, title and interest (hereinafter called "rights") in and to said inventions to SGT in every proper way to protect at SGT expense said inventions and rights therein, including but not limited to, the signing of patent applications, oath, and assignments in favor of SGT relating to said inventions, respecting such applications in the United States.

(iii) Make no applications for patents on any such inventions except as hereinafter provided.

(iv) Inventions, as that term is used in this Article, include without limitation, any invention which Consultant may conceive outside the scope of this Agreement, but which has been initiated, improved, or actually reduced to practice by Consultant or with his consent at SGT facilities.

(v) The consultant retains the right to reuse all "work and data" accomplished while in contract with SGT, Inc.

5.2 ***Propriety Information***: Consultant shall not, during the terms of this Agreement or afterwards, use or disclose, except as authorized in writing by SGT, any confidential information whatsoever obtained from or through SGT as a result of work done pursuant to this Agreement, nor display for any drawing, letter, report, or any copy or reproduction thereof, belonging to or pertaining to SGT

Initial Here

without written authorization from SGT, unless such drawing, letter or report has been previously published by the Company. For purpose of this Agreement, proprietary information includes any and all financial information, confidential, sensitive, company private, management private or any other such data. Except as may be required by law, the Consultant agrees not to disclose to any person either the fact that discussions or negotiations are taking place concerning possible transactions or any of the terms, conditions or other facts with respect to any such possible transaction, including the status thereof without the prior written consent of SGT. The term "confidential information" as used in this subparagraph shall mean any technical or non-technical data, communication computer program or record device, process, method or technique originated by or peculiarly within the knowledge of SGT, its employees and those in privity with it, which is not available to the public and is subject to protection as property under recognized legal principals.

5.3 ***Survival of Covenants:*** The covenants in this Section to be performed by Consultant shall survive the termination of this Agreement or any amendments or extensions thereof, regardless of the reason for such termination, and shall be performed without any additional compensation therefore by SGT.

**SECTION 6.0. ASSIGNMENT OF AND LICENSE TO COPYRIGHTABLE DATA:**

6.1 Consultant shall assign and does hereby assign to SGT all right, title and interest in copyright able materials which are first produced or composed by Consultant in the performance of this Agreement whether or not completed after termination of this Agreement.

6.2 Consultant shall grant and does hereby grant to SGT and to its officers, agents and employees acting within the scope of their official duties, a royalty-free nonexclusive and irrevocable license to reproduce, translate, publish, use and dispose of, and to authorize others to do so, all copyrighted and copyrightable materials which are not first produced or composed by Consultant in the performance of this Agreement, but which has been incorporated in any material furnished under this Agreement, provided that such license shall be only to the extent that Consultant now has, or prior to completion of final settlement of this Agreement may acquire, the right to grant such license without becoming liable to pay compensation of other solely because of such grant.

6.3 SGT shall grant and does hereby grant to Consultant, and to its officers, agents, and employees acting within the scope of their official duties, a royalty-free nonexclusive and irrevocable license to reproduce, translate, publish, use, and dispose of, and to authorize others to do so, all copyrighted and copyrightable materials which are first produced or composed by Consultant in performance of this Agreement whether or not completed after termination of this agreement.

**SECTION 7.0. STATUS AS INDEPENDENT CONTRACTOR: OTHER COMMITMENTS: TERMINATION: LIABILITY:**

7.1 ***Independent Contractor*:** Consultant is and shall be deemed at all times to be an independent contractor. Nothing herein contained is intended nor shall be construed for any purpose as creating the relation of employer and employee between the parties. Consultant shall be free from control in the methods; means and manner of his/her accomplishment of the work called for by TAO(s) issued hereunder, but shall be responsible for the timely and proper completion of such work.

7.2 ***Other Commitments*:** Consultant represents that except as may be provided elsewhere herein, he is now under no obligation, contract or agreement, nor has he previously executed any documents

Initial Here

whatsoever with any other person, firm, association or corporation that will, in any manner prevent his giving, and SGT from receiving, the benefit of his Consultant Services and any all inventions that may be made or devised by him or with his assistance or under his direction, in performance of this Agreement. During the term of this Agreement or any extension or renewal thereof, the Consultant may be engaged as a Consultant by other persons, firms or corporations engaged in the same or similar business as that of SGT provided, however, that the provisions of Section 5.0, 10.0 and 11.0 hereof shall be strictly observed by the Consultant as respects such other persons, firms or corporations. If the Consultant shall develop or assist in the development of an invention, either, for a corporation, himself or any other entity and if such invention is developed completely independent of any work performed hereunder of SGT or any information obtained as a result thereof, such invention shall be the sole and exclusive property of Consultant or such other persons, firms or corporations.

