# **Exhibit 3**

**IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND**

| | |
|---|---|
| SWALES AND ASSOCIATES, INC.<br>Plaintiff<br>v.<br>AEROSTRESS, INC, *et al.*<br>Defendants. | Case No. CAL07-02947<br>(Judge A. Michael Chapdelaine) |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Defendants, Aerostress, Inc. and Nicholas M. Galassi ("Defendants"), submit the following memorandum in opposition to the Motion for Preliminary Injunction filed by the Plaintiff, Swales & Associates, Inc. ("Swales" or "Plaintiff"), in the above-captioned case.

## I. INTRODUCTION

This action is brought by Swales, a 1,000 employee, $180 million per year, federal contractor, against Mr. Galassi, a former Swales engineer, and his consulting company, Aerostress, Inc. ("Aerostress"). Swales contends that, after Mr. Galassi left Swales' employ in October 2006, he disclosed Swales' trade secrets to a competitor, SGT, Inc. ("SGT"). Although Mr. Galassi performed a limited amount of consulting work for SGT, as was his right, he vehemently denies the allegation that he used or disclosed Swales' trade secrets. In fact, at the time he was providing consulting services to SGT in March-April 2006, Mr. Galassi *openly acknowledged to Swales' management* that he was providing those services to SGT. Swales did not object at the time and took no action until it filed the instant lawsuit almost a year later.

This lawsuit and its timing, therefore, must be viewed in the proper context. At present, Swales is in the midst of a heated battle with SGT for a $400 million contract with the National Aeronautics and Space Administration, Goddard Space Flight Center ("NASA") to provide Mechanical Systems Engineering Services. The contract is known as the "MSES-IIA Contract." Swales has been performing MSES work at NASA for the past five years, and now that that its contract is expiring, it faces fierce competition from SGT for the follow-on five-year contract. The stakes could not be higher for Swales. It faces the loss of an enormous revenue stream and a substantial percentage of its employees.

The stakes were raised even higher when NASA initially announced SGT as the winner of the MSES-IIA competition on December 1, 2006. After Swales filed a bid protest with the Government Accountability Office ("GAO"), NASA voluntarily agreed in January to set-aside the award and re-open the competition. At present, the competition is on-going and award is not expected until at least the summer of 2007. It was only after the competition was re-opened in January that Swales chose to object to Mr. Galassi's work for SGT on its proposal, despite knowing about it back in March-April 2006.

As the competition for MSES-IIA proceeds, therefore, Swales is leaving no stone unturned. Swales is no doubt aware that the mere allegation that trade secrets were disclosed between competitors could impact the MSES-IIA evaluation. In addition to this lawsuit, Swales has filed an administrative claim with NASA under the Procurement Integrity Act, 41 U.S.C. §423, making similar allegations. At a minimum, Swales' allegations of trade secret misappropriation could delay award of the new MSES-IIA contract. The delay of the new award results in direct financial gain for Swales – i.e., its current MSES contract, on which it is making $5-10 million per month, is incrementally extended.

Unfortunately, in its zeal to retain MSES work, Swales has chosen to impugn the integrity and honesty of a hard-working engineer that devoted 12 years of his professional career to helping Swales achieve its success. Despite its reckless accusations that Mr. Galassi has engaged in "deceit and deception," "industrial espionage" and "commercial thievery," Swales has presented *no evidence* to support its claim that trade secrets were disclosed to a competitor.[1] Indeed, these inciting allegations are false.

Not only is it very unlikely that Swales will succeed on the merits of its claim that its trade secrets have been disclosed, but there is no *threatened* disclosure that warrants the court's issuance of interim relief. Mr. Galassi is not currently working for SGT and has no intention of providing services to SGT in the future with regard to its MSES-IIA proposal. Swales, therefore, cannot demonstrate that there is a need for the court to intervene. Also, it is clearly not in the public interest for the court to issue interim relief in a manner that could negatively impact the MSES-IIA evaluation process, the pending Procurement Integrity Act Claim, or the performance of MSES work once the contract is awarded.

## II. <u>FACTUAL BACKGROUND</u>

### A. Mr. Galassi's Background at NASA

Mr. Galassi has been practicing structural analysis of aerospace structures since he graduated from college in 1978. Mr. Galassi began working at NASA when he became employed with Fairchild Industries in 1987. While at Fairchild, he supported the "Explorer Platform" spacecraft program and the first "Hubble Space Telescope Repair Mission." In 1993,

---

[1] In support of its motion, Plaintiff's brief cites extensively to its "Verified Complaint." The Verification attached to its complaint is given by Swales' General Counsel, Arthur R. Leaderman. Mr. Leaderman's personal knowledge of any relevant information, however, appears to be minimal. In fact, in his Verification, Mr. Leaderman can only attest that the information is based on either his personal knowledge "or knowledge or information that has been reported to him in his role as General Counsel," i.e., hearsay.

Mr. Galassi left Fairchild and accepted employment with Swales. During his tenure with Swales, he continued to work at NASA Goddard. Over the course of his 20 years of working at NASA, Mr. Galassi has remained focused solely on structural analysis and has built strong technical and working relationships with NASA Goddard staff. Mr. Galassi's record as a structural analysis engineer is beyond reproach. He has never before been accused of any wrongdoing, reprimanded, or disciplined, either by Swales or any other company. Mr. Galassi's reputation for honesty and integrity during his career speaks for itself.

**B. Mr. Galassi's Employment with Swales**

Mr. Galassi worked at Swales as a structural engineer from 1993 through the effective date of his resignation, October 28, 2005. Although employed with the company for 12 years, Swales never required Mr. Galassi to sign a non-disclosure agreement until the very last day of his employment, October 28, 2005, when they asked him to sign a "Separation Agreement." *See* Verified Complaint, Ex. A. Nor was Mr. Galassi ever asked to sign a non-competition agreement. Although Swales contends that Mr. Galassi was given access to valuable trade secrets, its failure to require him even to sign a non-disclosure agreement during his employment belies that claim.

During his employment with Swales, Mr. Galassi served as a structural engineer on various federal contracts. His involvement with the subject procurement, MSES-IIA, was minimal. In fact, NASA's request for proposals ("RFP") for the MSES-IIA procurement was not even released until March 9, 2006 – more than *four months after* Mr. Galassi's employment with the company had ended.

While employed at Swales, therefore, Mr. Galassi's involvement with the anticipated MSES-IIA procurement was limited to attendance at a kickoff meeting and subsequent meetings

in or around June-July 2005. These meetings were limited to discussions regarding Representative Task Order ("RTO") No. 1, which at that time had been released by NASA in draft form. It was anticipated that, once released, the MSES-IIA RFP would require, as one element of the evaluation process, that bidders prepare proposed solutions to task orders that are representative of those that might be issued under the contract, i.e., RTOs.

Mr. Galassi had no involvement in Swales' MSES-IIA effort after July 2005. He was not involved in the preparation or drafting of Swales' response to draft RTO No. 1 or any other portion of Swales' proposal for MSES-IIA.

On October 11, 2005, Mr. Galassi submitted his resignation in order to start his own engineering consulting business, Aerostress, Inc. It was Mr. Galassi's hope that having his own consulting business would allow him to decrease the number of hours that we was working and focus on other non-work related matters. After the announcement of his resignation from Swales, Mr. Galassi was approached by Swales management and asked to continue to work on the Solar Dynamics Observatory ("SDO") program. While with Swales, Mr. Galassi had been working on the SDO program, which was unrelated to the MSES-IIA procurement. Mr. Galassi accepted the offer and agreed to work for Swales two days per week on the SDO program.[2] There was no secret scheme to establish a competing consulting company, as Swales suggests. To the contrary, Mr. Galassi was very open with Swales about his future plans with Aerostress.[3]

---

[2] On January 26, 2007, Swales abruptly terminated its purchase order relationship with Aerostress without cause and without explanation. The following week, Swales filed the instant lawsuit.

[3] After he left Swales, Mr. Galassi, through Aerostress, also accepted consulting work with other companies, and in one instance, accepted a purchase order directly from NASA to work on its GPM Satellite program. Swales has not complained that its trade secrets have been disclosed in connection with Mr. Galassi's other work.

### C. Mr. Galassi's Work for SGT

In early 2006, Mr. Galassi was approached by SGT regarding a possible consulting relationship. Subsequently, Aerostress entered into a consulting agreement with SGT dated March 28, 2006 to review and provide technical input on SGT's proposal for the MSES-IIA procurement in the areas of Understanding the Requirements and Representative Task Orders ("RTOs"). Through Aerostress, Mr. Galassi performed 34 hours of consulting services in March-April 2006 consisting of reviewing and commenting on SGT's proposed solution in these areas.

During the time that he was working for SGT, he advised two members of Swales management (who supervised him on the work he performed while he was with Swales) that he was working for SGT on a portion of its proposal. He informed them of this because he had frequent contacts with them on the SDO program, and he wanted to ensure that they would not inadvertently disclose to him any confidential and proprietary information regarding Swales' proposal for MSES-IIA. They did not voice any objection and did not disclose any such confidential and proprietary information to Mr. Galassi.

In September 2006, Mr. Galassi was asked by SGT to participate in an oral presentation to NASA in the area of Integration and Test Engineering. He participated at SGT's oral presentation in this narrow area. Following the presentation, Mr. Galassi provided input in connection with SGT's response to NASA in the same area, i.e., Integration and Test Engineering.

In performing services for SGT, Mr. Galassi relied on his skills and expertise as a structural analysis engineer. At no time did he use or disclose to SGT any information regarding Swales' proposed solutions to RTOs or any confidential information or trade secrets of Swales.

At no time did Mr. Galassi become involved with drafting SGT's proposal. Rather, his involvement consisted of reviewing and providing technical input in the limited areas described above. Additionally, at not time did Mr. Galassi provide input or otherwise assist SGT in the preparation of any aspect of its cost or business proposal.

At present, Mr. Galassi no longer works for SGT on the MSES-IIA proposal and has no plans to perform additional services for SGT in that respect.

