# Exhibit 5

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| **SWALES & ASSOCIATES, INC.,**<br>**Plaintiff,**<br>**v.**<br>**UNITED STATES OF AMERICA,**<br>**Defendant,**<br>**and**<br>**SGT, INC.,**<br>**Defendant-Intervenor.** | **No. 07-253**<br>**(Senior Judge Smith)** |

**DECLARATION OF BRYAN A. JENNINGS**

1. My name is Bryan A. Jennings and the following statements are made based on my personal knowledge.

2. I was employed by SGT from March 2004 until August 2006 as Principal Pricing Analyst reporting to Mr. Matthew Yetman Vice President and Chief Financial Officer.

3. In my capacity as Principal Pricing Analyst I priced SGT's MSES II/A proposal, attended pricing strategy meetings and developed pricing and business case estimates for MSES II/A.

4. On or about January 20, 2006 I prepared an estimate of what SGT's price for MSES II/A might be based upon assumptions that SGT knew at that time about the program size and based upon indirect rates and fee rates as Mr. Yetman directed. These indirect rates and fee rates were in the range of bid rates of other proposals that I had priced for SGT in response to other RFPs. I emailed the price estimates to Mr. Yetman on January 20, 2006, as he had requested, and presented those price estimates at a meeting with Mr. Yetman and Mr. Kamal Ghaffarian, SGT's Chief Operating Officer on January 20, 2006.

5. I am aware from reading the newspaper (Space News) that Swales Aerospace has charged that Mr. Nicholas Galassi provided proprietary Swales Aerospace cost information to SGT.

6. To my knowledge Mr. Galassi did not participate in the development of SGT's MSES II/A cost strategy nor did he work on or assist in SGT's MSES II/A cost proposal or revised cost proposal.

7. To my knowledge Mr. Galassi did not share with SGT personnel, consultants hired by SGT or SGT officials any Swales proprietary information including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information.

I declare under penalty of perjury that the foregoing is true and correct.

4/30/07
Date

Bryan A. Jennings

# Exhibit 6

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| **SWALES & ASSOCIATES, INC.,**<br>**Plaintiff,**<br>**v.**<br>**UNITED STATES OF AMERICA,**<br>**Defendant,**<br>**and**<br>**SGT, INC.,**<br>**Defendant-Intervenor.** | **No. 07-253**<br>**(Senior Judge Smith)** |

**DECLARATION OF KAMAL S. GHAFFARIAN**
**IN RE: LIMITATION ON SUBCONTRACTING ISSUE**

1. My name is Kamal S. Ghaffarian. I am the co-owner, Executive Vice President and Chief Operating Officer for SGT, Inc. (SGT). I am also the acting Vice President of Business Development (VP BD). I have been employed by SGT since 1994.

2. On October 3, 2006 SGT submitted a proposal for NNG056383R, Mechanical Systems Engineering Services (MSES II/A).

3. The SGT proposal clearly stated SGT's ability and intent to comply with the limitations on subcontracting.

4. As the contract awardee, SGT is complying, and will continue to comply, with the limitations on subcontracting.

I declare under penalty of perjury that the foregoing is true and correct.

4/30/07
Date

Kamal S. Ghaffarian

# Exhibit 7

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| SWALES & ASSOCIATES, INC., Plaintiff, v. UNITED STATES OF AMERICA, Defendant, and SGT, INC., Defendant-Intervenor. | No. 07-253 (Senior Judge Smith) |

**DECLARATION OF MATTHEW J. YETMAN**
**IN RE: LIMITATION ON SUBCONTRACTING**

1. My name is Matthew J. Yetman and the following statements are made based on my personal knowledge.

2. I am SGT's Vice President for Business Operations and Chief Financial Officer (CFO). I have been employed by SGT since 1997.

3. In my capacity as CFO I am responsible for compliance with all contract regulations including compliance with the Limitation on Subcontracting clause (FAR 52.219-14) in the MSES II/A contract. This clause requires that "at least 50% of the cost of contract performance incurred for personnel shall be expended for employees of the offering concern."

4. It should be noted that this clause only applies to the cost of personnel and non-labor costs such as materials, travel, and other direct costs are not counted in calculating the Limitation of Subcontracting. This is noteworthy because these non-labor costs may, by some estimates, become ten percent of the cost of the MSES II/A contract.

5. [redacted]

6. The MSES II/A contract is an Indefinite Delivery, Indefinite Quantity (IDIQ) type contract with maximum ordering capacity of $400M. As the contract quantity is indefinite and contract value will be assigned as task orders are issued by NASA, there was no pricing of the total contract cost performed by SGT. Only four Representative Task Orders (RTO) were priced.

7. In SGT's proposal to NASA, [redacted] of the work share based on loaded labor dollars in both the Mission Suitability Volume and the Cost Volume was proposed to be performed by SGT. The remaining [redacted] was proposed to be performed by four subcontractors.

SGT [redacted]

Subcontractors:

[redacted]

8. Nowhere in SGT's proposal was there any indication that SGT would perform less than 50% of the labor cost of the contract nor was there any indication whatsoever that SGT would not comply with the Limitation on Subcontracting clause.

9. In my capacity as CFO I am responsible for all contractual agreements made by SGT with team members and subcontractors. The teaming agreements reflect the foregoing percentages as obligated by SGT. The subcontract agreements are currently in final negotiation and SGT expects to conclude subcontracts at the foregoing percentages.

10. The MSES II/A contract performance and transition began on April 15, 2007. NASA has issued few task orders for preliminary pricing. These task orders typically come in toward the end of the transition period. However, for those that have been issued already, SGT will perform the majority of the work share in compliance with the Limitation on Subcontracting provisions.

11. SGT intends to and will comply with the Limitation on Subcontracting clause throughout the term of contract performance.

I declare under penalty of perjury that the foregoing is true and correct.

4/30/07
Date

[signature]
Matthew J. Yetman

# Exhibit 8

Case 1:07-cv-00253-LAS Document 13-4 Filed 04/30/2007 Page 10 of 34

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| **SWALES & ASSOCIATES, INC.,** <br> **Plaintiff,** <br> **v.** <br> **UNITED STATES OF AMERICA,** <br> **Defendant,** <br> **and** <br> **SGT, INC.,** <br> **Defendant-Intervenor.** | ) | **No. 07-253** <br> **(Senior Judge Smith)** |

**DECLARATION OF ANDREW S. ENDAL**

1. My name is Andrew S. Endal and the following statements are based on my personal knowledge.

2. I am currently the Vice President for Business Development for SGT, Inc. where I have been employed for more than 5 years. In my current capacity as Vice President for Business Development among other duties I oversee proposal development, including strategies, management approach and technical approach. Previously, I was the Program Manager for the SGT Multidisciplinary Engineering and Technology Services (METS) contract with NASA/Goddard Space Flight Center.

3. I have a Ph.D. degree in astrophysics. I have worked continuously with the Goddard Space Flight Center on space missions since 1974, as a scientist analyzing data from missions such as IUE, SMM and HST, as a systems engineer for the NASA EOS series of spacecraft (Landsat 7, Terra, Aura, and Aqua), and as a Program Manager for contracts supporting NASA missions.

