**Agreed-Upon Redacted Copy—May Be Made Public**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

No. 07-253
(Senior Judge Smith)

SWALES & ASSOCIATES, INC.

Plaintiff,

v.

UNITED STATES,

Defendant,

and

SGT, INC.,

Defendant-Intervenor.

# SWALES' REPLY BRIEF IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION AND REQUEST FOR A TEMPORARY RESTRAINING ORDER

MARCIA G. MADSEN
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006
(202) 263-3000
(202) 263-3300 Facsimile

Of Counsel:
DAVID F. DOWD
LUKE LEVASSEUR
MAYER, BROWN, ROWE & MAW LLP
*Counsel for Plaintiff, Swales & Associates, Inc.*
May 2, 2007

## TABLE OF CONTENTS

Page

INTRODUCTION ..... 2

ARGUMENT ..... 3

I. SWALES IS LIKELY TO SUCCEED ON THE MERITS OF THE TWO ISSUES RAISED IN ITS REQUEST FOR INJUNCTIVE RELIEF ..... 3

A. The Government Failed To Reasonably Address SGT's Misappropriation Of Swales' Proprietary Information ..... 4

1. NASA Misevaluated The Taint From SGT's Actions By Analyzing The Procurement Integrity Violation In An Inappropriately Mechanistic Manner ..... 4

a. In Determining That SGT Did Not Violate The Procurement Integrity Act, NASA Applied A Fundamentally Flawed Rationale ..... 5

b. NASA Arbitrarily And Capriciously Decided Not To Disqualify SGT Because Of Its Procurement Integrity Violation ..... 9

2. The Government's Contention That Swales' Procurement Integrity Claim Is Barred By Laches Cannot Be Supported ..... 12

3. Swales Was Substantially Prejudiced By NASA's Erroneous Evaluation Of The Procurement Integrity Issue ..... 18

B. Swales Has Shown A Likelihood Of Prevailing With Regard To The Subcontracting Limitation ..... 19

II. THE BALANCE OF HARMS FAVORS GRANTING THE REQUESTED TRO ..... 21

A. There Are Three Possible Courses Of Action For Incumbent Employees If The SGT Transition is Temporarily Stopped And None Of These Will Result In Cognizable Harm To NASA ..... 22

B. Swales Will Suffer Irreparable Harm If Injunctive Relief Is Not Granted ..... 24

C. While NASA Claims That A Transition Is Difficult And The SGT Transition Thus Must Proceed Immediately, NASA Simultaneously Claims That Two Transitions Are Less Disruptive Than One ..... 25

D. NASA's Actions In Extending The Swales Contract Through 2008 Prior To This Protest Undermine Its Claim That SGT Is Needed To Perform The Services .......... 26

E. The Transition To SGT May Proceed, If Necessary, If And When This Protest Is Resolved .......... 27

CONCLUSION .......... 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Autel Servs., Inc. v. United States*, 70 Fed. Cl. 173 (2006) ........ 4

*Compliance Corp. v. United States*, 22 Cl. Ct. 193 (1990) ........ 10, 11, 18

*Denver & RGR Co. v. Ariz. & C.R. Co. of N.M.*, 233 U.S. 601 (1914) ........ 17

*Kola Nut Travel, Inc. v. United States*, 68 Fed. Cl. 195 (2005) ........ 9

*Mass Transit Admin. v. Granite Constr. Co.*, 471 A.2d 1121 (Md. Ct. Spec. App. 1984) ........ 15

*Mercy Medical Center, Inc. v. United Healthcare of the Mid-Atlantic, Inc.*, 815 A.2d 886 (Md. Ct. Spec. App. 2003) ........ 16

*NKF Engineering, Inc. v. United States*, 805 F.2d 372 (Fed. Cir. 1986) ........ 10

*Schmidt v. Millhauser*, 130 A.2d 572 (Md. 1957) ........ 16

*Schriefer v. Stewart*, 1989 WL 156878 (4th Cir. Dec. 27, 1989) ........ 15

*Synetics, Inc. v. United States*, 45 Fed. Cl. 1 (1999) ........ 12

*University Research Co., LLC v. United States*, 65 Fed. Cl. 500 (2005) ........ 25

*Unsatisfied Claim & Judgment Fund Bd. v. Fortney*, 285 A.2d 641 (Md. 1972) ........ 15

**Statutes:**

41 U.S.C. § 423(b) ........ 8

**Miscellaneous:**

*Restatement (Third) of Agency* § 5.02(1) (2006) ........ 15

*Restatement (Third) of Agency* § 5.03 (2006) ........ 16

# INDEX TO THE APPENDIX

## Index of Exhibits



| Exhibit | Description |
|---|---|
| 1 | Declaration of Patrick Miller, dated 2 May 2007 |
| 2 | Declaration of Paul Connors, dated 2 May 2007 |
| 3 | Ball Aerospace Press Release, dated 12 December 2006 |
| 4 | Northrop Grumman Press Release, dated 12 December 2006 |
| 5 | Declaration of Mark McQuaid, dated 2 May 2007 |
| 6 | Excerpt from RFP NNG05096383R |
| 7 | Amendment 96 to Contract No. NAS5-01090, dated 10 April 2007 |

**Agreed-Upon Redacted Copy—May Be Made Public**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| SWALES & ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | No. 07-253 |
| | ) | (Senior Judge Smith) |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SGT, INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**SWALES' REPLY BRIEF IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION AND REQUEST FOR A TEMPORARY RESTRAINING ORDER**

Pursuant to the Court's May 2, 2007 amended scheduling Order, plaintiff Swales & Associates, Inc. ("Swales") respectfully submits this reply brief in support of its request for a temporary restraining order and its motion for a preliminary injunction. In their opposition briefs, both the Government and intervenor, SGT, Inc. ("SGT"), fail to rebut Swales' demonstration that each of the requirements for equitable relief are satisfied. Accordingly, Swales requests that the Court enjoin the National Aeronautics and Space Administration, Goddard Space Flight Center ("NASA" or "the Agency") from commencing or continuing performance of any contract awarded under Request for Proposals No. NNG05096383R ("RFP") to SGT.

## INTRODUCTION

Temporary injunctive relief is appropriate here. During the next two weeks, SGT will continue to hire away Swales' employees. That conduct will deprive Swales both of its incumbency and the substantial investments that Swales has made to develop the staff on which it relies to perform the current MSES contract and on which it based its MSES II/A proposal.

In regard to the merits, this case concerns the awardee's admitted use of an individual to assist in preparation and presentation of the same portion of a proposal that he worked on for a competing offeror. SGT obtained an unfair competitive advantage by placing that individual (Mr. Galassi) in this dual role. When the issue was brought to NASA's attention, NASA first claimed that the Procurement Integrity Act did not even apply. NASA then grudgingly looked into the matter. But NASA failed to conduct a reasonable inquiry. NASA failed to ask reasonable questions, accepted half-answers, and looked for simple, crude copying. For example, NASA evidently never inquired why SGT retained Mr. Galassi to work on the same section of the SGT proposal that he had worked on for Swales. SGT's role in hiring Mr. Galassi was improper. NASA's failure to conduct a reasonable inquiry of the matter was unreasonable and an abuse of its discretion. The integrity of the procurement has been tainted.

NASA and SGT assert that Mr. Galassi informed certain Swales' employees of his activities for SGT. That contention, which does not cleanse this procurement of its taint, is not accurate. As discussed below, at least one claimed conversation

did not occur. As for the other, Mr. Galassi was (and is now) less than forthcoming as to what transpired. Even by his own account, he did not inform anyone of the salient fact, which is that he served on a Red Team for the very same portion of the SGT proposal that he prepared for Swales. Those dual roles are the problem here.

The balance of harms favors stopping the SGT transition while this case proceeds. NASA may obtain the same services that it needs (MSES services) from the same corps of employees that NASA now is seeking to transition from one contractor to another. The Swales contract remains in effect. NASA recently extended it. There is no reason it cannot be used to obtain the required services while this protest proceeding.

