Agreed upon redacted copy may be made Public

**Protected Information to be Disclosed Only in Accordance with the U.S. Court of Federal Claims Protective Order**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

No. 07-253C (Bid Protest)
(Senior Judge Smith)

---

SWALES & ASSOCIATES, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

SGT, INC.,

Defendant-Intervenor.

---

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S REQUEST FOR A TEMPORARY RESTRAINING ORDER**

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

TODD M. HUGHES
Assistant Director

SCOTT D. AUSTIN
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530
Telephone: (202) 616-0317
Facsimile: (202) 305-7643

April 30, 2007

Attorneys for Defendant

# TABLE OF CONTENTS


**PAGE(S)**

ISSUES PRESENTED ..... 3

STATEMENT OF FACTS ..... 4

I. Background On The Solicitation And Award ..... 4

II. Facts Pertinent To Swales' Alleged Procurement Integrity Act Violation ..... 5

A. Mr. Galassi's Employment Background ..... 7

B. GSFS' Investigation And Analysis Of Swales' Procurement Integrity Act Claim ..... 8

III. Facts Pertinent To Swales' "Limitations On Subcontracting" Claim ..... 12

IV. Current Status Of The Contract ..... 13

ARGUMENT ..... 14

I. Swales Cannot Demonstrate It Is Likely To Succeed On The Merits ..... 14

A. Swales Is Unlikely To Prevail On Its Procurement Integrity Act Claim ..... 16

1. It Is Unlikely Swales Will Be Able To Prove A PIA Violation .. 17

2. It Is Unlikely Swales Will Be Able To Demonstrate That There Was A Reasonable Likelihood That It Would Have Been Awarded The Contract But For The Purported PIA Violation ..... 21

B. Swales Is Unlikely To Prevail On Its "Limitations On Subcontracting" Claim ..... 22

II. Swales Will Not Suffer Irreparable Harm If The Temporary Restraining Order It Seeks Is Not Granted ..... 25

III. The Balance Of Hardships Weigh In Favor Of The Government ........................ 26

IV. An Injunction Will Harm The Public Interest ........................................................ 28

CONCLUSION ........................................................................................................................ 29

## TABLE OF AUTHORITIES

### CASES

PAGE(S)

Amazon.com, Inc. v. Barnesandnoble.com., Inc.,
239 F.3d 1343 (Fed. Cir. 2001) .......... 14

Avtel Serv., Inc. v. United States,
70 Fed. Cl. 173 .......... passim

Baird Corp. v. United States,
1 Cl. Ct. 662 (1983) .......... 2, 17

Banknote Corp. Of Am., Inc. v. United States,
365 F.3d 1345 (Fed. Cir. 2004) .......... 15

Bannum, Inc. v. United States,
60 Fed. Cl. 718 (2004) .......... 20

Bowman Trans., Inc. v. Arkansas-Best Freight Sys., Inc.,
419 U.S. 281 (1974) .......... 15

CACI-Inc.-Fed. V. United States,
719 F.2d 1567 (Fed. Cir. 1983) .......... 16, 21

Chapman Law Firm v. United States,
63 Fed. Cl. 519 (2005) .......... 24

Cincom Systems, Inc. v. United States,
37 Fed. Cl. 266 (1997) .......... 25, 28

Data Gen. Corp. v. Johnson,
78 F.3d 1556 (Fed. Cir. 1996) .......... 16, 21

DeMat Air, Inc. v. United States,
2 Cl. Ct. 197 (1983) .......... 2

FMC Corp. v. United States,
3 F.3d 424 (Fed. Cir. 1993) .......... 2

Hawaii, Ltd. v. Warner,
480 F.2d 1166 (D.C 1973) .......... 16

Impresa Construczioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) .......... 15, 16

Kinetic Structures Corp. v. United States,
6 Cl. Ct. 387 (1984) .......... 2

Kola Nut Travel, Inc. v. United States,
68 Fed. Cl. 195 (2005) .......... 2, 17, 25, 26

Latecoere Int'l, Inc. v. United States Dep't of Navy,
19 F.3d 1342 (11th Cir. 1994) .......... 16

Logican, Inc. V, United States,
22 Cl. Ct. 776 (1991) .......... 20

Miller-Holzwarth, Inc. v. United States,
44 Fed. Cl. 156 (1999) .......... 19

NFK Engineering, Inc. v. United States,
805 F.2d 372 (Fed. Cir. 1996) .......... 20

Nat'l Steel Car, Ltd. V. Canadian Pacific Ry., Ltd.,
357 F.3d 1319 (Fed. Cir. 2004) .......... 2, 14

National Australia Bank v. United States,
63 Fed. Cl. 352 (2004), rev'd on other grounds, 452 F.3d 1321 (Fed. Cir. 2006) .......... 20

Saratoga Dev. Corp. v. United States,
305 U.S. App. D.C. 351, F.3d 445 (D.C. Cir. 1994) .......... 16

Synetics, Inc. v. United States,
45 Fed. Cl. 1 (1999) .......... 15, 16, 20, 21

Yakus v. United States,
321 U.S. 414 (1940) .......... 28

## STATUTES

5 U.S.C. § 706 .......... 15

5 U.S.C. § 706(2) .......... 15

5 U.S.C. § 706(2)(A) .......... 15

5 U.S.C. § 706(2)(D) .......... 15

41 U.S.C. § 423 .......... 3

41 U.S.C. § 423(g) .......... 7, 11, 19

41 U.S.C. § 423(h)(2) .......... 11

4 C.F.R § 21.5 .......... 19, 20

4 C.F.R. § 21.5(d) .......... 6, 19

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(Bid Protest)**

| | | |
|---|---|---|
| SWALES & ASSOCIATES, INC., | ) | |
| | ) | **FILED UNDER SEAL** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-253 |
| | ) | (Senior Judge Smith) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| | ) | |
| SGT, INC., | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S REQUEST FOR A TEMPORARY RESTRAINING ORDER**

Defendant, the United States, respectfully requests that the Court deny plaintiff's request for a temporary restraining order[1] preventing defendant from proceeding with performance of a mechanical systems engineering services contract at the National Aeronautics and Space Administration's ("NASA") Goddard Space Flight Center ("GSFC") awarded to Stinger Ghaffarian Technologies, Inc. ("SGT") pursuant to Solicitation NNG05096383R ("the request for proposal" or "RFP") and, subsequently, contract number NNG07CA21C ("the contract"). In support of our opposition, we rely upon this memorandum and the accompanying appendix.

---

[1] The Court requested that our opposition, and the hearing scheduled for May 3, 2007, address plaintiff's request for a temporary restraining order, but not plaintiff's contemporaneously filed motion for a preliminary injunction. Accordingly, we address directly only plaintiff's request for a temporary restraining order and await the Court's schedule for further expedited proceedings concerning plaintiff's motion for preliminary injunction.

Plaintiff carries a heavy burden of proof in establishing that it is entitled to a temporary restraining order, and it fails to even approach satisfying that burden. It is well settled that a plaintiff seeking injunctive relief has a "heavy burden" because an injunction is a drastic remedy. Baird Corp. v. United States, 1 Cl. Ct. 662, 664 (1983). The equitable jurisdiction of this Court may be invoked only in "extraordinary circumstances." Kinetic Structures Corp. v. United States, 6 Cl. Ct. 387, 393 (1984). Since injunctive relief is drastic in nature, the Court must exercise great caution and restraint in reviewing plaintiff's request for a temporary restraining order. DeMat Air, Inc. v. United States, 2 Cl. Ct. 197, 201 (1983).

In order to establish the right to the extraordinary relief it seeks, plaintiff must establish:

> 1) that the [plaintiff] is likely to succeed on the merits at trial; 2) that it will suffer irreparable harm if preliminary relief is not granted; 3) that the balance of the hardships tips in the [plaintiff's] favor; and 4) that a preliminary injunction will not be contrary to the public interest.

FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); see Kola Nut Travel, Inc. v. United States, 68 Fed. Cl. 195, 197 (2005). Proving the first factor is an absolute necessity, Nat'l Steel Car, Ltd. V. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir. 2004), and the failure to establish any of the other factors may be sufficient to justify the denial of injunctive relief. FMC Corp., 3 F.3d at 427. The plaintiff must establish its entitlement to injunctive relief by clear and convincing evidence. Baird Corp., 1 Cl. Ct. at 664; Kola Nut Travel, 68 Fed. Cl. at 197. Here, plaintiff cannot satisfy any of the four factors required for the temporary restraining order it seeks.

## ISSUES PRESENTED

1. Whether Swales & Associates, Inc. ("Swales") can demonstrate, through clear and convincing evidence, that NASA abused its discretion in concluding that SGT did not violate the Procurement Integrity Act ("PIA"), 41 U.S.C. § 423, through its utilization of the services of Nicholas Galassi, president and sole owner of Aerostress, Inc. ("Aerostress"), in connection with its proposal in response to the RFP.

2. Whether Swales can demonstrate, through clear and convincing evidence, that there was a reasonable likelihood that it would have been awarded the contract but for the alleged violation of the PIA.

3. Whether Swales can demonstrate, through clear and convincing evidence, that NASA abused its discretion by failing to conclude that SGT will be unable to comply with the "Limitations on Subcontracting" provisions of FAR Clause 52.219-14 and the RFP.

4. Whether Swales has demonstrated, through clear and convincing evidence, that it will suffer irreparable harm if the Court does not enjoin the Government and SGT from continuing performance on the contract.

5. Whether Swales has demonstrated, through clear and convincing evidence, that the harm to the Government and SGT from granting Swales' request for a temporary restraining order would be less than the harm to Swales if the Court denies Swales' motion.

6. Whether Swales has demonstrated, through clear and convincing evidence, that it is in the public interest to grant Swales' motion.

## STATEMENT OF FACTS

### I. Background On the Solicitation And Award

This case arises out of a protest by Swales of the March 29, 2007 award of the contract to SGT pursuant to an RFP issued by GSFC on March 9, 2006. Complaint, Ex. 1. Prior to the award of the contract, Swales was the incumbent contractor at GSFC, performing work on a similar predecessor contract. Swales Mem., Ex. 7 at ¶¶ 1,8.[2] The RFP sought multiple engineering services related to space flight and ground operations, including development and validation of new technologies to enable future space and science missions. Complaint, Ex. 1. The RFP, which was entitled Mechanical Systems Engineering Services II/A ("MSES II/A"), was a "small business set aside" solicitation, and it called for the award of a Cost-Plus-Award-Fee contract with "Indefinite Delivery Indefinite Quantity." Id. The maximum amount of supplies or services that could be ordered during the effective period of the contract is $400,000,000. Id.

On April 17, 2006, two proposals were submitted, one by Swales and one by SGT. After submission, GSFC conducted discussions with the offerors in September 2006. GSFC then amended the RFP and requested final revised proposals. Both offerors submitted timely revised proposals by the due date of October 3, 2006.

On December 8, 2006, the MSES II/A contract was awarded to SGT. SGT's proposal was determined by the Source Selection Authority ("SSA"), Orlando Figueroa, to be the proposal that was "most advantageous to the Government." Complaint, Ex. 3. The SSA

---

[2] Swales' memorandum in support of its motion for a preliminary injunction and request for a temporary restraining order is cited as "Swales Mem. at ___," and Exhibits to the memorandum are cited as "Swales Mem., Ex. ___."

explained that the "*significantly* lower probable cost offered by SGT far outweighs the *slight* Mission Suitability advantage proposed by Swales." Id. (emphasis added).

Swales received a debriefing on the date of the award, December 8. Four days later, on December 12, 2006, Swales filed a bid protest with the Government Accountability Office ("GAO"). Before GAO reached a decision on the protest, GSFC decided to take corrective action and, as a result, GAO dismissed the protest.

In March 2007, limited discussions were held with both offerors concerning the Government Pricing Model ("GPM") in the RFP and, consistent with Swales' request, Def. App., Ex. 1,[3] amendment 6 to the RFP was issued eliminating the GPM and using the Representative Task Orders ("RTOs") for the assessment of both proposed and probable costs.

On March 29, 2007, the SSA issued its Selection Decision again awarding the contract to SGT. Complaint, Ex. 2. As before, the SSA concluded that SGT's proposal offered "significantly lower probable cost" and that it was "most advantageous to the Government" that the contract be awarded to SGT. Complaint, Ex. 2, at 10.

Following a second debriefing, Swales filed its bid protest in this Court on April 24, 2007.

## II. Facts Pertinent To Swales' Alleged Procurement Integrity Act Violation

In its effort to demonstrate that it can satisfy its burden of proving that it is likely to prevail on the merits, Swales relies primarily upon its claim that consulting work performed by Nicholas Galassi, in his role as a contractor for SGT, constituted a violation of the PIA. Mr. Galassi performed limited work on SGT's MSES II/A proposal about five or six months after

---

[3] The Appendix accompanying this memorandum is cited as "Def. App., Ex. ___."

terminating his employment with Swales in October 2005 and also participated in an oral presentation to GSFC, on behalf of SGT and its proposal, in September 2006.

Swales first raised a concern about a PIA violation to GSFC on December 13, 2006, seven days after the initial GSFC award to SGT, Swales Mem., Ex. 1, despite the fact that it had learned a full eight to nine months earlier that Mr. Galassi was working on SGT's MSES II/A proposal. Def. App., Ex. 2, at ¶¶ 4-5 (Galassi Aff.). Specifically, in March-April 2006, Mr. Galassi performed certain work upon SGT's proposal and has testified under oath that "[d]uring the time that I was performing services for SGT, I advised two members of Swales management (who supervised me on the work I performed while I was at Swales) that I was working for SGT on a portion of its proposal." Id. The two Swales managers Mr. Galassi spoke with were Patrick Miller (Swales' Director of MSES) and Paul Conners (Swales' Lead for the SDO program). Def. App., Ex. 3, at ¶ 5 (Galassi Aff.). Mr. Galassi so advised Swales of his SGT proposal work because, pursuant to a separate contract he had entered with Swales, Mr. Galassi had "frequent contacts" with Swales management and "wanted to ensure that they would not inadvertently disclose to me any confidential and proprietary information regarding Swales' proposal for MSES-IIA." Def. App., Ex. 2, at ¶¶ 4-5 (Galassi Aff.). Swales' management did not reveal any confidential and proprietary information to Mr. Galassi and never expressed to him any concern or objection that he was working on SGT's MSES II/A proposal. Id.

Although Swales reported its concerns about a potential PIA violation on December 13, 2006 (claiming, erroneously, that it had "learned" about the purported violation only days earlier), it did not include the PIA issue in its December 12 GAO bid protest. Swales Mem., Ex. 1. The applicable regulations precluded SGT from raising the issue before the GAO because 4 C.F.R. § 21.5(d) provides that, when, as here, a protester fails to report the information it

believes constitutes evidence of a PIA violation to the applicable Federal Agency responsible for the procurement (here GSFC) within 14 days after the protester "first discovered the possible" violation, the protester's claim "shall be dismissed." See 41 U.S.C. 423(g).

### A. Mr. Galassi's Employment Background

Mr. Galassi has been practicing structural analysis of aerospace structures since he graduated from college in 1978. He first began working at NASA in 1987 with Fairchild Industries. He worked at Fairchild Industries until 1993, when he started employment with Swales, and he continued to work at the GSFC location. Mr. Galassi worked at Swales as a structural engineer until his resignation on October 28, 2005. Def. App., Ex. 2, at ¶ 3 (Galassi Aff.).

Mr. Galassi's involvement with the Swales' MSES II/A proposal was limited to attending the kickoff meeting and subsequent meetings in June and July 2005 regarding RTO No. 1. Id. At that time, RTO No. 1 had only been released in draft form. Id. Mr. Galassi had no involvement with Swales' effort in connection with its MSES II/A proposal after July 2005. Id. Mr. Galassi was not involved in the preparation or drafting of Swales' response to the draft RTO No. 1 nor any other portion of Swales' proposal for MSES II/A. Id. As noted above, the final RFP was not submitted until March 2006, eight months after Mr. Galassi had involvement with it. Swales submitted its original proposal in April 2006 and its final proposal in September 2006, 14 months after Mr. Galassi last performed any work on the proposal.

Mr. Galassi resigned from Swales in October 2005 in order to start his own engineering business, Aerostress, Inc. It was Mr. Galassi's goal to decrease his work hours to focus on some non-work related matters. After he resigned, Swales asked Mr. Galassi (Aerostress) to work on the Solar Dynamics Observatory ("SDO") program for Swales. Mr. Galassi had worked on the

SDO program, which is unrelated to the MSES II/A procurement, while employed by Swales. According to Swales, Mr. Galassi and Aerostress continued to work with Swales until at least December 2006. Swales Mem., Ex. 7, at ¶ 14 (Kraus Aff.).

As noted previously, it was in March and April of 2006 that Mr. Galassi performed consulting work for SGT concerning SGT's proposal for the MSES II/A procurement. Mr. Galassi provided review and technical input on SGT's proposal in the areas of Understanding the Requirements ("UTR") and RTOs. Def. App., Ex. 2, at ¶ 4 (Galassi Aff.). Mr. Galassi worked a total of 34 hours on the proposal. Id. While performing this work for SGT, Mr. Galassi advised Swales management he was working on the SGT MSES II/A proposal. Id. at ¶ 5.

In September 2006, SGT asked Mr. Galassi to participate in an oral presentation to GSFC in the limited area of Integration and Test Engineering related to SGT's MSES II/A proposal. Id. at ¶ 6.

**B. GSFC's Investigation And Analysis Of Swales' Procurement Integrity Act Claim**

GSFC conducted an extensive investigation of Swales' PIA claim after Swales' request for an investigation on December 13, 2006 (immediately following the award of the contract to SGT). See Complaint, Ex. 1. The Contracting Officer's initial response was that, since Swales' claim was that a former Swales' employee may have assisted SGT in preparing its revised proposal, section 423(a)(2) of the PIA did not apply because that provision's applicability is limited to present and former Government employees and persons acting on behalf of the United States or advising the United States on behalf of agency procurement. Since Mr. Galassi was neither a Government employee, nor acting as an advisor to the MSES II/A Source Evaluation

Board ("SEB"), the Contracting Officer concluded that no PIA violation had occurred. Def. App., Ex. 4.

On February 12, 2007, Swales advised GSFC its claim extended to section 423(b) of the PIA which prohibits a person from obtaining contractor bid or proposal information or source selection information before the award of a contract related to the information. Swales claimed this provision applies to both SGT and Mr. Galassi. Def. App., Ex. 5. GSFC then expanded its investigation.

On March 1, 2007, the Contracting Officer contacted both SGT and Swales and advised that GSFC takes allegations of procurement integrity very seriously. GSFC asked specific questions of Swales pertinent to Mr. Gallasi's work with Swales and the same questions to SGT concerning Mr. Gallasi's work for SGT. GSFC also requested any proof deemed necessary, including affidavits. Def. App., Ex. 6, 7. By March 14, GSFC had received multiple affidavits from Swales and SGT employees, an affidavit from Mr. Gallasi, responses to the questions proffered, and additional documentation. Def. App., Ex. 8, 9, 10.

On March 20, 2007, MSES II/A SEB Member Ryan Simmons reviewed that portion of Swales' PIA claim concerning Mr. Galassi purportedly passing proprietary technical information to SGT that he gained while employed at Swales. Def. App., Ex. 11. Mr. Simmons concluded that there was no evidence that Mr. Galassi had transferred Swales trade secrets or proprietary information from Swales to SGT:

> In summary, no Swales' proprietary technical data is evident in SGT's proposals. Therefore, it cannot be shown that Mr. Galassi passed proprietary technical data on to SFT for use in its proposals.

Def. App., Ex. 11.