7.3 ***Termination:*** SGT may terminate this agreement at any time by written notice to the consultant. This agreement may be terminated by the consultant by giving (30) thirty days written notice to SGT. Termination under this paragraph shall be without prejudice to any sums therefore accrued, provided however, that SGT may retain any final payment otherwise due to Consultant pending Consultant's satisfactory completion of any work remaining under assigned TAO(s), or such other satisfactory completion as may be agreed to by SGT.

7.4 ***Liability:*** SGT or their employees shall not be liable for any injury to the person or property of Consultant, except where such injury was directly caused by the fault or negligence of SGT or such employees in the course of their employment.

**SECTION 8.0. GOVERNMENT SECURITY:**

8.1 If and to the extent that this Agreement involves access to matter classified "TOP SECRET", "SECRET", or "CONFIDENTIAL," Consultant shall comply with the Government security controls in accordance with;

(i) The requirements of the United States Department of Defense "Industrial Security Manual for Safeguarding Classified Information (Attachment to DD Form 441), "as in effect on the date of this agreement, which manual is hereby incorporated by reference and made a part of this Agreement, and

(ii) Any agreements to said manual required by the demands of national security as determined by the Government and made after the date of this Agreement, notice of which has been furnished to Consultant by SGT.

8.2 The requirements of the Federal Acquisition Regulation Subpart 4.4 (Safeguarding Classified Information Within Industry) apply to this agreement.

**SECTION 9.0. GENERAL TERMS:**

9.1 Any provisions of this Agreement, which shall be held to be unenforceable, shall not invalidate or render unenforceable any other provision of this Agreement. This Agreement shall be binding upon and inure to the benefit of the heirs, legatees, successors and assign of the parties hereto.

9.2 This Agreement may not be assigned by the consultant.

9.3 This Agreement shall be governed by and construed under the laws of the State of Maryland.

Initial Here

9.4 In the event that any dispute arising under this Agreement results in litigation, the parties hereby consent to and agree that the appropriate venue for such litigation shall be the Circuit Court for the City of Greenbelt.

**SECTION 10.0. RESTRICTION AGAINST COMPETITION**

10.1 Consultant agrees to provide exclusive support to SGT on various proposals as identified within the Task Assignment Orders. Consultant also agrees to not compete against SGT by providing support to another contractor for any proposal that SGT is pursuing wherein the consultant provides support to SGT.

**SECTION 11.0.** *Intentionally Omitted*

**SECTION 12.0.** *Intentionally Omitted*

**SECTION 13.0. RETURN OF MATERIALS:**

13.1 Upon the termination of this Agreement for any reason, whether such termination is effected by Consultant or SGT, with or without cause, Consultant shall promptly deliver to SGT all property, materials, documents, and copies of documents concerning SGT's operations or customers which Consultant has in his possession at the time of termination.

**SECTION 14.0. RESTRICTIVE COVENANTS OF THE ESSENCE:**

14.1 The restrictive covenants of the Consultant set forth herein are of the essence of this Agreement; they shall be construed as independent of any other provision in the Agreement; and the existence of any claim of cause of action of the Consultant against SGT, whether predicated on this Agreement or not, shall not constitute a defense to the enforcement by SGT of the restrictive covenants contained herein.

**SECTION 15.0. SEVERABILITY:**

15.1 It is the intention of the parties that the provisions of the restrictive covenants herein shall be enforceable to the fullest extent permissible under the applicable law. If any clause or provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws effective during the term hereof, then the remainder of this Agreement shall not be affected thereby, and in lieu of each clause or provision of this Agreement which is illegal, invalid, or unenforceable, there shall be added, as part of this Agreement, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause provision as may by possible and as may be legal, valid and enforceable.

Initial Here

**ENTIRE AGREEMENT**

The parties hereby agree that this agreement, including all documents incorporated herein by reference, shall constitute the entire agreement and understanding between the parties hereto and shall supersede and replace any and all prior or contemporaneous representations, agreements or understandings of any kind, whether written or oral, relating to the subject matter hereof. Further, all additions or modifications to this agreement must be made in writing and signed by SGT.

In witness whereof, the duly authorized representatives of SGT and the Consultant have executed this Agreement on the Dates shown.

| **Aerostress, Inc.** | **SGT, INC.** |
|---|---|
| [signature] | [signature] |
| Signature | Signature |
| Nicholas Galassi | Matthew Yetman |
| Name | Name |
| 20-3682447 | Vice President, Business Operations/CFO |
| Social Security # / EIN | Title |
| 4/14/06 | 4/19/06 |
| Date | Date |

## EXHIBIT A

## Task Assignment Orders (TAO) for Aerostress, Inc.

Task Order Number:

1

Task Monitor:

Andy Endal

Period of Performance:

March 17, 2006 through April 15, 2006

Hourly Rate:

$ 110.00

Total Task Value not to Exceed:

$ 4,400

Travel:

$ 0

Statement of Work:

Consultant will provide SGT Business Development expert reviews and contributions to understanding requirements and Representative Task Orders (RTO) for the MSES II/A proposal.