## II. ARGUMENT

### A. Plaintiff is Unlikely to Succeed on the Merits of Its Claim that its Trade Secrets Have Been Disclosed

Swales relies primarily on the Maryland Uniform Trade Secrets Act, *et seq*. ("MUTSA" or "Act"), which prohibits the "misappropriation" of "trade secrets."[4] Under the Act, actual or threatened misappropriation of a trade secret may be enjoined. Md. Code §11-1202. Therefore, to demonstrate a violation of the statute, Swales must: (i) identify a "trade secret" that falls within the MUTSA's definition; and (ii) present evidence to prove that the trade secret was "misappropriated," i.e., used or disclosed to another without consent. Md. Code §11-1201. Plaintiff has done neither.

[4] Most of the remaining counts in the Verified Complaint are largely derivative, or a restatement, of Plaintiff's MUTSA claim. Swales' "contractual" claims in the Second and Third Counts of the Verified Complaint fail to state colorable claims and are subject to dismissal. In the Second Count, Swales contends that Mr. Galassi breached a "Separation Agreement" that he signed on last day of his employment with Swales. That document (by its own words, a "reaffirmation" of an unidentified "professional obligation") is unsupported by any consideration from Swales and is unenforceable. *See* Verified Complaint, Ex. B. The Third Count claims that Aerostress breached a non-disclosure agreement it signed with Swales in November 2005. However, the agreement states that it "only controls information that is disclosed *on or after* the Effective Date," i.e., November 5, 2005 (emphasis added). Mr. Galassi's limited involvement with Swales on MSES-IIA, however, took place in June-July 2005. Accordingly, that non-disclosure agreement does not apply here.

**1. Swales has not Clearly Identified the "Trade Secrets" it Contends Were Disclosed**

In its motion, Swales fails to identify with any clarity the "trade secrets" that have allegedly been misappropriated. Rather, it assumes this to be the case and concludes "there can be no doubt that Mr. Galassi obtained trade secrets as they pertain to the MSES IIA procurement." Plaintiff's Motion at 9.

Swales suggests that the "specific design solutions" for the five RTOs, to which Mr. Galassi allegedly had access, constitute "trade secrets." To begin with, Mr. Galassi denies the allegation that he had access to Swales' proposed solutions – he attended several meetings in June-July 2005 regarding only draft RTO No. 1 (which was in his field), and never participated in the drafting of any proposal solutions for any RTOs, or any other part of MSES-IIA, during his employment with Swales. Swales has failed to produce the "specific design solutions" to which it refers, or to include any exhibits by which these solutions might be reasonably identified.[5]

In its motion, Swales suggests that these "solutions" include a "structural, thermal, optical (STOP) analysis." Plaintiff's Motion at 9. However, this STOP analysis was published by Swales at a 2003 conference in Norfolk, Virginia. Attached as Exhibit "1" is a paper presented by a Swales employee, Cengiz Kunt, discussing the STOP analysis in detail. Having publicly disseminated this information, Swales cannot legitimately claim that this analysis, or any processes or information in the paper, constitutes a trade secret.

Plaintiff also asserts Mr. Galassi participated in Swales' "assembling of SOW narratives" for its MSES-IIA proposal, an allegation that Mr. Galassi flatly denies. Plaintiff's Motion at 10. Nonetheless, Swales cannot clearly identify a "trade secret" here either. Rather, Swales' motion

---

[5] In *Space Aero Products Co., Inc. v. R.E. Darling Company, Inc.*, 238 Md. 93, 110, 208 A.2d 74, 82 (1965), which is cited by Plaintiff in its brief, the Court of Appeals describes six factors to be considered in determining whether given information is one's trade secret. Plaintiff makes not effort to analyze or apply these factors.

states that the "topics" of the narratives consisted of "finite element model analysis," "flight load analysis," "launch and ascent for Expendable Launch Vehicles," "coupled on-orbit loads analyses on task specified payload configurations," "stress and margin of safety analysis for spacecraft structures," "vibration, frequency response, shock, and vibro-acoustic analyses," and "fracture mechanics analyses." *Id.* It does not appear from this discussion that Swales contends that these "analyses" are proprietary to Swales (indeed Swales does not claim it developed them). Rather, these analyses appear to be merely "topics" of its SOW narratives. In fact, these analyses are defined by NASA Goddard and are described in detail on the "NASA/GSFC, Mechanical Engineering Branch, Code 543" design references website, which is found at http://mscweb.gsfc.nasa.gov/543web/designref.html. The opening page on that site (which links to the various designs and analyses) is attached as Exhibit "2." These publicly-available analyses clearly do not constitute Swales trade secrets.

Defendants submit that precision in identifying the involved "trade secrets" is of paramount importance here. Until this information is identified with a reasonable level of specificity, it cannot be determined: (i) whether it falls within the MUTSA's definition of trade secrets; or (ii) whether it has been wrongfully disclosed. Needless to say, Swales offers no clarity to the situation.

In fact, the limited role that Mr. Galassi played for Swales on MSES-IIA likely did not involve access to any MSES-IIA-related trade secrets. As mentioned, Mr. Galassi participated in a kickoff meeting and a few additional meetings regarding only draft RTO No. 1. His involvement ended in July 2005. Therefore, Mr. Galassi was not "intimately familiar with the technical and business elements of Swales' proposal," as Swales claims. Plaintiff's Motion at 3.

Indeed, he was not involved in the preparation or drafting of solutions to the RTOs, or any other aspect of Swales' proposal.

**2. Swales Cannot Demonstrate that its Trade Secrets Were Disclosed by Mr. Galassi to SGT**

Swales has not presented any evidence that its trade secrets were "misappropriated," i.e., *used* or *disclosed*, by the Defendants in violation the MUTSA.

Mr. Galassi's work for SGT was limited and temporary. In March-April 2006, he performed 34 hours of work for SGT reviewing and providing technical input on SGT's MSES-IIA proposal in the areas of Understanding the Requirements and RTOs. As stated above, at that time, Mr. Galassi openly made his work on a portion of the SGT proposal known to Swales, which voiced no objection. In September 2006, Mr. Galassi also participated in SGT's oral presentation to NASA in the area of Integration and Test Engineering, and provided follow-up input for SGT's written response to NASA in the same area.

In performing these services, Mr. Galassi relied on his skills and experience as a structural analysis engineer. At no time did he use or disclose any confidential information or trade secrets of Swales. Most of Mr. Galassi's work was to ensure that SGT understood the RFP's requirements and responded to each issue that NASA wanted to see addressed by bidders in their RTOs. Having worked with NASA on similar programs for 20 years, Mr. Galassi has acquired extensive knowledge of NASA's requirements and the issues to be addressed. To the extent that Swales maintains that Mr. Galassi's general knowledge and experience are proprietary to Swales, that argument must fail. *See Maryland Metals, Inc. v. Metzner,* 282 Md. 31, 46, 382 A.2d 564, 573 (1978) (finding that general experience, knowledge, memory and skill gained as a consequence of employment are not trade secrets) *citing Operations Research v.*

*Davidson*, 241 Md. 550, 567-69, 217 A.2d 375 (1966) and *Unfair Competition, Trademarks and Monopolies* § 54.2(a) (3d ed. 1968).

Swales presents no evidence that its trade secrets were disclosed to SGT by Defendants. Swales does not cite to any Swales document that was provided to SGT, or otherwise identify how, when or to whom its trade secrets were supposedly disclosed. Rather, Swales states in conclusory fashion that: "By supporting SGT's proposal, Mr. Galassi misappropriated Swales' trade secrets." Plaintiff's Motion at 6. This statement reveals Swales' claims to be entirely speculative.

Indeed, the proof should be in the pudding. A determination of whether trade secrets have been disclosed should not be made without a comparison of the proposals of Swales and SGT in the limited areas in which Mr. Galassi provided in input to SGT, i.e., RTOs and Understanding the Requirements. Swales has made no effort to seek such a comparison. Mr. Galassi is confident that such a review would reveal Swales claims to be specious.

**B. Because Defendants Consent to Maintain the Status Quo, There is No Threatened Misappropriation of Trade Secrets**

Swales seeks a preliminary injunction to: (i) prohibit Defendants' disclosure of Swales' trade secrets or confidential proprietary information; (ii) prohibit Defendants from performing "services of any kind ... to any entity or enterprise related to NASA's MSES IIA procurement or contract;" and (iii) to require Defendants to inform NASA in writing that they are so enjoined.

Under the MUTSA, "[a]ctual or threatened misappropriation may be enjoined." Md. Code, § 11-1202(a); *see also, Lejuene v. Coin Acceptors, Inc.*, 381 Md. 288, 301, 849 A.2d 451, 459 (2004) ("threatened appropriation may be enjoined"). In considering Plaintiff's motion for a preliminary injunction, therefore, the court must assess whether such harm is imminent. *See*

*DMF Leasing, Inc. v. Budget Rent-a-Car of Maryland, Inc. et al.* 161 Md.App. 640, 871 A.2d 639 (2005).

There is no threatened misappropriation that warrants the court's intervention. Mr. Galassi's work for SGT on the MSES-IIA proposal has long since concluded, and he has no intention of performing additional work for SGT on its MSES-IIA proposal. Defendants are agreeable to maintaining the status quo – i.e., to continue not to disclose Swales' trade secrets or confidential information, and to refrain from working for SGT in conjunction with its pre-award MSES-IIA effort. Defendants have no objection to a Consent Order stating as much; provided, however, that the order makes clear the no finding is made on the merits of Plaintiff's claims, and the order does not constitute an admission of liability.

Accordingly, with the MSES-IIA pre-award evaluation process continuing until at least the summer of 2007, there is no threatened misappropriation.