4. I have reviewed the Declaration of Mark McQuaid, dated April 23, 2007, in the Bid Protest submitted by Swales & Associates, Inc. against the United States regarding the award of the MSES II/A contract. Mr. McQuaid's Declaration begins by claiming that SGT, Inc. does not possess four critical resources required to perform the MSES II/A contract and, as a result, will not be able to comply with the Limitation on Subcontracting clause requiring that "at least 50% of the cost of contract performance incurred for personnel shall be expended for employees of the offering concern." My experience and analysis shows that this claim is incorrect, for the reasons stated below.

Case 1:07-cv-00253-LAS Document 13-4 Filed 04/30/2007 Page 11 of 34



5. First, as stated in the McQuaid Declaration, SGT does not have company-owned production facilities for fabrication of spacecraft hardware. The MSES II/A RFP does not require the offering concern to possess such facilities, but requires the offeror to demonstrate that they can access such facilities when Task Orders issued under the MSES II/A contract require hardware fabrication at contractor facilities. SGT's approach to this requirement is to [redacted] In our proposal, we characterized these costs savings to NASA missions as [redacted] NASA's Selection Statement of March 29, 2007 correctly identifies this outsourcing approach as a significant strength of SGT's proposal:

> The proposal received a significant strength for providing excellent state-of-the-art, critical facilities that are committed and available. SGT's teammates have extensive manufacturing and test facilities, laboratories, clean rooms, and other critical facilities. The team members' facilities have overlapping capabilities. The SGT proposal received a strength for a sound basis for teaming arrangements that augment their expertise and provides full coverage of the statement of work. SGT conducted a formal gap analysis to identify the specific areas in which its own capabilities required augmentation.

In other words, NASA correctly evaluated this aspect of SGT's proposal as a benefit to NASA, due to cost savings and risk reduction.

6. Second, contrary to the McQuaid Declaration, SGT has access to the necessary computing resources (hardware and software) to support mechanical engineering development activities for space flight systems. In our proposal, we identified the required computing hardware and software. [redacted] The engineering activities that utilize these computing resources will account for more than 50% of the total labor cost for this contract.

7. Third, contrary to the McQuaid Declaration, SGT has the processes in place to support NASA's spaceflight missions, as a result of performing NASA engineering contracts since 1994. These processes include safety processes, quality assurance processes, material handling, inventory management, document control, environmental regulatory compliance, engineering processes, and more. These documented processes are part of our ISO 9000 certified Quality Management System. [redacted]

[redacted]

8. The fourth point in Mr. McQuaid's Declaration (that SGT does not have the capability to produce mechanisms, structures, instrument systems, and electronic systems) is a repetition of his first point, so it does not need to be separately addressed.

9. The central point in Mr. McQuaid's Declaration is that, based on an analysis of the history of the current MSES contract, at least 56% of the total contract labor costs are associated with the Integrated Product Teams (IPTs) or Project Groups which produced hardware (Paragraph 21 of the McQuaid Declaration). However, the overwhelming majority of the IPT labor costs are in the engineering design and analysis activities, and in the integration and test activities, which will be performed by SGT, with minority participation by our subcontractors. In a typical Goddard in-house spacecraft project, a Systems Engineering IPT is initially formed to develop the mission requirements and define the mission subsystems (spacecraft structures, electronics, software, etc.). Subsystem IPTs are then formed to further refine the design and analyze the design elements to ensure that they will meet mission requirements. Both the Systems Engineering IPT and the Subsystems IPTs are comprised of NASA engineers and contractor engineers, working in a collaborative manner under the leadership of the NASA engineers. The contractor engineers perform according to Task Orders issued to the MSES (MSES II/A) contract, the current SGT METS contract, and other service contracts. The subsystem designs are refined by these IPTs to the level of component drawings. Drawings for the mechanical components are typically outsourced to vendors who fabricate the components and deliver them to Goddard for testing and assembly into subsystems. The subsystems are then integrated and the spacecraft goes through an extensive series of functional and environmental tests. The assembly, integration and testing for Goddard in-house missions is typically performed using facilities at the Goddard Space Flight Center, though outside facilities may be used if the Goddard facilities are oversubscribed. Upon completion of testing, the spacecraft is shipped to a launch site for integration with the launch vehicle. After launch, mission operations are performed at control centers located at Goddard. The fabrication and assembly element of this development sequence typically comprises much less than 10% of the total labor costs associated with the mission. Thus, the fact that SGT does not have its own fabrication facilities will not impact SGT's ability to perform more than 50% of the total contract labor cost.

10. In summary, SGT has proposed that significantly more than 50% of the cost of contract performance incurred for personnel will be expended for employees of SGT, and SGT has all the capabilities required to perform accordingly.

I declare under penalty of perjury that the foregoing is true and correct.

4/30/07
Date

Andrew S. Endal

# Exhibit 9

Case 1:07-cv-00253-LAS Document 13-4 Filed 04/30/2007 Page 14 of 34

# PROXY STATEMENT

This Proxy Statement (this "Proxy Statement") is being furnished by the management of Swales & Associates, Inc., a Delaware corporation (the "Company"), to the holders of record (each, a "Stockholder" and collectively, the "Stockholders") of issued and outstanding shares of Common Stock, par value $0.01, of the Company (the "Company Common Stock") as of the close of business on March 30, 2007, in connection with the Agreement and Plan of Merger, dated as of March 30, 2007, (the "Merger Agreement") by and among Alliant Techsystems Inc., a Delaware corporation ("ATK"), ATK Mergeco 3, Inc., a Delaware corporation and indirect wholly-owned subsidiary of ATK (the "Merger Sub"), and the Company, and in connection with the proposed merger ("Merger") contemplated by the Merger Agreement. At the Closing (as defined in the Merger Agreement), an executed copy of the Certificate of Merger (as defined in the Merger Agreement) shall be filed with the Secretary of State of Delaware in accordance with the DGCL, and the Merger shall be effective as of the date and time as the Certificate of Merger is filed in accordance with Section 103 of the DGCL (the "Effective Time"). At the Effective Time of the Merger Sub will merge with and into the Company. The Company will survive the Merger (the "Surviving Corporation") as an indirect wholly-owned subsidiary of ATK. At the Effective Time, the separate existence of the Merger Sub will cease.

You should carefully read in full the Merger Agreement, a copy of which will be made available to you at the Special Meeting. Upon consummation of the Merger, each share of Company Common Stock that you own as a Stockholder (except for any "Dissenting Shares" (as defined below)) will be converted into the right to receive a proportionate share "Merger Consideration" (as defined in the Merger Agreement and described below in "The Merger—Merger Consideration"), all in accordance with and subject to adjustment as provided in the Merger Agreement. Pursuant to the terms of the Merger Agreement, each Stockholder will receive his or its pro rata portion of the Merger Consideration entirely in cash.