Although NASA claims it would save money if SGT performed the services, those claims are predicated on a Pricing Model that NASA discarded from the evaluation because it was unreliable and NASA's invocation of those savings is simply an untruth. *See*, *e.g.*, Gov't Opp., Ex. 14 ¶ 8. In any event, whatever modest savings (if any) may accrue in the brief time that the Court considers this case do not outweigh the substantial harm to the integrity of the procurement and to Swales' status as an incumbent if the SGT contract is permitted to continue.

## ARGUMENT

### I. SWALES IS LIKELY TO SUCCEED ON THE MERITS OF THE TWO ISSUES RAISED IN ITS REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF

NASA's decision to award the MSES II/A contract to SGT was flawed in numerous respects. In its motion for preliminary injunctive relief, Swales has focused on two of those grounds: NASA's failure to properly evaluate the effect of SGT's procurement integrity violation and the Agency's misevaluation of SGT's failure to satisfy the "limitation on subcontracting" restriction of the RFP and the Federal Acquisition Regulation ("FAR"). Swales has demonstrated that it is substantially likely to prevail pursuant to each of the applicable standards.

In its opposition brief, the Government relies heavily on the deferential standard of review applicable in bid protest claims and the burden placed on applicants for emergency injunctive relief. *E.g.*, Gov't Opp. at 14-15; *see Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173, 190 (2006). But the burdens applicable in this context do not require this Court to sit idly by and sanction obviously improper investigations into procurement integrity violations—or procurement decisions that are not consistent with provisions of the RFP and the FAR. Contrary to the Government's assertions, we are not seeking improper "judicial interference in contract procurement"; instead, Swales respectfully asks for appropriate review of NASA's arbitrary and capricious decision-making with respect to the MSES II/A award.

### A. The Government Failed To Reasonably Address SGT's Misappropriation Of Swales' Proprietary Information

#### 1. NASA Misevaluated The Taint From SGT's Actions By Analyzing The Procurement Integrity Violation In An Inappropriately Mechanistic Manner

##### a. In Determining That SGT Did Not Violate The Procurement Integrity Act, NASA Applied A Fundamentally Flawed Rationale

There is no serious dispute that when he was a Swales employee, Mr. Galassi obtained procurement sensitive information and worked as part of a team that developed Swales' RTO No. 1 response for the MSES II/A competition. Gov't Opp. Ex. 3 ¶ 2 (Mr. Galassi concedes that he attended "the MSES IIA kickoff meeting and subsequent meetings" in June and July 2005 to work on RTO No. 1). Although he asserts he did not work on *drafts* of Swales' MSES II/A proposal (*id.*), Mr. Galassi recognizes that his group was developing Swales' RTO responses; moreover, because he left the company in October 2005, Mr. Galassi has no basis to dispute Mr. Kraus' testimony (*i.e.*, his April 20 declaration) that the story-boards and other materials on which Mr. Galassi worked as part of a collaborative team were the bases for the RTOs that were ultimately submitted as parts of Swales' final proposal. Swales Apr. 24, 2007 Memorandum In Support of Injunctive Relief ("Swales Memo"), Ex. 2 ¶¶ 4-8. There is similarly no serious dispute that after he began assisting SGT's MSES II/A proposal team, Mr. Galassi provided many hours of assistance during the Red Team review of that offeror's proposal. Complaint, Ex. 5 at 5. Red Team is a critical, final review stage at which proposals are sharpened to improve competitive positioning.

From those undisputed facts alone, NASA was presented with a situation in which it was highly likely that one competitor had tainted the procurement process by obtaining an unfair advantage as a result of its effort to benefit from knowledge held by another competitor's key employee. But instead of conducting an investigation into the real-world effects of employing someone with Mr. Galassi's knowledge of Swales' proposal, NASA conducted an inappropriate, mechanistic analysis of whether specific items were copied by SGT, thus completely missing the mark. That SGT sought out and entered into a teaming arrangement with a key former Swales employee to assist with its competitive proposal placed Mr. Galassi in a situation that any reasonable evaluator should have recognized would result in the transfer of Swales' proprietary information to SGT. Instead of analyzing the logical ramifications arising from the SGT/Aerostress teaming arrangement (and the dubious use of Mr. Galassi's knowledge), NASA performed an inadequate, mechanistic analysis of the wrong question. The Agency's failure to locate evidence of copying thus fails to answer the relevant question, *i.e.*, whether SGT received an unfair competitive advantage by seeking out a teaming arrangement with Aerostress and Mr. Galassi.

As Swales explained in its initial memorandum in support of the requested injunctive relief (at 23-25), NASA's analysis was unreasonable, in large part, because the Agency demanded direct proof of copying from Swales' proposal before a problem with the integrity of the procurement would be recognized. The Government begins its opposition brief not by disputing that the relevant

procurement officials required very specific types of evidence that, functionally, must be understood as imposing a copying requirement, but by finding it "remarkab[le]" that Swales did not dispute the specific determinations that Mr. Galassi's assistance had not left traceable evidence of, among other things, proprietary cost or pricing information and other proprietary information in SGT's proposal. *See* Gov't Opp. at 17.

Without having seen SGT's proposal (and thus without waiving any such argument when we do obtain the Administrative Record), no reasonable procurement integrity evaluator would find anything remarkable about the lack of direct evidence that SGT copied or directly transfused from Swales' proposal. Mr. Galassi presumably would not have been foolish (or crude) enough to leave evidence of his assistance to SGT at the "scene of the crime." *See* Swales Memo at 14. An agency evaluation that requires direct evidence in this context is flawed because someone like Mr. Galassi, who possesses highly sensitive proposal information belonging to a competitor, can—and would be expected to—employ his knowledge in a manner that would improve the final product in ways that either benefit indirectly from proprietary knowledge of Swales, or provide discriminators favoring SGT's proposal in important ways.

Mr. Galassi even could have provided such assistance without consciously attempting to use Swales' proprietary information in a manner that was harmful to Swales. That is why Swales and most companies in this situation require Separation Agreements, like the one that Mr. Galassi agreed to but did not comply

with. That is also why NASA could not—and did not, contrary to the implication in the Government's opposition brief—plausibly rely on Mr. Galassi's affidavit asserting that did not disclose any "confidential information or trade secrets of Swales." Gov't Opp. at 17 (quoting Gov't Opp. Ex. 2 ¶ 7).

The potential benefit of having an engineer who could use knowledge of a competitor's proposal to provide improper steering or assistance during SGT's RTO revision process was an obvious reason for SGT to acquire the services of Aerostress and Mr. Galassi. SGT already had more than 21 engineers (and other reviewers) participating on the Red Team review, Gov't Opp. Ex. 8 at 8/10 to 8/11 (¶¶ 5, 8), but it specifically sought and acquired the services of an additional engineer—one with specialized knowledge of a competitor's proposal. By acquiring the services of someone with knowledge of Swales' proposal in this manner, SGT violated the Procurement Integrity Act's proscription on knowingly "obtain[ing] contractor bid or proposal information . . . before the award of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 423(b).

The Government erroneously characterizes Swales' position as simply asserting that the Court should infer a Procurement Integrity Act violation "because Mr. Galassi *participated* in some meetings with Swales personnel in which a draft of RTO No. 1 issued by [NASA] was discussed, and . . . later reviewed and commented on SGT's proposed solution to RTOs."[1] Gov't Opp. at 18 (emphasis

[1] The fact that the participants at the Swales' meetings at issue were discussing what was then a "draft" RTO is irrelevant, as neither the Government nor SGT disputes the fact that, as NASA indicated when it put the draft RFP "on

added). Swales does not contend that the same individual could never consult or assist different offerors in the same procurement. However, doing so would require specific procedures to be put in place in advance, to be certain that proprietary knowledge regarding one offeror's proposal was not used to the detriment of a competitor. More fundamentally, the consent of the affected parties would be required in this situation, and an agency could only reasonably determine that such actions did not violate the procurement integrity rules if formal agreement to the arrangement was clear. It is highly unlikely (if not inconceivable) that any party would agree to such a sharing arrangement in a competitive procurement for services such as the MSES II/A contract.[2] As we demonstrate in section __ below, no such consent was provided here.