In reaching his conclusion, Mr. Simmons first considered the oral presentation Mr. Galassi made to the GSFC Source Evaluation Board ("SEB") during discussions on September 11, 2006 on behalf of SGT. Mr. Galassi's presentation was in response to six specific items for which the SEB requested clarification. Mr. Simmons concluded that the presentation included technical details that a senior-level engineer with experience in mechanical testing working at GSFC should have, but that "there was nothing that can be construed as proprietary." Def. App., Ex. 11, at 1.

Mr. Simmons also reviewed the relevant portions of Swales' proposal to determine whether there was any proprietary technical information contained therein and compared SGT's proposal to Swales' proposal to determine whether Mr. Galassi could have transferred any proprietary information to SGT. Mr. Simmons found some proprietar[redacted] (and some technical information in the public domain) under Swales' proposal [redacted] but, in reviewing SGT's proposal, there was no inclusion or mention of the proprietary [redacted]. Mr. Simmons found no proprietary information in the remaining relevant portions of Swales' proposal or elsewhere in the record. Def. App., Ex. 11.

Mr. Simmons' March 20, 2007 analysis was provided to the Procurement Officer, Valorie A. Burr, and was considered by the Procurement Officer in conjunction with multiple other materials. On March 29, 2007, the Procurement Officer issued her decision. Complaint, Ex. 5.

The Procurement Officer's decision contains an exhaustive analysis of Swales' numerous claims of a PIA violation. The Procurement Officer first noted that the Contracting Officer had correctly concluded that section 423(a) of the PIA was inapplicable. The Procurement Officer

devoted the majority of her review to consideration of Swales' claim that SGT violated section 423(b) of the PIA by wrongfully obtaining contractor bid and proposal information. She found no evidence that SGT officials either asked for, or received, any Swales proprietary information. Among the Procurement's Officer's numerous findings were the following:

- There was no evidence that SGT obtained Swales' cost or pricing proposal information. Numerous SGT management employees provided affidavits denying that Mr. Galassi had any involvement in SGT's cost proposal (citing the Affidavits of SGT co-owners Harold Stinger and Kamal Ghaffarian, Chief Financial Officer Matthew Yetman, and Vice President Andrew Endal and the SGT contractor responsible for production of the SGT proposal, William Emmett Brooks);

- Mr. Galassi proffered testimony that: "I did not provide input or otherwise assist SGT in the preparation of any aspect of its cost or business proposal. Further, I have not seen any portion of SGT's cost or business proposal, nor has any portion of SGT's cost or business proposal been verbally disclosed to me."

- Upon review of affidavits submitted from Swales, the Procurement Officer noted that "the Swales affidavits merely state that [Mr. Galassi] had access to old cost estimates and speculate that he may have provided this outdated information to SGT. Mere speculation without more is not sufficient to find a violation of the Procurement Integrity Act."

- With respect to proprietary information, "a technical review of the SGT and Swales proposal did not reveal any use of Swales proprietary information in the SGT proposal. . . All information utilized in SGT's proposal is available in the public domain according to . . . Mr. Simmons."

- "I find that there is no evidence of technical transfusion of the Swales' proprietary information to SGT."

- There is no evidence of any Swales contractor bid or proposal information disclosed to SGT.

- Swales voluntarily provided contractor bid or proposal information to Mr. Galassi which Swales is permitted to do under 41 U.S.C. § 423(h)(2). Mr. Galassi was permitted to receive that information under the provisions of 41 U.S.C. § 423(h)(2). However, no such information was received or requested by SGT.

The Procurement Officer reached the following conclusion in her decision:

> Based upon the above review, it is my determination that a Procurement Integrity Act violation has not occurred. Mr. Galassi was not and is not a Federal Government Official nor was he working as a contractor providing advice to the SEB on the MSES II/A procurement. Mr. Galassi may have had access to Swales technical information on the RTOs for MSES II/A. But there is no evidence to establish that SGT officials either asked for this information or received it. Mr. Galassi may have had access to Swales estimated rate information for the SDO contract dated before Oct 2005. However, there is no evidence to establish that SGT employees either asked for this information or knowingly accepted this type of information. In fact, the evidence presented establishes that SGT did not ask for or receive any type of cost assistance or information from Mr. Galassi. Further, the Procurement Integrity Act statute does not restrict contractors from disclosing their bid or proposal information or recipients from receiving it. Thus, it is my determination that a Procurement Integrity Act violation has not occurred. I find that the overall integrity of this procurement is still intact.

Complaint, Ex. 5.

### III. <u>Facts Pertinent To Swales' "Limitations On Subcontracting" Claim</u>

Section I.2(b)(1) of the RFP, under "Limitations on Subcontrating," explicitly states that "[a]t least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees for the concern." Complaint, Ex. 1, at 57 (RFP).

SGT, as it was required to do, addressed the proposed division of work to be performed by SGT and its subcontractors. Def. App., Ex. 12. Specifically [redacted]

[redacted]

Def. App., Ex. 12 [redacted]

The RFP also required an offeror to be evaluated "on the reasonableness, and extent of the functional split of the responsibilities between the prime and subcontractors." Def. App., Ex. 13, at ¶ 2 (Pierson Decl.). The Contracting Officer and other SEB members evaluated SGT's proposal and concluded that SGT would comply with the requirements of the "Limitation of Subcontracting" provision. Id. at ¶ 6. Specifically, the SEB concluded that SGT had demonstrated that it had the capability of providing [redacted] of the total function statement of work (SOW) activities required. Id.

IV. **Current Status Of The Contract**

The contract awarded to SGT has already started and SGT is currently engaged in the transitional "phase-in" period. Def. App., Ex. 13, at ¶ 12 (Pierson Decl.). The phase-in period will end on May 14, 2007, and the contract with SGT will be in full force effective May 15. Id. Swales is still on the premises and is continuing its work under the previous contract. [redacted] Id.

GSFC has three separate engineering services contracts to support NASA's missions and programs, all of which are crucial in obtaining mission success. One of those three contracts is the contract at issue here. Def. App., Ex. 14, at ¶ 5 (Figueroa Decl.). GSFC contractors have always relied upon incumbent capture in transitioning contracts, historically capturing roughly 85 percent of the incumbent workforce. Id. at ¶ 6. For this contract, SGT has indicated to GSFC "that incumbent capture during the phase-in portion of their contract is crucial to assure that all GSFC missions being supported do not suffer major technical and programmatic impacts." Def. Ex. 15, at ¶ 6 (Hinkle Decl.). In the view of GSFC's Chief of the Mechanical Systems Division, Raymond Hinkle, loss of the incumbent employees to the MSES IIA contract with SGT "would

be devastating to GSFC and our ability to meet our committments to the Center and the Agency." Def. App., Ex. 15 at ¶ 6 (Hinkle Decl.).

Stopping and starting a process of the magnitude involved here (there are currently 500 professional engineers from Swales supporting the MSES I contract at GSFC) "adds extreme volatility to the situation which forces contractor employees who would otherwise have transitioned, to remain with the incumbent or leave the area all-together." Def. App., Ex. 15, at ¶ 6 (Hinkle Decl.). Mr. Hinkle is aware of internal correspondence from Swales management to its employees encouraging the employees to remain with Swales that "has added significant volatility to the situation and is having a psychological impact that is preventing Swales contractor employees from considering transitioning to MSES IIA with SGT." Id. at ¶ 6.

**ARGUMENT**

**I. Swales Cannot Demonstrate It Is Likely To Succeed On The Merits**

As noted previously, a plaintiff is not entitled to the extraordinary remedy of injunctive relief if it cannot demonstrate a likelihood of success on the merits. National Steel, 357 F.3d at 1325; see Amazon.com, Inc. v. Barnesandnoble.com., Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001).

In the context of a bid protest, there is an extremely high burden to demonstrate that a contract award should be set aside. The court's equitable powers should be applied to best minimize "'judicial interference in contract procurement.'" Avtel Serv., , Inc. v. United States, 70 Fed. Cl. 173, 190 (quoting Synetics, Inc. v. United States, 45 Fed. Cl. 1, 5 (1999)). Courts provide wide discretion to government departments and agencies concerning the technical adequacy of bid proposals, evaluation of bids, and application of procurement regulations, in deciding whether the agency's decision had a reasonable basis. Impresa Construzioni Geom.

Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001); Avtel Serv., 70 Fed. Cl. at 190. Thus, the court must not substitute its own judgment for that of the agency or contracting officer provided that decision is founded upon a reasonable basis, even if reasonable minds might reach different results. Avtel Serv., 70 Fed. Cl. at 190; see Bowman Trans., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-86 (1974).

Following the Administrative Procedure Act, 5 U.S.C. § 706, et. seq. (2000), a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement official's procedure involved a violation of regulation or procedure. Banknote Corp. Of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004). "Agency procurement actions should be set aside when they are 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law,' or 'without observance of procedure required by law.'" Avtel Serv., 70 Fed. Cl. at 183, quoting, 5 U.S.C. § 706(2)(A), 2(D) (2000). In Impresa Construzioni, the United States Court of Appeals for the Federal Circuit applied that standard and outlined how courts should proceed to review agency procurement decisions and actions when challenged:

> When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. Latecoere Int'l, Inc. v. United States Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994). Accordingly, the test for reviewing courts is to determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," id., and the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" Saratoga Dev. Corp. v. United States, 305 U.S. App. D.C. 351, F.3d 445, 456 (D.C. Cir. 1994). When a challenge is brought on the second ground, the disappointed bidder must show " a clear and prejudicial violation of applicable statutes or regulations." Kentron [Hawaii, Ltd. v. Warner, 480 F.2d 1166, 1169 (D.C. Cir. 1973]; Latecoere, 19 F.3d at 1356.

238 F.3d at 1332-33.

Plaintiff simply cannot demonstrate that it is likely to succeed under the applicable law with either its PIA claim or its "Limitations on Subcontracting" claim.

### A. Swales Is Unlikely To Prevail On Its Procurement Integrity Act Claim

Swales has an extraordinary burden to overcome in order to prevail on its PIA claim. It is highly unlikely that it will be able to do so.

First, Swales must demonstrate that GSFC was arbitrary and capricious, or abused its discretion, in determining, after a thorough factual investigation, that no PIA violation occurred. Second, Swales must demonstrate that, even assuming that it could demonstrate "a clear violation of the Procurement Integrity Act, . . . that there was a reasonable likelihood that it would have been awarded the contract but for any such violation." Synetics, 45 Fed. Cl. at 13-14; see Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); CACI-Inc.-Fed. V. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983). Swales has not demonstrated that it is likely to satisfy either requirement.

#### 1. It Is Unlikely Swales Will Be Able To Prove A PIA Violation

After a complete and thorough investigation, GSFC determined that no PIA violation occurred. Its decision was not arbitary or capricious, it did not abuse its discretion, and its decision was in accordance with law, see, e.g., Avtel Serv., 70 Fed. Cl. at 183, and it is highly unlikely that Swales will be able to prove otherwise. Certainly, Swales has not demonstrated the existence of clear and convincing evidence that it will prove a PIA violation so as to justify a temporary restraining order. See Baird, 1 Cl. Ct. at 664; Kola Nut Travel, 68 Fed. Cl. at 197.

GSFC took Swales' request for an investigation of a PIA violation very seriously. Following the Contracting Officer's initial review of the alleged PIA violation, SEB member

Simmons evaluated the technical aspects of Swales' PIA claim and, after completion of that evaluation and submission of a report to the Procurement Officer, the Procurement Officer thoroughly reviewed all aspects of Swales' PIA claim. GSFC's evaluation included a comparison of Swales' and SGT's proposals, and a review of multiple affidavits provided by SGT and Swales, an affidavit from Mr. Galassi, responses to questions from GSFC posed to both Swales and SGT specific to the alleged PIA violation, and all other documents or proof that were deemed relevant by either party.

GSFC's conclusion was unequivocal: no PIA violation had occurred. GSFC found that there was no evidence that SGT obtained Swales' cost or pricing information; no evidence that Mr. Galassi was in any way involved in SGT's cost proposal; no evidence that SGT officials either requested or received any Swales technical proprietary information; no evidence of any Swales' proprietary information in SGT's proposal; and no evidence that any Swales contractor bid or proposal information was disclosed to SGT.

Remarkably, Swales makes no attempt to dispute <u>any</u> of these factual findings. Instead, Swales proffers only generalities and conjecture (instead of specifics or proof) that "highly valuable, competitive information" was disclosed to SGT. Swales Mem. at 22. In contrast, Mr. Galassi provided sworn testimony – which GSFC received as part of its investigation and which it confirmed from its further review of Swales' and SGT's proposals and other materials – unequivocally stating that "[a]t no time did I use or disclose to SGT *any* information regarding Swales' proposed solutions to RTOs or *any* confidential information or trade secrets of Swales." Def. Ex. 2, at ¶ 7 (Galassi Aff.) (emphasis added). Additionally, notably absent from Swales' request for a temporary restraining order is any attempt to distinguish between information that

is in the "public domain" (even if "esoteric and complex"), and information that is proprietary in nature. See Def. App., Ex. 11.

Swales claims that a PIA violation should be inferred because Mr. Galassi participated in some meetings with Swales personnel in which a draft of RTO No. 1 issued by GSFC was discussed, and, in addition, months later reviewed and commented on SGT's proposed solution to RTOs. Swales Mem. at 22. In essence, Swales finds it completely irrelevant that GSFC found absolutely no evidence, from Swales and SGT's proposals, as well as thorough affidavits from Swales, SGT, and Mr. Galassi, that no Swales' proprietary information was ever requested by or received by SGT.

Swales' unsupported allegations and requested inferences do not constitute clear and convincing evidence that Swales is likely to prevail on the merits that can justify the drastic relief of a temporary restraining order, especially given the deference that this Court must give to GSFC's decision, reached after a thorough investigation, that no PIA violation occurred.

Swales' own conduct illustrates that it is simply unreasonable to infer from Mr. Galassi's work with Swales – including his attendance at Swales meetings in which the early draft of RTO No. 1 was discussed – that proprietary Swales information would necessarily be disclosed to SGT because Mr. Galassi had some involvement with Swales' proposal. Swales – which certainly knew more about Mr. Galassi's involvement at Swales than did either SGT or GSFC – was advised by Mr. Galassi in March or April of 2006 that Mr. Galassi was working on SGT's MSES II/A proposal. Yet Swales never reported Mr. Galassi's conduct to GSFC, nor did it object to Mr. Galassi about his participation on SGT's proposal. Swales' failure to object to Mr. Galassi's SGT proposal work until eight or nine months later demonstrates that Swales was not concerned that proprietary information would be revealed because of Mr. Galassi's involvement

on the SGT proposal. Mr. Galassi's testimony that, at the very time he was performing the work with SGT in March-April 2006, he told Swales' Director of MSES and Swales' Lead for the SDO program that he was working on SGT's proposal – and Swales raised no objection – completely undermines Swales' current theory that it should somehow be inferred from Mr. Galassi's SGT proposal work that Swales' proprietary information necessarily must have been disclosed to SGT.

Under 41 U.S.C. § 423(g) and 4 C.F.R. § 21.5(d), Swales' failure to report to GSFC within 14 days of first discovering the information that it believes constitutes evidence of a possible PIA violation precluded Swales' right to file a bid protest with GAO. Strict adherence to the 14-day reporting rule does not appear to apply directly to a bid protest filed with this Court. But see Miller-Holzwarth, Inc. v. United States, 44 Fed. Cl. 156, 159 n. 6 (1999). Regardless, the equitable doctrine of laches should be applied here. Given the policy requiring prompt reporting of suspected PIA violations reflected in section 423(g) and of the PIA and 4 C.F.R.§ 21.5, Swales' eight or nine month delay in bringing this information to GSFC's attention for precludes Swales bid protest premised upon a purported violation of the PIA. See National Australia Bank v. United States, 63 Fed. Cl. 352, 363 n. 27 (2004), rev'd on other grounds, 452 F.3d 1321 (Fed. Cir. 2006); Bannum, Inc. v. United States, 60 Fed. Cl. 718, 727 (2004).

Finally, Swales relies, erroneously, upon the purported existence of an "appearance of impropriety" as demonstrating that it is likely to prevail on the merits of its PIA claim. See Swales Mot. at 26. But a purported "appearance of impropriety" claim cannot substitute for an unproven allegation of a PIA violation. As this Court made clear in Synetics, in the context of a claim of a PIA violation, the Court cannot rescind a contract based upon the "mere" appearance of impropriety when the plaintiff has failed to demonstrate "either that the CO's decision was

arbitrary or capricious, or that the plaintiff was prejudiced by a clear violation of a statute or regulation." Synetics, 45 Fed. Cl. at 18, citing Logican, Inc. V. United States, 22 Cl. Ct. 776, 782 (1991). Cases such as NFK Engineering, Inc. v. United States, 805 F.2d 372 (Fed. Cir. 1996), upon which Swales relies, Swales Mot. at 26, which involved the conduct of a Government employee involved in the procurement processs (not a contractor employee), did not involve the PIA, and in which the court held that the contracting officer's conclusion that there *was* an appearance of impropriety could not be said to be unreasonable or irrational, are accordingly inapposite.

### 2. **It Is Unlikely Swales Will Be Able To Demonstrate** That There Was A Reasonable Likelihood That It Would Have Been Awarded The Contract But For The Purported PIA Violation

In order to show that it is likely to prevail on its PIA claim, Swales is also required to demonstrate that, but for the purported PIA violation, there was a reasonable likelihood that it would have been awarded the contract. Synetics, 45 Fed. Cl. at 13-14; see Data Gen. Corp. at 1562; CACI-Inc.-Fed., 719 F.2d at 1574-75. Swales has failed to satisfy this requirement.

The March 29, 2007 Selection decision demonstrates that the cost factor was "the most significant differentiation between the two offerors" and that "[t]he *significantly* lower probable cost offered by SGT *far outweighs* the slight Mission Suitability advantage proposed by Swales." Complaint, Ex. 2. Swales utterly fails to demonstrate that it is likely to proffer clear and convincing evidence that, but for the purported violation, the "significantly" lower cost offered by SGT would not still "far outweigh[]" Swales' slight advantage on the Mission Suitability criteria and that, as a result, the awardee would still be SGT.

To the contrary, the purported PIA violation upon which Swales relies allegedly provided SGT with a competitive advantage as to the technical approach to RTOs, a mission suitability

factor, not a cost evaluation factor. Complaint, Ex. 2. Moreover, Swales cannot explain how Mr. Galassi's involvement with SGT's technical approach to RTOs provided SGT with any competitive advantage, since the Procurement Officer's decision noted that "SGT's proposal did not improve with Mr. Galassi's assistance. SGT received two technical weaknesses for RTOs 1 and 2 including one that Mr. Galassi's expertise should have helped avoid." Complaint, Ex. 5; see Def. App., Ex. 11.

Swales unsuccessfully attempts to disparage the Procurement Officer's decision by arguing that there is "no indication" that, without Mr. Galassi's purported PIA violation, SGT would have received more weaknesses and/or would have received some significant weaknesses. Swales' Memo.at 29-30. Swales ignores that there is also "no indication" SGT *would* have received more weaknesses (or any significant weaknesses). It would be completely speculative for Swales to contend otherwise.

Swales does appear to make a vague attempt to connect its PIA claim to an unfair competitive cost advantage for SGT by contending that, when the GPM was abandoned (with Swales' approval), and it was determined that comparative costs would be determined solely by reference to the offerors' RTOs, GSFC increased the importance of the same areas of the proposal in which Mr. Galassi had participated. Swales Mot. at 15. However, Swales' vague argument does not even approach a demonstration that, on the merits, Swales is likely to prove that, but for the purported PIA violation, it would have been able to overcome "the significantly lower probable cost" proffered by SGT in its proposal and, as a result, there would have been a reasonable likelihood that Swales would have been awarded the MSES II/A contract.