Deliverables:

Comments on proposal sections, as assigned by Task Monitor.

- Others as required by Task Monitor

Initial Here

# Exhibit 2 B. 8.

SGT, INC.

17926

| OUR REF. NO. | YOUR INVOICE NO. | INVOICE DATE | INVOICE AMOUNT | AMOUNT PAID | DISCOUNT TAKEN | NET CHECK AMOUNT |
|---|---|---|---|---|---|---|
| 22015 | 1019 | 05/31/2006 | $3,740.00 | $3,740.00 | $0.00 | $3,740.00 |
| | TOTALS | | $3,740.00 | $3,740.00 | $0.00 | $3,740.00 |

SGT, INC.
7701 Greenbelt Road
Suite 400
Greenbelt, MD 20770
301-614-8600

Wachovia
Wachovia, N.A.
wachovia.com
68-7270/2560

17926

| DATE | CONTROL NO. | AMOUNT |
|---|---|---|
| 06/01/2006 | 000017926 | $3,740.00 |

PAY Three Thousand Seven Hundred Forty And 00/100 Dollars

TO THE ORDER OF

AEROSTRESS, INC
5205 NAHANT STREET
BETHESDA, MD 20816

AUTHORIZED SIGNATURE

⑈017926⑈ ⑆256072701⑆2079900473106⑈

SGT, INC.

17926

AEROSTRESS, INC
5205 NAHANT STREET
BETHESDA, MD 20816

**Voucher:** 22015

**Entry User ID:** MLUNKINS

| | | |
|---|---|---|
| **Vendor:** AEROSTRESS Aerostress, Inc | | |
| **Invoice #:** 1019 | **Exp Rpt ID:** | **FY:** 2006 **Period:** 9 **Subperiod:** 2 |
| **Invoice Date:** 05/31/2006 | **AP Acct/Org:** 20000-001/1.01 | **Total Before Disc:** 3,740.00 |
| **Due Date:** 06/30/2006 | **Approved:** Y | **Discount Amt:** 0.00 |
| **Anticipated Pay Date:** 06/30/2006 | **Hold Voucher:** N | **Amount Due:** 3,740.00 |
| **Invoice Type:** N | **Recurring:** N | **Terms:** NET 30 |
| **Payment Control:** N | **Delivery Amt:** 0.00 | **Over Budget:** N |

**Header Notes:**

| Line | Acct No/Name | Org No/Name/Ref 1 | Proj No/Name/Ref 2 | Description | Total |
|---|---|---|---|---|---|
| 1 | 86500-001<br>B&P Cons & Subs Labor | 1.01.01.04<br>Marketing Dept Offsite | BP072.MSES<br>STARSS Capture | B&P Cons & Subs Labor<br>**Project Account Abbrev:** | 3,740.00 |

| | | | | | |
|---|---|---|---|---|---|
| **Cost Amt:** | 3,740.00 | **Sales Tax:** | 0.00 | **Total Before Disc:** | 3,740.00 |
| **Disc Amt:** | 0.00 | **Net Amt:** | 3,740.00 | **Use Tax:** | 0.00 |

**Total Voucher:** 3,740.00

# SGT - Accounting Department

## ENTER/EDIT A/P VOUCHERS

PAGE 1 OF

| | | | | | |
|---|---|---|---|---|---|
| VENDOR ID: | | VENDOR NAME: | Aerostress, Inc | | |
| VOUCHER NO: | | FISCAL YEAR: | ACCT PD: | | SUB PD: |
| INV. NO: | 1019 | INV. DATE: 4/30/06 | DUE DATE: 05/30/06 | | INVOICED AMOUNT: $3,740.00 |
| Agreement #: / P.O. #.: | 06-30 | TERMS: Net 30 | SENT: | | RECEIVED: |

| Account | Organization | Project | Description | Cost Amount |
|---|---|---|---|---|
| 86 500-00 | 1.01.01.4 | BPO72.MSES | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

In-house tracking / Please keep to the following schedule:

| (√) Upon Completion | Employee Name | Notes / Requests |
|---|---|---|
| √ | Sharon | Tracking |
| √ | Ron | Approval |
| Kos 5/2/06 | Kosa | Coding |
| | Sharon Tolson | Final Tracking |

Remaining Value:

Total Amount $3,740.00

22015

Aerostress, Inc.