Undersigned counsel recently proposed to Swales' counsel that such a Consent Order be entered. Swales did not respond for reasons that are now apparent. Swales not only seeks to have Mr. Galassi enjoined from working on SGT's MSES-IIA *proposal*, but it also seeks to have Mr. Galassi enjoined from working on the MSES-IIA *contract*. Although a limitation on proposal work might be within the court's purview if Swales' trade secrets claim had merit, a restriction

on Mr. Galassi's ability to work at NASA on the MSES-IIA contract – <u>which will span the next five years</u> – is blatantly overbroad. When the contract is being performed by SGT (should it receive the award), Swales' bid information, and its proposed design "solutions" to the RTOs will be immaterial. There is absolutely no basis for such an expansive injunction. In effect, Swales asks this court to enforce against Mr. Galassi a five-year non-competition covenant. This

would violate Mr. Galassi's right to earn a livelihood. Moreover, such a ban would be contrary to the public interest. Mr. Galassi is valued at NASA. If such a ban were imposed, NASA would be deprived of the services of a talented and experienced structural engineer, thereby impacting the MSES program.[6]

Although we will not speculate on Swales' motives for requesting that Mr. Galassi be excluded from contract performance and that he be required to advise NASA of this exclusion during an on-going competition for a $400 million contract, we believe the circumstances speak for themselves.[7]

In short, this motion should not be necessary. There is no threatened misappropriation and Defendants will consent to maintaining the status quo. The motion should be denied, or alternatively, the motion should be dismissed without prejudice to Swales' right to reinstate if SGT is named as the MSES-IIA awardee.

**C. The Public Interest Weighs Against Issuance of a Preliminary Injunction**

In considering a motion for preliminary injunction, the court must assess whether the issuance of an injunction is in the public interest. *See DMF Leasing, Inc. supra*. For the following reasons, it is not in the public interest for the court to order interim injunctive relief:

1. There is no threatened misappropriation or harm, and Defendants are agreeable to maintaining the status quo.

---

[6] Were Swales to apply the same logic to the rest of its staff, many Swales employees would be precluded from working for SGT should it receive the MSES-IIA award.

[7] Unlike Plaintiff's motion, Plaintiff's Verified Complaint does not request an order compelling the Defendants to advise NASA in writing that "they are restrained and enjoined from providing services related to the MSES-IIA procurement or contract." Therefore, the request in Plaintiff's motion is inappropriate. *See Chesapeake R. R. Co. v. Richfield Oil Corp.*, 180 Md. 192, 23 A. 2d 677 (1942), cert. den., 316 U.S. 698, 62 S. Ct. 1297, 86 L. Ed. 1768 (1942) (it is well- established that an injunctive decree must not be broader than the issue raised by the pleadings).

2. Swales' Procurement Integrity Act claim is currently pending at NASA. It is believed that the claim makes allegations similar to those in this lawsuit. Having access to the proposals of both Swales and SGT, NASA is well-positioned to determine whether trade secrets have been disclosed. The court's issuance of a preliminary injunction may be perceived by NASA as a finding that Swales trade secrets were, in fact, disclosed, thereby influencing NASA's investigation of the Procurement Integrity Act claim, as well as the on-going MSES-IIA competitive process. Particularly where there is no evidence of prior disclosure of trade secrets, and no threatened disclosure in the future, it is in the public interest that the court refrain from issuing interim relief that could impact NASA's investigation and evaluation of proposals.

3. As discussed above, an injunction prohibiting Defendants' performance of work for NASA on the MSES-IIA *contract* would impose an unjustifiable work restriction on Mr. Galassi, and impair his right to earn a living. In addition, it could affect the success of NASA's MSES program by depriving it of Mr. Galassi's services. Further, such a ruling would pave the way for Swales to attempt to enjoin others in its workforce from choosing to work for SGT should SGT win the MSES-IIA contract.

## III. CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Plaintiff's motion for preliminary injunction be denied.

Respectfully submitted,

PARGAMENT & HALLOWELL, PLLC

Date: 3/20/07

Andrew P. Hallowell, Esq.
Pargament & Hallowell, PLLC
1776 K Street, N.W., Suite 825
Washington, DC 20006
(202) 775-0707 (telephone)
(202) 775-0733 (facsimile)

Attorney for Defendants

**IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND**

| | |
|---|---|
| SWALES AND ASSOCIATES, INC.<br><br>Plaintiff<br><br>v.<br><br>AEROSTRESS, INC, *et al.*<br><br>Defendants. | Case No. CAL07-02947<br><br>(Judge A. Michael Chapdelaine) |

**ORDER**

Upon consideration of the motion for preliminary injunction filed by the Plaintiff, and the Defendants' opposition thereto, it is hereby;

ORDERED, that the motion be, and it hereby is, DENIED.

Circuit Court Judge, Prince George's County

cc:

Andrew P. Hallowell, Esq.
Pargament & Hallowell, PLLC
1776 K Street, N.W., Suite 825
Washington, DC 20006

Kim Hoyt Sperduto, Esq.
The Sperduto Law Firm
2021 L Street, N.W.
Second Floor
Washington, D.C. 20036

**Certificate of Service**

I hereby certify that on this 20th day of March 2007, I caused a true and correct copy of the foregoing to be served via regular mail, postage prepaid, upon:

Kim Hoyt Sperduto, Esq.
The Sperduto Law Firm
2021 L Street, N.W.
Second Floor
Washington, D.C. 20036

Andrew P. Hallowell

# EXHIBIT
# 1

44th AIAA/ASME/ASCE/AHS Structures, Structural Dynamics, and Materials Confere
7-10 April 2003, Norfolk, Virginia

AIAA 2003-1530

# WFC3 OPTICAL BENCH STRUCTURAL THERMAL OPTICAL PERFORMANCE (STOP) ANALYSIS AND OPTIMIZATION

Cengiz Kunt, Swales Aerospace, Beltsville, MD
Peter Mulé, NASA/Goddard Space Flight Center, Beltsville, MD

Abstract

New generation optical instruments with very demanding stability requirements are being proposed and developed for space applications. Structural-Thermal-Optical Performance (STOP) analysis and optimization is crucial in meeting the very tight distortion budgets of these instruments. This presentation outlines STOP analysis and optimization approach in the context of the Wide-Field Camera 3 (WFC3), which is a new instrument under development for the Hubble Space Telescope (HST). The optical performance of WFC3 instrument is required to equal or exceed that of earlier HST instruments. The key element in meeting WFC3 alignment requirements is a super stable Optical Bench, to which all the WFC3 optical components are mounted. The design of the WFC3 optical bench was challenging due to conflicting and difficult requirements including optical alignment, weight, stiffness, strength, and packaging. The multidisciplinary approach to this design problem proved to be very effective. Design and analysis of the bench progressed hand-in-hand starting from the selection of the type of bench construction to the detailed sizing of its mechanical components. STOP analysis was instrumental in quantifying the critical distortion effects and guiding mechanical, thermal, and optical engineering from the initial to the verification phases of design. STOP analysis was used to determine and keep track of long term and short term alignment errors. Long term errors are introduced primarily as a result of going from ground to orbit. Gravity release, set-point change, launch shift, and moisture desorption are sources of long term distortion and result in a wave front error with an allocation 50 arc-seconds for the WFC3 optical bench. Short term distortions are induced by on-orbit temperature changes and jitter. They result in line of sight errors, for which WFC3 the allocated budget is on the order of 10 milli-arc-seconds for the bench. STOP analysis demonstrated that both long term and short term error budgets could be met by the proposed optical bench design. STOP analysis was accompanied by classical aerospace structural analyses to ensure and demonstrate compliance with flow-down stiffness and strength requirements. Structural and thermal analyses were closely coordinated to ensure that the necessary temperature control can be implemented. Subsequent to fabrication and assembly, testing has demonstrated that the WFC3 optical bench meets the requirements.




**Figure 1. WFC3 Instrument Solid Model View**

## Introduction

WFC3 instrument, depicted in the solid model view in Figure 1, is designed to replace the Wide-Field Planetary Camera 2 (WFPC2) of the Hubble Space Telescope. WFC3 houses two separate channels, a near-UV/visible (UVIS) channel and a near-IR channel, and will have greater throughput and sensitivity than WFPC2. WFC3 line of sight alignment budget for the UVIS and IR channels are as small as 10 and 20 milli-arc-seconds, respectively. The optical bench, shown in Figure 2, is the most critical subsystem effecting the optical stability of WFC3 hence our effort concentrates on the design and analysis of the bench and its interfaces.

## WFC3 Optical Bench Key Requirements

Low distortion characteristics of its optical bench are key to the optical performance of WFC3 since it houses all the optical components. In addition to meeting the WFC3 optical stability requirements, the optical bench must: meet the HST Servicing Mission-4 structural and flow-down mass requirements, provide an interface satisfying thermal and structural requirements, meet volumetric requirements of an existing Enclosure, provide access for components



Copyright © 2003 by the American Institute of Aeronautics and Astronautics, Inc.
The U.S. Government has a royalty-free license to exercise all rights under the copyright claimed herein for Governmental purposes.
All other rights are reserved by the copyright owner.




**Figure 2. WFC3 Populated Optical Bench with top panel removed**

throughout integration, meet the HST and optical system contamination requirements, support late-in-the-flow change-out requirements of the detectors and filters, and reuse WFPC1 (Wide-Field Planetary Camera 1) hardware where possible.

Optical Performance Parameters

WFC3 is configured as a two-channel instrument. The incoming beam from the HST is directed into the instrument using a pick off mirror and is then sent to either a UVIS channel or an IR channel. Light enters HST as a set of individual parallel light rays that eventually come to focus at the instrument detector. The quality of the detector image is affected by two sources of misalignment; wave front and line of sight errors. When the mirrors move or distort, the light rays no longer focus at the same spot on the detector. In other words the ideal wave front now has an error. Wave front errors determine the long term stability of the image hence are also referred to as long term distortion. Major sources that cause this type of misalignment are gravity release, ground-to-orbit temperature (set point) change, moisture desorption, and launch shift. WFC3 long term distortion budget is approximately 50 arc-seconds for both the UVIS and IR Channels.