This Proxy Statement is being furnished to Stockholders in connection with the solicitation of proxies by the Company's Board of Directors for use at the Special Meeting of the Stockholders to be held on Wednesday, May 16, 2007, at 3:00 p.m. local time, at the offices of the Company, 5050 Powder Mill Road, Beltsville, Maryland 20705, and any adjournments or postponements thereof (collectively, the "Special Meeting"). Stockholders may also participate in the Special Meeting by means of conference telephone or similar communications equipment, which participation will constitute presence in person at the Special Meeting. At the Special Meeting, the Stockholders will consider and vote upon the approval and adoption of the Merger Agreement.

The Board of Directors of the Company has unanimously declared the Merger advisable and unanimously recommends that the Stockholders vote in favor of the Merger and the Merger Agreement. **In order for the Merger to be consummated, Stockholders holding at least a majority of the outstanding shares of Company Common Stock must approve and adopt the Merger Agreement. The Company's Board of Directors is hereby soliciting proxies from the Stockholders for use at the Special Meeting. We ask that you please complete, date and execute the Proxy enclosed with this mailing and return it to the Company promptly, but in any event no later than May 15, 2007. Further explanation of the Proxy is contained in this Proxy Statement.**

Unless another date is agreed to by the parties, the Merger will close as soon as practicable (but not later than 3 business days) after the satisfaction or waiver of the conditions to the closing of the Merger (the "Closing") set forth in the Merger Agreement (the date of Closing, the "Closing Date").

**THE MERGER INVOLVES CERTAIN RISKS TO YOU AND THE OTHER STOCKHOLDERS OF THE COMPANY. SEE "RISK FACTORS" ON PAGE 1 OF THIS PROXY STATEMENT.**

All information in this Proxy Statement regarding the Company has been furnished by the Company, and all information furnished to you regarding ATK has been furnished by ATK. No person has been authorized to give any information or to make any representation not contained in this Proxy Statement in connection with the Merger, except as otherwise provided in this Proxy Statement, and, if given or made, such information or representation must not be relied upon as having been authorized by the Company or ATK. Neither the delivery of this Proxy Statement nor any distribution of securities pursuant to the terms of the Merger shall, under any circumstances, create an implication that there has been no change in the information contained herein or in any other materials enclosed herewith since the date hereof or thereof.

Stockholders may exercise dissenters' rights in connection with the Merger. See "The Merger—Dissenters' Rights."

This Proxy Statement was first sent to Stockholders on or about April 13, 2007.

**THIS PROXY STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE SECURITIES TO BE ISSUED IN THE MERGER IN ANY JURISDICTION IN WHICH, OR TO ANY PERSON TO WHOM, IT WOULD BE UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION.**

**THIS TRANSACTION HAS NOT BEEN APPROVED, DISAPPROVED OR RECOMMENDED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROXY STATEMENT.**

The date of this Proxy Statement is April 13, 2007.

Case 1:07-cv-00253-LAS Document 13-4 Filed 04/30/2007 Page 16 of 34

TABLE OF CONTENTS

Page


RISK FACTORS ..... 1
- RISKS WITH RESPECT TO THE MERGER ..... 1

SPECIAL MEETING OF THE STOCKHOLDERS OF THE COMPANY ..... 2
- GENERAL ..... 2
- RECORD DATE; OUTSTANDING SHARES ..... 2
- REVOCABILITY OF PROXIES ..... 2
- VOTING OF PROXIES IF NO VOTING INSTRUCTIONS GIVEN ..... 2
- QUORUM ..... 2
- SOLICITATION OF PROXIES ..... 2
- VOTE REQUIRED ..... 3
- SHARE OWNERSHIP OF OFFICERS, DIRECTORS AND CERTAIN STOCKHOLDERS ..... 3
- RECOMMENDATION OF THE COMPANY'S BOARD OF DIRECTORS ..... 3

THE MERGER ..... 4
- THE PARTIES ..... 4
- THE MERGER ..... 4
- MERGER CONSIDERATION ..... 4
- THE COMPANY'S REASONS FOR THE MERGER ..... 5
- FEES AND EXPENSES OF HOULIHAN LOKEY HOWARD & ZUKIN AND OTHER ADVISORS ..... 6
- EXCHANGE OF THE COMPANY COMMON STOCK CERTIFICATES ..... 7
- CLOSING CONDITIONS ..... 7
- CERTAIN FEDERAL INCOME TAX CONSEQUENCES ..... 8
- ACCOUNTING TREATMENT ..... 10
- INTERESTS OF THE COMPANY'S OFFICERS AND DIRECTORS IN THE MERGER ..... 10
- DISSENTERS' RIGHTS (RIGHTS OF OBJECTING STOCKHOLDERS OF THE COMPANY) ..... 10
- DOCUMENTS AND AGREEMENTS TO BE EXECUTED IN CONNECTION WITH THE MERGER ..... 12

THE COMPANY'S BUSINESS AND MANAGEMENT ..... 13
- GENERAL ..... 13
- DIVIDENDS ..... 13

STOCKHOLDERS OF THE COMPANY ..... 14

CAPITALIZATION OF THE COMPANY ..... 14

CAPITALIZATION OF THE MERGER SUB ..... 14

ADDITIONAL INFORMATION ..... 14

## RISK FACTORS

**Risks with Respect to the Merger**

***If the Merger is not completed, the future business and operations of the Company could be harmed.*** If the Merger is not completed, the Company may be subject to the following material risks, among others:

- In the event of termination of the Merger Agreement due to certain actions by the Board of Directors or the Stockholders, the Company will have to pay a break-up fee of $4,000,000 to ATK;

- If the Merger is not completed, the Company's stock value is likely to decline, commensurate with the downsizing of the business, as a result of certain factors, including, without limitation, the uncertainties of the restructuring process due to the Company's loss of the Mechanical Systems Engineering Services ("MSES") contract at the Goddard Space Flight Center ("GSFC"). This contract was the principal vehicle through which approximately 50% of the Company's revenue was generated in 2006. While the Company expects to continue providing services to GSFC under other contracts, the anticipated level of revenue from this customer is about one-third of the 2006 level; thus, successful redeployment of the current GSFC work force will involve a high degree of uncertainty; and

- the Company's costs related to the Merger, such as legal, accounting and some of the fees of financial advisors, must be paid even if the Merger is not completed.

Further, if the Merger is terminated and the Company's Board of Directors determines to seek another merger or business combination, there can be no assurance that the Company would be able to find a merger partner or that the new merger partner would be willing to pay an equivalent or more attractive price than that to be paid by ATK in the Merger.