### b. NASA Arbitrarily And Capriciously Decided Not To Disqualify SGT Because Of Its Procurement Integrity Violation

Even assuming that NASA's determination that there was no technical violation of section 423(b) of the Procurement Integrity Act was correct, the Agency acted in an arbitrary and capricious manner by failing to apply a reasonable rationale in deciding whether to disqualify SGT for violating fundamental procurement integrity requirements. This Court and the Federal Circuit have long

---

the street," the RTOs were not materially modified from the early draft form. *See* Complaint ¶ 34; Swales Memo at 9 n.1.

[2] Contrary to SGT's contention, Swales never argued that a black-letter prohibition applied to the common use of consultants. See SGT Opp. at 9. But unlike the facts presented in the *Kola Nut Travel, Inc. v. United States*, 68 Fed. Cl. 195, 198-99 (2005), case relied on by SGT and the Government, Swales did not consent (in writing or otherwise) to such an arrangement here.

held that contractors can (and, in some instances should) be disqualified for industrial-espionage type activities even when such actions do not technically violate any federal or state law or regulation. *Compliance Corp. v. United States*, 22 Cl. Ct. 193, 199 (1990); *see NKF Engineering, Inc. v. United States*, 805 F.2d 372, 377 (Fed. Cir. 1986). Although (as is found throughout this area of law) those precedents involve discretionary decisions of the agency, this Court acts as a check on the reasonableness of such decisions. And agency action cannot be reasonable when the decisionmakers fail to address numerous basic issues required by the obvious taint of the competitive process.

In this circumstance, the Agency knew that a former Swales' employee and current Swales contractor, who had worked on Swales' RTOs, had been enticed to provide assistance to SGT during the Red Team review of SGT's RTO responses. Although such assistance obviously involved potentially severe harm to Swales' interests, NASA completely failed to ask obvious questions necessary to determine whether SGT improperly acquired an unfair competitive advantage that required SGT's disqualification. Among many others, the Government failed to ask:

- Of all the engineers it could have worked with, how and why did SGT go about selecting Mr. Galassi?
- What ongoing obligations to maintain Swales' proprietary information did Mr. Galassi have when he was assisting SGT?
- Was Mr. Galassi acting in a manner that was consistent with his obligations under the Separation Agreement he had executed with Swales?
  - If Mr. Galassi was not complying with his obligation under the Separation Agreement to obtain a written consent of

Swales before engaging in work for a competitor—as he had not done—why not? And what does such non-compliance with his obligations to his former employer (and current prime-contractor) that say about the integrity of his (and SGT's) actions?

- Whether Mr. Galassi's participation in SGT's RTO Red Team meetings could have provided that offeror any competitively sensitive information by means other than direct transfusion (*i.e.*, copying) of parts of Swales' proposal?

- What types of beneficial suggestions could someone with Mr. Galassi's knowledge provide during SGT's RTO Red Team without directly revealing or handing over Swales' information (or otherwise leaving evidence of its direct transfusion)?

- Did SGT know (or have reason to know) that it was obtaining a competitor's sensitive information by putting a former Swales' employee (and current Swales' contractor) in a position in which sharing the benefit of his knowledge was a foregone conclusion?

- Is it fundamentally unfair competition for an offeror to acquire the services of a key member of a competitor's proposal team and use his suggestions to revise the final proposal (without discussing the matter with the potentially aggrieved party in advance)?

    - Why did Mr. Galassi not seek (and SGT not require) a written consent from Swales?

As this Court explained in *Compliance Corp.*, when analyzing whether a procurement integrity violation has occurred, an agency must analyze whether the offending party "attempt[ed] to obtain proprietary information to gain an unfair competitive advantage," and whether such actions "created an appearance of impropriety that would taint the integrity of the procurement process." 22 Cl. Ct. at 200. Without asking these basic questions regarding SGT's and Mr. Galassi's actions and making an appropriate inquiry into a substantial procurement integrity

problem, NASA's procurement decision lacked a rational and reasonable basis and, thus, injunctive relief is appropriate.[3]

### 2. The Government's Contention That Swales' Procurement Integrity Claim Is Barred By Laches Cannot Be Supported

The Government next argues that NASA's faulty analysis of SGT's procurement integrity violation should be ignored because Swales purportedly knew that Mr. Galassi was working with SGT and potentially disclosing Swales' proprietary information beginning in March or April of 2006, but did nothing about it at that time. Contrary to the Government's and SGT's conclusory assertions, no responsible official of Swales knew anything about Aerostress' and Mr. Galassi's involvement with the SGT team until early December 2006, as we asserted in Swales' Complaint. What is more, it cannot be disputed that Mr. Galassi ***never provided notice and obtained the written consent*** required under his Separation Agreement with Swales before initiating work with SGT. *See* Complaint, Ex. 4. The Government's reliance on Mr. Galassi's declaration for these contentions is misplaced because, as we demonstrate below, his assertions are either flatly not true or grossly misleading.

---

[3] The Government contends that injunctive relief cannot be appropriate absent a violation of a specific statute or regulation. Gov't Opp. at 19-20 (citing *Synetics, Inc. v. United States*, 45 Fed. Cl. 1, 18 (1999)). Not only is that requirement satisfied because the Competition in Contracting Act requires full and open competition, but *Synetics* also makes clear that equitable relief is also appropriate when the procurement decision lacked a rational or reasonable basis, and a decision with a fundamentally flawed procurement integrity investigation surely fits into that category.

**a.** In a declaration prepared for the Government's and SGT's opposition briefs, Mr. Galassi asserts that he "advised two members of Swales management (who supervised [him] on the work [he] performed while [he] was with Swales) that [he] was working for SGT on a portion of its proposal." Gov't Opp. Ex. 3 ¶ 5. He then identifies two Swales' employees, Messrs. Patrick Miller and Paul Connors, and states that he "wanted to ensure that they would not inadvertently disclose to [Mr. Galassi] any confidential and proprietary information regarding Swales' proposal for MSES-IIA." *Id.* Mr. Galassi's statement is riddled with falsehoods.

*First*, although Mr. Miller is a manager within the Swales system, neither he nor Mr. Connors (who is not a manager) ***ever*** supervised Mr. Galassi. Ex. 1 (Miller Decl. ¶ 1); Ex. 2 (Connors Decl. ¶ 1). Mr. Miller was a manager in another area of the MSES program; Mr. Connors was a subordinate of Mr. Galassi, when Mr. Galassi was employed by Swales, and Mr. Connors was a contact when Mr. Galassi was a contractor. These were simply not representatives of the Company to whom Mr. Galassi could have provided notice.

*Second*, Mr. Galassi never told Mr. Miller about his involvement with SGT on the MSES II/A proposal. Sometime in mid-2006, Mr. Galassi informed Mr. Miller that he had formed a teaming relationship that was bidding on an entirely different MSES contract, *i.e.*, the ***MSES IIB*** procurement, which is a small business set-aside for which Swales does not even qualify. Ex. 1 ¶ 3. The conversation in which Mr. Galassi informed Mr. Miller about Aerostress' MSES IIB teaming arrangement was very informal, and as the information did not affect Swales' interests, it went

no further. Mr. Miller did not know that Mr. Galassi or Aerostress had any relationship with the SGT's MSES II/A proposal team until after the initial award. However, if Mr. Galassi had informed Mr. Miller that Aerostress was working with SGT on the MSES II/A procurement, a Swales management official such as Mr. Miller would have known to raise this issue with top Swales officials. Ex. 1 ¶ 5.

*Third*, although as part of a happenstance conversation between two former colleagues sometime in the Spring of 2006, Mr. Galassi apparently did mention to Mr. Connors that Aerostress was planning to work with SGT on its MSES II/A proposal, several aspects of Mr. Galassi's statement are misleading. The context of the conversation in which Mr. Galassi made the SGT-related statement to Mr. Connors was two long-time friends and former co-workers bumping into each other at work. Mr. Galassi provided no information regarding the specific role he would have with respect to the SGT proposal. And contrary to his declaration given in this case, Mr. Galassi said nothing to Mr. Connors about providing notice to protect Swales' data.