### B. Swales Is Unlikely To Prevail On Its "Limitations On Subcontracting" Claim

SGT's proposal, on its face, makes it clear that it intends to comply with the "Limitations on Subcontracting" requirement that "[a]t least 50 percent of the cost of contract performance incurred for personnel" be expended for its employees. Complaint, Ex. 1, at 57 (RFP). As we demonstrated, [redacted] Def. App., Ex. 12.

It is equally clear that GSFC reviewed SGT's representation for reasonableness and determined that it was reasonable to expect that SGT would be in compliance with the 50 percent requirement of the "Limitations on Subcontracting" clause just as it proposed. Thus, the Contracting Officer reasonably concluded that SGT's proposal was in compliance with the "Limitations on Subcontracting" requirements and that SGT is a responsible contractor. Def. Ex. 13 at ¶ 6 (Piersen Decl.).

Moreover, SGT's co-owner, Executive Vice President and Chief Operating Officer has reaffirmed that SGT's proposal clearly stated SGT's ability and intent to comply with the Limitations on Subcontracting requirement and that, as the contract awardee, SGT is complying, and will continue to comply, with the limitations on subcontracting requirements. Def. App., Ex. 16, at ¶¶ 3-4 (Ghaffarian Decl.).

Relying almost entirely upon the declaration of its vice president at GSFC, Mark McQuaid, Mot., Ex. 7, who does not claim to have ever reviewed SGT's proposal, Swales alleges, erroneously, that SGT's proposal will fail to comply with the "Limitations on Subcontracting" requirement. Swales Mem. at 30; Swales Mem., Ex. 7 at ¶ 2. The crux of Swales and Mr. McQuaid's position is that SGT's reliance upon its subcontractors for use of

"manufacturing and test facilities, laboratories, clean rooms, and other critical facilities" necessarily means that SGT will need to subcontract more than 50 percent of the work on the contract and thus violate the "Limitations on Subcontracting" requirement. Swales Mem. at 31.

Swales erroneously exaggerates the significance of STG's use of its subcontractors for the manufacturing and other functions as a percentage of the overall scope of the work in the contract. As Mr. Hinkle explains, these functions constitute only a small percentage of the work on the services contract awarded to STG, and STG's use of subcontractors to perform a relatively small portion of the contract in no way undermines STG's representation, and GSFC's acceptance of that representation, that STG will exceed performing 50 percent of the work on the contract:

> The Mechanical Systems Division heavily relies on the MSES contract to perform various design, analysis, and concept studies for the development of space flight hardware for GSFC projects. It is primarily a "paper" contract using skilled engineering talent to perform stress and structural dynamics analyses, produce mechanical design drawings, perform thermal design and analyses, estimate mass of flight hardware, perform trade studies, develop concept designs for new missions, provide senior consultation support, etc. A vast majority of all hardware fabrication and assembly for GSFC missions is performed on-site at Goddard within the Advanced Manufacturing Branch (Code 547) or through local vendors not affiliated with Swales. There are occasions where we do rely on the MSES contractor to provide these services as a convenience to us. *It is estimated that the average labor needed to support our fabrication and assembly needs is approximately 10% of the total MSES contract labor support for the contract.* Much of the fabrication work performed thru MSES can be outsourced to a wide range of vendors with the capability of manufacturing hardware ranging from machining standard parts to fabricating honeycomb panels. Although the incumbent has developed significant facilities over the years to provide fabrication and assembly capability, many other vendor sources are available to provide the same services at a reduced cost. *For these reasons, it is very reasonable to expect that SGT will exceed*

> *performing 50% of the total work for MSES IIA within the company (SGT).*

Def. Ex. 15 at ¶ 5 (Hinkel Decl.) (emphasis added).

This is simply not a case "where a proposal, on its face, should lead an agency to the conclusion that an offeror could not and would not comply with the subcontracting limitation." Chapman Law Firm v. United States, 63 Fed. Cl. 519, 526 (2005). The court must not substitute its own judgment for that of the agency or contracting officer since it is evident that the Contracting Officer's decision is founded upon a reasonable basis. Avtel Serv., 70 Fed. Cl. at 190.

## II. Swales Will Not Suffer Irreparable Harm If The Temporary Restraining Order It Seeks Is Not Granted

Swales has not even come close to demonstrating that it will suffer irreparable harm if this Court denies its request for a temporary restraining order.

As the incumbent contractor, Swales continues to perform work under the existing contract and will continue to do so until May 14, 2007 when most of its work is scheduled to be turned over to SGT. Swales Mot. at 18. Thus, until May 14, Swales can demonstrate absolutely no harm from the contract awarded to SGT proceeding simultaneously with Swales' performance under the old contract. SGT was recently issued a 30-day phase-in purchase order to commence phase-in activities through May 14, 2007, and the effective date of the MSES II/A contract is May 15, 2007. Def. App., Ex. 13, at ¶ 12 (Pierson Decl.). Thus, the performance of the disputed contract is still in the earliest of phases, demonstrating that any harm to Swales would not be irreparable. Kola Nut Travel, 68 Fed. Cl. at 199-200; Cincom Systems, Inc. v. United States, 37 Fed. Cl. 266, 268 (1997).

Moreover, the Court has adopted an expedited schedule to address plaintiff's request for a temporary scheduling order and has already discussed an expedited schedule for addressing plaintiff's motion for a preliminary injunction. Furthermore, the Government would not oppose an expedited schedule to address the merits of plaintiff's claims. Under such circumstances, any harm to plaintiff would not be irreparable. Kola Nut Travel, 68 Fed. Cl. at 199-200; Cincom Systems, Inc. v. United States, 37 Fed. Cl. at 268.

Swales claims it will suffer irreparable injury if SGT's performance under the contract is permitted to begin because SGT's performance would be obtained by "capturing" the Swales incumbent employees. Swales Mot. at 19-20. However, even if SGT does "capture" Swales employees, Swales has suffered no irreparable harm. In the unlikely event Swales ultimately prevails on the bid protest and is awarded the contract, SGT will not have available employment opportunities at GSFC on the MSES II/A contract for these employees to perform, and it is highly likely these employees will want to return to work for Swales on the MSES II/A contract. Indeed, GSFC has always relied upon incumbent "capture" in transitions of contracts (an historical 85 percent capture rate), and there simply is no reason to believe that if Swales ultimately prevails on the bid protest it would not be able to retain its former employees.

**III. <u>The Balance Of Hardships Weigh In Favor Of The Government</u>**

A delay in the transition of this contract would greatly harm GSFC, and the hardship to the Government (and STG) should a temporary restraining order be granted is far greater than the harm to Swales should Swales' request for a temporary restraining order be denied. GSFC and SGT have already begun to implement the disputed contract although the work under the contract is still in the earliest of phases. In such circumstances, "[t]here would be significant disruption and added cost if injunction relief were granted" and, as a result "the balance of the hardships

weigh in favor of [the Government and the contract awardee]." Kola Nut Travel, 68 Fed. Cl. at 200.

The prejudice to GSFC here should Swales be granted its request for a temporary restraining order would be particularly large. SGT has indicated to GSFC that incumbent "capture" during the phase-in portion of the contract is crucial to assure that all GSFC missions being supported do not suffer major technical and programmatic impacts. Dep. App., Ex. 15 at ¶ 6 (Hinkle Decl.). Several of these critical missions include the on-orbit servicing of the Hubble Space Telescope ("HST") which, if not completed on-schedule, would suffer cost impacts of over $12 million per month and seriously jeopardize all future attempts to service the telescope due to failing batteries on the observatory. Id. Human safety issues are also involved because failure to service HST on schedule could result in an uncontrolled reentry of the HST back to earth and its impact location. Id. Another concern from delay of the new contract concerns the critical mission of the launch of the nation's first mission back to the Moon (Lunar Reconnaissance Orbiter- "LRO") to map the lunar surface for further safe landing sites for humans. Id. A schedule slip for LRO would have a major impact on the President's initiative for space exploration and sending humans back to the Moon and on to Mars. Id. Successful implementation of incumbent contractor employees to the MSES II/A contract and otherwise moving forward with the new contract without delay is critical for avoiding significant cost overruns and long schedule delays for all GSFC space flight projects. Id.

The adverse impact of an injunction on GSFC is magnified because of the importance of the incumbent "capture" issue and Swales' ongoing efforts through internal correspondence to encourage employees to remain with Swales. Id. GSFC's Chief of the Mechanical Systems Division believes that Swales' efforts are having "a psychological impact that is preventing

Swales contractor employees from considering transitioning to MSES II/A with SGT" and that "[l]oss of these personnel on the MSES IIA contract with SGT would be devastating to GSFC and our ability to meet our project requirements, presidential directives, and national goals." Id. Stopping and starting the process of implementing GSFC's contract with SGT, which Swales seeks to do through its request for a temporary restraining order adds to the already existing stress on the incumbent contractor employees by "add[ing] extreme volatility to the situation which forces contractor employees who would have otherwise transitioned, to remain with the incumbent or leave the area all-together." Id.

## IV. An Injunction Will Harm The Public Interest

"A movant is confronted by a more substantial burden of proof when it seeks injunctive relief which would interfere with and infringe upon governmental operations if granted." Avtel, 70 Fed. Cl. at 227, citing Yakus v. United States, 321 U.S. 414, 440 (1940).

As we have demonstrated, the delay Swales seeks pursuant to its request for an injunction will dramatically "interfere with and infringe upon" GSFC's operations. Delays in the performance of this contract could delay multiple NASA operations, some, like HST, potentially impacting the health and safety of the American people. The President's intitiative for space exploration and sending humans back to the moon and Mars could also be impeded. All of these potential developments would be adverse to the public interest.

It is also beyond dispute that delay could lead to the loss of valuable incumbent contractor employees SGT is attempting to "capture." If this "human brain drain" occurs, GSES' essential projects will suffer and the public interest will be adversely affected.

Moreover, public interest militates against granting injunctive relief when national defense and national security interests are concerned. Cincom Systems, 37 Fed. Cl. at 269.

National security interests are involved here with respect to a project that could be delayed by granting the temporary restraining order Swales seeks. Def. App. 14, at ¶ 4 (Figuero Decl.) ("GSFC is the home of the Nation's largest organization of combined scientists and engineers dedicated to the study of the Earth, Sun, Solar System, and the Universe from space. The scope of science and exploration missions developed, managed or supported by the Center include scientific instruments, small to medium spacecraft, large observatories, human rated missions, and missions of great importance to national security.").

## CONCLUSION

For the foregoing reasons, plaintiff's request for a temporary restraining order should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Todd M. Hughes
TODD M. HUGHES
Assistant Director

/s/ Scott D. Austin
SCOTT D. AUSTIN
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L St., N.W.
ATTN: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 616-0317
Facsimile: (202) 305-7643

Electronically filed,
April 30, 2007

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on April 30, 2007, a copy of the foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFF'S REQUEST FOR A TEMPORARY RESTRAINING ORDER"was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Scott D. Austin

Agreed-Upon Redacted Copy – May be Made Public

**~~Protected Information to be Disclosed Only in Accordance with the U.S. Court of Federal Claims Protective Order~~**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

No. 07-253C (Bid Protest)
(Senior Judge Smith)

---

SWALES & ASSOCIATES, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

SGT, INC.,

Defendant-Intervenor.

---

**APPENDIX TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S REQUEST FOR A TEMPORARY RESTRAINING ORDER**

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

TODD M. HUGHES
Assistant Director

SCOTT D. AUSTIN
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530
Telephone: (202) 616-0317
Facsimile: (202) 305-7643

April 30, 2007

Attorneys for Defendant

INDEX TO APPENDIX


Exhibit

Swales letter to CO, March 19, 2007 . . . . . . . . . . 1

Affidavit of Nicholas M. Galassi, March 12, 2007 . . . . . . . . . . 2

Declaration of Nicholas M. Galassi, April 27, 2007 . . . . . . . . . . 3

Letter from CO to Swales regarding Procurement Integrity Act, February 8, 2007 . . . . . . . . . . 4

Swales Response to Procurement Integrity Matter, February 12, 2007 . . . . . . . . . . 5

Letter from CO to Offeror Swales Aerospace, March 1, 2007 . . . . . . . . . . 6

Letter from CO to Offeror SGT, Inc., March 1, 2007 . . . . . . . . . . 7

SGT Response to Procurement Integrity Matter, March 13, 2007 . . . . . . . . . . 8

Response from Pargament & Hallowell, PLLC, regarding Procurement Integrity Matter, March 13, 2007 . . . . . . . . . . 9

Swales Response to Procurement Integrity Matter, March 14, 2007 . . . . . . . . . . 10

Report from Ryan Simmons, March 20, 2007 . . . . . . . . . . 11

[redacted] . . . . . . . . . . 12

Declaration of Kathleen Pierson, April 30, 2007 . . . . . . . . . . 13

Declaration of Orlando Figueroa, April 30, 2007 . . . . . . . . . . 14

Declaration of Ken Hinkle, April 30, 2007 . . . . . . . . . . 15

Declaration of Kamal S. Ghaffarian, April 30, 2007 . . . . . . . . . . 16

SWALES
AEROSPACE

...d to support formerly performed work.



5050 Powder Mill Road • Beltsville, MD 20705 • 301-595-5500 • Fax 301-902-4114 • www.swales.com

SWALES
AEROSPACE



5050 Powder Mill Road • Beltsville, MD 20705 • 301-595-5500 • Fax 301-902-4114 • www.swales.com

SWALES AEROSPACE

3

5050 Powder Mill Road • Beltsville, MD 20705 • 301-595-5500 • Fax 301-902-4114 • www.swales.com

SWALES
AEROSPACE

5050 Powder Mill Road • Beltsville, MD 20705 • 301-595-5500 • Fax 301-902-4114 • www.swales.com

AFFIDAVIT OF NICHOLAS M. GALASSI

I, NICHOLAS M. GALASSI, being duly sworn, hereby swear and affirm as follows:

1. I am the President and sole owner of Aerostress, Inc. ("Aerostress"), a consulting company that provides structural analysis and engineering. I have provided structural and mechanical engineering services at NASA Goddard Space Flight Center since 1987, as an employee of various companies, including Fairchild Industries (1987-1993), Swales & Associates, Inc. ("Swales") (1993-2005), and Aerostress.

2. I have reviewed a letter from Kathleen M. Piersen dated March 1, 2007 to SGT, Inc. ("SGT") referencing "Procurement Integrity Matter" under NASA Solicitation No. NNG05963B3R ("MSES-IIA"). I am providing this affidavit to help provide answers to the questions in her letter.

3. I worked at Swales as a structural engineer from 1993 through the effective date of my resignation, October 28, 2005. While employed at Swales, my involvement with MSES-IIA was limited to attendance at the kickoff meeting and subsequent meetings in or around June-July 2005 regarding RTO No. 1, which at that time had been released by NASA in draft form. I had no involvement in Swales' MSES-IIA effort after July 2005. I was not involved in the preparation or drafting of Swales' response to that draft RTO No. 1 or any other portion of Swales' proposal for MSES-IIA.

4. In April 2006, my company, Aerostress, entered into a Consulting Agreement with SGT dated March 28, 2006 to review and provide technical input on SGT's proposal for the MSES-IIA procurement in the areas of Understanding the Requirements ("UTR") and Representative Task Orders ("RTOs"). Through Aerostress, I performed approximately 34 hours of consulting services in March-April 2006 consisting of reviewing and commenting on SGT's proposed solution to RTOs and UTR in the MSES-IIA procurement.

5. During the time that I was performing services for SGT, I advised two members of Swales management (who supervised me on the work I performed while I was with Swales) that I was working for SGT on a portion of its proposal. I informed them of this because I had frequents contacts with them on the SDO program, and I wanted to ensure that they would not inadvertently disclose to me any confidential and proprietary information regarding Swales' proposal for MSES-IIA. They did not voice any objection and did not disclose any such confidential and proprietary information to me.

6. In September 2006, I was asked by SGT to participate in an oral presentation to NASA in the area of Integration and Test Engineering. I participated at SGT's oral presentation in this limited area. Following the presentation, I provided input in connection with SGT's response to NASA in the same area, i.e., Integration and Test Engineering.

7. In performing services for SGT, I relied on my skills and expertise as a structural analysis engineer. At no time did I use or disclose to SGT any information regarding Swales' proposed solutions to RTOs or any confidential information or trade secrets of Swales.

8. At no time was I involved with drafting SGT's proposal, but rather, my involvement consisted of reviewing and providing technical input in the limited areas described above.

9. I did not provide input or otherwise assist SGT in the preparation of any aspect of its cost or business proposal. Further, I have never seen any portion of SGT's cost or business proposal, nor has any portion of SGT's cost or business proposal been verbally disclosed to me.

10. I no longer work for SGT regarding the MSES-IIA proposal and have no plans to perform additional services to SGT in connection with its MSES-IIA proposal.

11. I have also reviewed the Affidavit of David Baran, which is attached to Ms. Piersen's letter. This affidavit makes no reference to the MSES-*IIA* proposal. Under a separate purchase order from Swales issued in November 2005, through Aerostress, I provided engineering services to Swales in connection with the Solar Dynamics Observatory ("SDO") program. This was a continuation of similar work on the SDO program while I was a Swales employee. Swales discontinued the purchase order relationship by letter dated January 26, 2007 and requested that I return all Swales materials related to the performance of the purchase order. Accordingly, I promptly returned them. The external hard drive that I returned to Swales included data that I had used and/or retained in connection with my performance of services for the SDO program, both as a Swales employee and as a Swales consultant. At no time did I use or disclose to SGT any such data.

I HEREBY CERTIFY under the penalties of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

[signature]
NICHOLAS M. GALASSI

STATE OF MARYLAND :
COUNTY OF Prince Georges:

Subscribed and sworn before me this 12 day of March, 2007, a Notary Public in and for the State and County aforesaid.

[signature]
Notary Public

My commission expires:

SHANTEL THORNE
NOTARY PUBLIC
PRINCE GEORGE'S COUNTY
MARYLAND
MY COMMISSION EXPIRES JULY 3, 2010

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| **SWALES & ASSOCIATES, INC.,** **Plaintiff,** **v.** **UNITED STATES OF AMERICA,** **Defendant,** **and** **SGT, INC.,** **Defendant-Intervenor.** | ) | **No. 07-253** **(Senior Judge Smith)** |

**DECLARATION OF NICHOLAS M. GALASSI**

I, NICHOLAS M. GALASSI, being duly sworn, hereby declare as follows:

1. I am the President and sole owner of Aerostress, Inc. ("Aerostress"), a consulting company that provides structural analysis and engineering. I have provided structural and mechanical engineering services at NASA Goddard Space Flight Center since 1987, as an employee of various companies, including Fairchild Industries (1987-1993), Swales & Associates, Inc. ("Swales") (1993-2005), and Aerostress.

2. I worked at Swales as a structural engineer from 1993 through the effective date of my resignation, October 28, 2005. As of the date of termination of my employment with Swales, Solicitation No. NNG0596383 ("MSES-IIA") had not been released by NASA. Previously, however, NASA had circulated drafts of certain portions of the anticipated MSES-IIA solicitation for industry comment. While employed with Swales, I attended the MSES-IIA

kickoff meeting and subsequent meetings in or around June-July 2005. These meetings involved only issues relating to RTO No. 1. To the best of my recollection, I was not involved in any other areas relating to Swales' MSES-IIA effort. I had no involvement in Swales' MSES-IIA effort after July 2005.