5205 Nahant Street
Bethesda, VA 20816

# Invoice

| Date | Invoice # |
|---|---|
| 4/30/2006 | 1019 |

| Bill To |
|---|
| SGT, Inc.<br>Sharon Tolson<br>7701 Greenbelt Road., Suite 400<br>Greenbelt, MD 20770 |

| P.O. No. | Terms | Project |
|---|---|---|
| 06-30 | 30 days | |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 34 | MSES2A Proposal Support (3/19 - 4/13/06) Final Billing | 110.00 | 3,740.00 |

TIN#

RECEIVED
MAY - 1 2006

OK Ronald Dickey
change to 3P072.MSES
Ron
5/30/06

| | Total | $3,740.00 |
|---|---|---|

# SGT, Inc.
## CONSULTANT WEEKLY TIME SHEET

| Name: Nicholas M. Galassi | Purchase Order/Agreement 06-30 | Period Start Date 3/17/2006 | Period End Date 4/15/2006 |
|---|---|---|---|

| Agreement Number | Task Description | S | S | M | T | W | T | F | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| 06-30 | MSES2A Proposal Support (week of 3/24/2006) | | 5 | | | | 8 | 8 | 21 |
| 06-30 | MSES2A Proposal Support (week of 3/31/2006) | | | | | | | | 0 |
| 06-30 | MSES2A Proposal Support (week of 4/07/2006) | | | | | | | | 0 |
| 06-30 | MSES2A Proposal Support (week of 4/14/2006) | 8 | | | 2 | 1 | 2 | | 13 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Consultant Signature: [signature] 5/1/06 TOTAL<br>Approved By: [signature] | | | | | | | | | 34 |

May 1, 2006

SGT, Inc.
7701 Greenbelt Road, Suite 400
Greenbelt, MD 20770

Dear Ms. Tolson,

I have enclosed an invoice and timesheet for my work on the MSES2A Proposal Effort (Agreement # 06-30). This is my final invoice and includes all my hours on this task. Please let me know if you require any additional paperwork or information. Thank you.

Sincerely,

Nicholas M. Galassi
(301-320-5179)

Aerostress, Inc.
5205 Nahant Street
Bethesda, MD 20816

# **Exhibit 2 C**

PARGAMENT & HALLOWELL
ATTORNEYS AT LAW

March 13, 2007

**VIA FACSIMILE (301) 286-1720**

Ms. Kathleen M. Pierson
Contracting Officer
National Aeronautics and Space Administration
Goddard Space Flight Center
Greenbelt, Maryland 20771

RE: NASA Solicitation No. NNG0596383R, MSES IIA – Procurement Integrity Matter

Dear Ms. Pierson:

On behalf of Nicholas Galassi, I am forwarding an Affidavit for your consideration in the above-referenced Procurement Integrity Matter. Should you require any additional information from Mr. Galassi, please do not hesitate to contact me.

Also, as you may be aware, Swales & Associates, Inc. has filed a lawsuit against Mr. Galassi and his consulting company, Aerostress, Inc., in the Circuit Court of Prince George's County, Maryland alleging that Mr. Galassi used and disclosed trade secrets and confidential information of Swales to SGT. Mr. Galassi categorically denies the claims in the lawsuit, and is vigorously defending against them through this office.

Sincerely,

Andrew P. Hallowell

Enclosure

Cc: Dr. Kamal S. Ghaffarian
Executive Vice President/COO
SGT, Inc.

**AFFIDAVIT OF NICHOLAS M. GALASSI**

I, NICHOLAS M. GALASSI, being duly sworn, hereby swear and affirm as follows:

1. I am the President and sole owner of Aerostress, Inc. ("Aerostress"), a consulting company that provides structural analysis and engineering. I have provided structural and mechanical engineering services at NASA Goddard Space Flight Center since 1987, as an employee of various companies, including Fairchild Industries (1987-1993), Swales & Associates, Inc. ("Swales") (1993-2005), and Aerostress.

2. I have reviewed a letter from Kathleen M. Piersen dated March 1, 2007 to SGT, Inc. ("SGT") referencing "Procurement Integrity Matter" under NASA Solicitation No. NNG05963883R ("MSES-IIA"). I am providing this affidavit to help provide answers to the questions in her letter.

3. I worked at Swales as a structural engineer from 1993 through the effective date of my resignation, October 28, 2005. While employed at Swales, my involvement with MSES-IIA was limited to attendance at the kickoff meeting and subsequent meetings in or around June-July 2005 regarding RTO No. 1, which at that time had been released by NASA in draft form. I had no involvement in Swales' MSES-IIA effort after July 2005. I was not involved in the preparation or drafting of Swales' response to that draft RTO No. 1 or any other portion of Swales' proposal for MSES-IIA.