Line of sight errors refer to the stability of the detector image over a period of time that is enveloped by two-orbits of the HST. Scientists desire no more than quarter of a pixel motion so that successive images can be overlaid without degradation. Based on the pixel sizes, the short term distortion budget for the WFC3 instrument is 10 milli-arc-seconds for the UVIS channel and 20 milli-arc-seconds for the IR Channel. Sources of line of sight or short term error are on-orbit temperature variations and jitter.

Optical Bench Design

The optical bench is of box construction made up of edge-joined honeycomb panels, Figure 3. Box type construction was selected over a tubular truss or frame structure primarily because it better accommodated the large number of optical interfaces. The weights of the two concepts were judged equivalent and the box or panel design had a lower projected manufacturing cost.

The panels are of composite facesheet/aluminum core honeycomb. The facesheets are 0.060 inch thick with a quasi-isotropic ply arrangement. XN50/996 graphite/siloxane-enhanced cyanate ester laminate is used for the facesheets. This material exhibits high strength, stiffness and thermal conductivity and possesses the lowest available moisture absorption. The latter property minimizes the dimensional change of the bench due to moisture desorption on orbit. Aluminum 5056 honeycomb is used for the




**Figure 3. WFC3 Optical Bench Construction**

core. By design, the negative CTE (Coefficient of Thermal Expansion) of the facesheet is balanced with the positive CTE of the core to produce an overall panel CTE in the range of 0 ± 0.2 ppm/°C (1 ppm=1E-6).

There are seven vertical bulkheads, which support all of the critical optical components. Top, bottom and side panels complete the box and provide structural strength and stiffness. The calibration optics are packaged on the side and bottom panels. The required location accuracy of the calibration optics was less severe than the bulkhead-mounted optics. The panels are joined at their edges using bolts and pins into metallic edge blocks. The two side panels are joined with bonded super invar clips. All structural joints incorporated press-fit pins or precision fasteners to remove the possibility of dead band and alignment shift. There are large cutouts in each panel to simplify installation and access to the optics, as well as reduce weight. Installation of the SOFA (Figure 2) through a large cutout in the top panel was the principal assembly challenge. Smaller cutouts provide line of sight access to alignment cubes.

Patterns of threaded holes and pins are provided on bulkheads, and side and top panels for the interfaces with optical elements. These features are machined into super invar blocks bonded into the panels. Super invar edge blocks are used for the interfaces between panels. For stray light and contamination reasons, all panel edges are closed out with black Kapton tape.

A system of eight athermalized struts is used to support the bench and interface with the A, B and C latch fittings. On the bench side, the struts incorporate clevises, which are attached to lugs on the bench. Precision fasteners with a light press-fit are used at the clevis-lug joint to eliminate any structural dead band or possible alignment shift. Precision bosses on the struts fit into bores on the latch fittings. The struts have a composite outer tube and internal aluminum, steel and titanium collars. The strut end fittings are invar. The CTE difference between these materials and appropriate length choices are used to tailor negative effective CTEs for each strut pair. The strut CTEs are chosen (in pairs) to cancel the positive CTE of the latch assemblies and minimize overall distortion from thermal loading. The latch interface fittings are of titanium machined construction.

The pick-off mirror arm is a made up of a stack of eight XN50/996 laminates bonded together with structural adhesive. The four external laminates extend part of the length of the arm to give a stepwise taper between root and tip. The arm is bonded to the super invar POM fitting at the tip and a bench interface fitting at the root. The interface fitting is bolted and pinned to the bench front bulkhead.

## Structural Analysis & Verification

Analysis played a key role in meeting the challenging and conflicting requirements of the WFC3 optical bench. A multidisciplinary analysis approach was used with structural, thermal, and optical engineers working together in an interactive mode. A summary

**Table 1a. Design Limit Load Factors**
**(G=386.4 in/s$^2$)**

| Loading | X | Y | Z |
|---|---|---|---|
| Liftoff* | 5.0 | 3.5 | 2.6 |
| Landing* | 3.6 | 2.0 | 4.0 |
| Handling | 2.0 in any one axis | | |

* Component Load Factors are in the Shuttle Coordinate System and simultaneously applied in all ± combinations.

**Table 1b. Safety Factors**

| | Analysis Only | Analysis & Test |
|---|---|---|
| Yield | 2.0 | 1.25 |
| Ultimate | 2.6 | 2.0 |

of the analysis activities and critical results follow. Further details are given in References 1 and 2.

Structural analysis accompanied and guided the mechanical design of the bench from the initial concept study through the final verification phase. OB critical mechanical requirements consisted of designing a structure which is stiff enough to have a fundamental frequency of at least 35 Hz and to minimize the gravity sag induced distortions, strong enough to have positive margins of safety under the design loads and safety factors listed in Table 1, and light enough to satisfy a minimum weight requirement. In addition, all the optics had to be packaged within the limited space inside the existing enclosure with ample access, and supported with extreme stability to meet the optical alignment requirements.

A high fidelity structural Finite Element Model (FEM) of the bench was developed and used for sizing it to meet the stringent stiffness, strength, weight, accessibility, and optical alignment requirements. Finite Element Analysis (FEA) software was NASTRAN (Version 70.5) with eigenvalue solution used for normal modes analysis and linear static solution for stress and deformation analyses. The optical bench FEM shown in Figure 4 includes the instrument sides of the HST latches, which constrain the bench kinematically with the A latch fixing all three translations, B constraining only in the V1 direction and C both in the V1 and V2 directions. This mounting arrangement is inherited from the WFPC1 and WFPC2 instruments and is indispensable in minimizing the operational distortions due to thermal, and mechanical effects. The FEM accurately represented the optical assembly mass properties with a total weight of 315 lb including the bench structure, at 98 lbs and optics at 217 lbs. The bench reacts the launch induced inertial and vibrational loads primarily as a box-beam with the side and top panels developing shear, tension and compression to beam the load to the center bulkhead and to the front bulkhead area. The loads are then channeled into the support struts, which tie into the latches.

FEM represents all the panels and bulkheads in detail using plate elements. Bolted and pinned connections are individually modeled. The bonded inserts at fastener locations are simulated by plate and bar elements capturing the local stiffness and CTE of each bolted and pinned joint. Bonded inserts are analyzed separately using detailed off-line FEA to determine their local effective coefficients of thermal expansion, which are then used in the bench FEM. Bar elements are used for the eight support struts as well as for the pick-off mirror arm. Optical components are represented using mass elements at their center of gravity. These are mounted to the bench by bar element stands, to simulate the fundamental modal frequencies and mass participation of the actual optics and detectors. A nodal point at the optical center of each optical component is used to recover translational and rotational distortions. A rigorous testing program was implemented to verify the material properties used in the FEM.

FEA predicted a fundamental frequency of 38 Hz for the fully populated bench, thus satisfying the 35 Hz minimum frequency requirement. This was later verified during vibration testing. The FEA accurately predicted the fundamental mode shape shown in Figure 5. The mode is primarily bending in the V1 direction, which was the same as the gravity direction during bench integration. The gravity sag direction coincided with the lowest stiffness direction of the




**Figure 4. FE Model of the WFC3 Optical Bench**



**Figure 5. Views of the Fundamental Mode Shape of the Bench at 38 Hz overlayed with undeformed shape.**

bench. Satisfying the gravity sag, or gravity release requirement turned out to be one of the most difficult design challenges. This is described in more detail under Qualification Testing. Bench stress analysis had to take the presence of the enclosure into account because the flight enclosure is not self-supporting and induces stresses in the bench under inertial loading. The reason for this somewhat surprising design relationship can be explained as follows. The enclosure is supported kinematically on the same set of latches as the bench. The bench is mechanically isolated from the enclosure in the V3 direction at the B and C latches owing to the flexibility of its support struts in the V3 direction. This leaves the V2 connection at the B latch as the only redundant degree-of-freedom, which is released by a flexure system built into the enclosure. (It should be noted that the bench is intrinsically isolated from any rotational motions of the enclosure because the support struts at all three latches form truss structures thus cannot transmit any moments into the bench). The flexure system enables the enclosure to move in the V2 direction relative to the bench with negligible load induced on the bench. However, under V1 loading of the enclosure, this flexure system necessitates a V3 moment reaction. This is provided by a "hanging beam", that induces a V2 reaction that gets channeled through the bench into the C-Latch. Thus, stress analysis had to be performed with the bench FEM coupled with the enclosure FEM. Design Limit Loads and Safety Factors used in the analysis are listed in Table 1. Stress levels throughout the bench were minimized in order to reduce the risk of micro-cracking and launch shifts. All strength margins of safety were amply positive using finite element and classical stress analysis techniques (e.g., as outlined in References 3 and 4). Selected margins of safety are listed in Table 2.

STOP Analysis

The WFC3 program utilizes STOP analysis to provide quantitative performance predictions of the optical system based on thermal and mechanical loads/effects. The process as seen in the flow diagram in Figure 6 is iterative and continued throughout the program to accommodate design changes or implementation specific geometries. This process was repeated several times during the design

**Table 2. Summary of selected Strength Margins of Safety (MS) for the Optical Bench under Design Limit Loads and Safety Factors listed in Table 1.**

| PART OR LOCATION | FAILURE MODE | LIMIT FORCE or STRESS | ALLOWABLE yld / ult | MS |
|---|---|---|---|---|
| **H/C Panel Facesheets** | Compression | 9.9 ksi | 27 ksi ult | +0.95 |
| **Core** | Transverse Shear | 38 psi | 62 psi ult | +0.17 |
| **Strut Assembly** | Stepped Column Buckling | 1970 lb | 24.7 kip ult | +Large |
| **Flexures** | Column Buckling | 1970 LB | 95.7 kip ult | +Large |
| | Comp + Bending | 35.3 ksi | 60.8 ksi yld | +0.38 |
| | Beam-Column | 1970 lb + 600 in.lb | 24,700 LB +1540 in.lb | +0.52 |
| **Strut Sleeves** | Tens + Bending | 21.8 ksi | 56 ksi yld | +1.06 |
| | Crippling | 21.8 ksi | 33.2 ksi ult | +0.09 |

**Figure 6. WFC3 STOP Analysis Flow Chart**




of the optical bench and fabrication was not started until the analysis showed that the optical bench distortions met the tight stability requirements.