***Future Employment of the Company's Employees.*** While the Merger does not guarantee employment for all of the employees of the Company, ATK provides professional opportunities for many of the Company's professionals and the financial strength to support the business transition activities with a view toward longer term goals;

***Certain of the Company's officers and directors have interests that may influence them to support or approve the Merger.*** Within three (3) Business Days after the Effective Date, ATK shall pay to Mr. Mike Cerneck, the Company's chief executive officer, (a) $2,002,569.67, as potentially reduced in accordance with the Merger Agreement and (b) a synthetic equity dividend equivalent in an amount determined pursuant to Section 3.3 of the Synthetic Equity Shares Agreement dated October 31, 2006 between the Company and Mr. Cerneck (the "Synthetic Equity Agreement") after giving effect to the dividend to the Company's Stockholders, in full and complete satisfaction of the Company's obligations under the Synthetic Equity Agreement (such amounts collectively referred to as the "Synthetic Equity Payments"). Additionally, the Company intends to extend bonus grants to certain employees yet to be identified, in connection with the successful consummation of the Merger, in an aggregate amount not to exceed $300,000 (the "Transaction Bonuses"). At the close of business on March 30, 2007, the date of the Merger Agreement, directors and officers of the Company collectively held eleven and sixty-two one-hundredths percent (11.62%) of the outstanding Company Common Stock. In addition, at the close of business on March 30, 2007 trusts for the benefit of the children of the Chairman of the Board held one percent (1%) of the outstanding Company Common Stock.

**SPECIAL MEETING OF THE STOCKHOLDERS OF THE COMPANY**

**General**

The Proxy enclosed with this Proxy Statement is being solicited by the Company's Board of Directors on behalf of the Company for the Special Meeting. At the Special Meeting, the holders of Company Common Stock will:

- consider and vote upon a proposal to approve and adopt the Merger Agreement and any amendments thereto approved by the proper officers of the Company.

If the Stockholders approve and adopt the Merger Agreement and any amendments thereto, the Company's Board of Directors will have the authority, without any further vote of the Company's Stockholders, to enter into such other documents and agreements as the proper officers of the Company deem necessary to consummate the Merger with such changes as the proper officers of the Company deem necessary.

**Record Date; Outstanding Shares**

Only Stockholders of record at the close of business on March 30, 2007 (the "Record Date") are entitled to receive notice of and to vote at the Special Meeting. As of the Record Date, there were 299,615 shares of Company Common Stock outstanding. Each share of Company's Common Stock is entitled to one vote on each matter submitted to a vote of the Company's Stockholders.

**Revocability of Proxies**

The Proxy enclosed with this Proxy Statement is revocable at any time before its use by delivering to the Company a written notice of revocation or a duly executed proxy bearing a later date. If a Stockholder who has executed and returned a proxy is present at the Special Meeting and wishes to vote in person, he, she or it may do so and thereby automatically revoke the authority of the proxy holders to vote his, her or its proxy.

**Voting of Proxies if No Voting Instructions Given**

Properly executed proxies, received and unrevoked, that do not contain voting instructions will be voted by the persons named in the proxy: for the approval and adoption of the Merger Agreement.

**Quorum**

The presence, in person or by proxy, of the holders of a majority of the shares entitled to be voted generally at the Special Meeting is necessary to constitute a quorum at the Special Meeting. A proxy indicating that a Stockholder abstains from voting will be counted toward determining whether a quorum is present at the Special Meeting.

**Solicitation of Proxies**

Proxies are being solicited hereby on behalf of the Company's Board of Directors. In addition to the use of the mails, solicitation may be made in person or by telephone or otherwise by directors, officers and regular employees of the Company. Such directors, officers and employees will not be additionally compensated for such solicitation, but may be reimbursed for out-of-pocket expenses incurred in connection therewith. The expense of any such solicitation is expected to be nominal.

Case 1:07-cv-00253-LAS Document 13-4 Filed 04/30/2007 Page 19 of 34

**Vote Required**

As of the Record Date, there were 299,615 shares of Company Common Stock outstanding and entitled to vote. Pursuant to the Delaware General Corporation Law (the "DGCL"), approval and adoption of the Merger Agreement by the Stockholders of the Company requires the affirmative vote or consent of the holders of at least a majority of the shares of Company Common Stock issued and outstanding as of the Record Date, or 149,808 shares. The Company's Board of Directors is hereby soliciting proxies from the Stockholders for use at the Special Meeting. All shares represented at the Special Meeting by a proxy will be voted in accordance with the direction specified on the proxy. If proxies are executed but no direction is given, those proxies will be voted FOR the approval and adoption of the Merger Agreement and any amendments thereto.

**Share Ownership of Officers, Directors and Certain Stockholders**

At the close of business on March 30, 2007, the date of the Merger Agreement, directors and officers of the Company collectively held eleven and sixty-two one-hundredths percent (11.62%) of the outstanding Company Common Stock. In addition, at the close of business on March 30, 2007 trusts for the benefit of the children of the Chairman of the Board held one percent (1%) of the outstanding Company Common Stock.

**Recommendation of the Company's Board of Directors**

The Board of Directors of the Company has unanimously approved the Merger Agreement and has determined that the Merger and other transactions contemplated by the Merger Agreement are advisable and in the best interest of the Company and the Stockholders. **The Company's Board of Directors unanimously recommends that you approve and adopt the Merger Agreement.**

Case 1:07-cv-00253-LAS Document 13-4 Filed 04/30/2007 Page 20 of 34

## THE MERGER

*The following discussion summarizes the proposed Merger and related transactions. It is not, however, a complete statement of all provisions of the Merger Agreement and related agreements or a complete description of the transactions and agreements contemplated thereby. Detailed terms of and conditions to the Merger and certain related transactions and agreements are contained in the Merger Agreement, a copy of which (with certain exhibits and/or schedules) will be made available to you for review at the Special Meeting. Statements made in this Proxy Statement with respect to the terms of the Merger and such related transactions and agreements are qualified in their respective entireties by reference to the more detailed information set forth in the Merger Agreement.*

### The Parties

*ATK.* ATK is a leading provider of advanced weapon and space systems and is the world's leading supplier of solid rocket motors and the nation's largest manufacturer of ammunition. ATK was organized as a Delaware corporation in September 1990. ATK's principal executive offices are located at 5050 Lincoln Drive, Edina, Minnesota 55436, its telephone number is (952) 351-3000 and its Internet address is www.atk.com.

*The Merger Sub.* The Merger Sub, a newly formed Delaware corporation, is an indirect wholly-owned subsidiary of ATK. ATK will use the Merger Sub to acquire the Company. The Merger Sub has no material assets and, since its formation, has not engaged in any activities except in connection with the proposed Merger. The Merger Sub's executive offices are located at 5050 Lincoln Drive, Edina, Minnesota 55436 and its telephone number is (952) 351-3000.

*The Company.* The Company provides a full range of space systems, products, and engineering services. The Company was incorporated as a Delaware corporation in July 1990. The Company's principal executive offices are located at 5050 Powder Mill Road, Beltsville, Maryland 20705, its telephone number is (301) 595-5000 and its Internet address is www.swales.com.

### The Merger

At the Effective Time of the Merger, the Merger Sub will merge with and into the Company. The Company will survive the Merger as an indirect wholly-owned subsidiary of ATK. At the Effective Time, the separate existence of the Merger Sub will cease. A copy of the Merger Agreement (with certain exhibits and/or schedules) will be made available to you for review at the Special Meeting. You should carefully read in full the Merger Agreement.