Mr. Connors is a lead engineer on a specific project. He is not a management executive, and Mr. Galassi's brief discussion regarding his work on the SGT proposal cannot qualify as notice to Swales. Indeed, Swales has established procedures to guard against the disclosure of proprietary information that Mr. Galassi did not follow, and a brief chat with a low-level engineer who held no position of importance in the corporate hierarchy—and in fact did not supervise Mr. Galassi—clearly did not suffice. Under Maryland's law of agency, in these

circumstances, what Mr. Galassi told Mr. Connors constituted nothing more than an informal conversation between "personal friend[s]." Ex. 2 (Connors Decl. ¶ 3).

Maryland precedent imputes knowledge from an agent to a principal only when the agent has apparent or actual authority to receive the information on behalf of the principal. *See Mass Transit Admin. v. Granite Constr. Co.*, 471 A.2d 1121 (Md. Ct. Spec. App. 1984) ("It is a well-settled rule of agency law that notice to an agent, ***who has actual or apparent authority to receive it***, is binding on his principal") (*citing to Unsatisfied Claim & Judgment Fund Bd. v. Fortney*, 285 A.2d 641, 646 (Md. 1972) (emphasis added)); *see also Schriefer v. Stewart*, 1989 WL 156878, at *15 (4th Cir. Dec. 27, 1989) (unpublished opinion) (discussing Maryland law); *Restatement (Third) of Agency* § 5.02(1) (2006) ("A notification given to an agent is effective as notice to the principal ***if*** the agent has actual or apparent authority to receive the notification . . .." (emphasis added)).

Here, there can be no serious argument that Mr. Connors had actual authority to receive or transmit information regarding Mr. Galassi's actions. Mr. Connors did not work as a Swales corporate director or officer; Swales never assigned Mr. Connors a formal role under its written procedure for clearing potential conflicts; and Mr. Connors did not work as Mr. Galassi's supervisor. (Indeed, Mr. Galassi outranked Mr. Connors when they both worked at Swales. Ex. 2 (Connors Decl. ¶ 2).) As a result, Mr. Galassi's brief discussion with Mr. Connors matters only if Mr. Connors had apparent authority to receive the information on behalf of the company. Under Maryland law, he did not. *See Unsatisfied Claim*,

285 A.2d at 646 ("The principal is affected by the agent's knowledge, only if the agent in failing to impart the knowledge has failed to act properly within the scope of his authority."); *Schmidt v. Millhauser*, 130 A.2d 572, 577 (Md. 1957) (same); *Mercy Medical Center, Inc. v. United Healthcare of the Mid-Atlantic, Inc.*, 815 A.2d 886, 366 (Md. Ct. Spec. App. 2003) (stating "'notice to an officer or agent' of a corporation 'is notice to the corporation 'where the officer or agent in the line of his duty' ought, and could reasonably be expected, to act upon or communicate the knowledge to the corporation.'"); *see also Restatement (Third) of Agency* § 5.03 (2006) ("notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact *is material to the agent's duties to the principal* . . . .") (emphasis added).

Here, Mr. Connors served as the "project lead" for the Solar Dynamics Observatory ("SDO") program, and the scope of his employment was limited to "tracking of deliverables, budgeting and communicating scheduling priorities for a set of SDO tasks to support the launch schedule of the program." Ex. 2 ¶ 2. Mr. Connors did not have any duties related to Swales' determination of proprietary information, or conflicts relating to that information. Therefore, judging the importance or risk of such conflicts to the company was not "material" to the scope of his employment. Accordingly, Mr. Galassi never gave notice to Swales.[4]

---

[4] Neither the Government nor SGT can plausibly argue that knowledge obtained by Mr. Connors from Mr. Galassi is automatically imputed to Swales simply because Mr. Connors could be deemed Swales' principal for other purposes. As the *Restatement (Third) of Agency* § 5.03 (2006) explains, the earlier approach of courts and commentators that "an agent and a principal [were deemed] to share the

**b.** The Government's and SGT's arguments regarding the legal effect of Mr. Galassi's purported disclosure of his teaming relationship are even farther from the mark.

The Government contends that because Mr. Galassi purportedly informed two Swales employees of his activities, laches should bar this action. Laches is an equitable doctrine that, taking all the facts into consideration, only precludes a lawsuit when a party knowingly fails to exercise due diligence to protect its legal rights. *Denver & RGR. Co. v. Ariz. & C.R. Co. of N.M.*, 233 U.S. 601 (1914) (diligence defeats equitable defense of laches). But there can be no dispute that no responsible official with the party, Swales, knew about the fact that Aerostress and Mr. Galassi were working with SGT until early December 2006. At that time, the Company promptly raised the procurement integrity violation with NASA. Simply put, Mr. Galassi's casual conversation with a low-level Swales' employee cannot possibly trigger equitable preclusion under the laches doctrine. This is particularly true because Mr. Galassi clearly did not comply with his notification obligations under the Separation Agreement.

SGT asserts that Swales' purported failure to raise the procurement integrity violation within 14 days of its occurrence precludes jurisdiction in this Court to entertain Swales' procurement integrity claims. SGT Opp. at 4-6. Putting aside the fact that Swales did not have notice (as discussed above), and putting aside the fact that the Government does not agree with SGT's legal analysis (Gov't Opp. at 19),

---

same legal identity," has been abandoned as inconsistent with "the fact that principal and agent retain separate legal personalities."

SGT is mistaken. The applicable statutory "limitation on protests" specifies only the Government Accountability Office as being affected by the restriction. As in many areas, this Court's jurisdiction to entertain protests is broader than GAO's strict limitations. Accordingly, SGT's argument should be rejected.

### 3. Swales Was Substantially Prejudiced By NASA's Erroneous Evaluation Of The Procurement Integrity Issue

Contrary to the Government's arguments, NASA's failure to effect the appropriate remedy applicable to an offeror that violates procurement integrity rules clearly prejudiced Swales, which would be the prevailing offeror but-for the procurement integrity violation. *See* Gov't Opp. at 20-21. As *Compliance Corp.* and many similar decisions make clear, when an offeror violates procurement integrity requirements, the appropriate agency response is disqualification from the competition. Had NASA properly evaluated SGT's failure to comply with procurement integrity requirements, it reasonably would have concluded that the taint associated with SGT's offer precluded an award to SGT. Swales, as the only remaining offeror, would then prevail. And, even if the procurement were cancelled, Swales, as the incumbent would continue to perform under NASA's extensions of the MSES contract, as explained below and would prevail in any new competition. In light of the appropriate remedy for procurement integrity violations, the fact that NASA's flawed cost evaluation resulted in the Agency's determination that the "significantly lower probable cost offered by SGT far outweighs the slight Mission Suitability advantage proposed by Swales" is irrelevant.

The Government also responds to Swales' demonstration of prejudice by trotting out NASA's flawed assertion that the procurement decision was not affected because SGT's ratings on the RTOs on which Mr. Galassi would have worked were poor. Gov't Opp. at 21. The Government contends that absent Mr. Galassi's assistance, there is no way to know whether "SGT *would* have received more weaknesses (or any significant weaknesses)." This argument is flawed for at least two reasons. First, it is an improper bootstrap argument, as there is no way to know the precise effect of SGT's procurement integrity violation *because* NASA failed to properly evaluate the violation, or ask any of the questions set forth above. Second, the argument, like NASA's analysis, ignores the fundamental realities of the situation. A highly-trained person with knowledge of the details of the only competing proposal was providing helpful edits to SGT's offer during the critical Red Team review. Based on that situation alone, one would most logically conclude that absent Mr. Galassi's improper assistance, SGT's proposal would have received substantially lower ratings. As a protester without the record, Swales cannot prove this to an absolute certainty. But the Government's suggestion that the Court ignore obvious commercial reality should not be followed.

### B. Swales Has Shown A Likelihood Of Prevailing With Regard To The Subcontracting Limitation

NASA's position that SGT will comply with the Limitations on Subcontracting clause in the RFP is predicated on two points: (i) SGT claimed in its proposal that it would perform [redacted] of the effort and (ii) the manufacturing effort will be limited to [redacted] of the contract cost. *See* Gov't Opp. at 22-23.