3. In April 2006, my company, Aerostress, entered into a Consulting Agreement with SGT dated March 28, 2006 to review and provide technical input on SGT's proposal for the MSES-IIA procurement in the areas of Understanding the Requirements ("UTR") and Representative Task Orders ("RTOs"). Through Aerostress, I performed approximately 34 hours of consulting services in March-April 2006 consisting of reviewing and commenting on SGT's proposed solution to RTOs and UTR in the MSES-IIA procurement. At no time was I involved with drafting SGT's proposal. Rather, my involvement primarily involved cross-checking SGT's proposal against the RFP requirements. In performing these services for SGT, I relied on my skills and expertise as a structural analysis engineer. At no time did I use or disclose to SGT any information regarding Swales' proposed solutions to RTOs or any confidential information or trade secrets of Swales.

4. I did not provide input or otherwise assist SGT in the preparation of any aspect of its cost or business proposal. Further, I have never seen any portion of SGT's cost or business proposal, nor has any portion of SGT's cost or business proposal been verbally disclosed to me.

5. During the time that I was performing services for SGT (in or around March – April, 2006), I advised two members of Swales management (who supervised me on the work I performed while I was with Swales) that I was working for SGT on a portion of its proposal. Specifically, I informed Patrick Miller, Swales' Director of MSES, and Paul Conners, Swales' Lead for the Solar Dynamics Observatory ("SDO") program, that I was working for SGT to

review a portion of its MSES-IIA proposal. I informed them of this because I had frequent contacts with them on the SDO program, and I wanted to ensure that they would not inadvertently disclose to me any confidential and proprietary information regarding Swales' proposal for MSES-IIA. They did not voice any objection and did not disclose any such confidential and proprietary information to me.

6. In September 2006, I was asked by SGT to participate in an oral presentation to NASA in the area of Integration and Test Engineering. I participated at SGT's oral presentation in this limited area. Following the presentation, I provided input in connection with SGT's response to NASA in the same area, i.e., Integration and Test Engineering.

7. After SGT received the MSES-IIA award on or about December 6, 2006, SGT requested my assistance in transitioning the MSES staff from Swales. SGT indicated that in exchange for my assistance in this regard, there might be subcontracting opportunities for Aerostress in the future. Accordingly, I attended two SGT open houses in December 2006. During one of the open houses, a then current Swales employee asked me whether Aerostress had a retirement plan. As a single-employee company, I replied that Aerostress did not have such a plan. The individual suggested that it would be beneficial if her 401(k) account under Swales' 401(k) plan could be rolled over to Aerostress. Later in December, as a result of that conversation, I contacted the Principal Financial Group ("Principal"), which administers Swales' 401(k) plan. I inquired whether employee accounts could be rolled over to Aerostress. I was informed that this would not be possible. I had no further contact with Principal regarding the issue.

I HEREBY DECLARE under the penalties of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

NICHOLAS M. GALASSI

National Aeronautics and
Space Administration
**Goddard Space Flight Center**
Greenbelt, MD 20771

February 8, 2007

Reply to Attn of: 210.M

PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE
ORDER

Swales Aerospace
Attn: Mr. Arthur Leaderman
Vice President & General Counsel
5050 Powder Mill Road
Beltsville, MD 20705

Re: NASA Solicitation No. NNG0596383R, MSES II/A - Procurement Integrity Matter

Mr. Leaderman,

I am in receipt of your letters dated December 13, 2006 and December 16, 2006 regarding an alleged Procurement Integrity Act violation related to solicitation NNG0596383R. In these letters, you have advised me that you believe a Procurement Integrity Act violation has occurred. Specifically, your company is concerned that a former employee may have assisted SGT with preparing its revised proposal in response to the MSES II/A solicitation and in doing so may have used knowledge he acquired while working at Swales. You have asked me to looking into whether these allegations, if substantiated, would violate the Procurement Integrity Act. It is my opinion that the Procurement Integrity Act does not apply to this factual situation. I have set forth the basis for my opinion below.

The Procurement Integrity Act, Title 41 U.S.C. section 423(a)(2) provides, "Paragraph (1) applies to any person who-

(A) is a present or former official of the United States, or a person who is acting or has acted for or on behalf of, or who is advising or has advised the United States with respect to, a Federal agency procurement; and

(B) by virtue of that office, employment, or relationship has had access to contractor bid or proposal information or source selection information."

Under the facts that you presented the individual is not a Government employee nor was he acting as an advisor to the MSES II/A Source Evaluation Board. This was your former

employee that allegedly disclosed your company's proprietary information to another company in competition with it for a contract. As such, it is my opinion that the Procurement Integrity Act does not apply.

Sincerely,

Kathleen M. Pierson
Contracting Officer

SWALES
AEROSPACE

Arthur Leaderman
Vice President & General Counsel
(301) 902-4489

PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE
ORDER

February 12, 2007

Kathleen M. Pierson
Contracting Officer
Code 210.M
NASA Goddard Space Flight Center
Greenbelt, Maryland 20771

*Re: NASA Solicitation No. NNG05096383R, MSES II/A – Procurement Integrity Matter*

Dear Ms. Pierson:

This letter is in response to your February 8, 2007 letter regarding a potential Procurement Integrity Act violation relating to the subject MSES II/A procurement. In our December 13, 2006, December 16, 2006, and January 5, 2007 letters to you regarding this matter, we informed you that a former Swales Aerospace employee, Nicholas M. Galassi, who participated in the development of Swales' proposal in the MSES II/A procurement, also may have participated in the development of SGT, Inc.'s proposal in this on-going competition. We also noted that, upon information and belief, Mr. Galassi even may have participated in discussions with NASA on behalf of SGT in the procurement. The request was sent to you under FAR 1.602-2 and 33.102(f)

In your February 8 letter, you state that it is your opinion that the Procurement Integrity Act does not apply to this situation because Mr. Galassi "is not a Government employee nor was he acting as an advisor to the MSES II/A Source Evaluation Board." As support for this conclusion, you cite 41 U.S.C. § 423(a), which prohibits Government officials, agents, and advisors from disclosing contractor bid or proposal information or source selection information before the award of a contract to which the information relates.

Your letter, however, does not take into consideration 41 U.S.C. § 423(b), the next subsection of the Act. 41 U.S.C. § 423(b) prohibits a person from obtaining contractor bid or proposal information or source selection information before the award of a contract to which the information relates. This prohibition – which also is contained in FAR 3.104-3(b) – is not limited to Government officials, agents, and advisors, and it applies to SGT and Mr. Galassi. See, e.g., Computer Technology Assocs., Inc., Comp. Gen. Dec. B-288622, Nov. 7, 2001, 2001 CPD ¶ 187 at 3-7 (determining that a procuring agency reasonably determined to disqualify an offeror from further participation in a competition because the offeror improperly obtained and reviewed other vendors' proposal material during the course of the procurement, in violation of the Procurement Integrity Act); id. at 4 ("wherever an offeror has improperly obtained

SWALES
AEROSPACE



proprietary proposal information during the course of a procurement, the integrity of the procurement is at risk, and an agency's decision to disqualify the firm is generally reasonable"). See also Oceaneering Intl., Inc., Comp. Gen. Dec. B-278126 et al., Dec. 31, 1997, 98-1 CPD ¶ 133 at 1-2 n.1 (noting that the procuring agency's Inspector General was actively investigating allegations that key employees who played significant roles in the development of an offeror's proposal also were involved in the preparation of a competitor's proposal, in violation of the Procurement Integrity Act).

Because your letter relies on a misinterpretation of the Procurement Integrity Act, we hereby renew our request that you investigate the allegations discussed in our December 13, 2006, December 16, 2006, and January 5, 2007 letters, and that you make a determination as required by FAR 3.104-7(a). Moreover, because your letter does not deny, and therefore implicitly confirms, that Mr. Galassi participated in discussions with NASA on behalf of SGT in this procurement, which clearly constitutes a violation or possible violation of the Procurement Integrity Act that impacts the procurement, we request that you forward this matter to the Head of the Contracting Activity as required by FAR 3.104-7(a)(2).

Given the current status of the procurement, and the seriousness of a potential Procurement Integrity Act violation, including the fact that the Act imposes serious penalties for violations of 41 U.S.C. § 423(b), we believe rapid resolution is imperative. See 41 U.S.C. § 423(e)(1), (2).

Thank you for your attention to this matter.

Sincerely,

Arthur Leaderman

National Aeronautics and
Space Administration

**Goddard Space Flight Center**
Greenbelt, MD 20771

March 1, 2007

Swales Aerospace
Attention: Mr. Arthur Leaderman
Vice President & General Counsel
5050 Powder Mill Road
Beltsville, MDS 20705

**PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

Re: NASA Solicitation No. NNG0596383R, MSES II/A - Procurement Integrity Matter

Dear Mr. Leaderman:

I have received your letters, dated February 22 and 27, 2007, regarding procurement integrity matters with accompanying affidavits. National Aeronautics Space Administration Goddard Space Flight Center takes allegations of procurement integrity very seriously. I am conducting an inquiry into these assertions.

During this inquiry I will need to ask your company to answer several questions and provide any proof it deems necessary to support its answers including, but not limited to: affidavits regarding the facts and relevant written work performed by Mr. Galassi in support of Swales's proposal or revised proposal. Specifically, at a minimum, please address the following questions:

1.) When did Mr. Galassi begin working for Swales?
2.) What were his duties at that time?
3.) What duties and responsibilities did Mr. Galassi have at or for Swales in assisting it with its proposal or revised proposal in response to solicitation NNG05096383R?
4.) Did Mr. Galassi write or assist, in any manner, Swales in its proposal or revised proposal?
5.) If Mr. Galassi did assist Swales in its proposal or revised proposal, please explain specifically what he contributed.
    a. Did he work on the mission suitability portion of the proposal or revised proposal?
    b. Did he work on or assist in the cost proposal or revised cost proposal?
    c. Did he work on or assist in the past performance section of the proposal or revised proposal?

d. Did Mr. Galassi have access to or have possession of any Swales proprietary information including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information?

6.) When did Mr. Galassi leave Swales?

Please provide the requested information and any additional information you believe relevant to this inquiry to me on or before March 14, 2007. If you have any questions, I may be reached at 301-286-5257.

Sincerely,

Kathleen M. Pierson
Contracting Officer

National Aeronautics and
Space Administration

**Goddard Space Flight Center**
Greenbelt, MD 20771

March 1, 2007

PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE
ORDER

SGT, Inc.
Attn: Dr. Kamal S. Ghaffarian
Executive Vice President/COO
7701 Greenbelt Road, Suite 400
Greenbelt, MD 20770

Re: NASA Solicitation No. NNG0596383R; MSES II/A - Procurement Integrity Matter

Dear Dr. Ghaffarian,

National Aeronautics Space Administration Goddard Space Flight Center takes allegations of procurement integrity very seriously. We have received allegations questioning the integrity of the procurement in solicitation number NNG05096383R. Specifically, the allegations assert that Mr. Nicholas Galassi worked on both the Swales proposal and the SGT revised proposal for this solicitation. The allegations have been supported by affidavits. I am looking into these allegations to determine if there is any merit to them.

During this inquiry I will need your company to answer several questions and provide any proof it deems necessary to support its answers including, but not limited to: affidavits regarding the facts and relevant written work performed by Mr. Galassi in support of SGT's proposal or revised proposal. I have attached for your review a copy of the Swales affidavits. Please review the affidavits and address the assertions therein. Specifically, at a minimum, please address the following questions:

1.) When did Mr. Galassi begin working for SGT?
2.) What were his duties at that time?
3.) What duties and responsibilities did Mr. Galassi have at or for SGT in assisting it with its proposal or revised proposal in response to solicitation NNG05096383R?
4.) Did Mr. Galassi write or assist, in any manner, SGT in its proposal or revised proposal?
5.) If Mr. Galassi did assist SGT in its proposal or revised proposal, please explain specifically what he contributed.
    a. Did he work on the mission suitability portion of the proposal or revised proposal?
    b. Did he work on or assist in the cost proposal or revised cost proposal?

c. Did he work on or assist in the past performance section of the proposal or revised proposal?
d. Did Mr. Galassi share with SGT officials any Swales proprietary information he acquired while working at or with Swales Aerospace including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information?

Please provide the requested information and any additional information you believe relevant to this inquiry to me on or before March 14, 2007. If you have any questions, I may be reached at 301-286-5257.

Sincerely,

Kathleen M. Pierson
Contracting Officer

SGT, Inc.

March 13, 2007

National Aeronautics and
Space Administration
Goddard Space Flight Center
Greenbelt, MD 20771
Attn: Kathleen Pierson
Contracting Officer

PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE
ORDER

Hand Delivered

**Subject: Response in re: Procurement Integrity Matter- MSES II/A – RFP NNG0596383R**

Dear Ms. Pierson:

I am responding to your March 1, 2007, letter regarding the Procurement Integrity Act allegations made by Swales Aerospace in regard to Nick Galassi.

SGT, like NASA, is very serious about issues of procurement integrity. My staff and I have conducted a thorough review of the matter as it pertains to SGT and we find no evidence whatsoever that any one associated with SGT or Mr. Galassi did anything unethical or in violation of the Procurement Integrity Act.

Harold Stinger and I, along with our MSES II/A Capture Manager, Dr. Andy Endal, our MSES II/A Proposal Manager, Bill Brooks, and our CFO, Matt Yetman, have enclosed sworn affidavits supporting the position that SGT did not ask for and Mr. Galassi did not communicate in any way Swales proprietary data to anyone associated with SGT and its MSES II/A proposal effort. I have enclosed some additional evidentiary documents supporting our statements.

Furthermore, to assist in your review, I provided to Mr. Galassi's legal counsel, Andrew Hallowell, a copy of your March 1st letter for a response to you by Mr. Galassi. It is my understanding that Mr. Galassi, through counsel, will provide an affidavit responsive to the matters raised in your March 1st letter directly to you for your consideration during this review process.

I have provided answers to your specific questions in the attachment marked Answers to Questions posed in March 1 Letter.

Def. App. Ex. 8

Mr. Galassi was hired by SGT as a consultant for the period March 17, 2006, through April 15, 2006 to support SGT's MSES II/A proposal effort as a Red Team reviewer for the sections Understanding the Requirements (UTR) and Representative Task Orders (RTO) in the narrow areas of his field of specialization. He later assisted SGT in discussions with NASA. Mr. Galassi never worked on the management, cost or past performance volumes. Through this process SGT gained an appreciation for Mr. Galassi's technical capabilities and, as part our commitment to supporting small businesses we added him to our team of associate subcontractors as NASA is aware. No promise of workshare was made. Though we appreciate Mr. Galassi's assistance, his role was relatively minor in the scheme of things and did not have a major affect on the proposal product.

Based on your review of the complete record of evidence, you should find that the Swales allegations of a possible violation of the Procurement Integrity Act are without merit. In accordance with FAR 3.104-7, therefore, you should determine that the alleged possible violation of the Procurement Integrity Act has no impact on the award or pending selection processes.

Moreover, in addition to the Swales allegations having no substantive merit, it is noteworthy from a procedural standpoint that in any follow-on Swales protest at GAO, these Swales allegations of a possible violation of the Procurement Integrity Act will not be reviewed by GAO. Under GAO's protest regulations at 4 CFR 21.5 (d), GAO will not review allegations of Procurement Integrity Act violations "where the protester failed to report the information it believed constituted evidence of the offense to the Federal agency responsible for the procurement within 14 days after the protester first discovered the possible violation." Here, the Swales report to NASA of an alleged possible violation of the Procurement Integrity Act was submitted to NASA well beyond 14 days after Swales first discovered evidence of what it alleges is a possible violation.

Please feel free to contact me personally if you have any further questions. I have instructed all persons associated with SGT and our team to cooperate with and provide their full attention and assistance to NASA in this matter.

Best regards,

Kamal S. Ghaffarian

Executive Vice President and Chief Operating Officer
SGT, Inc.

Enclosures:

1. Answers to Questions posed in March 1 Letter
2. Affidavit of Harold S. Stinger
3. Affidavit of Kamal S. Ghaffarian
4. Affidavit of Andrew Endal
5. Affidavit of William E. Brooks
6. Affidavit of Matthew J. Yetman
7. Copy of Galassi/Aerostress Consulting Agreement
8. Copy of Aerostress Invoice and Check.

**Answers to Questions posed in March 1 Letter**

Q1. When did Mr. Galassi begin working for SGT?

A1. Mr. Galassi was hired as a consultant on or about March 17, 2006.

Q2. What were his duties at that time?

A2. In March/April 2006 Mr. Galassi performed 34 hours of work as a consultant in support of SGT's MSES II/A (solicitation NNG05096383R) proposal effort as a Red Team reviewer for the sections Understanding the Requirements (UTR) and Representative Task Orders (RTO) in the area of structural analysis engineering. Mr. Galassi later provided input in these same areas into the Final Proposal Revision (FPR).

In September 2006 Mr. Galassi assisted SGT in discussions with NASA related to Representative Task Orders (RTO) in the area of Integration and Test Engineering.

Q3. What duties and responsibilities did Mr. Galassi have at or for SGT in assisting it with its proposal or revised proposal in response to solicitation NNG05096383R?

A3. Same as A2 above.

Q4. Did Mr. Galassi write or assist, in any manner, SGT in its proposal or revised proposal?

A4. Yes. Mr. Galassi assisted in the both the proposal and FPR in the areas of Understanding the Requirements and in the RTOs. See A2 above.

Q5. If Mr. Galassi did assist SGT in its proposal or revised proposal please explain specifically what he contributed.

a. Did he work on the mission suitability portion of the proposal or revised proposal?
b. Did he work on or assist in the cost proposal or revised proposal submission?
c. Did he work on or assist in the past performance section of the proposal or revised proposal?
d. Did Mr. Galassi share with SGT officials any Swales proprietary information he acquired while working at or with Swales Aerospace including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information?

A5 a. Yes – see A2 and A4.
b. No
c. No
d. No - for all elements described.

AFFIDAVIT OF HAROLD S. STINGER

Harold S. Stinger, being first duly sworn, hereby deposes and says:

I have reviewed the NASA letter to SGT dated March 1, 2007, on the subject of Procurement Integrity Matter, and I have reviewed the two Swales affidavits that NASA attached to that letter. This affidavit is provided in response to that letter.

1. I am over the age of 21 years; a permanent resident of Fairfax County, Virginia and the following statement are made based on my personal knowledge.
2. I am the co-owner and President and Chief Executive Officer of SGT, Inc. (SGT). I have been employed by SGT since 1994. I am also the Head Pastor of the First Mount Olive Baptist Church in Leesburg, Virginia.
3. In my capacity as President and CEO I have limited involvement in the details of specific proposals and was not directly involved in overseeing the MSES II/A proposal but I do require that our company maintain high standards of integrity.
4. I have made inquiries of management team into the allegations made by Swales Aerospace regarding an alleged procurement integrity violation by Mr. Nicholas M. Galassi. Based on my inquiries I believe the following to be true: Mr. Galassi's role in SGT's MSES II/A proposal was limited to providing limited technical input within his narrow sphere of expertise. Mr. Galassi did not share with SGT personnel, consultants hired by SGT or SGT officials any Swales proprietary information including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information.
5. Regarding the affidavit of Mr. Tom Swales concerning the telephone conversation that I held with him on February 17, 2007 my recollection of the conversation agrees with Mr. Swales' recollection except for the Items 13 and 14.
   Item14: My pause (non-answer) was not in response to the question about participation on the Swales proposal. I am sure that I indicated that I was not aware.
   Item13: I failed to answer when Mr. Swales asked about Mr. Galassi's participation in our orals, as I was extremely surprised that he would know who was assigned to our orals.