4. In April 2006, my company, Aerostress, entered into a Consulting Agreement with SGT dated March 28, 2006 to review and provide technical input on SGT's proposal for the MSES-IIA procurement in the areas of Understanding the Requirements ("UTR") and Representative Task Orders ("RTOs"). Through Aerostress, I performed approximately 34 hours of consulting services in March-April 2006 consisting of reviewing and commenting on SGT's proposed solution to RTOs and UTR in the MSES-IIA procurement.

5. During the time that I was performing services for SGT, I advised two members of Swales management (who supervised me on the work I performed while I was with Swales) that I was working for SGT on a portion of its proposal. I informed them of this because I had frequents contacts with them on the SDO program, and I wanted to ensure that they would not inadvertently disclose to me any confidential and proprietary information regarding Swales' proposal for MSES-IIA. They did not voice any objection and did not disclose any such confidential and proprietary information to me.

6. In September 2006, I was asked by SGT to participate in an oral presentation to NASA in the area of Integration and Test Engineering. I participated at SGT's oral presentation in this limited area. Following the presentation, I provided input in connection with SGT's response to NASA in the same area, i.e., Integration and Test Engineering.

7. In performing services for SGT, I relied on my skills and expertise as a structural analysis engineer. At no time did I use or disclose to SGT any information regarding Swales' proposed solutions to RTOs or any confidential information or trade secrets of Swales.

8. At no time was I involved with drafting SGT's proposal, but rather, my involvement consisted of reviewing and providing technical input in the limited areas described above.

9. I did not provide input or otherwise assist SGT in the preparation of any aspect of its cost or business proposal. Further, I have never seen any portion of SGT's cost or business proposal, nor has any portion of SGT's cost or business proposal been verbally disclosed to me.

10. I no longer work for SGT regarding the MSES-IIA proposal and have no plans to perform additional services to SGT in connection with its MSES-IIA proposal.

11. I have also reviewed the Affidavit of David Baran, which is attached to Ms. Piersen's letter. This affidavit makes no reference to the MSES-IIA proposal. Under a separate purchase order from Swales issued in November 2005, through Aerostress, I provided engineering services to Swales in connection with the Solar Dynamics Observatory ("SDO") program. This was a continuation of similar work on the SDO program while I was a Swales employee. Swales discontinued the purchase order relationship by letter dated January 26, 2007 and requested that I return all Swales materials related to the performance of the purchase order. Accordingly, I promptly returned them. The external hard drive that I returned to Swales included data that I had used and/or retained in connection with my performance of services for the SDO program, both as a Swales employee and as a Swales consultant. At no time did I use or disclose to SGT any such data.

I HEREBY CERTIFY under the penalties of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Nicholas M. Galassi

NICHOLAS M. GALASSI

STATE OF MARYLAND :
COUNTY OF Prince Georges :

Subscribed and sworn before me this 12 day of March, 2007, a Notary Public in and for the State and County aforesaid.

Shantel A. Thorne

Notary Public

My commission expires:

SHANTEL THORNE
NOTARY PUBLIC
PRINCE GEORGE'S COUNTY
MARYLAND
MY COMMISSION EXPIRES JULY 3, 2010

# Exhibit 2 D

FACSIMILE

PROCUREMENT OPERATIONS DIVISION
CODE 210
PHONE: 301-286-8400
FAX: 301-286-0237

TO: Kam Ghaffarian

FROM: Valorie Burr

DATE: 3/30/2007

PAGES: 8

MESSAGE: ____________

SPECIAL INSTRUCTIONS: ____________

___Urgent ___For Review ___Please Reply ___Please Comment

National Aeronautics and
Space Administration
**Goddard Space Flight Center**
Greenbelt, MD 20771

March 30, 2007

Reply to Attn of: 210.M

Dr. Kamal S. Ghaffarian
Executive Vice President/COO
SGT, Inc.
7701 Greenbelt Road, Suite 400
Greenbelt, MD 20770

SUBJECT: NASA Solicitation Number NNG0596383R, MSES II/A
Procurement Integrity Matter

Dear Dr. Ghaffarian:

I would like to thank you and your company for your cooperation in this matter. As you know, NASA's Goddard Space Flight Center takes allegations of procurement integrity very seriously. After a thorough review and analysis of the information provided, I have made a determination that the Procurement Integrity Act has not been breached and that the integrity of this procurement is still intact. I have attached a copy of my decision for your records.

If you have any questions, I may be reached at (301) 286-7522.