Optical bench alignment budgets for both the long term and the short term errors proved to be very challenging to meet. FEA predicted distortional gravity release rotations on the order of 50 arc-sec for the fully populated bench, which marginally met the long term budget. Gravity release test later confirmed the FEA predictions. Gravity release is predicted to be the greatest contributor to the long term budget compared to moisture desorption, set point change, and launch shift effects.

Short term or line of sight Alignment error is very

**Table 3. Sample STOP Analysis spreadsheet showing selected Component distortions and the final detector error**

**DISPLACEMENTS (X,Y,Z): micrometer, ROTATIONS (RX,RY,RZ) : arcsec**

X,Y,Z is the Hubble Coordinate System (V1,V2,V3).

| ID | OPTIC | DOF | CASE-1 Enc Bulk dT | CASE-2 Latch & Struts dT | CASE-3 OB only hot-hot | OB Error Sum micron arcsec | UVIS dX micron | Focal dY micron |
|---|---|---|---|---|---|---|---|---|
| | Coef for OB Error Sum => | | 1.0 | 1.0 | -1.0 | | | |
| 1 | POM | X | -0.039 | -0.065 | -0.031 | -0.072 | -0.074 | 0.068 |
| | | Y | -0.142 | -0.129 | -0.021 | -0.250 | 0.000 | 0.000 |
| | | Z | -0.083 | 0.133 | 0.224 | -0.174 | 0.189 | -0.177 |
| | | RX | 0.066 | 0.029 | 0.009 | 0.085 | -0.259 | -0.277 |
| | | RY | -0.004 | -0.011 | 0.067 | -0.082 | 0.500 | -0.467 |
| | | RZ | -0.031 | -0.004 | -0.012 | -0.024 | 0.069 | 0.073 |
| 5 | UVIS DETECTOR | X | 0.114 | 0.034 | -0.065 | 0.212 | 0.155 | -0.144 |
| | | Y | 0.179 | 0.096 | 0.148 | 0.127 | -0.093 | -0.099 |
| | | Z | -0.043 | 0.160 | -0.333 | 0.450 | 0.000 | 0.000 |
| | | RX | 0.041 | 0.031 | 0.004 | 0.068 | -0.053 | -0.057 |
| | | RY | -0.017 | -0.009 | -0.010 | -0.016 | 0.012 | -0.012 |
| | | RZ | -0.026 | 0.002 | 0.011 | -0.035 | 0.000 | 0.000 |
| | MAX DISP | $10^{-6}$m | 0.179 | 0.160 | 0.333 | sum | -0.26 | -0.93 |
| | MAX ROT | arcsec | 0.066 | 0.031 | 0.151 | RSS | 0.97 | micron |




**Figure 7. Exaggerated Deformed Shapes overlaid with undeformed due to: a-Enclosure orbital temperature change only, b-Bench orbital temperature change only.**

important because it controls the motion of the image across the detector. This budget also proved to be difficult to meet because it is three-orders-of magnitude smaller than the long term error budget with an allocation of 10 milli-arc-seconds for the UVIS channel and 20 for the IR channel. This translates into a detector image motion of about 1.5 microns for either channel. Short term error sources are jitter and on-orbit temperature variations. Jitter is negligible for WFC3 so the STOP analysis concentrated on the temperature effects.

On-orbit short term temperature of the OB is held at $0 \pm 2$ C° by means of a cold plate designed by thermal engineering. The cold plate is located under the bench but is not physically connected and controls the temperature of the bench radiatively. The enclosure short term temperature variations are also confined to a couple of degrees C. A thermal math model provided temperature distributions that were applied to the structural FEM to determine the distortions of the optics and the detectors. These distortions were then processed using a sensitivity matrix, created by optical engineering, that relates the motions of individual components to the detector image motion. Total detector error could then be obtained and compared with the budget (selected portions of the UVIS STOP analysis spreadsheet is shown in Table 3). Temperature effects were analyzed in three parts, (enclosure, optical bench and the strut-latch assembly) using the coupled OB-enclosure FEM. Figure 7a shows the nature of the deformed shape of the enclosure and the bench due to enclosure temperature change only. Note that the OB seems to be almost unaffected by the motion of the enclosure owing to the mechanical isolation provided by the support struts and the enclosure internal flexure system explained in the Structural Analysis section. Figure 7b shows the deformed shape of the bench due to its own orbital temperature change (excluding the enclosure and the latch-strut assemblies at constant temperature). It should be noted that both the enclosure and the bench undergo a rigid body rotation about the V1 axis as a result of a bulk temperature change. This is a result of the type of kinematic mounting provided by the latches. The magnitude of this rotation is very small for the OB owing to its very low CTE. Thermal-structural stabilization of the latch-strut assemblies presented a difficult challenge. The latches are existing hardware made of a titanium alloy hence have a relatively large CTE compared to the bench.

The thermally induced motions of the latches had to be compensated and this was accomplished by designing the support struts to have a negative CTE. The internal design of the struts were complicated by this requirement making them multi-part assemblies using composite laminate tubes on the outside with aluminum, steel and invar parts on the inside. CTE testing results correlated well and verified that the required negative CTEs were obtained for the different struts. The strut-latch assemblies were effectively athermalized for orbital short term




**Figure 8. Slew analysis results showing the convergence of detector image motion subsequent to a drastic change in HST pointing.**

temperature variations. Table 3 shows selected portions of the STOP analysis performed for the UVIS channel. The component distortions are listed on the left half for the three different thermal load cases. On the right side distortions are multiplied by sensitivities and summed to obtain the final detector error. STOP analysis results demonstrated that both the short term and the long term alignment budgets will be met.

Slew Analysis

The WFC3 slew analysis predicted image drift on detector arrays due to temperature variations resulting from a change in HST attitude (slew). This slew analysis represents a worst-case cold attitude to hot attitude scenario. Drift allocation for the bench was less than 1.5 microns over two orbits (190 minutes). Temperatures at six minute time increments were provided by thermal engineering. These temperatures were applied to structural FEM with each time increment representing a loading case. Optic displacements from each FEA run were applied to sensitivity table to determine image offset from nominal zero position. UVIS results are shown in Figure 8 as a sample of the slew analysis. Results show that the 1.5 micron drift per 190 minute requirement is met in the first 190 minutes after slew initiation. The rate of drift after slew initiation decreases over time so the requirements are met for any 190 minute period. The results also indicate some lag in the reaction to the slew initiation.

Qualification Testing

The qualification test program consisted of four primary tests; vibration test, gravity release test, thermal vacuum test, and bake-out. Each test was supported by rigorous analyses, that predicted the bench behavior in the various test configurations. Strength qualification and workmanship assessments were accomplished by a multiple axis vibration test. This test was also used to correlate the FEM (traditionally accomplished with a modal survey) by acquiring modal signatures of the bench during sine sweeps. Further model correlation was accomplished by performance of a gravity release test. The thermal vacuum test sought to acquire performance of the bench under various temperature loads. Lastly, while the optical bench was still in the vacuum chamber, a bake-out was performed as a measure of moisture desorption and to certify the cleanliness level of the bench.

Vibration Test

The optical bench, configured with mass simulators, was installed into a vibration plate equipped with the kinematic latches. The entire vibration plate with bench was fastened to the shaker table for three different axes of tests. This test configuration was meant to closely resemble the kinematic mounting configuration of the bench. A factor needed to be considered in testing was loading from the enclosure. The mass of the enclosure in the V2 direction is

supported by the B- and C-side strut systems. To strength qualify these strut systems with the vibration test, the test levels needed to be high in order to account for the mass of the enclosure. The bench performed as predicted throughout the first 2 axes of tests. However, upon the completion of testing in the second axis, which was a skewed axis in the V2-V3 plane of the bench, a change in frequency was noted during the post test sine sweep. The team immediately began a series of investigations or diagnostic testing of this anomaly. Owing the complication of the kinematic latching system used, the investigations needed to be rigorous and involved. Upon investigation the team discovered an offset built into the surrogate plates. This offset displaced the centerline of the B and C struts by 0.20 inches. Diagnostic testing showed the mode to be highly damped, nonlinear, and to have high mass participation. These tests and visual inspections lead to the conclusion that the mode was related to the test fixture alignment and constraint. Rigid fixtures were built and testing was completed with no indication of an anomalous response. In the remaining cases, the bench performed again, according to predictions for all frequencies. This concluded the vibration testing. Alignment test performed before and after the vibration tests showed very low rotational shifts (less than 10 arc-seconds) in optical cubes mounted on the bench demonstrating that the bench is very stable under launch vibrational environment and minimal launch shift is expected.

Gravity Release Test

Gravity release testing was performed as a means to prove out the fundamental stiffness of the optical bench to ensure that the optical system would maintain proper optical performance between ground and orbit. Pre test analysis predicted rotations of locations to be measured in test. The analytical rotations from the fully loaded case were used as a baseline to which three other load case results were compared. Test data included alignment data for bench and fixture mounted optical cubes. Displacement measurements at latches (bench to fixture interface) were taken as secondary measurements but proved useful in removing unexpected rigid body motion discovered in test. Mass simulators were added and removed to provide four different load cases.

Initial comparison of test and analysis rotations showed large discrepancies that were identified as rigid body rotations resulting from low stiffness of the latches for small displacements. Measured latch displacements were incorporated into the analysis and the resulting rotation predictions correlated well with the alignment measurements and fell acceptably within the 50 arc-second budget. The analysis and test combined to successfully verify the stability of the bench.

## Conclusion

The WFC3 optical bench development has proven to be a very successful endeavor between several different and widely distanced disciplines. Constant communication and diligence in tracking all design parameters gave the team leaders the ability to transfer requirements, component interfaces, and design iterations in an efficient manner. The use of the honeycomb panel methodology as the construction technique proved to be very accommodating with regards to assembly and final optical component integration. Utilization of the STOP analysis technique was a key factor in meeting all of the challenging requirements.