### Merger Consideration

Upon consummation of the Merger, each share of Company Common Stock that you own as a Stockholder (except for any Dissenting Shares) will be converted into the right to receive a proportionate share of the Merger Consideration, as described in the Merger Agreement, all in accordance with and subject to adjustment as provided in the Merger Agreement.

Subject to potential reduction as described below, the Merger Consideration, equal to $333.76 per share, will be payable within one business day of the effective time of the Merger. Each Stockholder's portion of the Merger Consideration may be reduced by an amount equal to the such Stockholder's pro rata portion of the excess transaction fees and expenses after taking into account the amounts reserved for such expenses. See "The Merger—Fees and Expenses of Houlihan Lokey Howard & Zukin and other advisors."

**The Company's Reasons for the Merger**

The Board of Directors of the Company has determined that the Merger and other transactions contemplated by the Merger Agreement are advisable and in the best interest of the Company and the Stockholders, and the Board of Directors has recommended that the Stockholders vote for the approval and adoption of the Merger Agreement. In reaching this determination, the Board of Directors of the Company consulted with legal and financial advisors and considered, among other things, the following factors:

- the valuation of the Company implicit in the consideration to be paid by ATK, which the Board of Directors of the Company believes is favorable to the Stockholders; and
- the potential adverse consequences and negative factors associated with the Merger.

Additionally, the Company and ATK have jointly prepared the following information that they believe explains the advantages of a combination of ATK and the Company (that would be effected through the Merger):

**Strategic Benefits**

The combination of the Company's and ATK's space businesses would offer a number of strategic benefits that could deliver significant value to stockholders of both companies. ATK has grown from a $1 billion company in 2000 to a $3.5 billion business today. ATK's strategy is to continue growing through both internal investment and acquisitions in the space, aerospace and advanced weapons sectors. A combination of ATK with the Company complements this strategy and provides expanded growth prospects for both companies.

**Critical Mass and Expanded Resource Pool**

With annual revenues of approximately $350 million, the combined business would have the scale and resources to compete against other comparable-sized space companies in expanded market categories. ATK spends approximately $70 million annually in research and development and operates a government funded contract base of approximately $500 million. In addition to its research and development investments, ATK also invests approximately $45 million annually in bid and proposal activities. These investments are targeted at expanding ATK's space systems, launch systems, space exploration and systems engineering capabilities. Combined with the Company's technical capabilities and market position, the expanded resource and talent pool significantly enhances both companies' growth prospects.

**Expanded Growth Opportunities in Space Systems**

The Company has emerged as a government satellite integrator with expanding positions in the military and intelligence space markets. The combined businesses of ATK and the Company would have the credentials, scale, resources, and facilities to expand their position as a prime contractor in these niche markets. Both companies are focused on increased participation in the emerging small spacecraft market and operational responsive space initiatives. A combination of capabilities broadens the opportunity pool set for both the Company and ATK.

**Expanded Growth Opportunities in Satellite Components and Subsystems**

ATK produces a broad range of satellite components including solar arrays, bus structures, deployables, in-space propulsion, reflectors and tanks. The combination of the Company's capabilities in thermal management systems and ATK's capabilities in satellite components would enable the combined business to offer a broader, more

fully integrated product offering to the satellite prime customer base, generating increased revenue to both companies.

**Expanded Growth Opportunities in Engineering Services**

The integration of the Company's and ATK's engineering services organizations would provide the combined business with access to multiple customer communities and the potential to significantly expand positions in existing markets like launch services. ATK is playing a significant role in the National Aeronautics and Space Administrations ("NASA's") space exploration program. The company is also investing in the development of a new small launch vehicle. ATK's success in both of these areas will generate significant opportunity for the combined businesses in launch integration and launch services. Additionally, the combined businesses' capabilities in small satellite systems and launch vehicles will expand opportunities in the emerging operational responsive space market.

**Leadership, Culture and Strategic Continuity**

The combined business would be led by Mr. Mike Cerneck, chief executive officer of the Company, ensuring continuity of strategy and leadership. Business development for the combined business would be led by Mr. Tom Wilson, the Company's Vice President of Business Development. ATK operates as a small, nimble company and is recognized as a technology innovator in the space and weapons markets. Because the companies have operated in partnership on a number of programs, there is familiarity with people, capabilities, and processes.

**Continuity in Headquarters Location and Customer Proximity**

With headquarters in Beltsville, Maryland, the combined business would be in close proximity to key government customers in Washington, D.C. and Virginia, including the NASA, the Defense Advanced Research Projects Agency, and other United States Department of Defense customers.

**Diversified Base for Future Growth and Career Expansion**

The combination of the businesses would establish a strong, more diversified base for future organic and acquired growth in space platforms, launch systems, systems integration and technical services. Of ATK's 15,500 employees located in 21 states, 4,500 are engineers. These talented engineers are focused on a range of programs in the space, aerospace and defense markets. The combined businesses will have a more diversified base for growth and career expansion opportunities across a broad range of businesses and locations.

The foregoing information and list of factors considered by the Board of Directors of the Company is not exhaustive. In view of the variety of factors considered in connection with its evaluation of the Merger, the Company's Board of Directors did not find it practicable to, and did not, quantify or otherwise assign relative weights to the specific factors that it considered. However, the Board of Directors of the Company collectively reached the unanimous conclusion that the various factors considered by the Board, taken together, weighed in favor of approval of the Merger Agreement and the Merger.

**Fees and Expenses of Houlihan Lokey Howard & Zukin and Other Advisors**

Upon the closing of the Merger, Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey Howard & Zukin"), the Company's financial advisor in connection with the Merger, will be entitled to receive a cash transaction fee equal to $525,000 (after crediting a retainer paid upon its engagement), plus a percentage of amounts by which the value of the Merger exceeds certain thresholds starting at $80,000,000. In addition, the

Case 1:07-cv-00253-LAS Document 13-4 Filed 04/30/2007 Page 23 of 34

Company has agreed to reimburse Houlihan Lokey Howard & Zukin for its reasonable out-of-pocket expenses and to indemnify Houlihan Lokey Howard & Zukin and certain related parties for certain liabilities arising out of or resulting from its engagement. For purposes of calculating the transaction fee payable to Houlihan Lokey Howard & Zukin upon the closing of the Merger, the value of the Merger includes, among other things, the total proceeds and other consideration paid or received, or to be paid or received, in connection with the Merger and the aggregate principal amount of any interest-bearing debt, guarantees and any other non-operating liabilities or obligations of the Company decreased, repaid or extinguished in connection with or anticipation of the Merger or that remain outstanding upon the consummation of the Merger. The Company estimates that the aggregate transaction and other fees and expenses paid or payable to Houlihan Lokey Howard & Zukin will be between $1,400,000 and $1,526,000. The fees and expenses of Houlihan Lokey Howard & Zukin, along with those of other transaction advisors, incurred by the Company in connection with the Merger (hereinafter, the "Aggregate Transaction Expenses"), will be paid by ATK up to a maximum of $1,500,000 in accordance with the terms of the Merger Agreement. If the Aggregate Transaction Expenses exceed $1,500,000, the excess fees and expenses shall be paid from residual Company funds remaining after the payment of (i) a Stockholder dividend and (ii) the Transaction Bonuses described above (in an amount not to exceed $300,000 in the aggregate), with the total amount expended on such dividend payment, Transaction Bonuses and such excess transaction fees and expenses not to exceed a maximum aggregate amount of $5,012,500 as permitted by the Merger Agreement (such maximum amount, the "Payment Reserve"). If the residual funds in the Payment Reserve are less than such excess transaction fees and expenses, then such remaining transaction fees and expenses shall be borne by the Company's Stockholders and chief executive officer on a pro rata, fully diluted, basis and shall be paid by ATK from the Merger Consideration and the Synthetic Equity Payments.