In regard to the former, it is not surprising that SGT's proposal does not take express exception to the requirement in the Limitations on Subcontracting clause that the prime contractor perform more than 50% of the work. The question is whether NASA reasonably evaluated and accepted that claim in light of the MSES experience, particularly because SGT (i) lacks the requisite manufacturing capability to perform the MSES II/A contract and (ii) lacks the personnel to perform the [redacted] f the effort it claims it will perform (as shown by its plan to rely on hiring incumbent personnel).

Based on its opposition brief, NASA believed that the required manufacturing activities could be segregated into discrete, "pay by the drink" production efforts by SGT subcontractors. *See, e.g.*, Gov't Opp. at 23; Endal Declaration (SGT Opp. Ex. 8 ¶ 5). Both NASA and SGT evidently assumed that such activities would comprise only [redacted] of the labor costs. *See* Gov't Opp. at 23; SGT Opp. at 16. If that assumption is wrong, therefore, NASA's analysis—and SGT's claimed workshare—will collapse like a house of cards. *See, e.g.*, Pierson Declaration (Gov't Opp. Ex. 13 ¶ 9) (reflecting that NASA's analysis regarding SGT's ability to meet the 50% test was based on the assumption that "manufacturing was a small percentage of the MSES II/A requirement").

NASA's assumption is materially wrong. As discussed in the McQuaid Declaration (Swales Memo, Ex. 7 ¶ 9), the experience on the very similar and closely related MSES contract shows that well over 50% of the labor effort involves

production activities. Swales, which performed the work and expended the cost, is uniquely positioned to understand the tasks on which it expended funds.

Furthermore, the SGT subcontractor workshares relied on by NASA are undermined by the press releases issued by SGT's primary subcontractors (Ball and Northrop Grumman) in December 2006, prior to the second award decision. In those statements, Ball claimed that it would have 65 personnel working on its subcontract whereas Northrop Grumman claimed its share of the work would be between 10 to 20% of the total dollar value of the contract. *See* Exs. 3, 4. Those workshares do not correspond to the limited role that NASA believes each subcontractor will perform.

## II. THE BALANCE OF HARMS FAVORS GRANTING THE REQUESTED TRO

NASA alludes to potential harms that it claims would result from not beginning or completing the tasks it wants to assign to the MSES II/A contract. *See, e.g.*, Gov't Opp. at 26. That is a red herring. Even if temporary or preliminary relief is granted, the work at issue can be performed by the same people under a valid contract. The only issue is whether it is the MSES contract or the MSES II/A contract.

By NASA's account, therefore, the "harm" that it will suffer from a TRO is that it will be unable to obtain the MSES services from SGT by May 14, 2007. *See* Gov't Opp. at 25-26. NASA has not shown that it will be unable either to obtain the relevant kinds of services (*i.e.*, MSES services) under an existing, valid contract or that it will be unable to obtain the services from SGT when this protest is resolved.

In regard to the former, Swales could do the work under a current contract with the same employees that SGT wants to hire. In regard to the latter, NASA claims that 85% of incumbent employees are captured by a successor contractor. *See* Figueroa Declaration (Gov't Opp. Ex. 14 ¶ 6). NASA, unlike Swales, thus will not be harmed by any temporary stay in SGT's transition.

### A. There Are Three Possible Courses Of Action For Incumbent Employees If The SGT Transition is Temporarily Stopped And None Of These Will Result In Cognizable Harm To NASA

There are at least three possibilities with regard to the incumbent employees. First, it is possible that the relevant staff will transition to SGT if it ultimately prevails in this protest. NASA claims that 85% of incumbent contractor employees ultimately take jobs with the new contractor. *See* Gov't Opp. at 25. According to SGT, most Swales employees to whom SGT has spoken "want to wait for the protest case to be settled prior to making a decision to work for SGT." Johnson Declaration (SGT Opp. Ex. 10) at ¶ 7. SGT's assertion suggests that notwithstanding NASA and SGT's hysterical claims to the contrary, the staff likely will move to SGT if and when the protest is resolved and Swales no longer has a chance to win the work. In other words, and just as NASA claims that experience shows, most of the incumbent employees ultimately will work for whichever contractor ends up with the contract.

But NASA tries to have it both ways. While complaining about an alleged harm to SGT in the transition effort (*see* Gov't Opp. at 27-28), NASA claims that Swales easily will be able to recruit back its own employees should it lose them now to SGT but win the contract after this protest. *See* Gov't Opp. at 25. If NASA's

claims regarding "incumbent capture" are true, SGT should not have any trouble if it begins the transition effort after this protest is resolved. Based on NASA's claims about "incumbent capture," therefore, NASA (and SGT) would not be harmed by temporary injunctive relief.

Second, it is possible that the staff will not transition to SGT for their own reasons, such as the fact that they want to stay with Swales to work on other projects or on commercial work. That is a choice that every employee is free to make, as NASA must concede. *See* Hinkle Declaration (Gov't Opp. Ex. 15) at 3. Neither NASA nor SGT is entitled to the services of any particular employee. The failure to obtain the services of particular employees thus is not a valid harm. That is true even though NASA has sought to recruit particular employees on SGT's behalf. *See* Swales Memo, Ex. 6.

The targeted recruiting activity by NASA that is reflected in Exhibit 6 to the Swales Memorandum runs afoul of the prohibition in the FAR on personal services contracts. *See* FAR 37.104. A personal services contract is any contract that "by its express terms or as administered, makes the contractor personnel appear to be, in effect, Government employees." FAR 2.101. The MSES II/A RFP prohibits NASA from treating the contract as a personal services contract. *See* Exhibit 6. Yet, NASA's efforts to obtain the services of designated Swales employees would result in a personal services contract. The inability of SGT and NASA to implement an unlawful personal services contract is not a cognizable harm.

Finally, NASA speculates that Swales' personnel working on the MSES contract will leave the NASA support workforce altogether, rather than work for SGT or stay with Swales. *See e.g.*, Hinkle Declaration (Gov't Opp. Ex. 15) at 3. That is the "brain drain" specter that NASA and SGT invoked during the Court's initial status conference in this matter. The specter has not materialized. Neither NASA nor SGT have substantiated any claims of any ongoing "brain drain." To the contrary, as the May 2, 2007 Declaration of Mark McQuaid shows, Swales' MSES staffing has not been decreasing and, thus, no such "brain drain" has occurred. *See* Exhibit 5.

### B. Swales Will Suffer Irreparable Harm If Injunctive Relief Is Not Granted

NASA asserts that "the performance of the disputed contract is still in the earliest of phases, demonstrating that any harm to Swales would not be irreparable." Gov't Opp. at 24. That is wrong. Each day that the SGT transition proceeds, Swales will suffer immediate, palpable harm.

Swales is the incumbent. It is performing the MSES tasks with its own people. Swales obviously based its MSES II/A proposal on the assumption that it would have such staff, and would not need to hire new staff. Accordingly, Swales did not need to rely on a transition plan for MSES II/A, such as the type with which SGT now is struggling. If SGT is allowed to transition into Swales' role, it steadily will displace Swales as the incumbent. Each day, Swales will lose more of its incumbent status as the tasks – and the key staff – transition to SGT.

In any recompetition that follows from this protest, therefore, SGT rather than Swales will be the incumbent. The parties will trade positions relative to where they were during the competition. As a result, Swales will lack the status of an incumbent in any recompetition. That loss will be irreparable. *See University Research Co., LLC v. United States*, 65 Fed. Cl. 500 (2005). In *University Research*, the Court recognized the irreparable harm from the loss incumbency, and rejected the types of claims now made by NASA and SGT. *See* 65 Fed. Cl. at 513-14.

### C. While NASA Claims That A Transition Is Difficult And The SGT Transition Thus Must Proceed Immediately, NASA Simultaneously Claims That Two Transitions Are Less Disruptive Than One

NASA posits that it somehow would be less disruptive for the agency and the employees at issue to transition as many as two times rather than as little as once (or not at all). *See* Gov't Opp. at 25. Swales is performing MSES tasks today with its own staff. Aided by NASA, SGT is trying to hire away the Swales staff. *See supra*. If the transition proceeds and SGT is successful in its efforts to hire the Swales staff, SGT will begin to perform tasks transitioned from Swales to SGT.