I declare that under penalty of perjury and under the laws of the State of Maryland that the foregoing is true and correct.

Dated March 12, 2007
Greenbelt, Maryland

[signature]
Harold S. Stinger

Subscribed and sworn to before me, the undersigned Authority, by the said Harold S. Stinger this 12th day of March, 2007 at Greenbelt, Maryland

[signature]
Notary Public

My Commission Expires ________

WANDA HOLBROOK
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
My Commission Expires Aug. 28, 2007

8 / 5

AFFIDAVIT OF KAMAL S. GHAFFARIAN

Kamal S. Ghaffarian, being first duly sworn, hereby deposes and says:

I have reviewed the NASA letter to SGT dated March 1, 2007, on the subject of Procurement Integrity Matter, and I have reviewed the two Swales affidavits that NASA attached to that letter. This affidavit is provided in response to that letter.

1. I am over the age of 21 years; a permanent resident of Howard County, Maryland and the following statement are made based on my personal knowledge.
2. I am the co-owner and Executive Vice President and Chief Operating Officer for SGT, Inc. (SGT). I am also the acting Vice President of Business Development (VP BD). I have been employed by SGT since 1994. In my capacity as acting VP BD I oversee all business development activities and am involved in setting overall strategy including pricing strategy for proposals.
3. I was the Lead Executive and oversaw the capture and proposal efforts for MSES II/A for SGT, Inc. Dr. Andy Endal, an SGT Vice President, was Capture Manager under my direction and Bill Brooks, a consultant hired by SGT, was Proposal Manager under Dr. Endal's direction. As Lead Executive I was heavily involved in setting the proposal strategy, including pricing strategy for SGT and I made all final decisions in this regard.
4. Mr. Nicholas M. Galassi, through his company Aerostress, Inc., was hired by SGT to provide "Red Team" review support in the areas of Understanding the Requirement and Representative Task Orders. He assisted in discussions with NASA in these areas.
5. Up until the time of the Protest by Swales Aerospace (Swales) and the subsequent allegations by Swales against Mr. Galassi, SGT had no indication whatsoever that Mr. Galassi allegedly supported the Swales MSES II/A proposal effort. It is my understanding that this is a matter of dispute between Mr. Galassi and Swales.
6. To my knowledge, Mr. Nicholas M. Galassi did not participate in the development of SGT's MSES II/A cost strategy nor did he work on or assist in SGT's MSES II/A cost proposal or revised cost proposal.
7. To my knowledge, Mr. Galassi did not share with SGT personnel, consultants hired by SGT or SGT officials any Swales proprietary information including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information.
8. I declare that under penalty of perjury and under the laws of the State of Maryland that the foregoing is true and correct.

Dated March 12, 2007
Greenbelt, Maryland

Kamal S. Ghaffarian

Subscribed and sworn to before me, the undersigned Authority, by the said Kamal S. Ghaffarian this 12th day of March 2007 at Greenbelt, Maryland

Notary Public

My Commission Expires

WANDA HOLBROOK
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
My Commission Expires Aug. 08

AFFIDAVIT OF MATTHEW J. YETMAN

Matthew J. Yetman, being first duly sworn, hereby deposes and says:

I have reviewed the NASA letter to SGT dated March 1, 2007, on the subject of Procurement Integrity Matter, and I have reviewed the two Swales affidavits that NASA attached to that letter. This affidavit is provided in response to that letter.

1. I am over the age of 21 years; a permanent resident of Montgomery County, Maryland and the following statement are made based on my personal knowledge.
2. I am a Vice President and Chief Financial Officer (CFO) for SGT, Inc. where I have been employed for more than ten years. In my capacity as CFO among other duties I oversee proposal pricing and am involved in setting pricing strategy for proposals. I also approve consulting agreements for SGT.
3. I oversaw the pricing of SGT's MSES II/A proposal and was involved with setting pricing strategy for MSES II/A.
4. On 4/19/2006 I signed a consulting agreement on behalf of SGT with Mr. Galassi's company Aerostress, Inc. whereby Aerostress, Inc. was to "provide SGT Business Development expert reviews and contributions to understanding requirements and Representative Task Orders (RTO) for MSES II/A proposal". The value of the Aerostress task was not to exceed $4,400 and the period of performance was March 17, 2006 through April 15, 2006. The task monitor and requestor of the consulting agreement was Dr. Andy Endal, SGT's capture manager. On June 1, 2006 SGT paid an invoice in the amount of $3,740 for these services.
5. To my knowledge Mr. Nicholas M. Galassi did not participate in the development of SGT's MSES II/A cost strategy nor did he work on or assist in SGT's MSES II/A cost proposal or revised cost proposal.
6. To my knowledge Mr. Galassi did not share with SGT personnel, consultants hired by SGT or SGT officials any Swales proprietary information including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information.
7. I declare that under penalty of perjury and under the laws of the State of Maryland that the foregoing is true and correct.

Dated March 12, 2007
Greenbelt, Maryland

[signature]
Matthew J. Yetman

Subscribed and sworn to before me, the undersigned Authority, by the said Matthew J. Yetman this 12th day of March, 2007 at Greenbelt, Maryland

[signature]
Notary Public

My Commission Expires

WANDA HOLBROOK
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
My Commission Expires Aug. 28, 2007

AFFIDAVIT OF WILLIAM EMMETT BROOKS, III

William E. Brooks, III, being first duly sworn, hereby deposes and says:

I have reviewed the NASA letter to SGT dated March 1, 2007, on the subject of Procurement Integrity Matter, and I have reviewed the two Swales affidavits that NASA attached to that letter. This affidavit is provided in response to that letter.

1. I am over the age of 21 years; a permanent resident of Anne Arundel County, Maryland and the following statement are made based on my personal knowledge.
2. I am the President and sole proprietor of Aldebaran, LLC that has been in existence since 2003.
3. For the MSES II/A proposal, Aldebaran, LLC was under contract to SGT, Inc with duties as Proposal Manager. The Proposal Manager is responsible for organizing, planning, scheduling, and overseeing the daily details of proposal production. A part of this responsibility also involves setting up and conducting reviews of the various proposal volumes.
4. I first met Mr. Nick Galassi at a Red Team Review conducted at SGT on March 23-24, 2006. The Red Team Review is a review of the "almost final" proposal in that the text and graphics are in the final formats and have been reviewed at least twice before. Mr. Galassi was asked to review Representative Task Orders (RTO's) 1 and 2. As I recall, he had minor technical suggestions. The review of the RTO Basis of Estimates (BOE) was limited to a smaller team consisting of the RTO author's, Dr. Andy Endal, Bill Brooks, Mr. Al Sherman, and Mr. Don Krueger. This review of the BOEs was technical in nature and did not contain the cost data that was prepared by Mr. Matt Yetman and his finance team.
5. At no time did Mr. Galassi participate or provide inputs to any aspects of the Cost Volume.
6. At this time, March 2006, I was unaware that Mr. Galassi was a former employee of Swales Aerospace.
7. When SGT received notification of Discussions for the MSES II/procurement, a matrix of responsibilities was developed by me and Dr. Andy Endal to address each discussion item. Mr. Galassi was not on this initial matrix. As the team progressed in the preparation of specific answers to each Discussion Item, it became clear that we were not making adequate progress on several of the items. One of these was for Integration and Test (This was Question #4 under Subfactor A.4.a and A.4.b).
8. With Dr. Endal's approval, I personally contacted Mr. Galassi and asked if he would be willing to support the SGT response. He agreed to support this effort and did prepare the responses to this specific question for both the Discussion Presentation and the Final Proposal Revision (FPR) text. That was the limit of his participation in the MSES II/A Proposal. This work was performed in September, 2006.
9. I can state without equivocation that Mr. Galassi did not participate or have knowledge of any aspects of the SGT Cost strategy or Cost Volume. All Cost Volume work was physically and electronically isolated from the proposal team responsible for the Technical and Past Performance Volumes of the Proposal.
10. Mr. Galassi did not participate in the preparation or review of the Basis of Estimates (BOEs) required for the Representative Task Orders.
11. To my knowledge Mr. Galassi did not share with SGT personnel, consultants hired by SGT or SGT officials any Swales proprietary information including but not limited to:

Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information.

12. I declare that under penalty of perjury and under the laws of the State of Maryland that the foregoing is true and correct.

Dated March TBD, 2007
Greenbelt, Maryland

W. E. Brooks III

William E. Brooks, III

Subscribed and sworn to before me, the undersigned Authority, by the said William E. Brooks, III this 12th Day of March, 2007 at Greenbelt, Maryland

Notary Public

My Commission Expires

WANDA HOLBROOK
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
My Commission Expires Aug. 28, 2007

AFFIDAVIT OF ANDREW S. ENDAL

Andrew S. Endal, being first duly sworn, hereby deposes and says:

I have reviewed the NASA letter to SGT dated March 1, 2007, on the subject of Procurement Integrity Matter, and I have reviewed the two Swales affidavits that NASA attached to that letter. This affidavit is provided in response to that letter.

1. I am over the age of 21 years; a permanent resident of Anne Arundel County, Maryland and the following statement are made based on my personal knowledge.
2. I am a Vice President for Business Development for SGT, Inc. where I have been employed for more than five years. In my capacity as Vice President for Business Development among other duties I oversee proposal development, including strategies, management approach and technical approach.
3. I was the Capture Manager for SGT's MSES II/A proposal and was involved with setting overall strategies for MSES II/A.
4. In the first part of March 2006, I contacted Mr. Nicholas Galassi to assist in providing expert review and inputs to the Understanding the Requirements (UTR) and Representative Task Order (RTO) portions of SGT's MSES II/A proposal, based on Mr. Galassi's reputation in the NASA community as an expert mechanical stress analyst. I requested that SGT hire Mr. Galassi as a consultant to assist with the final reviews of the UTR and RTO portions of SGT's MSES II/A proposal. I was the SGT Technical Monitor for Mr. Galassi's work under this consulting agreement.
5. I first assigned Mr. Galassi to review and comment on drafts of the UTR sections on Structural Analysis & Loads Engineering and on Mechanical Engineering, his areas of engineering expertise. This review was performed on March 19, 2006. His comments were used to revise these sections prior to the Red Team Review. I then assigned him to participate in the Red Team Review of the RTOs on March 24-25, 2006. The Red Team Review involved 21 reviewers, with 6 of them assigned to review the RTOs. Mr. Galassi concentrated on RTOs 1 and 2, which dealt with mechanical engineering, consistent with his area of expertise. Subsequently, Mr. Galassi assisted our UTR and RTO authors in understanding his comments and revising their sections appropriately. SGT's initial proposal was submitted to NASA on April 17, 2006. The total time spent by Mr. Galassi in assisting with the reviews and revisions of the technical sections of SGT's initial proposal was 34 hours.
6. Around September 1, 2006, I requested that Mr. Galassi assist SGT in addressing the NASA findings on the UTR and RTO sections of our original proposal (findings transmitted by NASA letter of August 31, 2006). Specifically, I assigned Mr. Galassi to assist in addressing the findings on the Integration and Test (I&T) Engineering section of the UTR and to review (again) RTOs 1 and 2 with respect to the associated NASA findings. Mr. Galassi assisted in developing our presentation, and led the discussions with NASA on September 11, 2006 regarding the findings on the I&T Engineering section of the UTR. In doing so, Mr. Galassi applied his expertise as a mechanical engineer on aerospace projects. Mr. Galassi was one of 16 SGT Team participants in these discussions.
7. Subsequently, I requested Mr. Galassi to help incorporate the materials from the discussions into our final proposal. Mr. Galassi was assigned to revise Section 1.2.8 (UTR section on I&T Engineering). After several iterations, this assignment was completed on September 26, 2006. SGT's Final Proposal Revision (FPR) was submitted to NASA on October 3, 2006.

8. Throughout all of the above assignments performed by Mr. Galassi, he applied industry-wide and NASA-specific engineering practices and his engineering training and judgment to address the technical requirements of the MSES II/A RFP. Mr. Galassi participated as part of a large team of aerospace engineers, including SGT staff and consultants, as well as Team Member staff. This Team has over 5 decades of experience in addressing technical problems similar to those posed in the MSES II/A RFP. In developing the UTR and RTO sections of SGT's MSES II/A proposal, we utilized the proposal engineering processes, outlines, and presentation techniques previously developed for SGT's successful METS proposal to NASA/GSFC.
9. At no point did Mr. Galassi see, help develop, or review any aspects of SGT's cost strategy, Cost Proposal (original or revised), or Past Performance Proposal (revised Past Performance Volume not required).
10. Throughout all my interactions with Mr. Galassi, I did not solicit nor did he share, with SGT personnel, consultants hired by SGT, or SGT officials any Swales proprietary information including but not limited to: Swales proposal strategy; Swales cost or pricing information; Swales pricing strategy; Swales technical information.
11. I declare that under penalty of perjury and under the laws of the State of Maryland that the foregoing is true and correct.

Dated March TBD, 2007
Greenbelt, Maryland

Andrew S. Endal

Subscribed and sworn to before me, the undersigned Authority, by the said Andrew S. Endal this ___ day of March, 2007 at Greenbelt, Maryland

Notary Public

My Commission Expires ______

WANDA HOLBROOK
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
My Commission Expires Aug. 28, 2007

SGT, Inc.

7701 Greenbelt Road
Suite 400
Greenbelt, MD 20770
Phone: (301) 614-8600
Fax: (301) 614-8601

| | | | |
|---|---|---|---|
| ID No: | SGT | | |
| Date From: | March 17, 2006 | | |
| Date To: | April 15, 2006 | | |
| Agreement No: | 06-30 | | |

**CONSULTANT AGREEMENT**
**Between**
**SGT, INC.**
**and**
**Aerostress, Inc.**

**THIS CONSULTANT AGREEMENT** (hereinafter Agreement) is made as of this **28th** day of **March, 2006**, in the City of Greenbelt, Maryland by and between SGT, Inc. (herein "SGT"), a Maryland corporation, and **Aerostress, Inc.**(hereinafter "Consultant").

**WITNESSETH:**

**WHEREAS, SGT, Inc.** is now, among other activities, engaged in performance of certain studies, experiments, research and development projects at SGT, Inc., Greenbelt, MD., and

**WHEREAS, SGT** desires to retain the services of Consultant in connection with such activities and Consultant desires to render such services:

**AGREEMENT:**

**NOW THEREFORE,** in consideration of the foregoing and mutual covenants and conditions and warranties hereinafter contained, it is mutually agreed as follows:

**SECTION 1.0. STATEMENT OF WORK:**

1.1 Consultant shall provide SGT with his best efforts, information, and professional skills in the following areas (s):

**See Attached Exhibit A**

1.2 Consultant shall perform the work according to mutually agreed upon Task Assignment Orders (TAO's) issued on an as needed basis.

**See Attached Exhibit A**

Initial Here

SECTION 2.0. COMPENSATION:

2.1 For such Consultant services, SGT shall, within thirty (30) calendar days after receipt of invoices submitted in accordance with Section 4.0 hereof, compensate Consultant at the hourly rate listed for the services rendered in accordance with this Agreement, for the period of performance indicated:

| Fixed Hourly Rate | Period of Performance | | Initials | |
|---|---|---|---|---|
| **$110.00** | (From) **March 17, 2006** | (To) **April 15, 2006** | Aerostress, Inc. | SGT |

2.2 Travel, if authorized, for the performance of work effort, will be reimbursed for actual and reasonable costs. Travel will not be reimbursed beyond the amount specified in the TAO.

2.3 Travel arrangements must be made through or coordinated with the SGT Task Monitor.

2.4 In no event shall the total cost to SGT exceed the sum of TAO (s) issued unless so modified by written revision hereto.

2.5 SGT will provide consultant with task orders that will specify specific duties and will provide hour and dollar authorization. Consultant shall not exceed the cumulative amount of funding authorized.

2.6 Consultant, if not a US Citizen, shall obtain, appropriate visa status in order to be reimbursed for work performed under this Agreement. Reimbursement will be made in United States dollars.

2.7 Consultant will be responsible for payment of his/her own social security and other taxes and insurances. SGT is not responsible for the payment of these or any other benefits.

SECTION 3.0. IDENTIFICATION, NON-DISCLOSURE:

3.1 Consultant shall identify his/her affiliation as representing SGT when performing any effort funded under this agreement, such as attendance and presentations at meetings and conferences, in any written reports, or at any work location.

SECTION 4.0. PAYMENT/INVOICE REQUIREMENTS:

**4.1 Invoice Requirements:**

**Invoices Shall**

- **Clearly distinguish cost by specific Task Assignment Order/Proposal efforts**
- Reference Agreement Number

Initial Here

- Be submitted on a monthly basis
- Be submitted in arrears
- Be numbered chronologically
- Specify period covered by invoice
- Specify by proposal effort current period hours, other direct costs, and labor dollars
- Specify proposal effort cumulative-to-date hours, ODC's, and labor dollars
- Specify cumulative-to-date hours, ODC's, and labor dollars
- Include an itemized detail of dates and hours worked for the month covered by invoice
- Be attached to an Expense Report, if travel's applicable
- Be signed and mailed to the attention of:

SGT, Inc.
7701 Greenbelt Rd., Suite 400
Greenbelt, MD 20770
**Attn: Sharon Tolson,**
**Subcontract Administrator**

**SECTION 5.0. INVENTION: DATA: CONFIDENTIAL INFORMATION: SURVIVAL OR COVENANTS:**

5.1 *Inventions:* Consultant shall:

(i) Promptly disclose to SGT all inventions, developments, improvements and contrivances (herein collectively called "inventions") in the line of SGT's present or future business which are made or conceived or actually reduced to practice by Consultant or with Consultant's assistance or under Consultant's direction in the course of performance under this Agreement, whether or not patentable and whether so made by Consultant, individually or jointly with others, which relate or are attributable to or result from any work which Consultant may do pursuant to this Agreement or any information obtained by Consultant in any discussions or meetings with employees of SGT.

(ii) Assign and does hereby assign all Consultant's rights, title and interest (hereinafter called "rights") in and to said inventions to SGT in every proper way to protect at SGT expense said inventions and rights therein, including but not limited to, the signing of patent applications, oath, and assignments in favor of SGT relating to said inventions, respecting such applications in the United States.

(iii) Make no applications for patents on any such inventions except as hereinafter provided.

(iv) Inventions, as that term is used in this Article, include without limitation, any invention which Consultant may conceive outside the scope of this Agreement, but which has been initiated, improved, or actually reduced to practice by Consultant or with his consent at SGT facilities.

(v) The consultant retains the right to reuse all "work and data" accomplished while in contract with SGT, Inc.

5.2 *Propriety Information*: Consultant shall not, during the terms of this Agreement or afterwards, use or disclose, except as authorized in writing by SGT, any confidential information whatsoever obtained from or through SGT as a result of work done pursuant to this Agreement, nor display for any drawing, letter, report, or any copy or reproduction thereof, belonging to or pertaining to SGT

Initial Here

without written authorization from SGT, unless such drawing, letter or report has been previously published by the Company. For purpose of this Agreement, proprietary information includes any and all financial information, confidential, sensitive, company private, management private or any other such data. Except as may be required by law, the Consultant agrees not to disclose to any person either the fact that discussions or negotiations are taking place concerning possible transactions or any of the terms, conditions or other facts with respect to any such possible transaction, including the status thereof without the prior written consent of SGT. The term "confidential information" as used in this subparagraph shall mean any technical or non-technical data, communication computer program or record device, process, method or technique originated by or peculiarly within the knowledge of SGT, its employees and those in privity with it, which is not available to the public and is subject to protection as property under recognized legal principals.

5.3 *Survival of Covenants:* The covenants in this Section to be performed by Consultant shall survive the termination of this Agreement or any amendments or extensions thereof, regardless of the reason for such termination, and shall be performed without any additional compensation therefore by SGT.