Sincerely,

Valorie A. Burr

Valorie A. Burr
Procurement Officer

Enclosure

Decision of the Procurement Officer Regarding the Procurement Integrity of the Mechanical Systems Engineering Services Procurement

By letter dated February 27, 2007, Swales requested a reconsideration of the NASA-GSFC Contracting Officer (C.O.) determination finding no violation of the procurement Integrity Act on the Mechanical Systems Engineering Services (MSES) II/A procurement. In its request Swales presented new evidence to support its assertions. Based upon this new information, I agreed to review the issue.

As way of background information, on or about December 13, 2006, Swales Aerospace sent a letter to the C.O. for the MSES II/A solicitation, Mrs. Kathleen Pierson. In this letter, Swales representatives assert that its competitor for this acquisition, SGT, has breached the Procurement Integrity Act by hiring one of its former employees to assist it in its drafting of its proposal for MSES II/A. See Exhibit 1. Swales followed up this initial letter with another letter dated December 16, 2006. See Exhibit 2. In this letter, Swales requested an investigation and notification that an investigation would be conducted. On February 8, 2007, the C.O. notified Swales that it was her opinion that the Procurement Integrity Act was not applicable. The C.O. reasoned that the Procurement Integrity Act applies to Government employees and contractor employees serving as advisors to NASA on Source Evaluation Boards (SEB). She concluded by saying that the alleged acts were not committed by a Government employee or a contractor employee advising the SEB on this procurement, so the Procurement Integrity Act was not applicable. See Exhibit 5. By letter dated February 22, 2007, Swales requested a reconsideration of this decision In support of this request, Swales furnished an affidavit from Mr. Thomas G. Swales, founder and Chairman of the Board of Swales & Associates, Inc., stating that Mr. Galassi, a former Swales employee, misappropriated Swales trade secrets when he became involved with SGT's competitive proposal for MSES II/A. See Exhibit 7. In response, the C.O. initiated an inquiry and asked both Swales and SGT for affidavits and supporting information to address the issue of a Procurement Integrity Act problem related to Mr. Galassi's involvement in the MSES II/A proposals. See Exhibits 9 & 10. Both companies responded. See Exhibits 11, 12, 13, 14.

Discussion

The Procurement Integrity Act is implemented into the Federal Acquisition Regulation (FAR) at Part 3.104. The statute and implementing regulation contain prohibitions and restrictions. Specifically, FAR Part 3.104-3 provides:

> (a)(1) A person described in paragraph (a)(2) of this subsection must not, other than as provided by law, knowingly disclose contractor bid or proposal information or source selection information before the award of a Federal agency procurement **contract to which the information relates.**

> (a)(2) Paragraph (a)(1) of this subsection applies to any person who-(i) Is a present or former official of the United States, or a person who is acting or has acted for or on behalf of, or who is advising or has advised the United States with respect to, a Federal agency procurement; (ii) By virtue of that office, employment, or relationship, has or had access to contractor bid or proposal information or source selection information.

In addition, provisions of the United States Code prevent certain individuals from "knowingly disclosing contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates." **MTB Group, Inc. v United States**, 65 Fed. Cl. 516 (June 2005) citing 41 U.S.C. § 423 (a) (1). This prohibition applies to "a present or former official of the United States, or a person who is acting or has acted for or on behalf of, or who is advising or has advised the United States with respect to, a Federal agency procurement," and, because of that office, employment, or relationship, "has or had access to" the information protected in 41 U.S.C. § 423(a)(1). Id. §423 (a)(2).

In the instant case, Mr. Galassi is not a present or former official of the United States. Further, he did not provide advice to the United States on the MSES II/A procurement. Mr. Galassi is the sole owner of Aerostress which received a sole source award from GSFC in 2006 to perform structural engineering analysis on the Global Precipitation Mapper (GPM). See Exhibit 13 (Cover letter from Swales to C.O., dated March 14, 2007). However, this work did not involve MSES II/A. The GPM is a different and distinct contract from the planned MSES II/A contract.

In arguing that a Procurement Integrity Act violation has occurred, Swales relies on 41 U.S.C. 423(b) which prohibits an individual from "**knowingly obtaining contractor bid or proposal information** or source selection information before the award of a Federal agency procurement contract to which the information relates." Contractor bid and proposal information is defined as any of the following information submitted to a Federal agency as part of or in connection with a bid or proposal to enter into a Federal agency procurement contract, if that information has not been previously made available to the public or disclosed publicly: (1) Cost or pricing data; (2) indirect costs and direct labor rates; (3) Proprietary information about manufacturing processes, operations, or techniques marked by the contractor in accordance with applicable law or regulation; (4) information marked by the contractor as "contractor bid or proposal information" in accordance with applicable law or regulation. See FAR 3.104-1. I have reviewed each one of these areas and my review and findings are listed below.