## Acknowledgements

The authors would like to recognize all of WFC3 team members and especially Jill Holz, Doug McGuffey, Chris Lashley, Ben Rodini, Chris Fransen, Bill Chang, and Kevin Dahya for their significant contributions to the WFC3 optical bench analysis and test efforts.

**References**

1. WFC3 Optical Bench, Critical Design Review, Jill Holz et al., NASA GSFC, June 2000.

2. STOP Analysis and Optimization of a Very-Low-Distortion Space Instrument: HST WFC3 Case Study, Cengiz Kunt, presented at the FEMCI Workshop, NASA GSFC, May 2001.

3. Aircraft Structures, D.J.Peery and J.J.Azar, McGraw Hill, Inc., 1982.

4. Analysis of Flight Vehicle Structures, E.F. Bruhn, Jacobs Publishing Inc., 1973.

# EXHIBIT
# 2

# NASA/GSFC Mechanical Engineering Branch, Code 543

## Design References

TABLE OF CONTENTS

1. IHS Link
2. Standards
3. Shuttle and Carrier Interface Documents
4. Drafting and Drawings
5. Mechanical Design Software
6. Materials
7. Fasteners
8. Safety
9. Testing
10. Launch Vehicles / Aircraft and Launch Sites
11. Mass Properties
12. Design Reviews
13. Mechanisms
14. Misc. References

### IHS Link

- Information Handling Services (AIA/NAS and ASME Specs, Vendor Catalogs, and other Engineering Resources)

### Standards

- NASA Standards Program
- NASA-STD-5000 and -7000 series
- NASA-STD-8719.9 Standard for Lifting Devices and Equipment
- MIL-STD-1522A, Safe Design And Operation Of Pressurized Missile And Space Systems

- NASA TM X-73305, Marshall Astronautic Structures Manual
- NSS 1740.14, Guidelines and Assessment Procedures for Limiting Orbital Debris
- Orbital Debris Modeling
- DoD Index of Specifications and Standards

## Shuttle and Carrier Interface Documents

- NSTS 07700 Vol 14 -- Shuttle Requirements
- NSTS 14046 Payload Verification Requirements
- NSTS 1700.7 Safety Policy and Requirements for Payloads Using the STS
- ICD-2-19001 Shuttle Orbiter/Cargo Standard Interfaces
- Additional Shuttle ICD's
- Hitchhiker Customer Accommodation & Requirements Specifications (CARS)
- NSTS 07700 Vol 14 -- Shuttle Requirements
- Shuttle Program Documents and Library

## Drafting and Drawings

- Drawing Formats
- 500-PG-8700.2.3, Issue and Management of Engineering Drawing Numbers
- 500-PG-8700.2.5, Engineering Drawing Standards Manual
- ANSI Y14-5M, 1982, Dimensioning and Tolerancing for Drawings
- Request Drawing Numbers

## Mechanical Design Software

- Branch Developed Computer Software
- Ideas Masters Series

- Pro/E
- NASA STEP Central (for CAD/CAM/CAE Data Exchange)
- Units conversion , including downloads for your Palm

## Materials

- MIL-HDBK-5 (Metals)
- MIL-HDBK-17 (Composites)
  - Vol. 1
  - Vol. 2
  - Vol. 3
  - Vol. 4
  - Vol. 5

- NASA Ref Pub 1124, Outgassing Data for Selecting Spacecraft Materials
- MSFC-SPEC-522, Design Criteria for Controlling Stress Corrosion Cracking (superseded by MSFC-STD-3029)
- 731-0005-83 Fracture Control Plan for Payloads Using STS
- Guide to High Temperature Thermoplastic Materials
- MSFC-STD-3029, GUIDELINES FOR THE SELECTION OF METALLIC MATERIALS FOR STRESS CORROSION CRACKING RESISTANCE IN SODIUM CHLORIDE ENVIRONMENTS
- SUNY @ Stony Brook - Dept. of Materials Science & Engineering
- Material Tips
- The Composites Corner

## Fasteners

- 541-PG-8072.1.2 GSFC Fastener Integrity Requirements
- Flight Fasteners
- Fastener Design Manual, NASA Reference Publication 1228
- Understanding Metric Threads

- Standard Tap Drills/Clearance Holes

## Safety

- MSD Safety Manual
- (Re)Certification Requirements for Lifting Devices and Equipment & Pressure Vessels and Systems
- Analysis Procedure for Spreader Bar Lift Stability
- EWR 127-1, "Eastern and Western Range Safety Requirements"
- Various Range Safety Documents

## Testing

- GEVS-SE, for STS & ELV Payloads, Subsystems and Components
- Code 549 Facilities Manual and Catalog
- Space Flight Items Handling Requirements
- FORCE LIMITED VIBRATION TESTING HANDBOOK, NASA HDBK-7004
- FORCE LIMITED VIBRATION TESTING MONOGRAPH, NASA-RP-1403
- NASA-HDBK-7005 Dynamic Environmental Criteria
- NASA-STD-7003 Pyroshock Test Criteria
- Lifting Devices and Equipment (LDE)

## Launch Vehicles / Aircraft and Launch Sites

- Orbital's Pegasus® Launch Vehicle
- The Delta Launch Vehicle
- Taurus Launch Vehicle
- Ariane-5
- NASA's ER-2 Aircraft
- DC-8 Aircraft

- P-3B Aircraft
- Launch Site Info
- ELV Fairing Search Tool

## Mass Properties

- GSFC Mass Properties Measurement Facility
- How to Measure Mass Properties
- How To Calculate Mass Properties
- Society of Allied Weight Engineers (SAWE)
- Mass Properties Engineering

## Design Reviews

- Design Review Guidelines

## Mechanisms

- NASA Glenn Space Mechanisms
- Spacecraft Deployable Appendages
- NASA TM-110172, Pyrotechnic Design, Development and Qualification
- Aerospace Mechanisms Symposium
- European Space Mechanisms & Tribology Symposium
- Space Mechanisms Handbook

## Misc. References

- McMaster Carr Supply Company
- Thomas Register of American Manufacturers
- W.W. Grainger, Inc.

- **Hypertext Webster dictionary (Yes, even engineers need to spel !)**
- **NASA Documents Online**
- **Acronym Database**
- **Machine Design "Basics of Design Engineering"**

Return to Mechanical Engineering homepage

---

*Last Revised 4/5/2006*
*Responsible NASA Official: James Ryan*
*Content-owner: J. Woods*
*Webmaster: A. Lutes*

*Privacy Policy and Important Notices*

# Exhibit 4

**STATE OF MARYLAND**

**IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY**

| | |
|---|---|
| **SWALES & ASSOCIATES, INC.**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**AEROSTRESS, INC. and NICHOLAS M. GALASSI,**<br><br>**Defendants.** | **Case No. CAL07-02947**<br>**(Judge A. Michael Chapdelaine)** |

**PLAINTIFF'S REPLY IN FURTHER SUPPORT OF**
**ITS MOTION FOR A PRELIMINARY INJUNCTION**

**Preliminary Statement**

Plaintiff Swales & Associates, Inc., d/b/a Swales Aerospace, ("Swales") submits this reply in further support of its motion for a preliminary injunction against Defendants Aerostress, Inc. ("Aerostress") and Mr. Nicholas M. Galassi (collectively, "Defendants"). Fast moving factual developments since Plaintiff's original motion papers were filed have changed the context and contour of the needed injunctive relief, but those new developments only reinforce the compelling need for such preliminary relief. There is now new sworn testimony that Mr. Galassi intended to hire numerous Swales employees to work for Aerostress upon MSES IIA contract award to SGT. (See Point I, below). Thus, the uncontroverted evidence of irreparable harm to Swales could not be more compelling.

Since Plaintiff's original motion for a preliminary injunction was filed three major factual developments have occurred. First, on or about March 30, 2007, NASA awarded the MSES IIA procurement to SGT, Inc., the company for whom Defendants worked after Mr.

Galassi resigned from Swales. Those efforts included participating in composing SGT's MSES IIA proposal. As of this writing, the NASA Inspector General is still conducting its inquiry into the legal and ethical issues surrounding that procurement, and a bid protest against the United States (NASA) is concurrently being filed in the United States Court of Federal Claims. Second, on or about April 3, 2007, Alliant Techsystems, a Minnesota company, announced that it had signed an agreement to purchase all of the outstanding stock of Swales. (Plaintiff reported both of these developments to the Court by Line filed on April 10, 2007).

Third, new facts have come to life suggesting that Defendants' scheme since at least the time that it hooked up with SGT as a team member on the MSES IIA procurement, was not only to misappropriate Swales trade secrets to assist SGT in its effort to win contract award, but also to usurp for themselves a substantial portion of the revenue generated by that procurement. Plaintiff has learned that Defendants have taken steps to prepare to hire numerous Swales employees to work on behalf of Aerostress as a team member to SGT on its ill-gotten gains. Plaintiff has also obtained information that demonstrates that many of Defendants' self-serving and unsupported "denials" outside the record are contradicted by documentary evidence.

Despite Defendants' false pieties, it is apparent that Defendants and SGT engaged in a scheme or conspiracy to misappropriate Swales' trade secrets, and once contract award was achieved on the basis (at least in part) of such misappropriation, to utilize the fruits of that award to reward Defendants for their participation in the scheme.

Because of the newly discovered-scope of Defendants' fraudulent scheme, Swales now requests that the scope of the requested preliminary injunction be modified. Swales' original motion papers requested that Defendants be enjoined from: (1) any misappropriation of Swales' trade secrets; (2) participating in any way on SGT's MSES IIA proposal; (3)

participating in any way on working on the MSES IIA contract for SGT. Those requests remain. In addition, due to the growing scope of Defendants' fraudulent and anticompetitive scheme, Swales also requests that Defendants be enjoined from taking any actions to either solicit or hire Swales' employees on behalf of either Aerostress or SGT.