**Exchange of the Company Common Stock Certificates**

Each Stockholder must surrender the certificate(s) formerly representing his, her or its shares of Company Common Stock (other than Dissenting Shares) and deliver such certificate(s) to the Company or, if such certificate(s) have been lost, stolen or destroyed, deliver an appropriate affidavit to the Company. The Company will hold all such surrendered certificates and affidavits for the Stockholders until the Closing.

**Closing Conditions**

Consummation of the Merger requires the satisfaction (or waiver by the appropriate party) of certain customary closing conditions, including, among other things, (i) approval and adoption of the Merger Agreement by the Stockholders; (ii) receipt of certain regulatory and other third party approvals; (iii) resignations of each director of the Company effective as of the Effective Time; and (iv) the number of Dissenting Shares cannot represent more than ten percent (10%) of the outstanding shares of the Company Common Stock.

**Certain Federal Income Tax Consequences**

TO ENSURE COMPLIANCE WITH U.S. TREASURY DEPARTMENT CIRCULAR 230, STOCKHOLDERS ARE HEREBY NOTIFIED THAT ANY TAX ADVICE CONTAINED HEREIN, UNLESS OTHERWISE STATE, IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, FOR THE PURPOSE OF (A) AVOIDING TAX RELATED PENALTIES; OR (B) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TAX-RELATED MATTER ADDRESSED HEREIN.

In general, the Merger should be a fully taxable transaction to the Stockholders for U.S. federal income tax purposes. Tax matters, however, are very complicated and the tax consequences of the Merger to each Stockholder will depend on the Stockholder's particular facts and circumstances. Each Stockholder is encouraged to consult with his, her or its own financial or tax adviser to determine the particular tax consequences applicable to that Stockholder.

The following is a general summary of the material U.S. federal income tax consequences of the Merger to Stockholders upon their exchange of Company Common Stock for cash pursuant to the Merger Agreement. This summary is limited to Stockholders that hold their Company Common Stock as capital assets within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "Code"). This summary does not address any U.S. federal income tax consequences to Stockholders who exercise dissenters' rights pursuant to Delaware law. This discussion of certain federal income tax consequences of the Merger is not intended to provide a complete analysis or description of all potential federal income tax consequences of the Merger. It does not address all aspects of federal income taxation that may be important to a Stockholder in light of that Stockholder's particular circumstances, or apply to a Stockholder: (i) that is a foreign entity or individual who is not a citizen or resident of the U.S.; (ii) a partnership, sub-chapter S corporation or other pass-through entity; (iii) a regulated investment company or real estate investment trust; (iv) a tax-exempt organization; (v) a financial institution or insurance company; (vi) a dealer or broker in securities; (vii) a Stockholder whose shares are qualified small business stock for purposes of Section 1202 of the Code; (viii) a Stockholder who holds shares of the Company Common Stock as part of a hedge, appreciated financial position, straddle, constructive sale or conversion transaction; (ix) a Stockholder who acquired shares of the Company Common Stock pursuant to the exercise of incentive stock options or who holds shares of the Company Common Stock that are subject to a substantial risk of forfeiture; (x) or a Stockholder who does not hold shares of the Company Common Stock as capital assets.

Further, this summary does not address any aspect of state, local or foreign tax laws or the alternative minimum tax provisions of the Code.

The following summary is not binding on the Internal Revenue Service (the "IRS") or any court. The summary is based on the Code, the Treasury Regulations promulgated thereunder, and judicial and administrative rulings and decisions in effect on the date hereof, all of which are subject to change at any time, possibly with retroactive effect, which could result in U.S. federal income tax consequences different from those described above. As a result, the Company cannot assure you that the tax consequences described in this discussion will not be challenged by the IRS or will be sustained by a court if so challenged. No ruling has been or will be sought from the IRS, and no opinion of counsel has been or will be rendered, as to the U.S. federal income tax consequences of the Merger.

Material U.S. federal income tax consequences to a Stockholder (other than as described above), as a result of the Merger, are generally as follows:

- The receipt of cash should be a fully taxable transaction for U.S. federal income tax purposes. In general, a Stockholder should recognize gain or loss in an amount equal to the difference between (i) the amount realized by the Stockholder in exchange for his, her or its shares of Company Common Stock and (ii) the Stockholder's adjusted tax basis in the exchanged shares. Gain or loss should be determined separately for each block of Company Common Stock (i.e., shares acquired at the same cost in a single transaction) exchanged pursuant to the Merger. The amount realized by each Stockholder of Company Common Stock should equal the amount of cash received.

- Any gain or loss recognized should be long-term capital gain or loss if the shares exchanged were held for more than one year as of the date of the Merger and should be short-term capital gain or loss if the exchanged shares were held for one year or less.

- Capital gains recognized by an individual upon a disposition of Company Common Stock held for more than one year generally should be subject to a maximum U.S. federal income tax rate of 15%. Certain limitations apply to the use of capital losses.

**Backup Withholding**

Certain Stockholders of Company Common Stock may be subject to backup withholding, at applicable rates (currently 28%), on amounts received pursuant to the Merger. Backup withholding will not apply, however, to a Stockholder who (i) furnishes a correct taxpayer identification number and certifies that the Stockholder is not subject to backup withholding on IRS Form W-9 or a substantially similar form, (ii) provides a certification of foreign status on an appropriate Form W-8 or successor form, or (iii) is otherwise exempt from backup withholding. If a Stockholder does not provide its correct taxpayer identification number on IRS Form W-9 or a substantially similar form, the Stockholder may be subject to penalties imposed by the IRS. Amounts withheld, if any, are generally not an additional tax and may be refunded or credited against the Stockholder's U.S. federal income tax liability, provided that the Stockholder furnishes the required information to the IRS.