If this protest is successful, however, the SGT contract may be rendered invalid and the tasks may have to be transitioned back to Swales. That makes two transitions. To the extent that transitions and uncertainty pose a risk of disrupting NASA operations as Mr. Hinkle claims (*see* Gov't Opp. Ex. 15), two transitions should pose twice as much risk as one.

Swales respectfully submits that the status quo should be preserved for the brief period it will take this Court to decide the case, such that the tasks (and the

relevant staff) can be transitioned once, at most (*i.e.*, from Swales to SGT once this protest has been resolved and the award is final). In that event, if Swales were to win the contract following a successful protest, there would not be any need for a transition at all and NASA could avoid the disruption entirely. The approach of preserving the status quo by stopping the SGT transition thus would result in the least amount of disruption, confusion, and cost for all parties.

### D. NASA's Actions In Extending The Swales Contract Through 2008 Prior To This Protest Undermine Its Claim That SGT Is Needed To Perform The Services

NASA asserts that Swales will perform "until May 14, 2007 when most of its work is scheduled to be turned over to SGT." Gov't Opp. at 24. NASA's reference to "most" of the services raises the obvious question: what about the rest of the services? The answer is simple: Swales will perform them. NASA amended Swales' contract prior to this litigation to require it to accept orders through June 30, 2007 and to perform those orders through June 30, 2008. *See* Exhibit 7. On April 10, 2007, NASA issued Amendment No. 96 to Swales' contract, which extended the ordering period for task orders through June 30, 2007 and gave NASA the further right to extend performance under existing task orders for twelve months past the effective date, *i.e.*, through June 30, 2008. *See id.* at 2.

Through Amendment No. 96, NASA thus is *requiring* Swales to continue to perform at the same time that it now claims in this litigation that it "needs" the SGT contract and cannot rely on Swales to perform critical tasks. And NASA did not extend the Swales' contract merely to permit completion of existing orders.

Rather, NASA reserved the right to issue new orders through June 30, 2007 for which performance could extend through June 30, 2008.

If NASA truly required the SGT contract to be its means to acquire the MSES services, there would not have been any need to extend the Swales contract. NASA's litigation claim about the purported need for SGT to perform now thus is belied by the agency's prelitigation conduct in extending the Swales' contract.

Amendment No. 96 to the Swales contract establishes another point. Swales needs personnel to perform the tasks that NASA may require through June 30, 2008. Although NASA claims that it needs the SGT contract to continue so that SGT can obtain the personnel it lacks, Swales needs those people too because it has to be ready to perform any issued tasks through June 30, 2008, well after this protest will be decided.

### E. The Transition To SGT May Proceed, If Necessary, If And When This Protest Is Resolved

The fact that NASA is transitioning tasks from the Swales' contract to the SGT contract proves another point: regardless of which offeror ultimately prevails, the tasks can be transitioned. If the TRO or other temporary injunctive relief is put into effect, and the protest is resolved in SGT's favor, therefore, the work can be transitioned to SGT at any time even if the tasks were started by Swales.

So, why transition now? NASA fails to mention in its Opposition that the May 14 date is arbitrary. That date is not set by the RFP or driven by the tasks at issue (*i.e.*, NASA has and will issue various tasks before and after that date). Rather, NASA just picked May 14 as the magic date. It could just as well select

June 14 or some later date. The timing constraint invoked by NASA, therefore, is elective and self-imposed.

## CONCLUSION

For the reasons set forth above and in plaintiff's April 24 motion for injunctive relief, Swales' motion for a preliminary injunction and request for a temporary restraining order should be granted.

Respectfully submitted,

s/ Marcia G. Madsen

MARCIA G. MADSEN
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006
(202) 263-3000
(202) 263-3300 Facsimile

Of Counsel:
DAVID F. DOWD
LUKE LEVASSEUR
MAYER, BROWN, ROWE & MAW LLP
*Counsel for Plaintiff, Swales & Associates, Inc.*
May 2, 2007

# INDEX TO THE APPENDIX

## Index of Exhibits

| Exhibit | Description |
|---|---|
| 1 | Declaration of Patrick Miller, dated 2 May 2007 |
| 2 | Declaration of Paul Connors, dated 2 May 2007 |
| 3 | Ball Aerospace Press Release, dated 12 December 2006 |
| 4 | Northrop Grumman Press Release, dated 12 December 2006 |
| 5 | Declaration of Mark McQuaid, dated 2 May 2007 |
| 6 | Excerpt from RFP NNG05096383R |
| 7 | Amendment 96 to Contract No. NAS5-01090, dated 10 April 2007 |

# EXHIBIT 1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| SWALES & ASSOCIATES, INC., Plaintiff, | ) | |
| v. | ) | No. 07-253 (Senior Judge Smith) |
| UNITED STATES, Defendant. | ) | |
| and | ) | |
| SGT, Inc. Intervenor. | ) | |

**DECLARATION OF PATRICK MILLER**

1. My name is Patrick Miller. I have been employed by Swales & Associates, Inc. (Swales) for approximately 18 years. I am currently the MSES Director of Operations. In April 2006 my position was MSES Program Manager. My duties involved the tracking of deliverables, budgeting and reporting on the MSES contract tasks. I was not a supervisor of Nicolas Galassi at any time.

2. I have known Nick Galassi as a fellow employee for `13 years and have been with him at social events. I have read his affidavit, particularly paragraph no. 5, which refers to a conversation he asserts occurred with me. The events recounted in that paragraph are incorrect.

3. Sometime during mid-2006, Nick Galassi informed me that he formed a relationship with a team that was bidding the *MSES IIB* contract. The MSES IIB

contract is a different procurement from MSES IIA. Although MSES IIB involves mechanical engineering for NASA, in contrast to MSES IIA, it is based on a different solicitation with different Representative Task Orders. In addition, the MSES IIB contract is set aside for small business in a different NAICS/SIC code than Swales's code, and it does not rely on or require facilities for hardware development and space simulations as MSES IIA does. Swales did not bid and was not eligible to bid on MSES IIB.

4. On the occasion of the conversation in which Nick Galassi discussed MSES IIB, Nick Galassi talked about how Sigma was bidding as a prime contractor for ***MSES IIB*** and that Sigma was trying to get more of his time to write its proposals. He said that he could not give them the time requested. He informed me that Edge Space and his company, Aerostress, would be part of the IIB team of Sigma. SGT and MSES IIA were not discussed, even though Nick Galassi's affidavit says that in this time frame he was actually engaged to work for SGT. The conversation in which he revealed this information to me was very informal, and he told me he had more work than he could handle.

5. If Nick Galassi had disclosed that he was working on the SGT team proposal for MSES IIA, instead on the other contract for which Swales was not eligible, I would have raised this issue with Swales management.

6. I did not know that Nick Galassi or his company, Aerostress, had ***any*** relationship to MSES IIA or the MSES IIA team until after the initial award to SGT.

7. On December 2, 2006 Nick Galassi was at my house with other friends and acquaintances and told me for the first time that he had a relationship to MSES IIA and the SGT, Inc. team.

8. On that occasion, Nick Galassi told me only that SGT was going to give his new company a place on its team as a small business affiliate in some form. He told me that he had seen the SGT proposal, but even at that time, Nick Galassi *did not say* that he had worked on it or supported it. During the conversation it became clear that he wanted me to know the recruitment of Swales engineers would be his primary target.

9. Later, I was *informed by other coworkers at Swales* that on December 8, and December 11, 2006, at SGT recruitment open houses, Nick Galassi was introduced as part of the SGT team and had told others at those events that he had supported SGT at competitive discussions or orals at NASA Goddard. Later still, as a result of the legal activity, I am now aware that his support was not only at oral discussions, but on the proposal preparation of SGT before submittal to the Government.

I declare under penalty of perjury that the foregoing is true and correct.