**SECTION 6.0. ASSIGNMENT OF AND LICENSE TO COPYRIGHTABLE DATA:**

6.1 Consultant shall assign and does hereby assign to SGT all right, title and interest in copyright able materials which are first produced or composed by Consultant in the performance of this Agreement whether or not completed after termination of this Agreement.

6.2 Consultant shall grant and does hereby grant to SGT and to its officers, agents and employees acting within the scope of their official duties, a royalty-free nonexclusive and irrevocable license to reproduce, translate, publish, use and dispose of, and to authorize others to do so, all copyrighted and copyrightable materials which are not first produced or composed by Consultant in the performance of this Agreement, but which has been incorporated in any material furnished under this Agreement, provided that such license shall be only to the extent that Consultant now has, or prior to completion of final settlement of this Agreement may acquire, the right to grant such license without becoming liable to pay compensation of other solely because of such grant.

6.3 SGT shall grant and does hereby grant to Consultant, and to its officers, agents, and employees acting within the scope of their official duties, a royalty-free nonexclusive and irrevocable license to reproduce, translate, publish, use, and dispose of, and to authorize others to do so, all copyrighted and copyrightable materials which are first produced or composed by Consultant in performance of this Agreement whether or not completed after termination of this agreement.

**SECTION 7.0. STATUS AS INDEPENDENT CONTRACTOR: OTHER COMMITMENTS: TERMINATION: LIABILITY:**

7.1 *Independent Contractor:* Consultant is and shall be deemed at all times to be an independent contractor. Nothing herein contained is intended nor shall be construed for any purpose as creating the relation of employer and employee between the parties. Consultant shall be free from control in the methods; means and manner of his/her accomplishment of the work called for by TAO(s) issued hereunder, but shall be responsible for the timely and proper completion of such work.

7.2 *Other Commitments:* Consultant represents that except as may be provided elsewhere herein, he is now under no obligation, contract or agreement, nor has he previously executed any documents

Initial Here

whatsoever with any other person, firm, association or corporation that will, in any manner prevent his giving, and SGT from receiving, the benefit of his Consultant Services and any all inventions that may be made or devised by him or with his assistance or under his direction, in performance of this Agreement. During the term of this Agreement or any extension or renewal thereof, the Consultant may be engaged as a Consultant by other persons, firms or corporations engaged in the same or similar business as that of SGT provided, however, that the provisions of Section 5.0, 10.0 and 11.0 hereof shall be strictly observed by the Consultant as respects such other persons, firms or corporations. If the Consultant shall develop or assist in the development of an invention, either, for a corporation, himself or any other entity and if such invention is developed completely independent of any work performed hereunder of SGT or any information obtained as a result thereof, such invention shall be the sole and exclusive property of Consultant or such other persons, firms or corporations.

7.3 *Termination:* SGT may terminate this agreement at any time by written notice to the consultant. This agreement may be terminated by the consultant by giving (30) thirty days written notice to SGT. Termination under this paragraph shall be without prejudice to any sums therefore accrued, provided however, that SGT may retain any final payment otherwise due to Consultant pending Consultant's satisfactory completion of any work remaining under assigned TAO(s), or such other satisfactory completion as may be agreed to by SGT.

7.4 *Liability:* SGT or their employees shall not be liable for any injury to the person or property of Consultant, except where such injury was directly caused by the fault or negligence of SGT or such employees in the course of their employment.

**SECTION 8.0. GOVERNMENT SECURITY:**

8.1 If and to the extent that this Agreement involves access to matter classified "TOP SECRET", "SECRET", or "CONFIDENTIAL," Consultant shall comply with the Government security controls in accordance with;

(i) The requirements of the United States Department of Defense "Industrial Security Manual for Safeguarding Classified Information (Attachment to DD Form 441), "as in effect on the date of this agreement, which manual is hereby incorporated by reference and made a part of this Agreement, and

(ii) Any agreements to said manual required by the demands of national security as determined by the Government and made after the date of this Agreement, notice of which has been furnished to Consultant by SGT.

8.2 The requirements of the Federal Acquisition Regulation Subpart 4.4 (Safeguarding Classified Information Within Industry) apply to this agreement.

**SECTION 9.0. GENERAL TERMS:**

9.1 Any provisions of this Agreement, which shall be held to be unenforceable, shall not invalidate or render unenforceable any other provision of this Agreement. This Agreement shall be binding upon and inure to the benefit of the heirs, legatees, successors and assign of the parties hereto.

9.2 This Agreement may not be assigned by the consultant.

9.3 This Agreement shall be governed by and construed under the laws of the State of Maryland.



Initial Here

9.4 In the event that any dispute arising under this Agreement results in litigation, the parties hereby consent to and agree that the appropriate venue for such litigation shall be the Circuit Court for the City of Greenbelt.

**SECTION 10.0. RESTRICTION AGAINST COMPETITION**

10.1 Consultant agrees to provide exclusive support to SGT on various proposals as identified within the Task Assignment Orders. Consultant also agrees to not compete *against* SGT by providing support to another contractor for any proposal that SGT is pursuing wherein the consultant provides support to SGT.

**SECTION 11.0.** *Intentionally Omitted*

**SECTION 12.0.** *Intentionally Omitted*

**SECTION 13.0. RETURN OF MATERIALS:**

13.1 Upon the termination of this Agreement for any reason, whether such termination is effected by Consultant or SGT, with or without cause, Consultant shall promptly deliver to SGT all property, materials, documents, and copies of documents concerning SGT's operations or customers which Consultant has in his possession at the time of termination.

**SECTION 14.0. RESTRICTIVE COVENANTS OF THE ESSENCE:**

14.1 The restrictive covenants of the Consultant set forth herein are of the essence of this Agreement; they shall be construed as independent of any other provision in the Agreement; and the existence of any claim of cause of action of the Consultant against SGT, whether predicated on this Agreement or not, shall not constitute a defense to the enforcement by SGT of the restrictive covenants contained herein.

**SECTION 15.0. SEVERABILITY:**

15.1 It is the intention of the parties that the provisions of the restrictive covenants herein shall be enforceable to the fullest extent permissible under the applicable law. If any clause or provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws effective during the term hereof, then the remainder of this Agreement shall not be affected thereby, and in lieu of each clause or provision of this Agreement which is illegal, invalid, or unenforceable, there shall be added, as part of this Agreement, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause provision as may by possible and as may be legal, valid and enforceable.

Initial Here

**ENTIRE AGREEMENT**

The parties hereby agree that this agreement, including all documents incorporated herein by reference, shall constitute the entire agreement and understanding between the parties hereto and shall supersede and replace any and all prior or contemporaneous representations, agreements or understandings of any kind, whether written or oral, relating to the subject matter hereof. Further, all additions or modifications to this agreement must be made in writing and signed by SGT.

In witness whereof, the duly authorized representatives of SGT and the Consultant have executed this Agreement on the Dates shown.

| Aerostress, Inc. | SGT, INC. |
|---|---|
| [signature] | [signature] |
| Signature | Signature |
| Nicholas Galassi | Matthew Yetman |
| Name | Name |
| 20-3682447 | Vice President, Business Operations/CFO |
| Social Security # / EIN | Title |
| 4/14/06 | 4/19/06 |
| Date | Date |

## EXHIBIT A

## Task Assignment Orders (TAO) for Aerostress, Inc.

Task Order Number:

1

Task Monitor:

Andy Endal

Period of Performance:

March 17, 2006 through April 15, 2006

Hourly Rate:

$ 110.00

Total Task Value not to Exceed:

$ 4,400

Travel:

$ 0

Statement of Work:

Consultant will provide SGT Business Development expert reviews and contributions to understanding requirements and Representative Task Orders (RTO) for the MSES II/A proposal.

Deliverables:

- Comments on proposal sections, as assigned by Task Monitor.
- Others as required by Task Monitor

Initial Here

SGT, INC.

17926

| OUR REF NO. | YOUR INVOICE NO. | INV. DATE | INVOICE AMOUNT | AMOUNT PAID | DISCOUNT TA.. | NET CHECK AMOUNT |
|---|---|---|---|---|---|---|
| 22015 | 1019 | 05/31/2006 | $3,740.00 | $3,740.00 | $0.00 | $3,740.00 |
| | TOTALS | | $3,740.00 | $3,740.00 | $0.00 | $3,740.00 |

SGT, INC.
7701 Greenbelt Road
Suite 400
Greenbelt, MD [illegible]
[illegible]

Wachovia
Wachovia, N.A.
wachovia.com
[illegible]

17926

| DATE | CONTROL NO. | AMOUNT |
|---|---|---|
| 06/01/2006 | [illegible] | [illegible] |

Three Thousand Seven Hundred Forty And 00/100 Dollars

PAY TO THE ORDER OF

[illegible]

AUTHORIZED SIGNATURE

SGT, INC.

17926

AEROSTRESS, INC
5205 NAHANT STREET
BETHESDA, MD 20816

Voucher: 22015

Entry User ID: MLUNKINS

Vendor: AEROSTRESS Aerostress, Inc
Invoice #: 1019
Invoice Date: 05/31/2006
Due Date: 06/30/2006
Anticipated Pay Date: 06/30/2006
Invoice Type: N
Payment Control: N

Exp Rpt ID:
AP Acct/Org: 20000-001/1.01
Approved: Y
Hold Voucher: N
Recurring: N
Delivery Amt: 0.00

FY: 2006 Period: 9 Subperiod: 2
Total Before Disc: 3,740.00
Discount Amt:
Amount Due: 3,7
Terms: NET 30
Over Budget: N

Header Notes:

| Line | Acct No/Name | Org No/Name/Ref 1 | Proj No/Name/Ref 2 | Description | Total |
|---|---|---|---|---|---|
| 1 | 86500-001<br>B&P Cons & Subs Labor | 1.01.01.04<br>Marketing Dept Offsite | BP072.MSES<br>STARSS Capture | B&P Cons & Subs Labor<br>Project Account Abbrev: | 3,740.00 |

Cost Amt: 3,740.00
Disc Amt: 0.00

Sales Tax: 0.00
Net Amt: 3,740.00

Total Before Disc: 3,740.00
Use Tax: 0.00

Total Voucher: 3,740.00

8/21

8 / 22

# SGT - Accounting Department

## ENTER/EDIT A/P VOUCHERS

PAGE 1 OF

VENDOR ID: VENDOR NAME: Aerostress, Inc

VOUCHER NO: FISCAL YEAR: ACCT PD: SUB PD:

INV. NO: 1019 INV. DATE: 4/30/06 DUE DATE: 05/30/06 INVOICED AMOUNT: $3,740.00

Agreement #: / P.O. #.: 06-30 TERMS: Net 30 SENT: RECEIVED:

| Account # | Organization | Project | Description | Cost Amount |
|---|---|---|---|---|
| 86 500-00 | 1.01.01.0 | BPO72.MSES | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

In-house tracking / Please keep to the following schedule:

| Initial upon completion | Employee Name | Note / Request |
|---|---|---|
| ✓ | Sharon | Tracking |
| ✓ | Ron | Approval |
| Kc, 5/8/06 | Kosa | Coding |
| | Sharon Tolson | Final Tracking |

Remaining Value:

Total Amount $3,740.00

220/5

Aerostress, L

5205 Nahant Street
Bethesda, VA 20816

# Invoice

| Date | Invoice # |
|---|---|
| 4/30/2006 | 1019 |

| Bill To |
|---|
| SGT, Inc.<br>Sharon Tolson<br>7701 Greenbelt Road., Suite 400<br>Greenbelt, MD 20770 |

| P.O. No. | Terms | Project |
|---|---|---|
| 06-30 | 30 days | |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 34 | MSES2A Proposal Support (3/19 - 4/13/06) Final Billing | 110.00 | 3,740.00 |
| | **Total** | | $3,740.00 |

TIN#

RECEIVED
MAY 1 2006

OK Ronald Dickey
change to 3P072.MSES
Ron 5/30/06

# SGT, Inc,
## CONSULTANT WEEKLY TIME SHEET

| Name: Nicholas M. Galassi | Purchase Order/Agreement 06-30 | Period Start Date 3/17/2006 | Period End Date 4/15/2006 |
|---|---|---|---|

| Agreement Number | Task Description | S | S | M | T | W | T | F | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| 06-30 | MSES2A Proposal Support (week of 3/24/2006) | | 5 | | | | 8 | 8 | 21 |
| 06-30 | MSES2A Proposal Support (week of 3/31/2006) | | | | | | | | 0 |
| 06-30 | MSES2A Proposal Support (week of 4/07/2006) | | | | | | | | 0 |
| 06-30 | MSES2A Proposal Support (week of 4/14/2006) | 8 | | | 2 | 1 | 2 | | 13 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Consultant Signature: [signature] 5/1/06 TOTAL<br>Approved By: [signature] | | | | | | | | | 34 |

8 / 24

May 1, 2006

SGT, Inc.
7701 Greenbelt Road, Suite 400
Greenbelt, MD 20770

Dear Ms. Tolson,

I have enclosed an invoice and timesheet for my work on the MSES2A Proposal Effort (Agreement # 06-30). This is my final invoice and includes all my hours on this task. Please let me know if you require any additional paperwork or information. Thank you.

Sincerely,

[signature]

Nicholas M. Galassi
(301-320-5179)

Aerostress, Inc.
5205 Nahant Street
Bethesda, MD 20816

PARGAMENT & HALLOWELL, PLLC
Attorneys at Law

1776 K Street, N.W., Suite 825
Washington, DC 20006

(202) 775-0707 (v)
(202) 775-0733 (f)

# FAX COVER SHEET

| | |
|---|---|
| TO: | KATHLEEN M. PIERSON |
| FAX NO.: | 301-286-1720 |
| FROM: | ANDREW P. HALLOWELL |
| DATE: | March 13, 2007 |
| NO. OF PAGES: | 4 |
| NOTE: | |

**This facsimile contains information which is privileged and confidential. It is intended for the sole use of the individuals or entities to which it is directed. Unauthorized use of this communication is unlawful. If you have received this facsimile in error, please notify our office at the above number immediately.**

MAR-12-2007 22:51 FROM:PARGAME & HALLOWEL 2027750733 TO 3012861720 P.2

PARGAMENT & HALLOWELL
ATTORNEYS AT LAW

March 13, 2007

PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

VIA FACSIMILE (301) 286-1720

Ms. Kathleen M. Pierson
Contracting Officer
National Aeronautics and Space Administration
Goddard Space Flight Center
Greenbelt, Maryland 20771

RE: NASA Solicitation No. NNG0596383R, MSES IIA – Procurement Integrity Matter

Dear Ms. Pierson:

On behalf of Nicholas Galassi, I am forwarding an Affidavit for your consideration in the above-referenced Procurement Integrity Matter. Should you require any additional information from Mr. Galassi, please do not hesitate to contact me.

Also, as you may be aware, Swales & Associates, Inc. has filed a lawsuit against Mr. Galassi and his consulting company, Aerostress, Inc., in the Circuit Court of Prince George's County, Maryland alleging that Mr. Galassi used and disclosed trade secrets and confidential information of Swales to SGT. Mr. Galassi categorically denies the claims in the lawsuit, and is vigorously defending against them through this office.

Sincerely,

Andrew P. Hallowell

Enclosure

Cc: Dr. Kamal S. Ghaffarian
Executive Vice President/COO
SGT, Inc.

## AFFIDAVIT OF NICHOLAS M. GALASSI

I, NICHOLAS M. GALASSI, being duly sworn, hereby swear and affirm as follows:

1. I am the President and sole owner of Aerostress, Inc. ("Aerostress"), a consulting company that provides structural analysis and engineering. I have provided structural and mechanical engineering services at NASA Goddard Space Flight Center since 1987, as an employee of various companies, including Fairchild Industries (1987-1993), Swales & Associates, Inc. ("Swales") (1993-2005), and Aerostress.

2. I have reviewed a letter from Kathleen M. Piersen dated March 1, 2007 to SGT, Inc. ("SGT") referencing "Procurement Integrity Matter" under NASA Solicitation No. NNG05963383R ("MSES-IIA"). I am providing this affidavit to help provide answers to the questions in her letter.

3. I worked at Swales as a structural engineer from 1993 through the effective date of my resignation, October 28, 2005. While employed at Swales, my involvement with MSES-IIA was limited to attendance at the kickoff meeting and subsequent meetings in or around June-July 2005 regarding RTO No. 1, which at that time had been released by NASA in draft form. I had no involvement in Swales' MSES-IIA effort after July 2005. I was not involved in the preparation or drafting of Swales' response to that draft RTO No. 1 or any other portion of Swales' proposal for MSES-IIA.

4. In April 2006, my company, Aerostress, entered into a Consulting Agreement with SGT dated March 28, 2006 to review and provide technical input on SGT's proposal for the MSES-IIA procurement in the areas of Understanding the Requirements ("UTR") and Representative Task Orders ("RTOs"). *Through Aerostress*, I performed approximately 34 hours of consulting services in March-April 2006 consisting of reviewing and commenting on SGT's proposed solution to RTOs and UTR in the MSES-IIA procurement.

5. During the time that I was performing services for SGT, I advised two members of Swales management (who supervised me on the work I performed while I was with Swales) that I was working for SGT on a portion of its proposal. I informed them of this because I had frequents contacts with them on the SDO program, and I wanted to ensure that they would not inadvertently disclose to me any confidential and proprietary information regarding Swales' proposal for MSES-IIA. They did not voice any objection and did not disclose any such confidential and proprietary information to me.

6. In September 2006, I was asked by SGT to participate in an oral presentation to NASA in the area of Integration and Test Engineering. I participated at SGT's oral presentation in this limited area. Following the presentation, I provided input in connection with SGT's response to NASA in the same area, i.e., Integration and Test Engineering.

7. In performing services for SGT, I relied on my skills and expertise as a structural analysis engineer. At no time did I use or disclose to SGT any information regarding Swales' proposed solutions to RTOs or any confidential information or trade secrets of Swales.

8. At no time was I involved with drafting SGT's proposal, but rather, my involvement consisted of reviewing and providing technical input in the limited areas described above.

9. I did not provide input or otherwise assist SGT in the preparation of any aspect of its cost or business proposal. Further, I have never seen any portion of SGT's cost or business proposal, nor has any portion of SGT's cost or business proposal been verbally disclosed to me.

10. I no longer work for SGT regarding the MSES-IIA proposal and have no plans to perform additional services to SGT in connection with its MSES-IIA proposal.

11. I have also reviewed the Affidavit of David Baran, which is attached to Ms. Piersen's letter. This affidavit makes no reference to the MSES-IIA proposal. Under a separate purchase order from Swales issued in November 2005, through Aerostress, I provided engineering services to Swales in connection with the Solar Dynamics Observatory ("SDO") program. This was a continuation of similar work on the SDO program while I was a Swales employee. Swales discontinued the purchase order relationship by letter dated January 26, 2007 and requested that I return all Swales materials related to the performance of the purchase order. Accordingly, I promptly returned them. The external hard drive that I returned to Swales included data that I had used and/or retained in connection with my performance of services for the SDO program, both as a Swales employee and as a Swales consultant. At no time did I use or disclose to SGT any such data.

I HEREBY CERTIFY under the penalties of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

[signature]
NICHOLAS M. GALASSI

STATE OF MARYLAND :
COUNTY OF Prince George's:

Subscribed and sworn before me this 12 day of March, 2007, a Notary Public in and for the State and County aforesaid.