In the area of cost and pricing data including indirect costs and labor rates, I find no evidence that SGT obtained Swales cost or pricing proposal information. Numerous SGT management employees provided affidavits denying that Mr. Galassi had any

involvement in SGT's cost proposal. See Exhibits 11 & 12. For example, Mr. Harold Stinger, co-owner SGT and Chief Executive Officer in his affidavit states, " I have made inquiries of management team into allegations made by Swales Aerospace regarding an alleged procurement integrity violation by Mr. Nicholas Galassi. Based on my inquiries I believe the following to be true: Mr. Galassi's role in SGT's MSES II/A proposal was limited to providing limited technical input within his narrow sphere of expertise. Mr. Galassi did not share with SGT personnel, consultants hired by SGT or SGT officials any Swales proprietary information including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information." Mr. Kamal Ghaffarian, co-owner of SGT and Executive Vice President, in his affidavit states "As Lead Executive I was heavily involved in setting the proposal strategy, including pricing strategy for SGT and I made all final decisions in this regard...To my knowledge, Mr. Nicholas M. Galassi did not participate in the development of SGT's MSES II/A cost strategy nor did he work on or assist in SGT's MSES II/A cost proposal or revised cost proposal." Mr. Matthew Yetman, Vice President and Chief Financial Officer for SGT, in his affidavit states, "To my knowledge, Mr. Nicholas M. Galassi did not participate in the development of SGT's MSES II/A cost strategy nor did he work on or assist in SGT's MSES II/A cost proposal or revised cost proposal." Mr. William Emmett Brooks III, President and sole proprietor of Aldebaran, the SGT contractor responsible for production of the SGT MSES II/A proposal, in his affidavit states, "At no time did Mr. Galassi participate or provide inputs to any aspects of the Cost Volume." Mr. Andrew Endal, Vice President for Business Development for SGT, in his affidavit states, "At no point did Mr. Galassi see, help develop, or review any aspects of SGT's cost strategy, Cost proposal (original or revised), or Past Performance Proposal (revised Past Performance Volume not required)." And finally, Mr. Nicholas Galassi, President of Aerostress, in his affidavit states, " I did not provide input or otherwise assist SGT in the preparation of any aspect of its cost or business proposal. Further, I have never seen any portion of SGT's cost or business proposal, nor has any portion of SGT's cost or business proposal been verbally disclosed to me." Mr. Galassi concludes his affidavit by stating, "The external drive that I returned to Swales included data that I had used and/or retained in connection with my performance of services for the Solar Dynamics Observatory (SDO) program, both as a Swales employee and as a Swales consultant. At no time did I use or disclose to SGT any such data." All of the SGT affidavits directly support the position that Mr. Galassi did not assist SGT in its Cost proposal.

I have also reviewed the Swales affidavits, two of which were provided. Mr. David Baran, Engineer for Swales & Associates, Inc., states "Mr. Galassi served as a subcontractor/consultant to Swales providing structural analysis support on MSES Task 572 for the SDO with primary focus on the Propulsion Module primary structure." At the end of the task, Mr. Galassi delivered the final stress analysis report and all finite models, analyses and other materials related to his performance on the task. Mr. Baran states, " I was surprised to find Swales MSES task planning spreadsheets, internal Project Status Review presentations, MSES Monthly Reports and MSES Performance Evaluation Board

write-ups among the technical data...The planning spreadsheet data contains business confidential data of Swales costs of performance including, its management fees (known as PMT) its information technology and financial data charges (which are categories of ODCs or other Direct Costs, Swales overhead and G&A loadings on direct labor rates, and its labor escalation rates, all matters of great competition sensitivity. It is evident from the data itself that it was accumulated while Mr. Galassi was working as a Swales employee on the SDO effort, as was I at the time." See Exhibit 13. Mr. Galassi left Swales employment in October 2005. See Exhibit 12 affidavit of Mr. Galassi. Mr. Thomas Swales does not mention Mr. Galassi's possession of cost data. I note that neither of these affidavits provides any type of concrete assertion or evidence that Mr. Galassi had accurate and current rate information or that he shared it with SGT or that SGT knowingly tried to acquire such information. Rather, the Swales affidavits merely state that he had access to old cost estimates and speculate that he may have provided this outdated information to SGT. Mere speculation without more is not sufficient to find a violation of the Procurement Integrity Act.