## POINT I

## NEWLY DISCOVERED EVIDENCE CORROBORATES OF RECORD THE IMMINENT IRREPARABLE HARM THAT CONFRONTS SWALES ABSENT PRELIMINARY RELIEF.

Swales submits two sworn statements today evidencing the payback that Defendants expected to receive from SGT in exchange for Defendants' misappropriation of Swales' trade secrets. That "payback" came in the form of positions that SGT would grant to Aerostress upon MSES IIA contract award -- positions that Mr. Galassi intended to fill by stealing Swales' trained and talented team of structural and mechanical engineers.

The first piece of evidence originates with Swales' 401K benefits provider, Principal Financial Group. Swales' General Counsel, Arthur Leaderman, was informed on or about April 17, 2007, that Mr. Galassi had contacted Principal on at least two occasions in December 2006 to discuss setting up a benefits plan for Aerostress. Mr. Galassi had apparently informed Principal that he was a member of a team that had just won a significant government contract, and that as a result Aerostress would be hiring numerous new employees and desired to develop a benefits plan comparable to Swales.' (Leaderman Affidavit, sworn to April 23, 2007, ¶¶ 7-9). At the time Mr. Galassi sought out Principal, he was still working for Swales on the Solar Dynamics Observatory, a component of Swales' work on the MSES contract, the predecessor contract to MSES IIA.

It is now apparent that Mr. Galassi intended the new Aerostress employees to be Swales' engineers, already trained and familiar with the MSES contract. That fact is evinced by the Declaration of Stephen Chaykovsky, sworn to April 20, 2007, and attached to the Leaderman Affidavit as Exhibit A. Mr. Chaykovsky testifies under oath that he spoke with Mr. Galassi on December 11, 2006 at an Open House sponsored by SGT. In that conversation, Mr. Galassi admitted to Mr. Chaykovsky that Mr. Galassi had joined the SGT proposal team, had been involved in the preparation of SGT's final proposal, and even participated in SGT's face to face presentation to NASA. (Chaykovsky Dec. ¶ 3, attached to the Leaderman Aff. as Ex. A).

Mr. Galassi went on to tell Mr. Chaykovsky that in return for participating on SGT's proposal team, he expected that he and/or Aerostress would receive a substantial volume of work on MSES IIA. Mr. Galassi confided to Mr. Chaykovsky that Galassi, ideally, would "like to have [my] group back." (Chaykovsky Dec. ¶ 3). That reference was a reference to "Galassi's" former team of engineers at Swales working in the Mechanical Analysis Group, of which Mr. Galassi was Manager. (Verified Complaint, ¶ 9).

Thus, the evidence of record demonstrates a corrupt conspiracy of *quid pro quo*. Mr. Galassi was to misappropriate Swales' trade secrets for SGT's benefit. In return, when SGT received the MSES IIA contract award, SGT would provide Galassi and/or Aerostress numerous engineering positions so that Galassi could profit directly from his betrayal of Swales and misappropriation of its trade secrets. Not only would Galassi profit from the work for numerous engineers, but also he wanted to hire "his team" of engineers from Swales' Mechanical Analysis Group, a team trained and experienced with MSES task orders.

One cannot imagine or compose circumstances more appropriate for the issuance of a preliminary injunction. Absent preliminary injunctive relief, Swales stands to suffer

irreparable harm in the form of both misappropriation of its trade secrets, and tortious interference with its own employees and the business and contractual relations they represent. Loss of such employees is a textbook example of irreparable harm.

**POINT II**

**THE PRELIMINARY INJUNCTION SHOULD BE GRANTED BECAUSE DEFENDANTS HAVE FAILED TO SUBMIT OF RECORD ANY FACTUAL DEFENSES IN OPPOSITION TO THAT MOTION.**

Swales' motion for a preliminary injunction should also be granted because Defendants have failed to submit any facts in opposition to that motion. Defendants have not submitted an affidavit, other sworn testimony, or any factual basis recognized in Maryland law in support of their transparently specious defense. Maryland Rule 2-311(d) requires that a "response to a motion that is based on facts not contained in the record shall be supported by affidavit and accompanied by any papers on which it is based." Defendants have trivialized and ignored this simple rule: they have submitted no facts, no affidavits, and no supporting papers. A lawyer's signature on a brief does not constitute a submittal of facts based on personal, first-hand knowledge.

Maryland courts have been uniform and unambiguous: where a party files an opposition unsupported by an affidavit, any "facts" set forth that are not of record should be ignored by the court. *Scully v. Tauber,* 138 Md. App. 423, 428, 771 A.2d 550, 553-54 (Md. App. 2001; *see also Montgomery County, Md v. Smith,* 144 Md. App. 548, 553-54 , 799 A.2d 406, 410 (Md. App. 2002)(both cases holding arguments or facts not supported by affidavit should be disregarded by the motions judge).

Application of this rule here mandates the preliminary injunction be issued. The only materials of record include the Verified Complaint, the October 28, 2005 Separation

Agreement executed by Mr. Galassi, the November 4, 2005 Non-Disclosure Agreement executed by Mr. Galassi on behalf of Aerostress, the Affidavit of Thomas G. Swales, sworn to February 21, 2007 (the "Swales Affidavit"), and the affidavit of David Baran, sworn to February 27, 2007 (the "Baran Affidavit). With this reply, Plaintiff submits the Affidavit of Arthur Leaderman, sworn to April 23, 2007, which includes the Declaration of Stephen Chaykovsky, sworn to April 20, 2007. As noted above, Defendants submitted no affidavit at all. The alleged "facts" contained in Defendants' March 20, 2007 Opposition, are unsupported by this record. Defendants' bald (and sometimes demonstrably false) assertions, must be disregarded by this Court, in accordance with Rule 2-311(d) and controlling legal authority construing that Rule.

## POINT III

**DEFENDANT'S SELF-RIGHTEOUS DENIALS THAT HE DID NOT MISAPPROPRIATE SWALES' TRADE SECRETS IS DEMONSTRABLY FALSE; MISAPPROPRIATION HAS BEEN PROVEN OF RECORD.**

Defendants' piously protest that they did not misappropriate any trade secrets in Mr. Galassi's extraordinary transition from working on the Swales MSES IIA proposal to working on SGT's proposal for the same procurement: Mr. Galassi makes an unverified assertion that he "vehemently denies the allegation that he used or disclosed Swales' trade secrets." (Defendants' Opposition Brief, dated March 20, 2007 ("Opp. Br.") at p. 1). Not only do Defendants' fail to submit any "factual" basis to support their version of events, but also they simply ignore the sworn testimony by David Baran that Mr. Galassi transferred to his personal computer hard drive Swales' trade secret and proprietary information. Mr. Galassi's industrial espionage has been captured indisputably on his computer hard drive. (Baran Aff., ¶¶ 6-8). Mr. Galassi used and disclosed those trade secrets when he captured them to his own hard drive and downloaded them to the GSFC network. This misappropriation included MSES task planning

spreadsheets, which contain confidential and highly competition-sensitive data concerning Swales' cost of performance, including management fees, information technology costs, and financial data charges. All of these data comprise what is known as "other direct costs" in government contracting parlance, and comprise the critical components to a competitor's final cost proposal. Those spreadsheets also contained Swales' overhead and G&A (general and administrative) mark-ups, which are applied to direct labor costs, as well as Swales' labor escalation rates. (Baran Aff., ¶ 8). One cannot identify more competition-sensitive data than these critical cost components.

Yet the record stands uncontroverted that Mr. Galassi misappropriated these trade secrets during the course of his employment or subsequent work for Swales. Those Swales trade secrets would provide a competitive advantage to any competitor submitting a proposal on the follow-on MSES IIA procurement. Swales' only competitor on the MSES II-A procurement was SGT, Inc. Defendants admit that Mr. Galassi "review[ed] and provid[ed] technical input on SGT's proposal for the MSES-IIA procurement" and participated both in SGT's oral presentations to NASA and SGT's follow-up responses. (Opp. Br. at 6 and 10). The Baran Affidavit belies Defendants' arguments that "Swales has not presented any evidence that its trade secrets were 'misappropriated,' i.e., *used* or *disclosed* by Defendants in violation of MUTSA" and "[t]here is no threatened misappropriation that warrants the court's intervention. (See Opp. Br.at 10 and 12)(emphasis in original).[1] But the documentary evidence -- indeed, even the indisputable digital evidence -- proves that simply is not true. Perhaps it is that fundamental lie in Defendants' opposition that precluded them from submitting any sworn statement.

[1] It also evidences Defendants' breach of their respective confidentiality and non-disclosure obligations for which Swales is also entitled to a preliminary injunction.