THE SUMMARY OF MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES SET FORTH ABOVE IS INTENDED TO PROVIDE A GENERAL SUMMARY ONLY AND IS NOT INTENDED TO BE A COMPLETE ANALYSIS OR DESCRIPTION OF ALL POTENTIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE MERGER. IN ADDITION, THE SUMMARY DOES NOT ADDRESS TAX CONSEQUENCES THAT MAY VARY WITH, OR ARE CONTINGENT ON, INDIVIDUAL CIRCUMSTANCES. IT DOES NOT ADDRESS CERTAIN CATEGORIES OF HOLDERS OF SHARES OF COMPANY COMMON STOCK. MOREOVER, THE SUMMARY DOES NOT ADDRESS ANY NON-INCOME TAX OR ANY FOREIGN, STATE, LOCAL OR OTHER TAX CONSEQUENCES OF THE MERGER. THE SUMMARY DOES NOT ADDRESS THE TAX CONSEQUENCES OF ANY TRANSACTION OTHER THAN THE MERGER. ACCORDINGLY, EACH STOCKHOLDER IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR TO DETERMINE THE PARTICULAR FEDERAL, STATE, LOCAL OR FOREIGN INCOME, REPORTING OR OTHER TAX CONSEQUENCES OF THE MERGER TO THAT STOCKHOLDER.

**Accounting Treatment**

The Merger will be accounted for as a purchase under accounting principles generally accepted in the U.S. Consequently, the purchase price, including costs directly related to the Merger, will be allocated to the assets acquired, taking into account liabilities assumed, based on fair market values as of the completion of the Merger, with any excess allocated to goodwill and other identifiable intangible assets.

**Interests of the Company's Officers and Directors in the Merger**

Certain officers and directors of the Company have interests in the Merger which are different from those of the Stockholders generally, including the following:

- within three (3) Business Days after the Effective Date, ATK shall pay to Mr. Mike Cerneck, the Company's chief executive officer, (a) $2,002,569.67, as potentially reduced in accordance with the Merger Agreement, and (b) a synthetic equity dividend equivalent in an amount determined pursuant to Section 3.3 of the Synthetic Equity Agreement after giving effect to the dividend to the Company's Stockholders, in full and complete satisfaction of the Company's obligations under the Synthetic Equity Agreement;

- in connection with the Closing, the Company will extend bonus grants to certain employees yet to be identified in an aggregate amount not to exceed $300,000; and

- following the Closing, ATK will provide, and will cause the Company to provide, indemnification to each individual who served as a director or officer of the Company immediately prior to the Closing Date that is no less favorable in coverage and amount than that provided under any applicable insurance policy of the Company in effect immediately prior to the Closing Date. Such indemnification shall remain in effect until the earlier of the expiration of the applicable statute of limitations or the sixth anniversary of the Closing Date.

The Stockholders should consider these interests when evaluating the recommendation of the Company's Board of Directors.

**Dissenters' Rights (Rights of Objecting Stockholders of the Company)**

Any Stockholder who does not wish to accept the consideration provided in the Merger Agreement has the right to demand, pursuant to Section 262 of the DGCL (Appraisal Rights), judicial appraisal of the fair value of his, her or its shares of Company Common Stock held thereby, and to be paid the fair value for such shares ("Dissenting Shares"). Section 262 sets forth the rights, obligations, and procedures for each owner of Dissenting Shares who desires to receive payment of the fair value for his, her or its shares of Company Common Stock pursuant to the DGCL. If you perfect these rights and the Merger is consummated, your Company Common Stock will not convert into the right to receive cash in the manner otherwise described in this Proxy Statement. The Company will take no action to perfect the dissenters' rights you have as a Stockholder. Therefore, to exercise your dissenters' rights, you should strictly comply with the procedures set forth in Section 262 of the DGCL, a copy of which is enclosed herewith as Exhibit A.

Any Dissenting Shares will not have the right to receive any dividends or distributions payable to holders of record after the close of business on the date of the Special Meeting and shall cease to have any rights as a stockholder with respect to the shares except the right to receive payment of the fair value of the shares. The rights of the owner of the Dissenting Shares may be restored only upon the following:

- the withdrawal of the demand for payment, which withdrawal must be approved by the Surviving Corporation;
- the failure to file a petition for appraisal within the required time period;
- a determination by the court that the owner of the Dissenting Shares is not entitled to an appraisal; or
- the abandonment or rescission of the Merger.

Any owner of Dissenting Shares who exercises his, her or its right to be paid the value of his, her or its shares will recognize gain or loss, if any, for federal income tax purposes upon the receipt of cash for his, her or its shares.

The Company does not believe that the "fair value" of the shares of Company Common Stock under the DGCL would exceed the Merger Consideration contemplated by the Merger Agreement.

The following is a summary of the procedures to be followed under Section 262 of the DGCL. The summary does not purport to be a complete statement of, and is qualified in its entirety by reference to, Section 262 and to any amendments to such sections after the date of this Proxy Statement. The failure to follow any procedures required by Section 262 may result in the termination or waiver of dissenters' rights. Any Stockholder of the Company who desires to exercise his, her or its dissenters' rights should review carefully Section 262 and is urged to consult his, her or its legal advisor before electing or attempting to exercise such rights.

Under Section 262 of the DGCL, any stockholder who does not wish to accept the Merger Consideration may dissent from the Merger and elect to have the fair value of such stockholder's shares (exclusive of any element of value arising from the accomplishment or expectation of the Merger) judicially determined and paid to such stockholder in cash, together with a fair rate of interest, if any, provided that such stockholder complies with the provisions of Section 262. In order for a Stockholder to exercise his, her or its right to an appraisal pursuant to the DGCL, the Stockholder must deliver to the Company a written demand for appraisal as provided by the DGCL **PRIOR TO THE EFFECTIVE TIME.**

Neither not voting nor voting against the adoption of the Merger Agreement will be considered a demand for appraisal. **Any Stockholder who fails to send a written demand to Art Leaderman, Vice President & General Counsel, at the offices of the Company at 5050 Powder Mill Road, Beltsville, Maryland 20705 in accordance with the provisions of the DGCL, will lose the right to an appraisal pursuant to Section 262.** In addition, any Stockholder who votes for the approval and adoption of the Merger Agreement by the delivery of a proxy in favor thereof will lose the right to an appraisal.

The preceding discussion is not a complete statement of the law pertaining to appraisal rights under Section 262 of the DGCL, which is attached as <u>EXHIBIT A</u> to this Proxy Statement.

**ALL STOCKHOLDERS WHO WISH TO EXERCISE APPRAISAL RIGHTS PURSUANT TO DELAWARE LAW OR WHO WISH TO PRESERVE THEIR RIGHT TO DO SO SHOULD CAREFULLY REVIEW <u>EXHIBIT A</u>, AND ANY NOTICE THAT IS SENT BY THE COMPANY AFTER APPROVAL AND ADOPTION OF THE MERGER AGREEMENT, SINCE FAILURE TO COMPLY WITH THE PROCEDURES SET FORTH THEREIN WILL RESULT IN THE LOSS OF SUCH RIGHTS. FAILURE TO COMPLY STRICTLY WITH ALL OF THE PROCEDURES SET FORTH IN**

**SECTION 262 OF THE DGCL WILL RESULT IN THE LOSS OF A STOCKHOLDER'S STATUTORY APPRAISAL RIGHTS. CONSEQUENTLY, ANY STOCKHOLDER WISHING TO EXERCISE APPRAISAL RIGHTS IS URGED TO CONSULT LEGAL COUNSEL BEFORE ATTEMPTING TO EXERCISE SUCH RIGHTS.**

**Documents and Agreements to be Executed in Connection with the Merger**

In connection with the Special Meeting, you should complete, execute and date the Proxy enclosed herewith and return it to the Company promptly, but in no event later than May 15, 2007. Further, in order for you to be entitled, as a Stockholder, to receive your share of the Merger Consideration pursuant to the terms of the Merger Agreement in exchange for your shares of Company Common Stock following the Effective Time, you must surrender your stock certificates representing such shares to the Company, or deliver an appropriate affidavit in lieu thereof.