Pat Miller

May 2, 2007 Patrick Miller

# EXHIBIT 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | |
|---|---|
| SWALES & ASSOCIATES, INC., Plaintiff, v. UNITED STATES, Defendant. and SGT, Inc. Intervenor. | No. 07-253 (Senior Judge Smith) |

## DECLARATION OF PAUL CONNORS

1. My name is Paul Connors. I have been employed by Swales & Associates, Inc. (Swales) for approximately 12 years. I am currently TacSat 3 program manager. In April 2006 my position was project lead on the Solar Dynamics Observatory tasks that were performed by Swales under the current Swales MSES contract.

2. As a project lead my duties involved the tracking of deliverables, budgeting and communicating scheduling priorities for a set of SDO tasks to support the launch schedule of the program. At Swales a project lead is a designee from a group of task managers who coordinates estimating, tracking, and reporting of task activity to the customer's project for his or her own tasks and also the other tasks for that project. I do not

supervise personnel. I was not a supervisor of Nicolas Galassi at any time. While he was at Swales Nick Galassi held a job senior to mine in rank and pay. Nick Galassi worked on certain SDO tasks supervising two to three other engineers and was also Swales' Group Manager of Swales' Mechanical Analysis Group, where he had supervision over 25 Swales employees on various programs. His supervisor was the company's V.P. for Engineering.

3. I have known Nick Galassi as a fellow employee for 11 years and have known him as a personal friend with whom I have motorcycled, flown and shared after-work drinks over those years. I have read his affidavit, particularly paragraph no. 5, which refers to a conversation he asserts occurred with me. The events recounted in that paragraph are not accurate.

4. Nick Galassi told me about his plan to be working with SGT's MSES IIA proposal in happenstance discussion occurring as we were doing the SDO task work at the NASA Goddard facility sometime in the spring of 2006, but that there was not a formal discussion. Nor did Nick Galassi give me any notice or have any discussion about protecting Swales data. Nor did he say anything to indicate that by talking to me he thought he was getting clearance for working on the SGT proposal.

5. Nick Galassi told me that SGT had approached him soon after he left Swales to work on writing their proposal. He said he had declined to commit to write the proposal. He then said something about taking a role in "reviewing" it. He did

not tell me about his specific role, what he planned to do or what he had already done. I expressed a concern to him that it would seem improper to take on a role with SGT. I did not convey this matter to Swales' management. At the time I did not think I could state a specific factual accusation about the things that he had done or not done.

I declare under penalty of perjury that the foregoing is true and correct.

May 2, 2007

Paul Connors

# EXHIBIT 3

# News Release

home | programs | products | profile | careers | news | contact us

Contact:
(303) 533-6059
media@ball.com

2006
News Releases

**Ball Aerospace Selected for NASA's MSES II/A Team**

Boulder, Colo., Dec. 12, 2006 – Ball Aerospace & Technologies Corp. has been selected as part of a multi-contractor team for a five-year contract to provide engineering services to NASA's Goddard Space Flight Center.

The Mechanical Systems Engineering Services II/A (MSES II/A) contract was awarded to the Stinger Ghaffarian Technologies (SGT) Inc. team, of which Ball Aerospace is a member.

The MSES II/A task order contract provides engineering services and related services to the Mechanical Systems Division and related organizations throughout NASA/GSFC, as required, for the formulation, design, development, fabrication, integration, testing, verification, and operations of space flight and ground system hardware and software. The team will also develop and validate new technologies to enable future space and science missions.

"MSES II/A is a strategic win for Ball Aerospace," said David L. Taylor, the company's president and chief executive officer. "It expands our already strong position as a provider of engineering and support services to the civil space market and affords us the opportunity to be an even larger contributor to Goddard Space Flight Center, a customer we've served for more than 40 years."

The Ball Aerospace portion of the MSES II/A contract will require staffing of approximately 65 personnel.

Ball Aerospace is celebrating its 50th year in business in 2006. The company began building pointing controls for military rockets in 1956, and later won a contract to build one of NASA's first spacecraft, the Orbiting Solar Observatory. Over the years, Ball Aerospace has been responsible for numerous technological and scientific 'firsts' and now acts as a technology innovator for important national missions.

Ball Corporation is a supplier of high-quality metal and plastic packaging products and owns Ball Aerospace & Technologies Corp. Ball reported 2005 sales of $5.8 billion and employs 15,600 people.

**Forward-Looking Statements**
This release contains "forward-looking" statements concerning future events and financial performance. Words such as "expects," "anticipates," "estimates" and similar expressions are intended to identify forward-looking statements. Such statements are subject to risks and uncertainties which could cause actual results to differ materially from those expressed or implied. The company undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. Key risks and uncertainties are summarized in filings with the Securities and Exchange Commission, including Exhibit 99.2 in our Form 10-K, which are available at our Web site and at www.sec.gov. Factors that might affect our packaging segments include fluctuation in consumer and customer demand and preferences; availability and cost of raw materials, including recent significant increases in resin, steel, aluminum and energy costs, and the ability to pass such increases on to customers; competitive packaging availability, pricing and substitution; changes in climate and weather; fruit, vegetable and fishing yields; industry productive capacity and competitive activity; failure to achieve anticipated productivity improvements or production cost reductions, including those associated with our beverage can end project; the German mandatory deposit or other restrictive packaging laws; changes in major customer or supplier contracts or loss of a major customer or supplier; changes in foreign exchange rates, tax rates and activities of foreign subsidiaries; the effect of LIFO accounting; and any changes to such accounting. Factors that might affect our

aerospace segment include: funding, authorization, availability and returns of government and commercial contracts; and delays, extensions and technical uncertainties affecting segment contracts. Factors that might affect the company as a whole include those listed plus: accounting changes; acquisitions, joint ventures or divestitures; integration of recently acquired businesses; regulatory action or laws including tax, environmental and workplace safety; governmental investigations; technological developments and innovations; goodwill impairment; antitrust, patent and other litigation; strikes; labor cost changes; rates of return projected and earned on assets of the company's defined benefit retirement plans; pension changes; reduced cash flow; interest rates affecting our debt; and changes to unaudited results due to statutory audits or other effects.

*Copyright © 2005 by Ball Aerospace & Technologies Corp.*

# EXHIBIT 4

NORTHROP GRUMMAN
DEFINING THE FUTURE

[Search]

Home About Us Capabilities Careers Media / Communications Investor Relations Diversity Contact Us

# News Releases



Northrop Grumman > News Releases

## News Releases

Printer friendly format

### Northrop Grumman Among Companies Awarded NASA Engineering Services Contract

HERNDON, Va., Dec. 12, 2006 (PRIME NEWSWIRE) -- NASA's Goddard Space Flight Center has selected a team of companies, including Northrop Grumman Corporation (NYSE:NOC), to provide engineering-related services for the Mechanical Systems Engineering Services (MSES) II/A contract.

Northrop Grumman is a subcontractor to Stinger Ghaffarian Technologies on the indefinite delivery, indefinite quantity task-order contract, which is potentially valued at $400 million over five years. Northrop Grumman's contract is potentially valued at $40-$80 million, depending on the task orders received.

Northrop Grumman will provide mechanical engineering-related services to Goddard's Mechanical Systems Division and other NASA organizations in the areas of materials, structural analysis and loads, design, thermal, contamination and coatings, and integration and test. Contract work is scheduled to begin Feb. 1, 2007.

MSES II/A is a comprehensive contract that provides for the evaluation of the mechanical engineering operations of space flight and ground system hardware and software, including development and validation of new technologies to enable future space and science missions. MSES II/A provides support to NASA programs such as Lunar Reconnaissance Orbiter, James Webb Space Telescope, and Solar Dynamics Observatory, among several others.

"Being selected for this contract speaks a lot about the skills of our team and the solutions we offered to the customer," said Dave Werkheiser, vice president of Life Cycle Optimization and Engineering for Northrop Grumman's Technical Services sector. "We look forward to continuing to build on our strong reputation with Goddard and the NASA community through our performance on this visionary work."

Northrop Grumman Corporation is a $30 billion global defense and technology company whose 120,000 employees provide innovative systems, products, and solutions in information and services, electronics, aerospace and shipbuilding to government and commercial customers worldwide.