[signature]
Notary Public

My commission expires:

SHANTEL THORNE
NOTARY PUBLIC
PRINCE GEORGE'S COUNTY
MARYLAND
MY COMMISSION EXPIRES JULY 3, 2010

SWALES
AEROSPACE

Arthur Leaderman
Vice President & General Counsel
(301) 902-4489

PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE
ORDER

March 14, 2007

Kathleen M. Pierson
Contracting Officer
Code 210.M
NASA Goddard Space Flight Center
Greenbelt, Maryland 20771

*Re: NASA Solicitation No. NN60596383R (MSES IIA; Investigation of Procurement Integrity Matter under MSES IIA*

Dear Ms. Pierson,

This letter and its attachments respond to your letter of March 1, 2007 requesting that Swales provide data responsive to six questions. Our submittal includes some documentary exhibits, including among others, a spread sheet in the possession of Aerostress, Inc. during the MSES IIA procurement. The document is annotated by Swales to point to the algorithms and formulae in the spread sheet that may be accessed to compute contract costs and prices with Swales' current cost data.

Besides providing other data related to Mr. Galassi's obligations to protect Swales' proprietary data, we observe that Mr. Galassi's entity, Aerostress, was the recipient of a sole source award from GSFC in 2006 to perform work that he performed as an employee of Swales Aerospace and for which other contractors regularly competed. In this sole source capacity for GSFC and in his previous work at Swales, Mr. Galassi was assigned certain responsibilities most usually reserved for civil servants which included giving guidance and technical direction to civil servants. These included top level program technical decisions. Accordingly, his role and that of his emerging entity had significant visibility at GSFC. All his activity occurred simultaneously with consulting work that Aerostress and Mr. Galassi obtained from Swales under a *promise* to maintain a confidentiality obligation.

A strong inference emerges that Mr. Galassi's work on behalf of SGT, Inc was aimed to obtain new business for Aerostress while trading *against* his obligation to Swales and trading *for* status and MSES IIA positions with SGT. We believe further that in this procurement evaluation SGT sought (and may have obtained) from GSFC meaningful credit in its management proposal for a corporate affiliation or mentoring relationship with this emerging entity.

SWALES
AEROSPACE

Kathleen M. Pierson
March 14, 2007, page 2

As the federal court that maintains special jurisdiction over such matters has held:

> When it appears that a bidder may have prepared its bid proposal with knowledge of its competitor's bid, such an appearance taints the integrity of the procurement process, regardless of whether any proprietary information was actually obtained or used.
> 22 Ct. Cl. 193

For these reasons, Swales expresses concern that each item of the letter of March 1, 2007 seeking data from Swales focuses solely on Mr. Galassi in his individual capacity. Nothing in the GSFC letter evidences concern that Aerostress and SGT related to each other as *corporate* persons for *mutual corporate* gain. This element of the problem needs investigation, as much as Mr. Galassi's role as a person acting individually.

Very truly yours,

Arthur Leaderman

cc: Robert M. Stephens, Chief Counsel.

5050 Powder Mill Road • Beltsville MD 20705 • 301-595-5500 • Fax 301-902-4114 • www.swales.com

STATE OF MARYLAND

IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY

| | |
|---|---|
| SWALES & ASSOCIATES, INC.,<br>Plaintiff,<br><br>v.<br><br>AEROSTRESS, INC. and<br>NICHOLAS M. GALASSI,<br>Defendants. | Case No. CAL07-02947 |

AFFIDAVIT OF DAVID BARAN

County of Prince George's )
) ss:
State of Maryland )

I David Baran, being first duly sworn, hereby deposes and says:

1. I am over the age of 21 years, a permanent resident of Carroll County, Maryland and the following statements are made based on my personal knowledge.

2. I am an engineer and project lead at Swales & Associates, Inc, where I have been employed for more than six years. My current work assignment is at the Goddard Space Flight Center where I am the lead on a project known as the Solar Dynamics Observatory for the Mechanical Systems and Engineering Support contract (MSES).

3. Following his separation from Swales, Mr. Galassi served as a subcontractor/consultant to Swales providing structural analysis support on MSES Task 572 for

the Solar Dynamics Observatory (SDO) with primary focus on the Propulsion Module primary structure. Mr. Galassi had supported this task while he was employed at Swales during 2005.

4. Swales elected to end the subcontracting/consulting arrangement in January 2007.

5. In anticipation of the end of the subcontracting/consulting arrangement, the Swales Task Lead, Mr. Michael Kaiser, and I, the Swales Project Lead, requested that Mr. Galassi deliver the final stress analysis report and all finite element models, analyses and other materials related to his performance on the task.

6. Due to the large volume of data (~33 GB), it could not easily be transferred via DVD ROM, or other type of removable media. A file folder was created on a Goddard Space Flight Center computer server (\\msc-cae\caedata\SDO_Temp_Transfer) that both Mr. Galassi and I could access. Mr. Galassi copied the requested files from his computer/external hard drive to this file folder on January 30, 2007. A copy of his confirmation of that transmission is annexed to this affidavit as Attachment A.

7. Data transfer rates from the referenced server and my office location in GSFC Building 29 are very slow and attempts to copy the data to my own external hard drive failed. On the afternoon of February 22, 2007, I logged onto the GSFC network from GSFC Building 5 which I believed would allow for faster file transfers. The files were successfully copied onto my external hard drive.

8. On the afternoon of February 23, 2007, I brought the external hard drive to Swales so I could upload the files onto the Swales Corporate Network. While the files were copying to the server, I began to look through the various folders and files. The data were divided into to main folders named "After 110105" and "Before 110105". I was surprised to find

Swales MSES task planning spreadsheets, internal Project Status Review presentations, MSES Monthly Reports and MSES Performance Evaluation Board write-ups among the technical data. There was also a large volume of technical data in the form of finite element models and other analyses that appear to represent work that was completed by Mr. Galassi during his employment at Swales. The planning spreadsheets data contains business confidential data of Swales costs of performance including, its management fees (known as "PMT") its information technology and financial data charges (which are categories of ODCs or "other direct costs", Swales' overhead and G&A loadings on direct labor rates, and its labor escalation rates, all matters of great competition sensitivity. It is evident from the data itself that it was accumulated while Mr. Galassi was working as a Swales employee on the SDO effort, as was I at that time. It is also evident that he retained this data on a personal external storage device after he left the employ of Swales to start his own company.

9. Upon discovery of this information, I informed the MSES Program Manager, Mr. Patrick Miller, the MSES Vice President, Mr. Mark McQuaid and company counsel. I have removed the subject files from the GSFC computer server to protect the Swales proprietary information from unintended distribution.

10. I declare that under penalty of perjury and under the laws of the State of Maryland that the foregoing is true and correct.

Dated: February 27, 2007
Beltsville, Maryland

David Baran

Subscribed and sworn to before me, the undersigned authority, by the said David Baran this 27th day of February, 2007 at Beltsville, Maryland

Notary Public
Commission expires 8/3/09

CYNTHIA L. TEED
HOWARD COUNTY
MARYLAND
NOTARY PUBLIC

Attachment A:

-----Original Message-----
From: Ngalassi [mailto:ngalassi@pop500.gsfc.nasa.gov]
Sent: Tuesday, January 30, 2007 11:33 AM
To: dbaran@swales.com
Cc: Peter D Mule; Mike Kaiser
Subject: SDO Electronic Files

Hello,

I wasn't able to zip entire directories, so I just copied the files (all
33 GB) over to the folder listed below.

Take care,

Nick

-----Original Message-----
From: Dave Baran [mailto:dbaran@swales.com]
Sent: Monday, January 29, 2007 4:13 PM
To: Nick Galassi
Subject: Folder location

Nick,

See if you can map to this folder:

\\msc-cae\caedata\SDO Temp Transfer

David Baran
Swales Aerospace
Mechanical Engineer

Voice & Fax: 301-286-2212, 301-286-1658 (GSFC) Voice & Fax: 301-902-4653, 301-902-4422 (Swales Aerospace)
Cell: 240-882-3978, press "1" at voice mail to send numeric page
Text Message: <mailto:2408823978@messaging.nextel.com>
dbaran@swales.com <mailto:dbaran@swales.com>

**Cynthia Teed**

| | |
|---|---|
| **From:** | Cynthia Teed [cteed@swales.com] |
| **Sent:** | Tuesday, February 27, 2007 1:11 PM |
| **To:** | valorie.a.burr@nasa.gov |
| **Cc:** | robert.m.stephens@nasa.gov; michael.g.ryschkewitsch@nasa.gov; edward.j.weiler@nasa.gov; rwyatt@mail.nasa.gov; Kathleen.M.Pierson@nasa.gov |
| **Subject:** | Procurement Integrity Matter |

valorie.burr.2.27.07.pdf

Please see the attached correspondence dated February 27, 2007.

Cynthia L. Teed
Senior Paralegal/Export Administrator
Swales Aerospace
5050 Powder Mill Rd.
Beltsville, MD 20705
(301) 902-4810
Fax (301) 902-4114

Swales Proprietary Information

Swales Proprietary Information

Swales Proprietary Information

Swales Proprietary Information

Swales Proprietary Information

Swales Proprietary Information

Swales Proprietary Information

STATE OF MARYLAND

IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY

| | |
|---|---|
| SWALES & ASSOCIATES, INC.<br><br>Plaintiff,<br><br>v.<br><br>AEROSTRESS, INC. and<br>NICHOLAS M. GALASSI,<br><br>Defendants. | Case No. CAL07-02947 |

AFFIDAVIT OF THOMAS G. SWALES

County of Prince George's )
) ss:
State of Maryland )

Thomas G. Swales, being first duly sworn, hereby deposes and says:

1. I am over the age of 21 years, a permanent resident of Howard County, Maryland and the following statements are made based on my personal knowledge.

2. I am the founder and Chairman of the Board of Swales & Associates, Inc., the Plaintiff in this lawsuit, which has done business under the name of Swales Aerospace in Prince George's County since 1978.

3. Swales Aerospace performs engineering services to develop satellites for U.S. agencies, including the National Aeronautics and Space Administration (NASA). It is also a manufacturer of parts and subsystems for government and commercial satellites.

4. Swales Aerospace has performed and is continuing to perform work for the NASA Goddard Space Flight Center in Greenbelt, Maryland on mechanical engineering

issues for more than 30 NASA missions. That work is performed under a contract referred to as the "MSES contract" (Mechanical Systems & Engineering Support). The successor to the MSES contract is currently in a procurement competition for the follow-on at contract work, the successor procurement being known by the acronym "MSES IIA" and by proposal number NNG05096383R.

5. Our competition in the award of the MSES IIA contract is Stinger-Ghaffarian Technologies, Inc (known also as SGT, Inc.). Its founder and president Harold Stinger worked for Swales Aerospace from June 1992 to September 1995. Swales Aerospace and I gave Mr. Stinger encouragement in the founding of his business at the time of his departure, and I have remained on friendly terms with Mr. Stinger since then.

6. SGT was preliminary selected for award for the MSES IIA proposal on December 1, 2006, but the award decision was rescinded and vacated by NASA as a result of its observation of flaws in its evaluation. The procurement decision today remains under examination and review.

7. Soon after the initial, and now withdrawn, award decision to SGT in the MSES IIA competition, Swales Aerospace learned of the activities of an employee engineer who worked for Swales on its proposal for the MSES IIA contract. This employee was deeply familiar with the engineering solutions and business approaches used in Swales evaluation of the sample engineering problems and cost estimating that were part of Swales competitive proposal. The employee, Nicholas Galassi, left the employ of Swales in late 2005 to open his own start-up company known as Aerostress, Inc. He signed a personal separation agreement and a corporate non-disclosure agreement promising to maintain confidentiality for Swales' competition sensitive data at the time of his resignation and new business start-up. Aerostress, Inc. and Mr.

Galassi, however, subsequently became involved in the support for SGT's competitive proposal for MSES IIA. Swales learned from persons who spoke with Mr. Galassi after the initial award that Mr. Galassi informed them that his support included presentations (also called "orals') to the NASA Source Evaluation Board and review and participation in the written proposal submitted by SGT to NASA. Swales regards this as a serious violation of promises undertaken by Mr. Galassi and a misappropriation of Swales trade secrets. SGT also advertised after the initial award that Aerostress was a constituent subcontractor of SGT's team in the event it performed on the MSES IIA contract.

8. As a result of Aerostress' and Mr. Galassi's actions, and in view of the agreements reconfirmed when he left Swales, my company filed an action on February 7, 2007 against Aerostress and Mr. Galassi in the Circuit Court of Prince George's County, Maryland. (No. CAL 07-02947).

9. On Friday, February 17, 2007, I received an e-mail from the office at Swales saying that Harold Stinger of SGT wanted me to call him on his cell phone #240-375-4647. Ms. Pam Butziger received the call at the Swales office and Mr. Stinger said to her that he wanted to speak with me personally. Ms Butziger advised Mr. Stinger that Swales current CEO, Mike Cerneck, was handling matters pertaining to any Swales business. She related my preference that business calls be made through the CEO channel. Mr. Stinger said that he wanted to reach me personally nonetheless.

10. I called Mr. Stinger at about 11:30 A.M on Friday, February 17. The call appeared personal in nature. Mr. Stinger said he thought I knew "he wouldn't do anything unethical, and he wanted to know if that was still the case, because of this thing with somebody called Nick."

11. I said, "You're talking about Nick Galassi, who worked on your proposal."

12. Mr. Stinger then confirmed his awareness that both Aerostress and Mr. Galassi participated in crafting the SGT proposal.

13. Harold Stinger said "Nick is just a little guy and he really didn't help them that much. They didn't even get strength in the area he worked on." I said that he represented SGT at orals. He said, "Yes, that's true."

14. I told Mr. Stinger had Mr. Galassi worked on our proposal too. At that point there was a pause. It was not evident to me in this conversation that Mr. Stinger knew that Mr. Galassi had worked on our proposal when he sought me out to talk. Mr. Stinger made no comment with regard to what other persons at SGT knew about Mr. Galassi's conflict created by participation in both proposals. Mr. Stinger made no further comment related to MSES IIA. After a few moments he said that we should get together some time in the future for a burger. I said that we might do so when the controversies are over. We said good-bye pleasantly.

15. I declare that under penalty of perjury and under the laws of the State of Maryland that the foregoing is true and correct.

Dated: February 21, 2007
Beltsville, Maryland

Thomas G Swales
Thomas G. Swales

Subscribed and sworn to before me, the undersigned authority, by the said Thomas G. Swales this 21st day of February, 2007 at Beltsville, Maryland

Cynthia L Teed
Notary Public
My Commission Expires 8/3/09

CYNTHIA L. TEED
HOWARD COUNTY
MARYLAND
NOTARY PUBLIC

## 1) When did Mr. Galassi begin working for Swales?

Mr. Galassi was hired by Swales on January 25, 1993.

## 2) What were his duties at that time?

Mr. Galassi was a Senior Stress Analysis Engineer at the time of hire and assumed increasing levels of engineering and management responsibilities though the date of his departure on October 28, 2005. Mr. Galassi's initial duties at Swales Aerospace were as a member of the stress analysis group. In 1995 Mr. Galassi took on the lead stress analyst role on the Swales 740 contract. His duties in this role included performing as the lead stress analyst on the Triana spacecraft. This assignment, established Mr. Galassi in the Goddard community as a lead structural systems engineer for spacecraft systems, a role that is typically performed by civil servants because of its critical importance, as well as the requirement to give direction to other product team members including civil servants and other contractors. Mr. Galassi went on to perform this role on SDO, GPM and LRO. In 2001, Mr. Galassi became a functional manager of one of the stress groups at Swales, eventually rising to become the functional manager of the entire Mechanical Analysis Group. As the functional manager of this Swales group, Mr. Galassi was responsible for conducting performance appraisals, and determining salary increases for many Swales employees. In this regard he obtained records of salaries and five-year raise history of everyone in his functional group, although as shown later his access to salary and rate data also reached through the *entire* engineering organization. Throughout his tenure at Swales Aerospace Mr. Galassi had task management duties for nearly 20 tasks ranging in size between $1,700 and $1.3 million.

Performance of these task management duties caused Mr. Galassi to have access to financial reports and information including full exposure to indirect rates, labor rates, pricing strategies, forward bid rates, escalation factors, and proposal strategies and methodologies.

Mr. Galassi had experience as a proposal manager. In 2003 Mr. Galassi was the proposal manager for Swales' Patuxent River subcontract proposal to Mantech Inc. for the Naval Air Warfare Center. He organized Swales proposal for the Patuxent River opportunity and participated in the oral presentation in the competition.

## 3) What duties and responsibilities did Mr. Galassi have at or for Swales in assisting it with its proposal or revised proposal in response to solicitation NNG05096383R?

For Solicitation NNG05096383R, Mr. Galassi developed the responses to the representative task orders (RTO's). Of the four RTO's derived from the Lunar Mission of the RFP, Mr. Galassi's assisted principally on RTO 1, but his knowledge and interaction was not limited to RTO 1, as all the RTO teams did interact. Also, as the manager of the Mechanical Analysis Group, Mr. Galassi was responsible for the material developed by engineers in his group for the Statement of Work (SOW). Given the strong emphasis of the SOW on mechanical engineering, Mr. Galassi's engineers prepared, and later Mr. Galassi reviewed a significant portion of the SOW response.

## 4) Did Mr. Galassi writes or assist, in any manner, Swales in its proposal or revised proposal?

Mr. Galassi was part of a small team of engineers that *conceptualized and wrote* the solution to RTO 1, produced a basis of estimate, and generated a "storyboard" which

contained the specific solutions, methods, figures and text that was used in the proposal. The RTO 1 Team at Swales comprised Mr. Galassi, R. Kraus, M. Pryzby, and C. Koont as well as other advisors. The solution developed by this team was committed to principal text and storyboard and was congruent to the final proposal *but for editing and format.* Given the related and integrated nature of the sample problems around a single mission, the RTO teams interacted to ensure consistency of the assumptions and methods throughout the proposal. Because consistency of approach was required between the mechanical, thermal and mechanism design tasks, Mr. Galassi's role *cannot* be seen as confined to a single RTO. As the manager of the Mechanical Analysis Group, Mr. Galassi assisted in the development of and reviewed the material generated for the Statement of Work response by the engineers in his group.

## 5) If Mr. Galassi did assist Swales in its proposal or revised proposal, please explain specifically what he contributed.

### *a. Did he work on the mission suitability portion of the proposal or revised proposal?*

Yes. Mr. Galassi was part of the team for the response to the sample problems contributing significantly to the team that developed the solution to RTO 1, produced the basis of estimates and generated the material to be used in the proposal. He also was responsible for the review of SOW responses for his functional group for Finite Element Model Analysis, Stress Analysis and Fracture Control. He had access to other SOW response material.

***b. Did he work on or assist in the cost proposal or revised cost proposal?***

Mr. Galassi did not work on the proposal cost volume, as such. Mr. Galassi had detailed current knowledge of Swales direct and indirect bid and actual rates, however. Mr. Galassi did work on the RTO 1 costing by developing the basis of estimate.

***c. Did he work on or assist in the past performance section of the proposal or revised proposal?***

No.

***d. Did Mr. Galassi have access to or have possession of any Swales proprietary information including but not limited to: Swales pricing strategy; Swales technical information?***

Mr. Galassi's role on a day-to-day basis and in his proposal support functions required him to have the broadest access to Swales competition sensitive and proprietary information.

***With regard to MSES IIA Proposals.*** He attended the MSES IIA RTO team kickoff meeting as well as the SOW kickoff and was provided the briefing packages, which outlined the Swales proposal strategy. As a senior manager, reviewer, and a member of the RTO and SOW proposal teams, Mr. Galassi had access to all the network directories containing the proposal material being generated.