In the area of proprietary information, I find that there is no evidence of technical transfusion of the Swales proprietary information to SGT. The concept of technical transfusion refers to an improper disclosure by agency officials of information contained in one firm's proposal which resulted in the improvement of a competing proposal. See Matter of: Contact International Corporation, B-237122.3, B-237122.4, 70 Comp. Gen 115 (Dec 1990). Technical transfusion is inapplicable to this case because agency officials did not have the information contained in Swales proposal at the time of the alleged transfer. Further, a technical review of the SGT and Swales proposal did not reveal any use of Swales proprietary information in the SGT proposal. See Exhibit 15 (Report of Ryan Simmons regarding the allegations of technical transfusion) All information utilized in SGT's proposal is available in the public domain according to Mr. Ryan Simmons, NASA engineer. See Exhibit 15, Report of Ryan Simmons. In fact, it must be pointed out that SGT's proposal did not improve with Mr. Galassi's assistance. SGT received two technical weaknesses for RTOs 1 and 2 including one that Mr. Galassi's expertise should have helped avoid. This weakness is in regard to finite element modeling and analysis. Mr. Simmons concludes his analysis in this area by stating, " No proprietary information is involved, but the nature of the weakness is such that if Mr. Galassi had helped with this portion of the proposal, his expertise proved inadequate." Therefore, I find no evidence of technical transfusion of proprietary information from Swales to SGT.

In the area of information marked by the contractor as "contractor bid or proposal information" in accordance with applicable law or regulation, I find no evidence of disclosure. The spreadsheets presented with the Swales affidavits were not marked "contractor bid or proposal information." Further, Swales has provided no evidence of such a release to SGT.

Finally, I looked at Title 41 U.S.C. § 423 (h)(2) which provides, "This section does not: (2) restrict a contractor from disclosing its own bid or proposal information or the recipient from receiving that information." In the instant case, Swales admits it gave Mr. Galassi its technical proposal information when it permitted him to work on its response to the RTOs and by providing him with estimated rate information for the SDO contract, a separate and distinct contract from the MSES II/A procurement. The Court of Claims has held that the Procurement Integrity Act has removed from the disclosure prohibition restrictions on the contractor from disclosing its own bid or proposal information. At the same time, these provisions also allow the recipient of that information to receive it. MTB Group, Inc. v United States, 65 Fed. Cl. 516 (June 2005) citing 41 U.S.C. § 423 (h)(2); 48 C.F.R. § 3.104-4(e)(1). While, SGT states that it did not receive Swales' proposal information, the statute would have excluded this type of disclosure.

In addition to a strict review of the Procurement Integrity Act, I have also considered whether the alleged actions, if true, would have so tainted this procurement to warrant administrative action to be taken by NASA. A review of the facts reveals that at no time did Mr. Galassi ever advise NASA on the MSES II procurement. The record does indicate that Mr. Galassi had a consulting contract with SGT for the limited purpose of assisting it with the final reviews of the Understanding the Requirements and RTO portions of the SGT's MSES II/A proposal. Mr. Galassi provided comments that were used to revise these sections prior to the Red Team Review. He was then assigned to the Red Team of the RTOs on March 24-25, 2006. Mr. Galassi spent a total time of 34 hours in assisting SGT. See Exhibit 11 affidavit of Mr. Andrew S. Endal, Vice President for Business Development for SGT, Inc. However, his work was so limited and did not result in a strength for SGT in this area, that it is doubtful to me that Mr. Galassi utilized any Swales proprietary information. Further, I note that Mr. Galassi was only paid $3,400.00 for this work. This small payment amount and limited hours further leads me to believe that Mr. Galassi's involvement with the SGT proposal was limited and not of major importance. Finally, I note the record is devoid of any evidence to indicate that Mr. Galassi improperly used Swales cost and pricing information or proprietary information. Based upon these facts it is my determination that the integrity of this procurement is still intact.

Conclusion

Based upon the above review, it is my determination that a Procurement Integrity Act violation has not occurred. Mr. Galassi was not and is not a Federal Government Official nor was he working as a contractor providing advice to the SEB on the MSES II/A procurement. Mr. Galassi may have had access to Swales technical information on the RTOs for MSES II/A. But there is no evidence to establish that SGT officials either asked for this information or received it. Mr. Galassi may have had access to Swales estimated rate information for the SDO contract dated before Oct 2005. However, there is no evidence to establish that SGT employees either asked for this information or knowingly

accepted this type of information. In fact, the evidence presented establishes that SGT did not ask for or receive any type of cost assistance or information from Mr. Galassi. Further, the Procurement Integrity Act statute does not restrict contractors from disclosing their bid or proposal information or recipients from receiving it. Thus, it is my determination that a Procurement Integrity Act violation has not occurred. I find that the overall integrity of this procurement is still intact.

Valorie A. Burr
Valorie A. Burr
Procurement Officer

3/29/07
Date