## POINT IV

## DEFENDANTS' OPPOSITION OTHERWISE FAILS TO REBUT THAT SWALES IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF.

Contrary to Defendants' hypothesis that "Swales fails to identify with any clarity the 'trade secrets' that have allegedly been misappropriated" (see Opp. at 8), Swales specifically identified those trade secrets, including among others: (1) Swales' proposed solutions to NASA's RTOs that were based on Swales' specific application of analyses and models to the technical problems posed by NASA; (2) Swales' Basis of Estimates that presents "budgets to support the work and the methods by which Swales accumulates and charges direct and other direct costs for the technical solutions proposed;" (3) the manner and method of Swales' proposed application of specified analyses and models to "Structural Analysis and Load Engineering;" and (4) Swales' MSES planning spreadsheets, internal Project Status Review presentations, MSES Monthly Reports and MSES Performance Evaluation Board write-ups. (See Swales' Br. at 3-4, 9-10; Baran Affidavit, ¶ 8). Whether one applies the test for what comprises a trade secret as defined by MUTSA, as Swales' did (see Swales' Br. at 11), or the six factors Defendants urge (see Opp. Br.at 8, n. 5), the result is the same: Swales derives economic value from this information, which Swales endeavored to keep secret, and which if disclosed would allow others to derive an economic benefit. *Compare* Md. Code Ann., Commercial Law, § 11-1201(e) *with Space Aero Products Co., Inc. v. R.E. Darling Co., Inc.*, 238 Md. 93, 110, 208 A.2d 74, 82 (1965).[2]

Defendants' argument, relegated to passing mention in a footnote, that Swales' contract claims fail to state a colorable claim is disingenuous at best. (See Opp. Br. at 7, n.4). First, the consulting agreement that Mr. Galassi and Aerostress received from Swales was dependant on execution of the separation agreement. The consideration Mr. Galassi received

[2] Because the MUTSA definition of trade secret is based on the factors set out in the *Restatement, Torts*, § 757(b), as quoted in *Space Aero, supra*, Swales' trade secret analysis does consider these factors.

was the income and other value represented by the SDO consulting agreement. Second, when read and applied in conjunction with the separation agreement signed by Mr. Galassi, the non-disclosure agreement executed by Mr. Galassi on behalf of Aerostress is enforceable to protect Swales' confidential information and trade secrets previously disclosed to Mr. Galassi. *See Rothman v. Silver*, 245 Md. 292, 296 (1967)(near contemporaneous agreements should be read and construed together). Finally, other than to state that they "are largely derivative" of Swales' MUTSA claim, Defendants completely fail to address Swales' claims for Breach of Duty of Loyalty/Confidentiality, Wrongful Interference with Economic Relationships, and Quantum Meruit/Unjust Enrichment.[3]

**POINT V**

**NO HARM WILL BEFALL DEFENDANTS IF A PRELIMINARY INJUNCTION ISSUES; IN CONTRAST, SWALES AND ITS EMPLOYEES WILL SUFFER IRREPARABLE HARM ABSENT SUCH AN ORDER.**

Defendants attempt to mislead this Court when they argue that a preliminary injunction would be tantamount to a five-year non-compete clause that would infringe Mr. Galassi's right to earn a livelihood. (Opp. Br. at 12-13). That argument (perhaps purposefully) ignores the distinction between preliminary and permanent injunctive relief. Swales is only asking for a preliminary injunction until such time as its claims can be heard on the merits. Swales is seeking to maintain the status quo by preventing Defendants from working on the ill-gotten MSES IIA contract, or from soliciting or hiring Swales' employees to work on the MSES IIA contract for either Aerostress or SGT. Swales' claims will be heard on the merits in due course, and after a full trial on the merits, permanent relief may be awarded to the prevailing

[3] Mr. Galassi's disclosure of Swales' confidential and trade secret information on the GSFC network represents, at a minimum, breaches of the separation agreement and the non-disclosure agreement as well as a breach of Mr. Galassi's duties of loyalty and confidentiality.

party. Swales is currently seeking neither a permanent injunction nor a five-year prohibition against Mr. Galassi -- it is simply seeking to maintain the status quo pending trial on the merits. Maryland courts have repeatedly and consistently held that such a function is the very rationale and purpose underlying Maryland's jurisprudence on preliminary injunctive relief. *See Maloof v. State*, 136 Md. App. 682, 692 767 A.2d 372, 378 (Md. App. 2001) and cases cited therein (the purpose of preliminary injunction is simply to maintain status quo until the parties rights and obligations can be determined and adjudicated at trial).

## CONCLUSION

For all the foregoing reasons, Swales' motion for a preliminary injunction should be granted.

Dated: April 23, 2007
Washington, D.C.

Respectfully submitted,

Kim Hoyt Sperduto
Md. Bar No. 930617
T. Stewart Rauch

THE SPERDUTO LAW FIRM
2021 L Street, N.W.
Second Floor
Washington, D.C. 20036
(202) 408-8900
(202) 408-8910 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 23rd day of April, 2007, I caused a copy of the foregoing Reply in Further Support of Its Motion for a Preliminary Injunction and Affidavit of Arthur Leaderman, dated April 23, 2007, with attached exhibit, to be served via first-class mail, postage pre-paid on:

Andrew P. Hallowell
PARGAMENT & HALLOWELL
1776 K Street, N.W.
Suite 825
Washington, DC 20006
(202) 775-0707
(202) 775-0733

Counsel for Defendants

T. Stewart Rauch

**STATE OF MARYLAND**

**IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY**

| | |
|---|---|
| **SWALES & ASSOCIATES, INC.** <br> **Plaintiff,** <br> v. <br> **AEROSTRESS, INC. and NICHOLAS M. GALASSI,** <br> **Defendants.** | Case No. CAL07-02947 |

**AFFIDAVIT OF ARTHUR LEADERMAN**

County of Prince George's )
) ss:
State of Maryland )

Arthur Leaderman, being first duly sworn, deposes and says:

1. I am over the age of 21 years, a permanent resident of Maryland, and the following statements are made based on my personal knowledge, or knowledge or information that has been reported to me in the regular course of business and as standard business policy in my role as General Counsel.

2. I am General Counsel for Swales & Associates, Inc. ("Swales"), the Plaintiff in this lawsuit.

3. Since Swales filed its motion for preliminary injunction on or about February 23, 2007, a number of events have occurred of which the Court should be informed.

4. On or about March 30, 2007, the National Aeronautics and Space Administration ("NASA") awarded the Mechanical Systems Engineering Services IIA ("MSES IIA") procurement to SGT, Inc. ("SGT"). Despite NASA's contract award, NASA's own Inspector General continues to conduct its inquiry into the legal and ethical issues surrounding that procurement and contract award.

5. Concurrently with filing its Reply in this matter, Swales is filing a bid protest against the United States (NASA) in the United States Court of Federal Claims.

6. On or about April 3, 2007, Alliant Techsystems, a Minnesota company, announced that it had signed an agreement to purchase all of the outstanding stock of Swales.

7. On or about April 17, 2007, it was brought to my attention that Mr. Galassi had contacted the Principal Financial Group ("Principal"), the firm that administers Swales' 401k plan, on at least two occasions in the second half of December 2006 to discuss setting up a benefits plan for Aerostress. I conferred on this matter with Swales' HR interface with Principal. I was surprised to learn that persons at Principal were advised that Aerostress would be hiring employees presently working on the Swales MSES contract, the predecessor to the MSES IIA procurement. At the time that Mr. Galassi contacted Principal, he was still doing consulting work through Aerostress for Swales on the Solar Dynamics Observatory, a component of Swales' scope of work on the MSES contract.

8. Both Galassi's admitted work on the SGT proposal, and Principal's revelation that Mr. Galassi had contacted them for assistance in developing a benefits plan for numerous new (Swales) employees, is further corroborated by the Declaration of Stephen Chaykovsky, sworn to April 20, 2007. (A copy of Mr. Chaykovsky's sworn Declaration is attached as Exhibit A). Mr. Chaykovsky is a Swales Structural Analysis Engineer.

9. Mr. Chaykovsky spoke with Mr. Galassi on December 11, 2006, at an Open House related to the MSES IIA procurement hosted by SGT, Defendants' new "employer." Mr. Galassi admitted to Mr. Chaykovsky that he had joined the SGT proposal team, had been involved in preparation of SGT's final proposal, and even participated in SGT's face-to-face presentation to NASA. (Chaykovsky Dec. ¶ 3). Mr. Galassi even told Mr. Chaykovsky that as a result of participating on SGT's proposal team, he anticipated that he and/or Aerostress (his corporate alter-ego) expected to receive a substantial volume of work on MSES IIA, work that would have to be staffed by experienced and competent engineers. Ideally, Mr. Galassi reported to Mr. Chaykovsky, that he would "like to have his group back," referring to all the engineers on his former team as Manager of the Mechanical Analysis Group at Swales. .

10. This evidence corroborates that Mr. Galassi intended to cash in on his misappropriation of Swales' trade secrets in a get-rich-quick scheme to build his one person shop into an on-going entity overnight through the award of the MSES IIA contract to SGT.

11. The apparent plan for SGT to provide Aerostress with positions on MSES IIA demonstrates the value that SGT placed on Mr. Galassi's commercial thievery.

12. I declare that under penalty of perjury and under the laws of the State of Maryland that the foregoing is true and correct.

Dated: April 23, 2007
Beltsville, Maryland

Arthur Leaderman

Subscribed and sworn to before me, the undersigned authority, by the said Arthur Leaderman this 23rd day of April, 2007 at Beltsville, Maryland

Notary Public

CYNTHIA L. TEED
HOWARD COUNTY
MARYLAND
NOTARY PUBLIC

# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| SWALES & ASSOCIATES, INC., Plaintiff, | ) | |
| v. | ) | No. ______________ |
| UNITED STATES, Defendant. | ) | |

DECLARATION OF STEPHEN CHAYKOVSKY

1. My name is Stephen Chaykovsky. I have been employed by Swales & Associates, Inc. ("Swales") for approximately 10 years. I am currently a Structural Analysis Engineer. My responsibilities include being lead structural analyst for the SAM instrument, as well as work on other programs performed at Goddard Space Flight Center.

2. I attended an SGT Inc. Open House meeting for MSES IIA program recruitment on or about December 11, 2006 at Martins West in Greenbelt, Md. This was the second of two Open House meetings.

3. Before the SGT team members' presentations during the Open House, several Swales employees discussed the MSES II/A contract award with Mr. Galassi. During this discussion, Mr. Galassi openly described his role supporting SGT's proposal to NASA. For instance, Mr. Galassi explained that he had joined the SGT proposal team in the mechanical area and had been involved in the preparation of SGT's final proposal, including participation in in-person

presentation to NASA. Mr. Galassi informed me that he had participated on behalf of SGT in discussions for the MSES II as part of the SGT proposal team. Finally, Mr. Galassi told me that as a result of participating with SGT in its proposal, Aerostress (and he) anticipated performing a substantial volume of work as a SGT contractor for MSES II/A. He said that ideally he would like to have his group back. This clearly meant to me his former group from Swales.

I declare under penalty of perjury that the foregoing is true and correct.

April 20, 2007

Stephen Chaykovsky