## THE COMPANY'S BUSINESS AND MANAGEMENT

**General**

The Company provides a full range of space systems, products, and engineering services.

**Dividends**

Since 2001, the Company periodically has paid cash dividends on its shares of Company Common Stock.

Case 1:07-cv-00253-LAS Document 13-4 Filed 04/30/2007 Page 30 of 34

## STOCKHOLDERS OF THE COMPANY

The following table presents information regarding the beneficial ownership of the Company Common Stock as of the date hereof: (a) by each person or group of affiliated persons who is the beneficial owner of more than five (5%) of the outstanding Company Common Stock; (b) by each of the Company's executive officers; (c) by each of the Company's directors; and (d) by all of the Company's executive officers and directors as a group. The Company has determined beneficial ownership in accordance with the rules of the SEC. Unless otherwise indicated, the persons included in the table have sole voting and investment power with respect to all shares beneficially owned thereby. The address of each of the persons whose name appears in the table is c/o Swales & Associates Inc., 5050 Powder Mill Road, Beltsville, Maryland 20705.

| | Beneficial Ownership | |
|---|---|---|
| Name | Number | Percentage |
| ESSOP | 247,221 | 82.52% |
| Luzier, Ronald A. Trust | 14,587 | 4.86% |
| Swales, Thomas | 20,220 | 6.74% |
| Trust, Carrie Lee Swales | 500 | 0.17% |
| Trust, Justine M. Hein | 500 | 0.17% |
| Trust, Larissa M. Swales | 500 | 0.17% |
| Trust, Pamela D. Butziger | 500 | 0.17% |
| Trust, Stephanie T. Swales | 500 | 0.17% |
| Trust, Tasha M. Swales | 500 | 0.17% |
| Wilson, Thomas L. | 14,587 | 4.86% |
| All stockholders as a group | 299,615 | 100% |

## CAPITALIZATION OF THE COMPANY

The authorized capital stock of the Company consists of 300,000 shares of Company Common Stock. At the Effective Time of the Merger, there will be 299,615 shares of the Company Common Stock outstanding. There is no established trading market for any of the Company's securities. At the Effective Time, each outstanding share of the Company Common Stock will be converted into the right to receive cash in the amount determined as described above. As of the date hereof, there were ten (10) holders of record of the Company Common Stock.

## CAPITALIZATION OF THE MERGER SUB

The authorized capital stock of the Merger Sub consists of 1,000 shares of common stock, par value $0.01 per share, of which 1,000 shares are issued and outstanding and held by ATK. At the Effective Time of the Merger, each issued and outstanding share of the Merger Sub will be converted into and become one validly issued, fully paid and nonassessable share of common stock, par value $0.01 per share, of the Surviving Corporation.

## ADDITIONAL INFORMATION

You are invited to ask questions and receive answers concerning the terms and conditions of the Merger, the Company and the voting of your shares, and, subject to the Company's right to protect confidential information in its sole discretion, obtain any additional information which the Company possesses or can acquire without unreasonable effort or expense that is necessary to verify the

Case 1:07-cv-00253-LAS Document 13-4 Filed 04/30/2007 Page 31 of 34

information contained herein. All requests for such information should be directed to Art Leaderman, Vice President & General Counsel, Swales & Associates, Inc., 5050 Powder Mill Road, Beltsville, Maryland 20705 (Tel.: 301-902-4489).

# **Exhibit 10**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| **SWALES & ASSOCIATES, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES OF AMERICA,**<br><br>**Defendant,**<br><br>**and**<br><br>**SGT, INC.,**<br><br>**Defendant-Intervenor.** | **No. 07-253**<br>**(Senior Judge Smith)** |

**DECLARATION OF SHELLEY JOHNSON**

1. My name is Shelley Johnson. I am a Director of Program Development and Transition Manager of SGT's Mechanical Systems Engineering Services (MSES II/A) contract. I have been employed by SGT since 2006 but have held a Program Manager position and engineering positions at NASA Goddard Space Flight Center since 1998.

2. One of my primary responsibilities as Transition Manager is recruiting incumbent personnel currently performing work on the predecessor MSES contract to come to work for SGT on the MSES II/A contract.

3. It is typical in a service contract recompetition for 90% or more of incumbent employees on a predecessor contract to transition to the new contractor team. SGT's rate for incumbents transitioning for all of its large contracts is well above 90%.

4. A recently hired employee from Swales Aerospace told me that Swales instituted a company policy that any employee that gives notice to leave for employment with a Swales competitor will have his/her employment with Swales Aerospace terminated immediately. In fact, although his two weeks was officially accepted on a Monday; two days later, Wednesday, he was informed verbally of this policy change and immediately escorted to the door.

5. This is an unusual policy in a contract transition at Goddard Space Flight Center. Typically, we see the incumbent contractor work with the successor contractor to afford a seamless transition so that the customer's work is not impacted. In most cases an

6. employee giving notice stays with the incumbent contractor until the successor contractor takes over.

7. My staff and I have spoken to many incumbent employees and have been told on several occasions that the employees want to wait for the protest case to be settled prior to making a decision to work for SGT. In the present case many employees are "on the fence" waiting to see if an Temporary Restraining Order is granted halting the MSES II/A contract performance.

8. We have been told that this is partly due to the fact that there was a prior GAO protest that has delayed the contract start for four months. Many employees are simply afraid to come over until they are assured that they have a job and they know that the start date is certain.

9. Another disturbing factor to the incumbent workforce is the lawsuit that Swales Aerospace has vigorously pursued against Nicholas Galassi, a former Swales employee. This has caused great damage to the reputation of SGT as Swales Aerospace has repeatedly published details about the allegations in "all-hands" emails and in the *Space News* periodical. Even after NASA investigated and cleared SGT of all charges Swales has continued to publish these allegations, causing potential employees to question whether SGT is an ethical company.

10. In addition, the lawsuit against Mr. Galassi has made some employees fearful of approaching SGT for fear that legal action may be taken against them.

11. Moreover, I have talked with several of the NASA customers of the MSES contract and they have also expressed a grave concern that the tactics employed by Swales Aerospace are having a chilling affect on the ability of the employees to transition to the new contractor and that some are leaving the NASA support workforce altogether. This in turn is endangering mission performance.

I declare under penalty of perjury that the foregoing is true and correct.

4/29/2007
Date

Shelley Johnson
Shelley Johnson