CONTACT: Bryan Culbert
Northrop Grumman Technical Services
(703) 713-4488
bryan.culbert@ngc.com

BACK TO TOP

Copyright © 2007 Northrop Grumman Corporation. All Rights Reserved
Home | EU Policy | Contact Us | Site Map

# EXHIBIT 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| SWALES & ASSOCIATES, INC., Plaintiff, v. UNITED STATES, Defendant. and SGT, Inc. Intervenor. | ) | No. 07-253 (Senior Judge Smith) |

## DECLARATION OF MARK MCQUAID

1. My name is Mark McQuaid. I have been employed by Swales & Associates, Inc. ("Swales") for approximately 15 years. I am the Vice President of NASA Goddard Services Programs. In that capacity, my responsibilities include Management of the Mechanical Systems and Engineering Services Contract ("MSES") with NASA Goddard Space Flight Center ("GSFC").

[redacted]

[redacted]

I declare under penalty of perjury that the foregoing is true and correct.

May 2, 2007

Mark McQuaid

# EXHIBIT 6

(End of clause)

**H. 11 NON-PERSONAL SERVICES**

(a) No personal services shall be performed under this contract. No Contractor employee will be directly supervised by the Government. All individual employee assignments, and daily work direction, shall be given by the applicable employee supervisor If the Contractor believes any Government action or communication has been given that would create a personal services relationship between the Government and any Contractor employee, the Contractor shall promptly notify the Contracting Officer of this communication or action.

(b) The Contractor shall not perform any inherently governmental actions under this contract. No contractor employees shall hold him or herself out to be a Government employee, agent, or representative. No contractor employee shall state orally, or in writing at any time that he or she is acting on behalf of the government. In all communications with third parties in connection with this contract, contractor employees shall identify themselves as Contractor employees and specify the name of the company for which they work. In all communications with other government contractors in connection with this contract, the Contractor employee shall state that they have no authority to in any way change the contract.

(c) The Contractor shall insure that all of its employees working on this contract are informed of the substance of this clause. Nothing in this clause shall limit the Government's rights in any way under other provisions of the contract, including those related to the Government's right to inspect and accept services to be performed under this contract. The substance of this text shall be included in all subcontracts at any tier.

(End of text)

# EXHIBIT 7

04/10/2007 10:46 3012861720 PROC 210M3 PAGE 02/02

04/09/2007 15:27 3012861720 PROC 210M3 PAGE 02/03

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

1. CONTRACT ID CODE | PAGE 1 OF PAGES 2

2. AMENDMENT/MODIFICATION NO.: Ninety Six (96)

3. EFFECTIVE DATE: See Block 16C

4. REQUISITION/PURCHASE REQ. NO.: 4200184328

5. PROJECT NO. (If applicable)

6. ISSUED BY: CODE 210.8

NASA Goddard Space Flight Center
Mission Enabling Procurement
Bldg 11, Rm S215A, Code 210.8
Greenbelt, MD 20771

7. ADMINISTERED BY (If other than Item 6): CODE

DCMA Maryland
217 East Redwood Street
Suite 100
Baltimore, MD 21202-5299

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

Swales and Associates, Inc
5050 Powder Mill Road
Beltsville, MD 20705

9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (SEE ITEM 11)

X 10A. MODIFICATION OF CONTRACT/ORDER NO.: NAS5-01090

10B. DATED (SEE ITEM 13): January 16, 2001

CODE | FACILITY CODE

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning one (1) copy of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA: N/A

BNC: G88 PPC: KL

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (✓) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: 10 U.S.C. 2304(c)(1) |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 2 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

The purpose of this modification is to: 1) Revise Clause B.5 - Increase the maximum ordering value; 2) Revise Clause F.2 - Extend the effective ordering period, and; 3) Extend Attachment G – CY8.

Accordingly,

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)
Mark McQuaid
V.P. NASA/GSFC SERVICES

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
Kathleen M. Pierson
Contracting Officer

15B. CONTRACTOR/OFFEROR: [signature] (Signature of person authorized to sign)

15C. DATE SIGNED: 04/09/07

16B. UNITED STATES OF AMERICA: [signature] (Signature of Contracting Officer)

16C. DATE SIGNED: 4/10/07

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

30-105
Computer Generated

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

NAS5-01090
Modification No. 96
Page 2 of 2

1. **Revise B.5 - MINIMUM/MAXIMUM AMOUNT OF SUPPLIES OR SERVICES (GSFC 52.216-90) (DEC 2000).** The maximum ordering value identified under B.5 (a) is hereby increased from $600,500,000 by **$45,000,000** to $645,500,000, as follows:

(a) The minimum amount of supplies or services that shall be ordered during the effective period of this contract is **$100,000**. The maximum amount of supplies or services that may be ordered during the effective period of this contract is **$645,500,000**.

(b) The minimum amount is reached when the sum of the dollar amounts of all ordered supplies or services, except for any adjustments made pursuant to the Limitation of Cost or Limitation of Funds clause, equals or exceeds the minimum amount stated in paragraph (a).

(c) The maximum amount is reached when the sum of the dollar amounts of all ordered supplies or services, except for any adjustments made pursuant to the Limitation of Cost or Limitation of Funds clause, equals the maximum amount stated in paragraph (a).

(d) The maximum amount, if reached, precludes the issuance of further orders for supplies or services under this contract. However, reaching the maximum amount does not preclude adjustments to the dollar amounts of existing placed orders, for actions that are within the scope of the placed orders, and which are made pursuant to existing contract authority, such as the Changes clause.

(End of Clause)

2. **Revise F.2 – EFFECTIVE ORDERING PERIOD - TASK ORDERS.** The effective ordering period is hereby extended as follows:

The effective ordering period for all Task Orders issued is through **June 30, 2007.** New Task Orders shall not be issued after the expiration of this effective ordering period, however, the Contracting Officer may extend existing Task Orders up to twelve (12) months past the effective ordering period.

(End of Text)

3. Attachment G – *Direct Labor Rate Matrix and Indirect Cost Matrix* for contract year (CY) 6 shall remain effective for pricing all task orders contemplated or issued during this extended effective ordering period.

4. All other contract terms and conditions remain unchanged.

(End of modification 96)

E-MAIL ____ NAS1 ____

COST POINT ____

# CAB
## SWALES CONTRACT AUTHORIZATION BRIEF

| | | | |
|---|---|---|---|
| Charge #: | 00012.1.0000.00.01 | Mod #: | 0111 |
| Customer Name: | NASA/GODDARD SPACE FLIGHT CENTER | Issue Date: | 04/17/2007 |
| Customer PO #: | NAS5-01090 | CAB Log #: | 38638 |
| Job Description: | MSES CODE 540 SUPPORT | | |

Action: Modify  Charge # As Of: 04/12/2007  Customer Mod #:

Comment: ADMINISTRATIVE: IAW TASK 1069/3 DATED 04/12/07, AT CO'S DIRECTION, ALL LISTED TASKS HAVE ADJUSTED TASK VALUES NOW APPROVED THROUGH 06/30/07.

THIS SECTION TO BE COMPLETED FOR TASKS + COST/PRICE REVISION

| | | | | | |
|---|---|---|---|---|---|
| End Date: | 06/30/07 | | | Rev End Date: | 06/30/07 |
| Contract Cost: | | +/- Cost: | | Rev Contract Cost: | |
| Profit/Fee: | | +/- Profit/F: | | Rev Profit/Fee: | |
| Contract Price: | | +/- Price: | | Rev Contract Price: | |
| Funding: | | +/- Funding: | | Rev Funding: | |
| | | | | Rev Funds Thru: | |

DISTRIBUTION w/attachments

- GOODWIN, PAUL
- JOHNSTON, ROGER
- O'NEILL, DANIEL
- SONTHEIMER, ALEX
- FILE

CORPORATE REVIEW

CFO ________________ or Contracts Bonnie L. Rice

Form No: SAI-FORM-0009 Rev.B page 1 of 1
Previous versions of this form may not be used.
Check that this is the correct version before use.

[PAGE REDACTED IN FULL]]

[PAGE REDACTED IN FULL]]

[PAGE REDACTED IN FULL]]