***Role as Task Manager for Swales.*** Appended to these comments is a list of tasks where Mr. Galassi performed a role as a senior Task Manager for the Mechanical Analysis Group and his responsibilities as a Task Manager. He was responsible for presenting and negotiating task plans, and tracking month-to-month actual costs against plans. In undertaking this role, Mr. Galassi had personal and direct access to Swales

- bid and actual indirect rates,
- recurring ODC rates,
- direct rates of individuals,
- category rates of classes of engineers,
- task order pricing strategies,
- contract pricing strategies,
- employee salary information,
- employee raise histories,
- company raise policies,
- company raise history,
- escalation practices,
- methods and rates for allocating computer costs,
- material handling costs,
- manufacturing costs,
- subcontractor handling costs including special teaming arrangements, and accounting practices with specific knowledge of overhead rates,
- employee benefits, including training, education and retirement benefits and their costs.

Mr. Galassi's role as a task manager began in 1995 with work under a support contract executed by Swales' for the Code 740. He then worked as the manager of 13

tasks under Code 540 mechanical support contract that ended in January 2001. Then he was a task manager for two substantial tasks under the MSES contract No. NAS5 01090 including the major work on Solar Dynamics Laboratory, in process at the time of his departure, throughout the MSES IIA bidding period, and still as of this date. As a task manager, Mr. Galassi was provided with tools to assist in the development of estimates for task orders. These tools included task planning and tracking workbooks. These workbooks contained worksheets that permitted the planner to enter information such as employee names, categories, material costs, travel costs, subcontractor costs, and other direct costs in the spreadsheet, which would perform the calculations applying indirect cost factors to determine an estimated cost for the task order. To achieve this, the workbooks contained complete information on Swales indirect costs. As stated an appended affidavit by David Baran, Mr. Galassi's company Aerostress, Inc. is conclusively shown to have retained some versions of these workbooks, because they were included as residual or extraneous material among computer file of deliverable reports Aerostress Inc. submitted to Swales in January 2007. Appended these comments is a proposal work sheet populated with the algorithms that are used to take hypothetical or actual direct rates and load them to obtain fully loaded rates. This work sheet exhibited both indirect and direct rate data. The rates showed escalations through 2006. The algorithms are deemed current because they would have been known to Mr. Galassi and Aerostress to be extremely close to those in effect at the time of his departure as a Swales employee. The work sheet was in the possession of Mr. Galassi after he separated from Swales, notwithstanding his separation agreement under which he represented that he had not maintained personal copies of such data. As a task manager

and functional manager Mr. Galassi had access to Swales online financial reporting tools, which provide project and financial status reports, 533's, and labor hour reports. Through this system, and these reports Mr. Galassi had access to ***all*** of Swales actual indirect rates and could query labor hours by employee, task, program, group, and time.

## 6) When did Mr. Galassi leave Swales?

Mr. Galassi left the employ of Swales on October 28, 2005, and became an independent contractor to Swales on or about November 10, 2005 through his company known as Aerostress, Inc. Mr. Galassi's task manager responsibilities ceased, but he continued to perform regular engineering work at an hourly rate.

Mr, Galassi later supported SGT's MSES proposal as confirmed by Swales through the admission of SGT principals Harold Stinger and Kam Ghaffarian as indicated in the appended affidavits. SGT created the expectancies that upon award Aerostress Inc. would obtain positions and revenues through an SGT awarded contract. Aerostress was introduced publicly as an affiliate for MSES IIA at an open house meeting on December 6, 2007.

Attachments:

- List of Tasks managed by Nicholas Galassi at Swales within which he obtained proprietary data.
- Affidavit of David Baran to establish possession of competition sensitive data after departure form Swales during participation on the SGT proposal effort
- Swales estimation forms and algothrims in the possession of Aerostress with detailed competition sensitive data after departure from Swales during participation on the SGT proposal effort showing current data with annotations

- Affidavit of Thomas G. Swales to establish admission by SGT principal that Aerostress and Mr. Galassi participated in the SGT MSES IIA proposal

PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE
ORDER

11 / 2

# ...nical Systems Engineering Services

RFP-NNG05096383R

## Volume I - Offer

NASA



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
GOVERNMENT ACCOUNTABILITY OFFICE
PROTECTIVE ORDER

Def. App. Ex. 12

STINGER GHAFFARIAN TECHNOLOGIES

PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE
ORDER

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | | |
|---|---|---|
| SWALES & ASSOCIATES, INC., | ) | **FILED UNDER SEAL** |
| Plaintiff, | ) | |
| v. | ) | No.07-253 (Senior Judge Smith) |
| UNITED STATES, | ) | |
| Defendants, | ) | |
| and | ) | |
| SGT, INC., | ) | |
| Defendant-Intervener | ) | |

**DECLARATION OF KATHLEEN PIERSON**

I, Kathleen Pierson, hereby declare under oath and say as follows:

1. I am over the age of eighteen, have personal knowledge of the facts cited herein, and am competent to testify.

2. I have been a civil servant for approximately 19 years. I am currently a NASA Goddard Space Flight Center Contracting Officer (CO). As a CO, my responsibilities included formulating the acquisition strategy for the Mechanical Systems Engineering Services II/A (MSES II/A) solicitation, drafting the request for proposal (RFP), which included the model contract, Section L offeror instructions and Section M the evaluation criteria. In addition, I am the CO and a voting member on the MSES II/A source evaluation board (SEB).

3. I have knowledge that the RFP set forth the limitations on subcontracting (clause I.2 Limitation on Subcontracting (52.219-14) (Dec 1996)). Specifically subsection (b)(1) provides: "By submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract for -- (1) Services (except construction). At least 50% of the cost of contract performance incurred for personnel shall be expended for employees of the concern." Furthermore, Section M, Mission Suitability Subfactor C Management Plan, provided, "The offeror will be evaluated on the reasonableness, and extent of the functional split of the responsibilities between the prime and subcontractors."

4. I have knowledge that the RFP does not restrict prime offerors from obtaining critical facilities and equipment from subcontractors. Specifically, RFP Section L instructions stated that, "The offeror shall describe all critical facilities and equipment required for performance of the contract. Indicate whether these critical facilities and equipment are Government owned or company owned...... For any critical facilities and equipment not currently in the company's possession, provide your plan for obtaining these items." In addition, Section M of the RFP provided that the "offeror will be evaluated on its capability to provide adequate critical facilities and equipment needed to perform the requirements of the SOW."

5. I personally participated in SGT's proposal evaluation in accordance with RFP Section M, relating to the functional split of responsibilities and providing critical facilities and equipment.

6. I evaluated SGT's proposal which demonstrated that they had the capability of providing [redacted] of the total functional statement of work (SOW) activities required. The SGT proposal identified which SOW function(s) SGT would provide and which SOW function(s) would be subcontracted. The following reflects a summary of the proposed split: [redacted] In accordance with the evaluation criteria, I concurred with the SEB's determination that the SGT Team had the capability to perform the SOW and their respective functional division of work between the prime contractor and subcontractors was reasonable.

7. I reviewed and concurred with the other SEB members that the SGT team (including subcontractors) provided an extensive, detailed plan for obtaining critical facilities and equipment, which included the capability to provide: clean rooms, test facilities, manufacturing facilities, laboratories, and integration facilities, necessary for contract performance.

8. During the evaluation, I requested the current Contracting Officer's Technical Representative (COTR) to analyze the historical level of manufacturing effort associated with the current contract. The results of this analysis demonstrated that manufacturing effort was less than 10% of the overall contract value.

9. I participated in an analysis and concurred with other SEB members that there is a small percentage of manufacturing effort required of the overall effort. The SGT proposal relied on its proposed subcontractors for offsite manufacturing facilities. However, since manufacturing was a small percentage of the MSES II/A requirement and SGT demonstrated that it could perform the majority of the functional SOW requirements as a prime contractor, the SEB concluded that SGT could perform at least 50% of the cost of contract performance incurred for its personnel as required by the Limitation of Subcontractor Clause.

10. I have knowledge that the offerors' proposals are not compared to each other during the evaluation process. Nor are proposals compared to each other prior to reaching SEB consensus findings. The evaluation findings are not a comparison of one contractor to another, but rather an evaluation of the proposal against the RFP evaluation criteria. A final consistency check is an important process to make sure all proposals have been evaluated fairly and consistently.

11. I have knowledge of and participated in a U.S. Government Accountability Office (GAO) protest, whereby the Agency decided to take corrective action. As part of the corrective action, the SEB, among other things, reviewed both offerors findings under Mission Suitability and Past Performance and re-evaluated each offerors Cost proposals in accordance with the RFP and the Agency's correction action plan.

12. I issued a Determination of Contractor Responsibility for SGT prior to contract award.

13. One of my contract administration responsibilities would be to monitor the Contractor during contract performance to ensure that SGT meets its contractual requirement of performing at least 50% of the cost incurred for personnel under the contract, in accordance with the Limitation of Subcontracting Clause.

14. I awarded SGT a 30-day MSES II/A Phase-in Purchase Order NNG07CA35P to commence its phase-in activities through May 14, 2007. The effective date of the MSES II/A Cost Plus Award Fee Contract NNG07CA21C is May 15, 2007. During this phase-in period, I am in the process of submitting to SGT approximately 180 task orders (90% of total task orders) that must transition to MSES II/A in order to commence work on May 15, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

April 30, 2007

Kathleen Pierson

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | | |
|---|---|---|
| SWALES & ASSOCIATES, INC., | ) | **FILED UNDER SEAL** |
| Plaintiff, | ) | |
| v. | ) | No.07-253<br>(Senior Judge Smith) |
| UNITED STATES, | ) | |
| Defendants, | ) | |
| and | ) | |
| SGT, INC., | ) | |
| Defendant-Intervener | ) | |

**DECLARATION OF ORLANDO FIGUEROA**

I, Orlando Figueroa, hereby declare under oath and say as follows:

1. I am over the age of eighteen, have personal knowledge of the facts cited herein, and am competent to testify.
2. I am the Director of the Applied Engineering Technology Directorate (AETD). As Director of AETD I am responsible for providing engineering expertise and independent technical assessment to all programs and projects developed or supported by the Goddard Space Flight Center.
3. I have been employed at NASA since January 1978. I received a Bachelor of Science degree in mechanical engineering from the University of Puerto Rico, and have completed advanced courses in mechanical engineering at the University of Maryland.
4. The engineering capability at NASA-Goddard Space Flight Center (GSFC), and entrusted to AETD, consists of a combination of approximately 1300 civil servants and an equal number of contractors, and the tools, laboratories, and facilities to enable engineering activities associated with the mission of the Center. GSFC is the home to the Nation's largest organization of combined scientists and engineers dedicated to the study of the Earth, Sun, Solar System, and the Universe from space. The scope of science and exploration missions developed, managed or supported by the Center include scientific instruments, small to medium spacecraft, large observatories, human rated missions, and missions of great importance to national security.

5. Engineering at GSFC is divided into five specialty areas, as follows: mechanical systems, instruments systems, electrical systems, information systems, and, mission engineering and system analysis. AETD has four major contracts to supplement and complement its engineering capability as defined previously. One of the contracts focuses on the test and verification facilities only, but the other three provide direct engineering support to the areas that have the greatest demand for engineering support services, namely: mechanical/thermal engineering, electrical engineering, and systems engineering and mission design and analysis. The volume and highly specialized nature of the mission work at GSFC requires uninterrupted support by AETD in order to meet the commitments of NASA. These three major contracts are a significant element of the engineering capability and skills of the Center. In addition, the demand for Mechanical/thermal systems expertise has always been well beyond capacity.

6. GSFC has always relied upon a significant incumbent capture in transitioning contracts. Historically it has been roughly 85% of the incumbent workforce. The MSES II/A contract was not expected to be any different.

7. Any disruption in providing mechanical/thermal expertise comes at a great risk to the missions for which the Center is responsible. Such disruptions have a bottleneck effect on our ability to support our missions, leading to delayed schedules and increased costs to NASA. We take our commitments to the Agency seriously, and any such impacts are clearly unacceptable, particularly in an era of decreasing budgets. Some of the programs that are currently being negatively affected are: Lunar Reconnaissance Orbiter (LRO), Solar Dynamics Observatory (SDO), Hubble Space Telescope (HST), Geostationary Orbiting Environmental Spacecraft -R (GOES-R), Tracking Data Relay Satellites (TDRS), and the James Webb Space Telescope (JWST).

8. All the projects mentioned above are experiencing lower productivity and schedule impacts and increased risks. There are indicators that there are stresses in the system. The psychological effect on the workforce will be great if this TRO is granted. For example, GSFC's Mechanical Division has approximately 280 civil servants and approximately 500 incumbent contractor (including their subcontractors) employees. The dominant conversation in the hallways these days is this procurement, job security and retirement. It is in our very best interest to get these people focused on their jobs. The best way to do that is to permit the transition of the contract expeditiously. To put things in perspective, the cost incurred for each day lost for lack of productivity, is in the hundreds of thousands and can be in the millions depending on the scope and the development phase the missions are in. The savings that SGT offered the Government with its proposal are approximately $60M over the life of the contract. However, we are losing those savings by failure to transition. At the Center Management Council monthly status reviews, project after project have noted the schedule and cost risks associated with the lack of stability, and the uncertainty in the transition of this contract

I declare under penalty of perjury that the foregoing is true and correct.

April 27, 2007

Orlando Figueroa
Director, Applied Engineering and Technology
Goddard Space Flight Center

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | | |
|---|---|---|
| SWALES & ASSOCIATES, INC., Plaintiff, v. UNITED STATES, Defendants, and SGT, INC., Defendant-Intervener | ) | **FILED UNDER SEAL** No.07-253 (Senior Judge Smith) |

**DECLARATION OF KEN HINKLE**

I, Raymond Kenneth Hinkle Jr., hereby declare under oath and say as follows:

1. I am over the age of eighteen, have personal knowledge of the facts cited herein, and am competent to testify.
2. I am the Chief of the Mechanical Systems Division. My duties require me to provide executive leadership to manage all engineering, personnel, and administrative functions for developing instrument and mission space flight mechanical systems for the Applied Engineering and Technology Directorate at the GSFC.
3. I have been employed at NASA since June 1978. I received a Bachelor of Science degree in Aerospace Engineering from the University of Maryland. I hold a masters degree in aerospace engineering from the University of Maryland.
4. **Role of the Mechanical Systems Division and the need for the MSES IIA contract** – The Applied Engineering and Technology Directorate (AETD) at the GSFC has 4 major support service contracts that are used to provide end-to-end engineering support to develop Agency science missions. These include a systems engineering, electrical systems engineering, mechanical systems engineering, and an environmental testing and integration contract. The environmental test and integration contract focus' primarily on the operation of testing facilities and flight hardware integration services. The discipline engineering support provided by each of the remaining 3 contracts

combined are critical for the development of space flight science missions at Goddard. The loss of the contractor engineering support provided by MSES IIA would have a catastrophic impact on the GSFC's ability to develop all space flight science missions for the Agency.

5. **Primary Need for the MSES Contract** – The Mechanical Systems Division heavily relies on the MSES contract to perform various design, analysis, and concept studies for the development of space flight hardware for GSFC projects. It is primarily a "paper" contract using skilled engineering talent to perform stress and structural dynamic analyses, produce mechanical design drawings, perform thermal design and analyses, perform contamination analyses, estimate mass of flight hardware, perform trade studies, develop concept designs for new missions, provide senior consultation support, etc. A vast majority of all flight hardware fabrication and assembly for GSFC missions is performed on-site at Goddard within the Advanced Manufacturing Branch (Code 547) or through local vendors not affiliated with Swales. There are occasions where we do rely on the MSES contractor to provide these services as a convenience to us. It is estimated that the average labor needed to support our fabrication and assembly needs is approximately 10% of the total MSES contract labor support for the contract. Much of the fabrication work performed thru MSES can be outsourced to a wide range of vendors with the capability of manufacturing hardware ranging from machining standard parts to fabricating honeycomb panels. Although the incumbent has developed significant facilities over the years to provide fabrication and assembly capability, many other vendor sources are available to provide the same services at a reduced cost. For these reasons, it is very reasonable to expect that SGT will exceed performing 50% of the total work for MSES IIA within the company (SGT).

6. **Impact of an Injunction on the Implementation of the MSES II-A Contract** - There are currently, approximately, 500 professional engineers supporting the GSFC to develop critical Agency flight missions for the US Space program through the MSES I contract w/ Swales Aerospace. The winner of the MSES II-A contract, SGT, has indicated that incumbent capture during the phase-in portion of their contract is crucial to assure that all GSFC missions being supported do not suffer major technical and programmatic impacts. Several of these critical missions include the on-orbit servicing of the Hubble Space Telescope (HST) which if not completed on-schedule would suffer cost impacts of over $12M per month and seriously jeopardize all future attempts to service the telescope due to failing batteries on the observatory. Failure to service HST on schedule also has the potential of a human safety issue due to the uncontrolled reentry of the HST back to earth and it's impact location. Another critical mission is the launch of the nation's first mission back to the Moon (Lunar Reconnaissance Orbiter - LRO) to map the lunar surface for future safe landing sites for humans. A schedule slip for LRO would have a major impact on the President's initiative for space exploration and sending humans back to the Moon and on to Mars. In addition to LRO

and HST, there are over 10 other major space and earth science missions GSFC is currently developing thru the MSES I contract with Swales. Earth science missions that GSFC are currently developing such as the Global Precipitation Mission (GPM) has high potential societal impacts with measurements that are used to predict climate change and global warming. Successfully transitioning incumbent contractor employees to the MSES IIA contract with SGT is critical for avoiding significant cost overruns and long schedule delays for all GSFC space flight projects.

Transitioning large quantities of people from one contractor to another through incumbent capture is extremely challenging for any company. The decision to transition is a personal decision by each contract employee based on career goals, salary, benefits, and quality of work. To be effective, the transition process must be smooth, well coordinated, free of distraction, and most of all, uninterrupted. Stopping and starting a process of this magnitude adds extreme volatility to the situation which forces contractor employees who would have otherwise transitioned, to remain with the incumbent or leave the area all-together. Attempts by Swales management to issue internal correspondences encouraging employees to remain with the company in a false effort to continue to bring GSFC work to Swales has added significant volatility to the situation and is having a psychological impact that is preventing Swales contractor employees from considering transitioning to MSES IIA with SGT.

The incumbent contractor engineering personnel have a long history of working GSFC flight projects and are critical with the corporate knowledge of developing our systems. Loss of these personnel on the MSES IIA contract with SGT would be devastating to GSFC and our ability to meet our commitments to the Center and the Agency.

I declare under penalty of perjury that the foregoing is true and correct.

April 30, 2007

Raymond K. Hinkle Jr.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | |
|---|---|
| SWALES & ASSOCIATES, INC., Plaintiff, v. UNITED STATES OF AMERICA, Defendant, and SGT, INC., Defendant-Intervenor. | No. 07-253 (Senior Judge Smith) |

DECLARATION OF KAMAL S. GHAFFARIAN
IN RE: LIMITATION ON SUBCONTRACTING ISSUE

1. My name is Kamal S. Ghaffarian. I am the co-owner, Executive Vice President and Chief Operating Officer for SGT, Inc. (SGT). I am also the acting Vice President of Business Development (VP BD). I have been employed by SGT since 1994.
2. On October 3, 2006 SGT submitted a proposal for NNG056383R, Mechanical Systems Engineering Services (MSES II/A).
3. The SGT proposal clearly stated SGT's ability and intent to comply with the limitations on subcontracting.
4. As the contract awardee, SGT is complying, and will continue to comply, with the limitations on subcontracting.

I declare under penalty of perjury that the foregoing is true and correct.

4/10/07
Date

Kamal S. Ghaffarian

Def. App. Ex. 16